**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen
Phillip Kim
Jing Chen
Daniel Tyre-Karp
Robin Howald
275 Madison Ave, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
        pkim@rosenlegal.com
        jchen@rosenlegal.com
        dtyrekarp@rosenlegal.com
        rhowald@rosenlegal.com

*Lead Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE DIDI GLOBAL INC. SECURITIES LITIGATION<br><br>This Document Related To:  All Actions | Master Docket<br><br>21-CV-5807 (LAK)<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u><br><br>JURY TRIAL DEMANDED |

Lead Plaintiff Junhong Cao and named plaintiffs Shereen El-Nahas, Alaka Holdings Ltd., Bosco Wang, Daniil Alimov, and Njal Larson ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon,

*inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents, announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, newswire and press releases, media reports of interviews with (i) representatives of Didi and the underwriters, and (ii) government officials, and statements published by Didi Global Inc. ("Didi" or the "Company") and the Underwriters regarding Didi.

## I.    INTRODUCTION

1.    This is a securities class action on behalf of all purchasers of Didi's American Depositary Shares ("ADSs") from June 30, 2021, through July 21, 2021 (the "Class," and the period from June 30, 2021, to July 21, 2021, both dates inclusive, is the "Class Period").[1]

2.    Plaintiffs bring the following claims on behalf of the Class: (1) Sections 11 and 15 under the Securities Act of 1933 (the "Securities Act") for all purchasers of Didi ADSs pursuant and/or traceable to the Registration Statement and Prospectus (collectively, the "Registration Statement") in connection with Didi's June 30, 2021, initial public offering ("IPO"); (2) Sections 12(a)(2) and 15 under the Securities Act for all purchasers at the IPO price directly from one of the Underwriters in the IPO; (3) Sections 10(b) and 20(a) under the Securities Exchange Act of 1934 (the "Exchange Act") for all purchasers of Didi ADSs during the Class Period; and (4)

---

[1] Excluded from the Class are: (a) Defendants; the present and former officers and directors of Didi, Softbank, Uber Technologies, Inc, Alibaba Group Holdings, Inc., Tencent Holdings, Inc., Boyu Capital or the Underwriters at all relevant times; such excluded persons affiliates, subsidiaries, members of such excluded persons' immediate families and their legal representatives, heirs, successors, or assigns, and (b) any entity that any of the Defendants, or any excluded person under subsection (a) controlled or has or had a majority ownership interest at any time. In addition, any persons who suffered no compensable losses under the federal securities laws are excluded from the Class.

Sections 20A and 20(a) under the Exchange Act for all purchasers of Didi ADSs contemporaneous with the sale by Didi and the Underwriters of Didi ADSs.

3.    Founded in 2012, Didi is a ride-hailing business headquartered in the People's Republic of China ("China" or "PRC"). Didi is often referred to as "the Uber of China." After a series of mergers and acquisitions, Didi boasted 377 million active users in China in the year ended March 2021. At the time of its June 2021 IPO, Didi was riding high, enjoying near-complete market dominance in China.

4.    The Chinese Communist Party ("CPC" or "Party") has complete control not only over all branches of government in China, but also controls Chinese commerce, the internet in China, and internet-based businesses. Over the past 10 years, the Chinese government has enacted numerous laws and regulations designed to further tighten the Party's grip over cyberspace and the troves of data amassed by internet-based companies in China.

5.    The Cyberspace Administration of China (the "CAC") is the government agency responsible for regulating the internet, internet-based businesses and their activities, and the collection, storage, and protection of any type of digital information.

6.    The CAC has immense power to regulate the activities of internet-related businesses. This includes, among other things, the power to close businesses, shut down or suspend websites, and to prohibit the business from taking on customers if the CAC believes the business is violating laws and/or regulations concerning national security, cybersecurity, data security, and/or personal privacy.  Because the CAC has wide discretion to mete out these punishments, it has tremendous power to enforce the laws and regulations under its jurisdiction.

7.    Didi's business runs almost entirely on an internet-based platform for all aspects of its operations, including navigating vehicles, communicating with and billing customers,

managing and paying drivers, and collecting, managing, and analyzing various related data. As such, Didi's operations fall squarely under the regulatory authority of the CAC.

8.    On Wednesday, June 30, 2021, Didi commenced the IPO, announcing that "[t]he closing of the offering is expected to occur on July 2, 2021, subject to the satisfaction of customary closing conditions".

9.    Didi's IPO Registration Statement omitted material facts required to be stated therein.

10.    Specifically, the Registration Statement failed to inform investors that the CAC directed Didi to postpone its IPO in the United States until after Didi had completed a thorough self-examination of its business, operations and policies to ensure compliance with all applicable laws and regulations concerning national security, network security, data security, and/or the collection and protection of private personal information, and to rectify any violations, to the CAC's satisfaction (the "CAC Directives" or the "Directives").

11.    Didi had given the CAC the impression that it would follow the Directives. Instead, Didi went forward with its $4.4 billion IPO on the morning of June 30, 2021.  It was the second largest ever U.S. IPO of a Chinese firm, falling behind only the historic $25 billion Alibaba U.S. IPO in 2014.

12.    When trading commenced at 9:30 a.m. in New York on June 30, it was 9:30 in the evening (of that same day) in Beijing. China was a few hours away from a very important national holiday. July 1, 2021, marked the 100th anniversary of the founding of the Chinese Communist Party with a day of nationwide celebrations. CAC officials were appalled when they learned that Didi had disobeyed the Directives to postpone the IPO.

13.    On July 2, 2021, when CAC officials returned to work, they set about to punish Didi for disobeying the Directive.

14.    On July 2, 2021, at approximately 6:00 p.m. Beijing time (6:00 a.m. New York time), the CAC notified Didi via telephone that the agency was placing Didi under a cybersecurity review and was also prohibiting Didi from registering any new customers. Approximately an hour later, at 7:19 a.m. New York time, the CAC published the news on its official website, first revealing to the public that Didi was facing intense scrutiny from the CAC and would be prohibited from registering any new customers. By 7:44 a.m., before trading opened on the NYSE, the CAC's announcement was reported by a U.S. news outlet. At that moment, the closing of the IPO transaction had not yet taken place.

15.    Two days later, on Sunday, July 4, the CAC announced that it was forbidding any new or existing customers or drivers to download Didi Travel (Didi's primary app), and that Didi and third parties were required to remove the Didi Travel app from all app stores in China.  The CAC said it was imposing these penalties on Didi "due to serious violations of laws and regulations".

16.    News of the CAC's serious penalties for Didi's violation of the Directives, which instructed Didi conduct a thorough self-examination and rectify any violations to the CAC's satisfaction *before* conducting its IPO, caused Didi's ADS price to decline dramatically.  Didi's stock price fell 20% the next trading day (closing at $12.49 per ADS July 6, 2021[2]), wiping out approximately $15 billion of market value in just a matter of days.

---

[2] The  NYSE was closed on Monday, July 5.

17.     The massive July 6 sell-off followed Didi's July 4 statement stating that "the app takedown may have an adverse impact on its revenue in China."  The CAC's actions would also damage Didi's reputation and strengthen its competitors' efforts to take away Didi's customers and drivers.

18.     Over the following weeks, Didi's share price continued to decline as the market learned more about the business consequences and official penalties that Didi would incur from its refusal to follow the CAC's Directives: On July 7, Didi's mini-program – which affords users access to a service without having to download an app – was removed from the ubiquitous WeChat and Alipay super-apps; on July 9, more than two dozen additional Didi apps were ordered removed from app stores; on July 16, regulators from multiple agencies, including the CAC and the Ministry of State Security (a combination of the FBI and CIA), descended on Didi's offices. By Monday, July 19, 2021, Didi's stock closed at $11.06/share – its lowest close since the IPO.

19.     Before the market opened on July 22, it was reported that even more serious penalties for Didi's defiance of the CAC Directive might be imposed including a significant fine, suspension of certain operations, introduction of a state-owned investor, and/or delisting from the NYSE. The price of Didi's ADSs plummeted as investors contemplated Didi's increasingly bleak fate.  Didi's stock fell over 11.3% from the prior day, closing at $10.20 per ADS on July 22, 2021, and further fell to just $8.06 per ADS by the close of trading on July 23, 2021—marking a two-day decline of nearly 30% as the market absorbed the additional bad news.

20.     During the summer, while the cybersecurity review grinded on, there was much speculation about what would happen next. Stories circulated about a rift on the Didi board, a senior management shake-up, and possible take-over of Didi by the City of Beijing. One concrete

fallout from Didi's actions was that it was forced to shelve its expansion plans in the United Kingdom and Europe.

21.     Ultimately, under tremendous pressure from the CAC and other PRC officials angry that Didi had violated the CAC's Directives, Didi announced its plan to delist from the NYSE on December 3, 2021, just five months after its disastrous debut on the U.S. stock market. This announcement sent Didi's stock into a further tailspin.  Didi's stock closed at $6.07 per ADS on December 3, representing more than a 22% drop from its price of $7.80 per ADS at the close of trading on December 2.

22.     After the markets closed on December 29, 2021, Didi reported its financial results for the second and third quarters of 2021. The impact of the ongoing regulatory actions was stark: revenues dropped 11.5% as between the second and third quarters, due primarily to declines in Didi's core ride-hailing business in China; Didi's loss for the quarter was $4.7 billion.  Revenue for Q3 2021 was down RMB5.8 billion from Q2 2021.

23.     Closing out the year at an ADS price hovering around $5.00, the ongoing fallout decimated Didi's ADS price by nearly 65% from the $14.00 IPO price. As Didi prepared to move its listing to Hong Kong, no formal end to the regulators' investigation has been announced, and Didi's apps still have not been restored to the app store.

24.     The Securities Act and Exchange Act obligated Defendants to disclose in the Registration Statement the material facts that: (i) the CAC directed Didi to postpone its IPO in the United States until after Didi had completed a thorough self-examination of its business, operations and policies to ensure compliance with all applicable laws and regulations concerning national security, network security, data security, and/or the collection and protection of private personal information, and to rectify any violations, to the CAC's satisfaction; and (ii) Didi faced

a high risk that CAC would impose harsh penalties against Didi that could harm its business, financial performance, and its reputation if it went forward with its IPO against the CAC's Directive  (collectively the "Omitted Facts").

25.    Defendants violated their affirmative duties of disclosure in the Registration Statement and are liable to the Class for the resulting damages.

## II.    JURISDICTION AND VENUE

26.    The claims asserted herein arise under and pursuant to Sections 11, 12, and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l, and 77o), and Sections 10(b), 20A, and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

27.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. §78aa).

28.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)) because certain of the acts and conduct complained of herein, such as the trading of Didi ADSs on the NYSE, occurred in this District.

29.    In connection with the acts alleged in this Complaint, including the sale of Didi ADSs to investors in the IPO and the purchase and sale of Didi ADSs on the NYSE, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, the internet, and the facilities of the national securities markets.

### III.    CLASS ACTION ALLEGATIONS

30.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all persons or entities that purchased Didi ADSs during the Class Period.

31.    The members of the Class are so numerous that joinder of all members is impracticable. There are thousands of members in the proposed Class.

32.    Plaintiffs' claims are typical of the claims of the members of the Class, as all Class purchased Didi ADSs during the Class Period.

33.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

34.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the Registration Statement omitted material facts required to be stated therein;

(b)    whether Defendants had an affirmative duty to disclose the Omitted Facts;

(c)    whether Defendants' failure to disclose the Omitted Facts violated the federal securities laws; and

(d)    to what extent the members of the Class have sustained damages and the proper measure of damages.

35.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IV.    PARTIES

### A.    Plaintiffs

36.    Lead Plaintiff Junhong Cao purchased Didi ADSs pursuant and traceable to the Registration Statement during the Class Period and was damaged thereby. His PSLRA certification was previously filed with the Court and is incorporated by reference herein.

37.    Named plaintiff Shereen El-Nahas and Daniil Alimov purchased Didi ADSs on June 30, 2021, at $14.00 per share directly from the Underwriters in the IPO pursuant and traceable to the Registration Statement during the Class Period and were damaged thereby. Their PSLRA certification is attached hereto as Exhibit 1 and 2.

38.    Named plaintiff Alaka Holdings Ltd. purchased Didi ADSs pursuant and traceable to the Registration Statement during the Class Period and was damaged thereby.  Its PSLRA certification was previously filed with the Court and is incorporated by reference herein.

39.    Named plaintiffs Bosco Wang and Njal Larson purchased Didi ADSs pursuant and traceable to the Registration Statement during the Class Period and were damaged thereby.  Their PSLRA certifications are attached hereto as Exhibits 3 and 4.

### B.    Didi Defendants

40.    Didi is an internet-based platform offering a variety of services in China and more than a dozen other countries, including ride hailing, taxi hailing, chauffeur, hitch, and other forms of shared mobility services.  Approximately 98% of Didi's revenues are earned from its operations

in China.  The Company was formerly known as Xiaoju Kuaizhi Inc. It changed its name to Didi Global Inc. in June 2021.

41.    Didi is incorporated in the Cayman Islands and its main office is located at No. 1 Block B, Shangdong Digital Valley, No. 8 Dongbeiwang West Road, Haidian District, Beijing, China.

42.    Didi's ADSs traded on the New York Stock Exchange under the ticker symbol "DIDI" from June 30, 2021, until the present.  On December 3, 2021, Didi announced a plan to delist its shares from NYSE and pursue a listing on the Hong Kong Stock Exchange.

43.    Defendant Will Wei Cheng ("Cheng") was at the time of the IPO and throughout the Class Period the Company's Co-Founder, Chief Executive Officer, and Chairman of the Board of Directors.  Cheng owned 7.0% of Didi, 78,384,741 ordinary shares, valued at $4.4 billion at the IPO price. Cheng's shares were supervoting, giving him 16.2% of the voting power pre-IPO (35.5% post-IPO).

44.    Defendant Jean Qing Liu ("Liu") was at the time of the IPO and throughout the Class Period the Company's Co-Founder, President and a Director.  Liu owned 1.7% of Didi, 19,172,128 ordinary shares, valued at $1.1 billion at the IPO price.  Liu's shares were supervoting giving her 6.7% of the voting power pre-IPO (22.8% post-IPO).

45.    Defendant Stephen Jingshi Zhu ("Zhu") was at the time of the IPO and throughout the Class Period the Company's Senior Vice President and Chief Executive Officer of the International Business Group and a Director.

46.    Defendant Alan Yue Zhuo ("Zhuo") was at the time of the IPO and throughout the Class Period the Company's Chief Financial Officer.

47.     Didi, Cheng, Liu, Zhu, and Zhuo are referred to herein collectively as the "Officer Defendants."

48.     Defendant Zhiyi Chen ("Chen") was a Director of the Company until such time as the Registration Statement became effective on June 29, 2021.

49.     Defendant Martin Chi Ping Lau ("Lau") was a Director of the Company at the time of the IPO.

50.     Defendant Kentaro Matsui ("Matsui") was a Director of the Company until such time as the Registration Statement became effective on June 29, 2021.

51.     Defendant Adrian Perica ("Perica") was a Director of the Company at the time of the IPO.

52.     Defendant Daniel Yong Zhang ("Zhang") was a Director of the Company at the time of the IPO.

53.     Defendants Cheng, Liu, Zhu, Zhuo, Chen, Lau, Matsui, Perica, and Zhang are referred to herein as the "Individual Defendants."

54.     The Individual Defendants each reviewed and signed, or authorized the signing, of the Registration Statement in connection with the IPO prior to the Effective Date.

**C.    Underwriter Defendants**

55.     Defendant Goldman Sachs (Asia) L.L.C. and Goldman Sachs & Co. LLC (together "Goldman Sachs") served as an underwriter for the IPO. In the IPO, Goldman Sachs purchased and resold to Class members at least 104,544,000 of the Company's ADSs.[3]

---

[3] This was firm commitment underwriting in which the Underwriters committed to purchase all of the IPO shares from Didi.

56.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as an underwriter for the IPO. In the IPO, Morgan Stanley purchased and resold to Class members at least 104,544,000 of the Company's ADSs.

57.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") served as an underwriter for the IPO. In the IPO, J.P. Morgan purchased and resold to Class members at least 50,688,000 of the Company's ADSs.

58.     Together, Goldman Sach, J.P. Morgan and Morgan Stanley served as the representatives for all of the Underwriters, also known as "lead underwriters" for the IPO.

59.     Defendant BofA Securities, Inc.  ("BofA Securities") served as an underwriter for the IPO. In the IPO, BofA Securities, Inc. purchased and resold to Class members at least 6,336,000 of the Company's ADSs.

60.     Defendant Barclays Capital Inc. ("Barclays") served as an underwriter for the IPO. In the IPO, Barclays purchased and resold to Class members at least 6,336,000 of the Company's ADSs.

61.     Defendant Citigroup Global Markets Inc. ("Citigroup") served as an underwriter for the IPO. In the IPO, Citigroup purchased and resold to Class members at least 6,336,000 of the Company's ADSs.

62.     Defendant HSBC Securities (USA) Inc. ("HSBC") served as an underwriter for the IPO. In the IPO, HSBC purchased and resold to Class members at least 6,336,000 of the Company's ADSs.

63.     Defendant UBS Securities LLC ("UBS") served as an underwriter for the IPO. In the IPO, UBS purchased and resold to Class members at least 1,584,000 of the Company's ADSs.

64.    Defendant Mizuho Securities USA LLC ("Mizuho") served as an underwriter for the IPO. In the IPO, Mizuho purchased and resold to Class members at least 1,584,000 of the Company's ADSs.

65.    Defendant China Renaissance Securities (US) Inc. ("CRS") served as an underwriter for the IPO. In the IPO, CRS purchased and resold to Class members an unknown amount of the Company's ADSs.

66.    Defendants Goldman Sachs, Morgan Stanley, J.P. Morgan, BofA Securities, Barclays, Citigroup, HSBC, UBS, Mizuho, and CRS are collectively referred to herein as the "Underwriters."

**D.    Relevant Non-Parties**

67.    Didi's early investors held substantial portions of its restricted shares that they were eager to sell publicly as soon as the agreed-upon lock-up period expired six-months following the IPO.

68.    Prior to the IPO, Softbank Group Corporation, through a number of limited partnerships, indirectly owned 21.5% of Didi's shares (242,115,016 Class A ordinary shares) valued at approximately $13.6 billion at the IPO's ADS price.[4]  Until the time that Didi's Registration Statement became effective on June 29, 2021, Defendant Matsui was Softbank's representative on Didi's board of directors.

69.    Uber Technologies Inc., through a wholly owned subsidiary, owned 12.8% of Didi's shares (143,911,749 Class A ordinary shares) prior to the IPO valued at approximately $8.1 billion at the IPO's ADS price.

---

[4] Four ADSs represent one Class A ordinary share.  *See* Didi Prospectus, filed June 29, 2021.

70.    Tencent Group, through two wholly owned subsidiaries, owned 6.8% of Didi's shares (75,777,780 ordinary shares) prior to the IPO valued at approximately $4.24 billion at the IPO price.  During the Class Period, Defendant Lau was Tencent's representative on Didi's board of directors.

71.    Alibaba Group ("Alibaba") also has a substantial, but undisclosed, investment in Didi.  During the Class Period, Defendant Zhang was Alibaba's representative on Didi's board of directors.  Alibaba owned approximately 5% of Didi's shares as of September 30, 2017.

72.    Boyu Capital, a prominent private equity fund, owns a substantial but undisclosed investment in Didi. Boyu Capital was founded by Jiang Zhicheng who, by virtue of being the grandson of Jiang Zemin – China's former President and the Party's former General Secretary – is a Party "princeling," *i.e.*, someone who can use his political connections to gain business advantage, while ensuring the business hews to CPC policies and principles. Until the time that Didi's Registration Statement became effective on June 29, 2021, Defendant Chen was Boyu Capital's representative on Didi's board of directors.

## V.    BACKGROUND FACTS

### A.    The Chinese Communist Party Controls All Branches of Government, Chinese Commerce, and Is Integrated Into the Structure of All Companies; Businesses Are Expected to Heed All Regulators' Directives in Addition to Complying With Laws and Regulations

73.    The rule of law in China—officially called "socialist rule of law with Chinese characteristics"[5]—differs fundamentally from rule of law in the United States. In the U.S. there is not only a separation of powers, with checks and balances limiting the absolute powers of the

---

[5] PRC Constitution, Preamble (as amended March 29, 1993).

executive, legislative, and judicial branches of the government, but major elections are hotly contested by two large political parties. China, by contrast, is a country of one-party rule and China's government has no separation of powers; the CPC wields absolute power over all branches of government. The Constitution of CPC provides: "The Party exercises overall leadership over all areas of endeavor in every part of the country."[6] Consequently, the Party's highest-ranking official, the General Secretary, exercises ultimate power and authority over all aspects of the Chinese government.

74.    The National People's Congress of China, the Chinese legislature, recognizes the Party's supremacy: "The CPC leads the issuance of law, ensures law enforcement, supports the judiciary, and takes the lead in abiding by the law"—a principle announced by the Party's current General Secretary, Xi Jinping.[7]  This means that the CPC exercises complete control over the legislature, administrative agencies, law enforcement, and the judiciary.

75.    Antithetical to the American notion of a "private sector" comprised of for-profit businesses with no official ties to the government, the Company Law of the People's Republic of China requires that all entities in China—including non-state-owned corporations such as Didi—employing three or more Party members shall form a primary-level Party organization[8] within the company to "communicate to the public and carry out" CPC's policies.[9] The leader of a primary-

---

[6] https://www.12371.cn/special/zggcdzc/zggcdzcqw/

[7] http://www.npc.gov.cn/npc/c30834/202110/5f179fe3d55c4da1b6e77dbabaf91eae.shtml

[8] Depending upon how many Party members work at the corporation, the organization may have a "primary-level CPC committee," a "general CPC branch committee", or multiple "CPC branch committees".

[9] Constitution of the Communist Party of China (adopted and revised Oct. 24, 2017), Article 32.

level CPC committee within a corporation has the title of "Secretary."[10] Soon after its founding, in 2013, Didi established its CPC committee. By 2016, Didi employed more than 3,000 Party members; more than 3 million of Didi's drivers are also Party members. Jinglei Hou, Didi's Chief Mobility Safety Officer, is currently the Secretary of Didi's CPC committee.

76.     Because the CPC can exert absolute control over all political and economic life, Chinese regulatory agencies such as the Cyberspace Administration of China ("CAC") have tremendous power over the corporations they regulate.  Enforcing the will of the Party, the CAC wields authority beyond the letter of the law when providing regulatory guidance and issuing administrative directives to regulated businesses. Even if Didi had believed (incorrectly) that Chinese laws and regulations did not empower the CAC to direct Didi to postpone its IPO until after it had completed a thorough self-examination to the satisfaction of the CAC, Didi was fully aware that the CAC was legally empowered to impose draconian penalties against Didi— preventing new user registration or app downloads, or even completely shutting down Didi's network and website—at any time if the CAC believed Didi was violating national security, cybersecurity, data security and/or collection and protection of personal information laws or regulations, or any other Chinese law or administrative directive.

77.     Contrary to our country's core value of upholding the right to publicly criticize all branches of our government, as well as any elected or appointed official, in China, individuals and businesses are required to accord government agencies and officials great respect and deference. If an individual or business ignores a directive from a government official or agency, whether a formal administrative order or an informal one, the official or agency will almost

---

[10] https://trade.ec.europa.eu/doclib/docs/2017/december/tradoc_156474.pdf

certainly deal severely with such non-compliance—particularly if, as was the case with Didi, the defiance is public.[11]

**B.    The Cyberspace Administration of China Is a Powerful Agency Directly Supervised by President Xi Jinping to Carry Out Laws and Regulations Adopted to Enforce President Xi's Internet, Network, and Data Security Policies**

78.    China connected to the internet in 1994. Since then, the number of Chinese citizens who use internet and phone apps has grown exponentially. In 2018 alone, China generated 7.6 zettabytes[12] of data, as compared to 6.9 ZB of data generated by the U.S. in the same year. Data usage in China is expected to grow to 48.6 ZB in 2025.  The early years of internet growth and expansion in China came during a period of lax government regulation – first under Jiang Zemin, who stepped down in 2003, and later under his successor, Hu Jintao, who ran the country until 2012. The era of loose regulation came to an abrupt halt with the ascension of Xi Jinping.[13] Because Xi uses control over internet content to ensure Chinese citizens hew to the Party line, he views data and cybersecurity as critical to the national interest.

1.    The Cyberspace Administration of China is under the direct leadership of Xi Jinping

79.    During the years in which there was only light regulation, China's citizenry used the internet to promote civic organization, advocate for political reform, and hold authorities

---

[11] "Why Didi defied Beijing and Listed in the U.S.," *SinoInsider.com* (July 15, 2021) https://sinoinsider.com/2021/07/why-didi-defied-beijing-and-listed-in-the-us/    ("Why Didi Defied Beijing"). Attached hereto as Exhibit 5.

[12] A zettabyte ("ZB") is equal to a trillion gigabytes or $10^{21}$ (1,000,000,000,000,000,000,000) bytes.

[13] *See* "Why Didi Defied Beijing," *SinoInsider.com* (July 15, 2021) (Exhibit 5).

accountable for their actions.[14] Indeed, "[i]n 2010, a survey of 300 Chinese officials revealed that 70% were anxious about whether mistakes or details about their private life might be leaked online. Of the almost 6,000 Chinese citizens surveyed, 88% believed it was good for officials to feel this anxiety."[15]   Soon thereafter, in May 2011, the CAC was established to manage cybersecurity regulation and control internet content and data. The next year, Xi Jinping took over as the CPC's General Secretary and as China's president. As the nation's ultimate authority, Xi took control over China's internet policy.

80.    In 2014, the Central Committee of CPC formed the Central Cyberspace Affairs Commission (formerly known as the Cyberspace Affairs Leading Group, "CCAC") to lead the CAC.[16] The Director of the CCAC is Xi Jinping and its Deputy Directors are Premier Li Keqiang, the highest administrative official in China, and Wang Huning. Xi, Li and Wang are also members of the seven-person CPC Politburo Standing Committee, China's top decision-making body. The Office of CCAC, the operating arm of the CCAC, shares the same leadership team, working staff and offices with the CAC, *i.e.*, they are one agency under the CCAC's leadership.[17] Xi directed the CCAC to "coordinate major cybersecurity and informatization issues in various fields,

---

[14] "The Great Firewall of China: Xi Jinping's internet shutdown," *The Guardian.com* (June 29, 2018) ("The Great Firewall of China").

[15]  The Great Firewall of China, *supra, id.*

[16] http://www.cac.gov.cn/2016-02/29/c_1118191115.htm

[17] The CPC gives an agency two names to hide its ultimate control over such agency. A generic, descriptive name, such as the CAC, is used outside of China. Internally, a different name, here the CCAC Office, is used by the CPC to demonstrate its power over the agency. Other examples are the State Council Information Office (internally known as the Propaganda Department of the CPC Central Committee), and the Taiwan Affairs Office of the State Council (internally known as the Taiwan Work Office of the CPC Central Committee).

formulate and implement national cybersecurity and informatization development strategies, macro plans, and major policies, and continuously enhance security assurance capabilities."[18]

> ### 2. Amid growing tensions with the United States, Xi Jinping stresses the importance of cybersecurity to China

81.    The United States and China are the world's two superpowers. In the battle for global supremacy, industrial and commercial competition between the two has been fierce; in recent years, each has enacted protectionist trade measures. With respect to cybersecurity, expressions of mutual distrust concerning potential espionage have played out rather publicly.

82.    In the U.S., fears that equipment produced by Chinese companies could be programmed to surreptitiously obtain data from unsuspecting users, including our military, have led to a decade of efforts in Washington to prevent governmental entities and American companies from using products manufactured by large Chinese companies such as Huawei and ZTE. In 2020, the FCC designated those two companies as threats to national security. A month later, former President Trump signed an executive order seeking to remove the popular Tik-Tok app from phones in the United States unless ByteDance sold Tik-Tok to an American company.

83.    Even more concerning to China than such individual instances are American laws with potentially broad scope seen as usurping China's sovereignty over its citizens' personal data. In 2018, the U.S. Congress enacted the Clarifying Lawful Overseas Use of Data ("CLOUD") Act, empowering federal law enforcement to compel communications service providers subject to U.S. jurisdiction to produce data the company controls, including data stored on foreign soil. [19]

---

[18] http://www.cac.gov.cn/2016-02/29/c_1118191115.htm

[19] The Chinese government, media and academia view the CLOUD Act as imposing severe threats to the "judicial sovereignty and national security of [China'] cyberspace, increasing the legal risks of Chinese enterprises that conduct business overseas, and also violating the personal privacy of Chinese users." http://www.gjbmj.gov.cn/n1/2020/1127/c411033-31947264.html;

84.    China-based companies' business data was similarly targeted for U.S. review. In December 2020, Congress passed the Holding Foreign Companies Accountable Act ("HFCAA"), directing the SEC to prohibit from trading on a U.S. exchange the securities of SEC-reporting issuers whose financial statements have not been audited for three consecutive years by accounting firms subject to inspection by the Public Company Accounting Oversight Board (the "PCAOB"). China regards the audit work papers sought for PCAOB inspection as containing confidential information, *e.g.*, critical business and industrial information and user data, subject to the protection of Chinese national security laws. U.S.-listed Chinese corporations cannot send audit work papers outside of China without the government's prior approval.[20]

85.    China is also concerned about the U.S. strongarming other East-Asian corporations. In September 2021, the U.S. Department of Commerce asked global leaders in the semiconductor supply chain to "voluntarily" fill out questionnaires seeking information pertaining to the ongoing chip shortage. Commerce Secretary Gina Raimondo warned industry representatives that the White House might invoke the Defense Production Act or other tools to

---

http://tc.people.com.cn/n1/2018/0801/c183008-30182463.html;
http://www.casted.org.cn/channel/newsinfo/8127. For this reason, China warned Chinese enterprises that intend to conduct business overseas that, considering U.S. legislation, they should be aware of data security and privacy protection and, to avoid business/legal risk, "further improve internal data security management mechanisms, clarify requirements for cross-border data flows." http://tc.people.com.cn/n1/2018/0801/c183008-30182463.html

[20] Another provision of the HFCAA requires companies outside the reach of the PCAOB to disclose information relating to any board members who are officials of China's Communist Party. China's Foreign Ministry spokesman, Wang Wenbin, criticized the HFCAA as "an unjustified political crackdown on Chinese enterprises" that "[would] seriously hinder the listing of Chinese enterprises in the United States". https://www.complianceweek.com/regulatory-policy/sec-china-react-as-trump-approves-foreign-audit-oversight-bill/29860.article

force their hands should they fail to respond. Under pressure, the worlds' top chipmakers, companies located in Taiwan and South Korea, provided data to the U.S. before the deadline.[21]

86.     To China's leaders, these acts were viewed as invasive and provocative threats to China's cybersecurity and national security, requiring China to be hyper-vigilant of such perceived threats.[22] In addition to public efforts by the United States to obtain information and data stored in China, there is also a concern about covert cyberwarfare.[23] Xi Jinping has become increasing vocal about the perceived danger that the United States may pose to China's cyberinfrastructure.[24]

87.     Even before the recent escalation of tensions with the U.S., President Xi has consistently stressed the need to treat cyberinfrastructure and data as a national resource: "No cybersecurity, no national security" is Xi's watchword. President Xi first expressed this principle during the CCAC's initial session in 2014,[25] and has repeated it in high-visibility fora thereafter. Examples include:

(a)     In a December 16, 2015, speech at the opening ceremony of the Second World Internet Conference, President Xi maintained that cyberspace is an element of a nation's sovereignty and requested that all countries refrain

---

[21]     https://www.bloomberg.com/news/articles/2021-11-07/tsmc-withholds-customer-specific-data-in-answering-u-s-request?sref=L0o59hMS

[22]     https://cn.chinadaily.com.cn/a/202112/08/WS61b0b199a3107be4979fc199.html

[23]     In 2018, the National Computer Network Emergency Response Technical Team found that the more cyberattacks against Chinese networks were initiated in the U.S. than in any other country.

[24]     https://www.globaltimes.cn/content/1164607.shtml

[25]     "Xi Jinping: The Overall Planning And Coordinating Of The Innovation And Development Of All Parties, Strives To Build Our Country Into A Cyber Power", *People.com.cn*, February 28, 2014. http://cpc.people.com.cn/n/2014/0228/c64094-24488180.html

from cyber activities that interfere with or jeopardize a country's national security.[26]

(b)    On April 19, 2016, presiding over a Cybersecurity and Informatization Work Symposium, President Xi expressed his fundamental philosophy in a speech given to CAC directors, central governmental officials in charge of cybersecurity and development, and executives of leading internet companies, such as Jack Ma of Alibaba Group. Xi described information technology as China's biggest "gate of life".[27] As such, China "needs to keep control over its internet development and keep the internet and the nation safe."[28] President Xi mandated that the cyberinfrastructure of the communications and transport industries – both essential to the proper functioning of society – receive the "highest priority" of protection. Xi also demanded active scrutiny of existing cybersecurity to identify and eliminate risks. In a demonstration of the close relationship between private companies and the Chinese government, to aid efforts to safeguard their enormous troves of cyber information and data from external security threats, Xi also demanded that the nation's large information-based

---

[26] "Xi Jinping: Speech at the Opening Ceremony of the Second World Internet Conference," People.com.cn, September 24, 20121. http://cpc.people.com.cn/n1/2015/1217/c64094-27938930. People.com.cn html; *see also* "The Great Firewall of China".

[27] In traditional Chinese medicine, this refers to a spot on the lower back that holds the Yin and Yang, the origin from which all substances and functions develop. The "gate of life" has come to refer to the most fundamental part of a policy, as well as its enforcement, operations, and survival.

[28] "Xi Jinping's Speech at The Cybersecurity and Informatization Work Symposium", Xinhua Net, April 26, 2016. http://www.xinhuanet.com//zgjx/2016-04/26/c_135312437.htm

companies share the information and data with the government to actively participate in its protection. This speech was deemed to be of critical importance and was widely disseminated by national media; its text was published as a primary guide for both government agencies and businesses with respect to these issues.

(c)    At an October 9, 2016, CPC Politburo Standing Committee conference discussing China's cyber strategies, President Xi urged China to "strengthen the protection of critical information infrastructure" and "keep cyberspace secure and cyber data intact, secure and reliable, and improve our ability to safeguard cyberspace security."[29]

(d)    At a December 8, 2017, CPC Politburo Standing Committee conference to analyze China's "big data" strategies, President Xi noted that the exponential increase in data usage and technology development fundamentally impacts both governmental functions and citizen's daily lives. Given its central role in society, Xi emphasized that data security is critical: "[China] shall strengthen the security protection of critical information infrastructure, strengthen the ability of protecting the national critical data resources, and enhance data security, early notification, and source tracing ability."[30]

---

[29] "Xi Jinping: Accelerate the independent innovation of Cyber information technology; Persist in Our efforts towards the goal of building a cyber power", People.com.cn, October 10, 2016. http://cpc.people.com.cn/n1/2016/1010/c64094-28763907.html .

[30] http://www.gov.cn/xinwen/2017-12/09/content_5245520.htm.

(e)    During Cybersecurity Week in September 2019, President Xi pledged to "safeguard the security of personal information and citizens' legal rights and interests in cyberspace." [31]

(f)    On March 15, 2021, chairing a meeting of the Party's top financial advisory and coordination committee, in "unusually strongly worded comments," President Xi ordered regulators to "step up" oversight of internet platform companies, noting that internet companies need to enhance data security. [32]

## C.    To Carry Out President Xi's Directives, China Has Enacted a Series of Laws to Protect National Security, Cybersecurity, Data Security and Private Personal Data

88.    Over the past ten years, corresponding to President Xi's increasing level of concern over cybersecurity sovereignty, China has enacted a series of laws pertaining to cybersecurity and data protection. To centralize regulation and enforcement, upon the formation of the CAC in 2011, the State Council, China's chief administrative authority, authorized the CAC "to manage internet content in China and be in charge of supervising and managing the law enforcement in this regard to ensure the healthy and orderly development of internet information services, protect Chinese people's … rights and maintain national security…" ("State Council Authorization"). [33] Among

---

[31] http://politics.people.com.cn/n1/2019/0916/c1024-31355600.html

[32] Zheping Wang and Bloomberg, "China President Xi Jinping singles out 'platform' companies in sign tech crackdown will continue," *Fortune.com* (Mar. 16, 2021). https://fortune.com/2021/03/16/china-xi-jinping-platform-companies-tech-internet-crackdown/. The article noted that although, to date, the crackdown was focused on Alibaba and Ant Group, "[t]he term platform economies could apply to a plethora of mobile and Internet giants that offer services to hundreds of millions, from ride-hailing behemoth Didi Chuxing …."

[33] http://www.cac.gov.cn/2014-08/28/c_1112264158.htm

the many laws governing Didi's business operations, at least five relate to data storage and cybersecurity.

1.    The Standing Committee of the National People's Congress's
Decision on Strengthening Information Protection on Networks

89.    On December 28, 2012, the Standing Committee of the National People's Congress of China published a Decision on Strengthening Information Protection on Networks ("Congress Decision"), which first established network service providers' duties to keep personal digital information confidential and safe and barred providers from leaking or illegally providing personal information to a third party. Violations of the Congress Decision are punishable by monetary fines, revocation of business licenses, and/or the closure of websites held in violation.

2.    The National Security Law of China

90.    Effective July 1, 2015, the National Security Law ("NSL") updated a 1993 law focusing on cybersecurity. Article 25 of the NSL broadly provides for the creation of a structure for the research, development and implementation of cybersecurity systems (particularly in critical areas), increased network management, the enactment and enforcement of criminal laws against breaches of national data security, and the maintenance of cyberspace sovereignty and security.

91.    The NSL also establishes a review and oversight system to safeguard data deemed essential to national security from malevolent foreign actors. Highly-relevant to the case at bar, Article 59 provides, *inter alia*, for "conducting national security review of foreign commercial investment, special items and technologies, internet information technology products and services … as well as other significant matters and activities that impact or may impact national security." Article 60 simultaneously empowers multiple government agencies to enforce its provisions: "Each agency of the central government carries out the duty of national security reviews, issues

national security review opinions, and supervises enforcement in accordance with law and administrative regulations."

 3.   The Cybersecurity Law of China

92.     The Cybersecurity Law ("CSL"), effective June 1, 2017, specifically regulates cyber information and data that originates in China or is imported from overseas, and activities relating to China's cyberinfrastructure. CSL Article 31 expands the scope of cybersecurity coverage beyond network providers to all businesses deemed to be critical information infrastructure ("CII") operators, requiring a multi-level protection scheme ("MLPS") for "public communication and information services, energy, traffic, water resources, finance, public service, e-government, and other critical information infrastructure" which, if destroyed, disabled or compromised "might seriously endanger national security, national welfare, the people's livelihood, or the public interest."

93.     Article 37, China's strongest expression of cyber-sovereignty to date, requires:

> "[c]ritical information infrastructure operators that gather or produce personal information or important data during operations within the mainland territory of the People's Republic of China, shall store it within mainland China. Where due to business requirements it is truly necessary to provide it outside the mainland, they shall follow the measures jointly formulated by the State cybersecurity and informatization agencies and the relevant agencies of the State Council to conduct a security assessment…"[34]

94.     To limit the cybersecurity risks posed by the collection, storage, and use of vast amounts of private, personal information not essential to the provision of services, Article 41

---

[34] Law firms warned those doing business in China that CIIs would have to submit to a security assessment *before* information could be sent outside of China for business reasons.  *See, e.g.,* https://www.skadden.com/insights/publications/2017/06/privacy-and-cybersecurity-june-2017 ("[W]hat qualifies as "truly necessary" remains undefined, and companies seeking reprieve under this exception would still have to submit to a security assessment…")

prohibits the collections of unnecessary information and requires notice and informed consent from persons whose data is collected:

> Network operators collecting and using personal information shall abide by the principles of legality, propriety, and necessity; publish rules for collection and use, explicitly stating the purposes, means, and scope for collecting or using information, and obtaining the consent of the person whose data is gathered.
>
> Network operators must not gather personal information unrelated to the services they provide; must not violate the provisions of laws, administrative regulations or agreements between the parties to gather or use personal information; and shall follow the provisions of laws, administrative regulations and agreements with users to process personal information they have stored.

95.     Article 66 provides penalties of increasing severity for violations of the law, including the provision of warnings, ordering of corrective measures, confiscation of unlawful gains, levying of fines against businesses and supervisory personnel, suspension of a business or its operations pending correction, closing down of websites, and the revocation of permits and business licenses.

### 4.    Data Security Law

96.     The Standing Committee of the National People's Congress enacted the Data Security Law ("DSL") on June 10, 2021. The first draft of this law was released in July 2020; the second draft was released on April 29, 2021. Law firms updated clients on important comparisons between the first two drafts.[35] One firm noted that the second draft of the law included a provision that "stipulates that where a foreign judicial or law enforcement organ requests for data that is 'stored' within China, such data shall not be provided unless China's 'competent government

---

[35] *See* https://www.huntonprivacyblog.com/2021/05/03/china-issues-the-second-version-of-the-draft-of-data-security-law/#more-20445

agency' has approved such a provision (Article 35)."[36]  As explained above, this new requirement, ultimately enacted as DSL Article 36 effective September 1, 2021, could present a formidable roadblock for China-based companies seeking to list and trade on U.S. exchanges. Because regulations have not yet been adopted setting forth the bases for approving or rejecting such a request, a company could not be certain whether requested documentation, including but not limited to work papers required for a PCAOB audit, would be allowed to leave China.

97.    More generally, Article 31 mandates that all cross-border data transfers by CII operators comply with the CSL and that cross-border transfers of other important data must comply with CAC rules.  Pursuant to Article 45, violations can result in fines, business suspension, license revocation, business closure, and, for violations by CII operators that endanger national security, criminal penalties.  Moreover, under Article 24, national security reviews of data processing activities under the state's review system are final and not appealable.

5.    Personal Information Protection Law ("PIPL")

98.    Although existing laws and regulations prohibited the collection of more personal information from customers than is necessary to provide service, the first comprehensive law concerning personal information protection in China, effective November 1, 2021, was enacted on August 22, 2021. Draft versions were released on October 21, 2020, and April 29, 2021. The law applies to both personal information and sensitive personal information (the disclosure of which would impinge on one's dignity or cause harm) and sets stringent standards for personal information processors' collection, use and handling of such information. Working in conjunction

_____

[36] "China Released Updated Draft Data Security Law and Personal Information Protection Law for Public Comments," Covington (May 3, 2021) (https://www.cov.com//media/files/corporate/ publications/2021/05/covington-alert--china-released-updated-draft-data-security-law-and-personal-information-protection-law-for-public-comments-may-3-2021.pdf).

with the CSL and DSL, CIIs and other processors of large amounts of personal information cannot export such data without either passing a security assessment, being certified to do so, entering into a standard contract (drafted by the CAC) binding the recipient to comply with the PIPL, or as otherwise permitted.

### D.    To Implement Xi's Cybersecurity Vision, the CAC Adopted Extensive Regulations to Enforce China's National Cybersecurity Laws

99.    Since 2018, Zhuang Rongwen has served as Director of both the CAC and of the Office of CCAC. He also serves as Deputy Director of the dual-named CPC Central Propaganda Department/State Council Information Office. In his writings, Zhuang has reiterated Xi's position concerning the importance of data as a critical national asset.[37] Consequently, to implement its regulatory and enforcement authority over cybersecurity and internet content, the CAC has published numerous regulations; those most relevant to Didi's business are described below.

1.    Provisions on the Administration of Mobile Internet Applications Information Services (the "Provisions")

100.    Apps have become the main platforms for mobile internet services in China. The CAC promulgated the Provisions on June 28, 2016, pursuant to the Congress Decision and the State Council Authorization. Effective August 1, 2016, app service providers were directed to improve their user information security protection mechanisms. Article 6 broadly prohibits app

---

[37] For example, writing in the People's Daily in 2019, Zhuang said data "will have a significant impact on economic development, governance and everyday life" and "The capability of controlling data is a key measure in a country's competitiveness." In the March 2021 edition of *Qiushi*, the CPC's flagship bi-monthly journal on political theory, Zhuang wrote an article promoting Xi's book on building China to be a cyber power. Underscoring Xi's watchword, "No Internet Security, No National Security," Zhuang elsewhere pledged to carry out Xi's mandate to strengthen the protection of critical cyberinfrastructure, important personal information, and data. http://www.iwhr.com/zgskywwnew/ztbdtwo/networksafe2020/sjjs./webinfo/2020/09/160000288 5975085.htm

service providers from engaging in any activities that may jeopardize national security or infringing others' legal rights and interests.

> 2.    Interim Measures for the Administration of Online Taxi Booking Business Operations and Services (the "Taxi Booking Measures")

101.    On July 27, 2016, the CAC, together with the Ministry of Transport, the Ministry of Industry and Information Technology, the Ministry of Public Security, Ministry of Public Security, Ministry of Commerce, and State Administration for Market Regulation, published the Taxi Booking Measures, which were amended on December 28, 2019. The Taxi Booking Measures require ride hailing companies in China to observe China's security-related laws and expressly prohibit any data collected or generated by a ride hailing company to leave China. Specifically, Article 27 requires ride-hailing companies to: comply with "relevant national network and information security regulations," store the personal information collected and the business data generated for two years, and, unless otherwise permitted, retain all such information in China. Under Article 37, the CAC, as well as public security and communication agencies, are empowered to impose civil and criminal penalties for violations.

> 3.    The Measures of Cybersecurity Review (the "CSR Measures")

102.    To implement the CSL, on April 27, 2020, the CAC, together with another 10 ministries,[38] published the CSR Measures, effective June 1, 2020. The CSR Measures outline the process by which the CAC will safeguard critical information infrastructure and national security.

103.    Under Article 2, CIIs such as Didi – which possesses vast quantities of sensitive

---

[38] The National Development and Reform Commission, the Ministry of Industry and Information Technology, the Ministry of Public Security, the Ministry of State Security, the Ministry of Finance, the Ministry of Commerce, the People's Bank of China, the State Administration for Market Regulation, the National Radio and Television Administration, the National Administration of State Secrets Protection, and the State Cryptography Administration.

mapping and traffic data – "procuring network products and services that influence or may influence national security should conduct a cybersecurity review according to these measures." Thus, even if no information and data will be exported, imported network products and services are subject to a cybersecurity review if the services provided could affect national security.

104.    Article 4 provides that "under the leadership of CCAC", the CAC, in conjunction with the other 10 agencies, will establish national standards and a process for cybersecurity reviews that will be conducted by the Cybersecurity Review Office of the CAC. Articles 5-13 set forth the requirements for submitting proposed transactions to the CAC for a determination of whether a cybersecurity review is required, the documents to be submitted, the factors to be considered during a cybersecurity review, and the period of review – which can vary depending upon the level of complexity, whether there is a uniform opinion among the reviewing agencies, and whether remediation and supplemental submissions are required. Eventually, the CAC determines whether the proposed transaction may proceed.

    4.    Regulations on the Scope of Necessary Personal Information for Common Types of Mobile Internet Applications

105.    On March 12, 2021, four agencies, including the CAC,[39] jointly promulgated the "Provisions on the Scope of Necessary Information for Common Types of Common Mobile Internet Applications" ("Provisions on Necessary Information"). The preamble and Article 1 of the regulations indicate that they were written to implement Article 41 of the CSL, prohibiting the collection of more information from a user than is necessary to provide the service.[40] Article 5 of

---

[39] The other agencies are the Ministry of Industry and Information Technology, the Ministry of Public Security, and the State Administration for Market Regulation.

[40] http://www.cac.gov.cn/2021-03/22/c_1617990997054277.htm

the regulation sets forth 39 different service categories of apps and, for each, sets forth the type of information deemed necessary to provide the service. A provider who requests information unnecessary to the provision of its service can be reported to the agencies for enforcement. The Provisions on Necessary Information took effect May 1, 2021.

  **E.**  **Didi Collects Personal Information as Well as Mapping and Traffic Data Concerning China's Critical Infrastructure Information; Didi Was Required to Comply With Both Cybersecurity and Privacy Laws and Regulations and the CAC**

  106. From China's Congress Decision in 2012 through the enactment of the PIPL in the summer of 2021 (a second draft of which had been published on April 29, 2021, prior to the IPO), the need to keep personal information securely stored has been well-established in Chinese law. Moreover, multiple CAC regulations – from the Provisions and the Taxi Booking Measures adopted in 2016 to the Provisions on Necessary Information – made it abundantly clear that Didi had to secure personal user information, strengthen its network security, ensure that the information did not leave China, and limit the amount of information requested to only that necessary to provide its myriad services. This is no small task, as Didi has 377 million annual active ride-hailing users in China who provide their cellphone numbers (which are linked to their real names and identifications), and often share photos, recurring destinations (*e.g.*, home and office), as well as their gender, age, occupation, and employers. To use other Didi services, customers may also have to share more personal information, including facial-recognition data. During the car ride, in-car cameras and recorders can capture conversations. In addition to private, personal user information, Didi also has 13 million drivers in China who must provide their real names, vehicle information, criminal records, and credit- and bank-card information to Didi.

  107. In addition to its vast amounts of personal information, Didi possesses the most extensive traffic and mapping data in China, to wit: (a) its repository of real-world traffic data is

the world's largest, with 25 million daily rides on its platform in China feeding a database of pickup points, destinations, routes, distance and duration;[41] (b) In 2017, Didi won a government license to produce high-precision maps. Not only are foreign companies barred from this work, for national security reasons, [42] but only 29 Chinese entities are licensed to do detailed surveying and mapping; and (c) The traffic and road data that Didi owns—surveying, mapping, car flow, people flow, and car-charging network data—fall into the definition of "automobile industry significant data" according to the Automobile Data Security Management Decisions (draft) published on May 12, 2021.[43]

108.    Under the National Security Law and the Cybersecurity Law, critical information infrastructure operators must comply with a multi-level protection scheme to protect information that is critical to China's national security, expressly including traffic information.  Didi could not potentially expose its comprehensive and sensitive traffic and mapping data to foreign review by listing on a U.S. exchange before undertaking a comprehensive examination of its business, operations, and policies to the satisfaction of the CAC..

109.    Beyond the letter of the law, in April 2016, during his seminal Symposium speech, President Xi urged China's leading cyber-infrastructure companies to share their vast stores of

---

[41] On March 24, 2021, Ding Neng, a Didi Vice President, stated that "Didi is the only company with hundreds of billions of kilometers of travel scene data," providing a very accurate picture of a city's travel operations. For example, Ding indicated, just in Beijing alone, Didi's cars travel through every street at least 400 times a day. https://www.sohu.com/a/458288326_389742

[42] "Mapping points to potentially sensitive areas such as Chinese defense zones … can be a treasure trove of information for hostile actors," said Carly Ramsey, a Shanghai-based director at consulting firm Control Risks Group. Y. Kubota & L. Lin, "In the New China, Didi's Data Becomes a Problem," *The Wall Street Journal* (July 18, 2021). https://www.wsj.com/articles/in-the-new-china-didis-data-becomes-a-problem-11626606002. Attached hereto as Exhibit 6.

[43] https://baijiahao.baidu.com/s?id=1704446235397813267&wfr=spider&for=pc

data with the government so that they could actively participate in protecting that data in the interest of national security. Thereafter, Didi made a very public showing of cooperating with the CAC.

110.   On April 13, 2017, to commemorate the anniversary of President Xi's speech, the CAC held a meeting with key cyber-infrastructure entities. Wang Xin, a Didi Vice President who attended the meeting, stated that Didi innovated "big data," with a world-leading 1.43 billion orders generated on Didi's platform. Wang promised that "Didi will always be following General Secretary's Xi's calling …. and endeavor to play an active role in the cyberspace construction."

111.   Similarly, in 2020, Defendant Wei—Didi's Co-Founder, CEO, and Chairman of the Board of Directors—was a keynote speaker at the headline forum at National Cybersecurity Week. In a speech entitled "Build Cybersecurity ecosystem together, Share terrific outings," Wei proclaimed that "cybersecurity is the vital foundation of Didi's security system."[44]

112.   Didi's public displays of cooperation in the past led the CAC to believe that Didi would complete the thorough examination process the CAC deemed necessary to implement Xi's national security vision prior to Didi conducting its IPO on the NYSE.

113.   The CAC and CCAC were furious when they learned that Didi had charged ahead with the IPO in violation of the CAC Directives.

### F.    Defying Xi Jinping and the CAC's Directives Created a Serious Risk of Material Harm to Didi's Current Business and Future Growth

114.   Xi Jinping is the paramount leader who dictates the law and policies in China. As such, as the global media has widely reported, it is reasonably foreseeable that defying President Xi's directives will result in severe punishment to one's person or business.

---

[44] https://tech.sina.com.cn/roll/2020-09-15/doc-iivhvpwy6797611.shtml

115.    The CAC has the expansive power to close or suspend websites, close down businesses, revoke business licenses, and/or impose large fines or other draconian penalties if it determines that a business is violating any cybersecurity-related law or implementing regulation. *See, e.g.,* CSL Articles 59-69; *see also* DSL Article 45.

116.    Purportedly careful to not run afoul of national, provincial, or local authorities, Didi maintains an enormous government affairs team of over 200 persons skilled in navigating the complexities of PRC government policies.[45]

117.    No Chinese company, no matter how large, is powerful enough to run up against the will of China's central government: Although technology entrepreneurs in China can be wildly popular and tremendously wealthy, Beijing ultimately has the upper hand. For example, in November 2020, just days before Ant Group's $34 billion initial public offering – which would have established a world record on the Shanghai and Hong Kong exchanges rather than on the NYSE – Jack Ma, the controller of Ant Group and Alibaba Group, publicly criticized China's state-owned banks for not being innovative or taking risks, saying they operated with a "pawnshop" mentality. Top-level officials viewed Jack Ma's remarks as a disgrace to the Chinese government. Upon hearing of Ma's criticism, Xi was furious and personally made the decision to initiate an investigation into Ant and halt the Ant Group IPO.[46]

118.    Specifically, on November 2, just nine days after Ma's critical comments went viral, financial regulators issued new rules pertaining to online microlending. The same day, Jack Ma, Eric Jing, and Simon Hu were very publicly summoned to be interviewed by representatives

---

[45]  J. Zhu & Z. Yan, "How Didi's govt relations team navigated myriad regulators, until IPO dustup," *Reuters*, (July 20, 2021, 6:20 a.m. EDT). Attached hereto as Exhibit 7.

[46] https://www.wsj.com/articles/china-president-xi-jinping-halted-jack-ma-ant-ipo-11605203556

of the central bank as well as Chinese financial, insurance, and securities regulators. The next day, the Shanghai Stock Exchange suspended the IPO, citing changes in the regulatory environment.[47]

119.    Not only did investors who had already committed to paying more than $34 billion for Ant's IPO shares walk away emptyhanded, but its existing owners were also dealt a blow. Alibaba, which owns a 33% stake in Ant Group, saw its Hong Kong-listed shares tumble by more than 7% in Asia trading that day and its NYSE shares close more than 8% lower overnight.

120.    Several months later, Ant still felt the pain of having crossed President Xi. In April 2021, the Chinese government slapped a record $2.75 billion fine on Alibaba Group for violations of anti-monopoly laws.[48]  American media noted that Chinese central bank regulators had forced Ant to become a less-valuable holding company,[49] "leaving the company's employees and investors in limbo."[50]

121.    Alibaba had a similar experience when it conducted its IPO in 2014.  In 2015, it was revealed that two months prior to Alibaba's 2014 IPO, Alibaba was summoned to a critical meeting with China's State Administration for Industry and Commerce to address numerous violations of law on Alibaba's web platforms, including the sale of illegal and counterfeit items. The incident resulted in severe administrative guidance in China and a record-setting securities

---

[47]https://www.wsj.com/articles/china-president-xi-jinping-halted-jack-ma-ant-ipo-11605203556

[48]  https://prod.reuters.com/business/retail-consumer/china-regulators-fine-alibaba-275-bln-anti-monopoly-violations-2021-04-10/

[49] "Jack Ma's Ant Group to become a financial holding company under a Beijing-enforced revamp," *CNBC.com* (April 12, 2021) https://www.cnbc.com/2021/04/12/jack-mas-ant-group-to-become-financial-holding-company.html.

[50]  https://www.wsj.com/articles/jack-mas-costliest-business-lesson-china-has-only-one-leader-11629473637

class action in the U.S. for Alibaba's failure to disclose the meeting and its attendant risks in Alibaba's IPO registration statement.

122.    Outside the spotlight of Ant's aborted IPO and Alibaba's massive fine in China, violations of the laws and regulations cited in the prior section have resulted in serious administrative sanctions levied against many thousands of persons and businesses. From 2015 to 2017, the CAC summoned more than 2,200 website operators for administrative meetings, shut down over 13,000 websites, and closed nearly 10 million user accounts "that had violated relevant laws and regulations."[51] In 2019 and 2020, enforcement actions rose significantly: the number of operators summoned by the CAC for administrative meetings increased from 2,767 in 2019 to 4,282 in 2020; warnings were issued to 2,174 websites (2019); 384 websites were suspended in 2019, sharply increasing to 1,994 in 2020; and regulators shut down 11,767 websites in 2019 and a whopping 18,489 in 2020 because they had "violated laws."[52]

123.    Both the high-profile cases and the tens of thousands of information services companies that have been sanctioned and warned since the CPC took over the CAC in 2014 demonstrate that the CAC wielded significant power to direct the actions of businesses, such as Didi, that fell within its purview to ensure compliance with all relevant laws and regulations.

124.    According to several Didi employees, the Chinese government's investigation into Didi has disrupted its business: "Several business units of the company have lowered their

---

[51]    https://www.scmp.com/news/china/policies-politics/article/2125592/china-shuts-down-over-13000-websites-past-three-years; http://www.xinhuanet.com/2017-12/24/c_1122158880.htm

[52]    http://www.cac.gov.cn/2020-02/18/c_1583568767032468.htm (2019); https://news.cctv.com/2021/01/30/ARTIbZW8p6fmvDhDnz6tbu8c210130.shtml (2020)

performance targets for 2021, which were set in January at the start of the financial year, because those goals were no longer realistic, given the review of the company's business on July 16."[53]

125.    As of September 17, 2021, the CAC penalties imposed on Didi had caused its daily active users to drop 30% from the IPO date.  Based on its historical rate of sign-ups, the ban on opening new customer accounts is depriving Didi of about 4 million users a month. [54]

126.    On December 29, 2021, Didi disclosed a $4.7 billion loss in the third quarter of 2021, largely due to the Chinese government's regulatory actions against Didi. Didi's sales declined more than 12.9 % from the previous quarter.

## VI.    DEFENDANTS HAD AN AFFIRMATIVE DUTY TO CONDUCT A REASONABLE DUE DILIGENCE INVESTIGATION OF DIDI'S BUSINESS

127.    Didi, the Underwriters, and each of the Individual Defendants who at the time were officers and/or directors of Didi and signed the Registration Statement, each had a legal duty to conduct a thorough due diligence investigation of Didi's business and carefully review the Registration Statement to ensure that it did not omit to state any material facts required to be stated therein.

128.    The required due diligence investigation included obtaining a thorough understanding of whether Didi was the subject of any regulatory warnings, orders, directives, prohibitions, investigations or other actions that might be material to Didi's business or to the

---

[53] C. Feng and M. Hu, "Didi's business slows from break-neck pace as on-site probes by China's cybersecurity regulators gum up operations," *South China Morning Post*  (Aug. 17, 2021). Attached hereto as Exhibit 8.

[54] R. McMorrow, "Didi loses 30% of daily users after Beijing crackdown following IPO Promotions and discounts help ride-hailing rivals increase customer numbers," *Financial Times* (September 15, 2021); M. Hu, "Didi Chuxing's ride-hailing orders fall in August as Beijing's data security investigation starts to bite," *South China Morning Post* (Sept. 17, 2021).

success of the IPO. The CAC Directives, requiring Didi to ensure its business, operations and policies complied with applicable cybersecurity laws and regulations before going public, constituted a material regulatory event that should have been ascertained and analyzed in any reasonable due diligence investigation.

## VII.  DEFENDANTS HAD AN AFFIRMATIVE OBLIGATION TO DISCLOSE THE OMITTED FACTS IN THE REGISTRATION STATEMENT

129.    Provisions of SEC Regulation S-K govern the duty of affirmative disclosure imposed upon filers of various reports under the Securities Act and the Securities Exchange Act. Some regulations apply to all filings and others apply exclusively to Registration Statements and Prospectuses. In connection with the IPO, these regulations imposed on each Defendant the duty to disclose in the Registration Statement the Omitted Facts.

### A.    17 C.F.R. §229.105 – Item 105 (Risk Factors)

130.    Issuers are obligated to "provide, under the caption 'Risk Factors,' a discussion of the material factors that make an investment in the registrant or offering speculative or risky." The presentation of risks that could apply generically to any registrant or any offering is discouraged. Item 105(a). Where a summary of risk factors is required, the issuer should provide "a series of concise, bulleted or numbered statements that is no more than two pages summarizing the principal factors that make an investment in the registrant or offering speculative or risky."

131.    Going forward with the IPO without first completing a thorough self-examination of Didi's business, operations and policies to ensure compliance with all applicable laws and regulations concerning national security, network security, data security, and/or the collection and protection of private personal information, and to rectify any violations, to the CAC's satisfaction as instructed by the CAC made Didi's IPO especially risky because of the harsh consequences

Didi would face from the CAC and other PRC regulators. Thus, Defendants had a duty to disclose under Item 105 the Omitted Facts in the Registration Statement.

**B.    Form F-1 – Item 5(D) (Trend Information)**

132.    SEC Regulation S-K (17 C.F.R. 229.10) provides that Registration Statements such as the one filed by Didi on Form F-1 comply with the other requirements of Regulation S-K "to the extent provided in the forms to be used for registration under the [Securities] Act." Part I, Item 4(a) of Form F-1 requires registrants to furnish the information required by Part I of Form 20-F.

133.    Part I, Item 5(D) Form 20-F, requires registrants to:

[D]iscuss, for at least the current financial year, any ***known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources,*** or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition. (Emphasis added)

134.    Item 5(D) of Form 20-F "call[s] for the same disclosure as Item 303 of Regulation S-K".[55] And pursuant to Item 303, issuers must disclose actual and contemplated regulatory action or "changes in" the "regulatory environment[.]" *In Re Comm'n Guidance Regarding MD&A of Fin. Condition & Results of Operation*, Release No. 8350 (Dec. 19, 2003) (the "2003 Guidance") available at 2003 WL 22996757, *1 nn.1, 27.

135.    As a foreign issuer, Didi faces heightened obligations to disclose potential

---

[55] *See also* SEC Division of Corporation Finance's *Financial Reporting Manual* ("FRM") which provides: "The requirements for MD&A [Management's Discussion & Analysis] are set forth in Item 5 of Form 20-F, under Operating and Financial Review and Prospects (sometimes referred to as the OFR). This Item calls for the same disclosure as S-K 303 …" FRM §9410.1. FRM §9410.2 further provides: "The requirements of Item 5 of Form 20-F are as follows:  … d. Trend information – Item 5.D."

governmental or regulatory action in their home country. Item 303 specifically instructs foreign private registrants to "discuss briefly any pertinent governmental economic, fiscal, monetary, or political policies or factors that have materially affected or could materially affect, directly or indirectly, their operations or investments by United States nationals." 17 C.F.R. § 229.303(b) & Instruction ¶9.

136.    Even a one-time regulatory event, if "reasonably expect[ed]" to have a material impact on the company must be disclosed.

137.    The CAC's Directives issued to Didi constituted an important regulatory event that was reasonably likely to result in harsh penalties impacting Didi's business and financial performance should Didi fail to comply. Thus, pursuant to Item 5(D), Didi had an affirmative duty to disclose the Omitted Facts in the Registration Statement.

## VIII.  SECURITIES EXCHANGE ACT CLAIMS

138.    All of the preceding allegations in the Complaint are repeated and realleged herein as they are applicable to the Class's claims under Sections 10(b), 20(a) and 20(A) of the Securities Exchange Act of 1934.

139.    The allegations in this Securities Exchange Act section apply only to claims under the Securities Exchange Act of 1934 and are not alleged in respect of any of Plaintiffs' Securities Act of 1933 claims.

### A.    The Cyberspace Administration of China Instructed Didi Not to Go Public Until Didi Completed a Thorough Examination Ensuring Its Compliance with Relevant Cybersecurity Laws and Regulations

140.    According to the *Wall Street Journal,* when plans to list on the Hong Kong exchange fell apart in April because of a stringent requirement that issuers' operations must be fully compliant and licensed, something Didi and its millions of drivers admittedly could not achieve in every market, Didi decided to list in the United States. To do so, however, Didi knew it

needed cooperation from Beijing. For that reason, Didi was in discussions with Chinese regulators well in advance of the June 30, 2021 IPO.[56]

141.    After Didi filed its SEC Form F-1 registration statement in early June, it told officials from the Ministry of Transport, the Chinese Securities Regulatory Commission, the National Development and Reform Commission and the CAC that it had tentatively planned the IPO to be completed in early July.[57]

142.    In the weeks leading up to the IPO, however, officials instructed Didi to postpone the IPO until they were satisfied that Didi had conducted a thorough self-examination of its business, operations and policies to ensure compliance with all applicable laws and regulations concerning national security, network security, data security, and/or the collection and protection of private personal information, and to rectify any violations, to the CAC's satisfaction.[58] As *The*

---

[56] J. Yang, K. Zhai & C. Driebusch, "Didi Tried Balancing Pressure From China and Investors. It Satisfied Neither. *The Wall Street Journal* (Jul. 9, 2021) ("Didi Tried Balancing Pressure From China") https://www.wsj.com/articles/didi-ipo-china-regulators-investors-trouble-11625873909. (attached hereto as Exhibit 9)

[57] Didi Tried Balancing Pressure From China, *The Wall Street Journal* (Jul. 9, 2021) (Exhibit 9).

[58] The CAC's instructions to Didi to postpone the IPO were independently reported in numerous international media. *See* J. Yang, K. Zhai & C. Driebusch, "Didi Tried Balancing Pressure From China and Investors. It Satisfied Neither," *The Wall Street Journal* (Jul. 9, 2021) (Exhibit 9); C. Feng, C. Pan, M. Hu & Z. Xin, "Didi Chuxing 'forced its way' to a New York listing, triggering data security review, sources say," *South China Morning Post* (July 6, 2021) (attached hereto as Exhibit 10); H. Lockett, T. Kinder, S. Yu, C. Shepherd, Y. Yang & J. Franklin, "Didi Caught As China And US Battle Over Data," *Financial Times* (July 6, 2021) (attached hereto as Exhibit 11); Bloomberg News, "China Weighs Unprecedented Penalty for Didi After U.S. IPO" *The Japan Times* (July 22, 2021, 5:44 AM EDT, Updated on July 22, 2021, 4:22 PM EDT) (attached hereto as Exhibit 12); L. Wei & K. Zhai, "Chinese Regulators Suggested Didi Delay Its U.S. IPO," *The Wall Street Journal* (July 5, 2021 2:43 pm ET) (attached hereto as Exhibit 13); Nearly all of the many news reports on this point state the meeting between Didi and the CAC occurred "weeks" or in the "weeks" before the IPO. One source—a former director of the Publicity Department of the Central Committee of the CPC and currently an executive at a Chinese internet company—identifies June 21, 2021 as the specific date of the meeting, "*Interpretation on the Didi Incident*",

*Wall Street Journal* explained:[59]

> ***The Chinese officials urged the company to postpone the share sale*** because Beijing was concerned that IPO documents required by U.S. regulators could have sensitive information and data it didn't want U.S. authorities to have.

> ***The officials made clear to Didi***, according to the two people, ***that the government*** didn't intend to block the IPO, but ***wanted the company to wait until it had carried out the proper security checks*** and made sure the documents it would present to the U.S. regulators contained no sensitive information.

> The officials also wanted to address the issue of audit working papers, the two people said . . . Audit materials could contain raw data such as meeting logs, user information and email exchanges between the company and government agencies, among other things.

> One person close to the company said Didi hasn't handed anything sensitive to U.S. regulators to date. ***Chinese officials, however, argue that it is for regulators, not the company, to decide what is sensitive.*** In China, the ride-hailing company is classified by law as a "critical infrastructure provider," language that signals national-security sensitivities.

> Beijing's suggestion that Didi delay its IPO left the company having to decide whether to comply with U.S. or Chinese priorities.

> Didi signaled to regulators that it would consider the request, and that it wouldn't be a problem to postpone the listing if needed, say people familiar with its communications with regulators.  (Emphasis supplied.)

143.    *Bloomberg* similarly reported on July 6, 2021, that "Chinese regulators asked Didi as early as three months ago to delay its landmark U.S. IPO because of national security concerns involving its huge trove of data, according to people familiar with the matter."[60]

144.    Another report, in the *South China Morning Post* confirmed a meeting between

_____

an analysis circulated internally in Huaxi Securities, a Chinese investment bank. https://drive.google.com/file/d/18diceb2XXdsQG4tofHmTvGRxO8t1aWUY/view.

[59] "Didi Tried Balancing Pressure From China," *The Wall Street Journal* (Jul. 9, 2021) (Exhibit 9).

[60] "China Cyber Watchdog Asked Didi to Delay IPO on Data Concern," *Bloomberg News* (July 6, 2021).    https://www.bloomberg.com/news/articles/2021-07-06/didi-slumps-after-china-regulators-order-stores-to-remove-app. Attached hereto as Exhibit 20.

the CAC and Didi in Beijing. Meetings such as these are not always highly formal, but although the format of the CAC's meeting with Didi may have "produced no written records," there is no mistaking the message being given: "For the CAC, such sit-down discussions … constituted channels to formally deliver the regulator's instructions, with no room for defiance."[61]

145.    Didi led the CAC to believe that it would comply with its directive and would postpone its IPO until it had completed the required cybersecurity review. As the *South China Morning Post* reported, regulators called Didi's actions of charging ahead with the IPO in defiance of the CAC's directive a "deliberate act of deceit." Specifically, "Some officials are privately describing Didi's move as '*yang feng yin wei*'— to comply publicly but defy privately (or, put another way, to say one thing and then do another)—according to a source who was briefed, speaking on condition of anonymity for describing confidential discussions." [62]

146.    In truth, Didi had other plans.  It did not intend to follow the CAC's directive.

147.    After the IPO, Didi employees shared information on Chinese social media saying that Didi was under pressure from the CAC to delay its initial public offering but proceeded anyway.[63]  Similarly, the *Financial Times* reported that "one person close to Didi acknowledged

---

[61] M. Hu, M. Borak, C. Zhou, & Z. Xin, "China's regulators suspect Didi's US listing was 'deliberate act of deceit', a portrayal that shows severity of mistrust, sources say," *South China Morning Post* (July 9, 2021) ("Didi's US listing was 'deliberate act of deceit'") https://www.scmp.com/tech/policy/article/3140471/chinas-regulators-suspect-didis-us-listing-was-deliberate-act-deceit. Attached hereto as Exhibit 14.

[62] Didi's US listing was 'deliberate act of deceit,' *South China Morning Post* (July 9, 2021) (Exhibit 14).

[63] C. Feng, C. Pan, M. Hu & Z. Xin, "Didi Chuxing 'forced its way' to a New York listing, triggering data security review, sources say, *South China Morning Post* (July 6, 2021) ("Didi Forced Its Way") (Exhibit 10) (citing a July 5 research note by Gavekal's Ernan Cui and Thomas Gatley).

that the company had been advised by the CAC to delay its listing until it had conducted a data security review".[64]

148.    Chinese officials characterized Didi's actions as "'forc[ing] its way' to go public in New York without completing a through data security assessment by CAC, a necessary step for Beijing amid its enhanced scrutiny of data security."  According to an anonymous source close to CAC, the focus of the CAC's concern with the Didi IPO was that there was a potential security risk of "important data and the personal information of Chinese citizens going abroad."[65]

149.    In the aftermath, Chinese officials said they were quite certain that Didi understood their instructions to postpone its IPO until it had ensured the security of its data.[66] "One person involved in the meetings, when asked why Didi didn't act on suggestions from regulators, referred to a proverb that you can't wake a person pretending to sleep."[67]

150.    On August 11, 2021, the *South China Morning Post* reported that "China's regulators have been conducting investigations at Didi's Beijing head office for weeks, involving daily summons of mid-level managers for hours of questioning at short notice, even on weekends, sources said." "The investigators' top priorities are to ascertain the line of responsibility in Didi's IPO decision, and to fix what are considered security loopholes in Didi's apps."  "The investigations, which are being conducted to ascertain the persons responsible for Didi's decision to force its way to list in New York, contrary to the Chinese regulators' verbal instructions –

---

[64] "Didi Caught As China And US Battle Over Data," *Financial Times* (July 6, 2021) (Exhibit 11).

[65]  Didi Forced Its Way, *South China Morning Post* (July 6, 2021) (Exhibit 10).

[66]  "China weighs unprecedented penalty for Didi after US IPO," *Bloomberg* (July 22, 2021) (Exhibit 12).

[67]  "China weighs unprecedented penalty for Didi after US IPO," *Bloomberg* (July 22, 2021) (Exhibit 12).

characterized by officials as a 'deliberate act of deceit' – may result in Liu's role being changed, said one of the sources, speaking on condition of anonymity about an ongoing investigation."[68]

151.    The fact that Chinese regulators believe that Didi deceived them, and that the regulators want to determine who at Didi is responsible for not following the CAC Directives, which the CAC believes were clear instructions to Didi, demonstrate that Didi and the Officer Defendants were aware or reckless in not knowing of the CAC's instructions to postpone the IPO.

**B.    Didi and the Officer Defendants Were Determined to Push Ahead With the IPO, Regardless of the CAC's Directives**

152.    In June 2021, it appeared that the window for high valuation Chinese IPOs in the United States could close very soon. Tensions between U.S and Chinese government regulators concerning audit transparency were heating up. On June 10, China had also passed the Data Security Law, to become effective September 1, 2021,[69] and drafts of the Personal Information Protection Law, ultimately enacted on August 22, 2021,[70] had been circulated.  The DSL would give Chinese regulators authority over data requests from foreign regulators and increase security measures for all cross-border data transmission; the PIPL would increase regulation over private information requiring, before data could be exported, special certification and the recipient's agreement to abide by the PIPL.  With the continued crackdown on big data platform companies, Didi and the Officer Defendants did not want the window of opportunity to close.

---

[68] J. Ye, "China's probe into ride hailing giant Didi Chuxing may lead to management reshuffle, sources say," *South China Morning Post* (Aug. 11, 2021) (attached hereto as Exhibit 15).  Another later report confirmed that Chinese officials said that part of the on-site investigation was focused on the decision-making process behind Didi's IPO. *See* K. Zhai & L. Lin, "Chinese Regulators Nudge Didi Towards Hong Kong Listing," *The Wall Street Journal*  (Oct. 21, 2021) (attached hereto as Exhibit 16).

[69] http://www.npc.gov.cn/npc/c30834/202106/7c9af12f51334a73b56d7938f99a788a.shtml

[70] http://www.npc.gov.cn/npc/c30834/202108/a8c4e3672c74491a80b53a172bb753fe.shtml

153.    Compliance with the CAC's Directives could mean a lengthy delay – as long as six months or more – and perhaps an inability to move forward in the U.S at all after the new laws took effect. Completion of the IPO, however, would enable both Didi's founders (Cheng and Liu) and other early investors to cash out their investment and make billions.  Didi faced pressure from some of its early investors to go ahead with the IPO and earn them a big payout.[71]

154.    While Didi's founders and some of its early investors were eager to complete the IPO in violation of the CAC Directives, two of Didi's directors, Daniel Yong Zhang (Chairman and CEO of Alibaba Group Holdings) and Martin Chi Ping Lau (president and executive director of Tencent Holdings) "were surprised and furious when they learned that Didi was in trouble with the Cyberspace Administration of China."  In fact, "Messrs. Lau and Zhang had earlier advised Didi Chairman Will Cheng and President Jean Liu—who also sit on the eight-member board— against rushing to go public in the midst of China's wide-ranging regulatory crackdown on the business practices of dozens of internet-technology companies, the people familiar with the matter said."[72]

155.    These cooler heads did not prevail.  Instead of heeding the CAC's directive and its own directors' urging to delay the IPO, Didi accelerated the process to avoid the CAC taking action to halt the IPO, conducting 3.5 days of "round-the-clock virtual meetings," in an unusually

---

[71] L. Wei & K. Zhai, "Chinese Regulators Suggested Didi Delay Its U.S. IPO: Ride-hailing giant, under pressure to reward shareholders, pushed ahead with NYSE listing despite concerns of China's cybersecurity watchdog," *The Wall Street Journal* (July 5, 2021) (Exhibit 13); "China Weighs Unprecedented Penalty for Didi After U.S. IPO," *Bloomberg*, (July 22, 2021) (Exhibit 12).

[72] J. Yang, "Rift Forms on Didi's Board Following Beijing's Regulatory Assault," *The Wall Street Journal* (Aug. 18, 2021) (attached hereto as Exhibit 17).  The article confirms an earlier report in the *South China Morning Post* "that the Tencent and Alibaba executives advised Didi to defer its New York listing." *See* "China's probe into ride hailing giant Didi Chuxing may lead to management reshuffle, sources say," *South China Morning Post* (Aug. 11, 2021) (Exhibit 15).

short time frame for a $4.4 billion public offering. In fact, "[i]t was one of the shortest periods to take investor orders for an IPO in recent memory, according to bankers, investors and lawyers."[73]

156.    Didi also scheduled its IPO to occur the day before July 1st, a major Chinese National Holiday celebrating the founding of the Chinese Communist Party.  The CPC Founding Day is a holiday in which all government workers suspend their daily work and conduct only celebratory activities. The CPC Founding Day in 2021 was particularly important because it was the 100th anniversary of the CPC. According to *Fortune*: "This is a week of pomp [and] pageantry … as the Chinese Communist Party, which has ruled the nation since 1949, celebrates the 100th anniversary of its founding congress in July 1921."[74]  When Didi's shares began trading on the NYSE at 9:30 a.m. on June 30, it was 9:30 p.m. on the eve of Founding Day in Beijing and the festivities had been underway for several days.

157.    Scheduling its IPO to coincide with CPC Founding Day lessened the risk that CAC officials would be able to immediately react to Didi's disobeying the CAC's Directive, or otherwise interrupt or stop the IPO once it commenced.  When President Xi decided to personally block the Ant Group IPO, although retribution for Jack Ma's comments critical of state-owned banks was swift, it did not happen overnight.

---

[73] *See* Didi Tried Balancing Pressure From China, *The Wall Street Journal* (July 9, 2021) (Exhibit 9).

[74] "The debate that racked China's Communist Party founders 100 years ago still reverberates today," *Fortune* (June 29, 2021). https://fortune.com/2021/06/29/china-communist-party-100th-anniversary-date-debate/. The article describes President Xi's appearances at a spectacular show at the National Stadium on Monday and at a ceremony at the Great Hall of the People to award medals to "ordinary heroes" for their contributions to the Party.

158.    Didi began its roadshow on June 24 and completed it on June 28, 2021, one day earlier than planned.[75]

159.    On June 29, 2021, Didi's Chairman and CEO, and the Underwriters, filed separate letters requesting the SEC to declare the Registration Statement Effective at 4:00 pm on June 29.

160.    Less than 90 minutes later, at 5:23 p.m. on June 29, 2021, a report indicated that the Underwriters and Didi priced the IPO at $14.00/share, the upper end of the previously discussed $13 - $14 range.[76]

161.    On June 30, at 12:15 a.m. the SEC declared the Registration Statement effective.

162.    The Underwriters offered 316.8 million shares at $14.00 per share hoping to rake in proceeds of $4.4 billion (including the overallotment option) in the IPO. Upon the IPO, Didi had a market capitalization of $68 billion. Its founders Cheng and Liu were worth at least $4.4 billion and $1.1 billion respectively. Softbank's stake was now worth $13.6 billion.

163.    On June 30, Didi issued a terse press release announcing the IPO and stating that "[t]he closing of the offering is expected to occur on July 2, 2021, *subject to the satisfaction of customary closing conditions*." (Emphasis added.)

164.    To maintain a low profile, unlike almost every other IPO, particularly multi-billion-dollar IPOs, Didi's senior management did not ring the NYSE bell the morning of the IPO. Didi was doing its best to fly below the radar and not flout its defiance of the CAC.

───────────────

[75] S. Murdoch, J. Zhu & Y. Sun, "Chinese firm Didi's $4 bln IPO books covered on first day of bookbuild – sources," *Reuters* (June 24, 2021) https://www.reuters.com/business/autos-transportation/chinas-didi-list-new-york-stock-exchange-2021-06-24/; Y. Sun & S. Murdoch, "Didi's $4bln IPO order books to close Monday – sources," *Reuters* (June 27, 2021).

[76] C. Driebusch, "Didi Global Prices IPO at $14 a Share," *Dow Jones Institutional News* (June 29, 2021, at 5:23 p.m.).

165.     Didi succeeded in pulling off its IPO before the CAC or other regulatory agencies in China could stop it.  However, its victory was short-lived.

166.     On July 2, at 6:00 pm Beijing time (6:00 a.m. New York Time), the CAC contacted Didi and warned them that in one hour the CAC would publicly order Didi to stop signing up new users and would commence a cybersecurity review of Didi.[77]  The punishment was in response to Didi's refusal to comply with the CAC's Directives.  Now instead of conducting a self-examination and seeking CAC sign-off, Didi would have to endure an investigation by the CAC – one of indeterminate length.  This punishment would also have major financial consequences for Didi because it could no longer take on new customers, halting all growth and giving its competitors a chance to take new and existing customers away from Didi.

167.     At 7:19 pm Beijing time on July 2 (7:19 a.m. Eastern Daylight Savings time), the CAC posted a notice on its website that "In order to prevent national data security risks, safeguard national security and protect public interests, in accordance with the National Security Law of the People's Republic of China and the Cyber Security Law of the People's Republic of China, the Cyber Security Review Office will conduct a cyber security review on Didi Chuxing pursuant to the Cyber Security Review Measures.  During the review, Didi Chuxing will halt new user registration in order to cooperate with the cyber security review and prevent further risks."  The CAC also announced that  Didi was no longer permitted to accept new user registrations.

168.     Before U.S. markets opened for trading on Friday, July 2, 2021, a number of prominent news outlets reported the CAC's actions against Didi:

(a)     CNBC reported this news at 7:44 a.m. New York time.

---

[77]  "Didi Caught As China And US Battle Over Data," *Financial Times* (July 6, 2021) (Exhibit 11).

(b)    At 7:55 a.m. (New York Time), Reuters reported "China's cyberspace administration said on Friday it has launched a new investigation into ride-hailing giant Didi Global Inc to protect national security and the public interest."

(c)    On July 2, at 8:09 a.m. New York Time, *Bloomberg News* reported:

> *Didi Dives as China Unveils New Cyber Probe After Mega IPO*
>
> Didi Global Inc. tumbled Friday after China said its starting a cybersecurity review of the ride-hailing company just two days after it pulled off one of the biggest U.S. stock market debuts of the past decade.
>
> The move is to prevent data security risks, safeguard national security and protect public interest, according to a statement from the Cyberspace Administration of China. Didi has halted new user registrations during the probe.

169.    By 8:51 a.m. on July 2, 2021*, Marketwatch* reported that Didi said it will "fully cooperate and examine its risks."

170.    Five hours after learning the news, and more than 90 minutes since the start of trading on the NYSE, Didi issued a press release at 11:03 a.m., confirming the CAC's announcement and stating: "DiDi will fully cooperate with the PRC government authority during the review. It plans to conduct a comprehensive examination of cybersecurity risks and continue to improve on its cybersecurity systems and technology capabilities." Given the dissemination of an alarming story concerning a company that just two days earlier had conducted a blockbuster $4.4 billion IPO, the two-hour delay in issuing a formal statement was quite surprising.

171.    The *Financial Times* shed light on what was happening during this critical period: "Didi's bankers, who were still settling shares allocated in [its June 30] New York $4.4bn IPO, were forced to pause while lawyers assessed whether the [CAC's] order was 'an existential threat

to the company'".[78] This was an excellent question. With no user sign-ups allowed during the pendency of the review, should the investigation last 45 days, one analyst estimated that Didi would lose at least 6 million new users.[79] Moreover, the Underwriters were now obligated to investigate and discover the reasons for the CAC regulatory action and assess whether additional regulatory actions against Didi might be taken.

172.    Specifically, when the news broke before 8:00 a.m. in New York, the IPO had not yet closed.  Closing for the transaction was set for later that day on July 2.  The underwriting agreement contained the standard closing conditions that the Underwriters could cancel the transaction and not close if: (i) a material adverse event occurred, (ii) the Registration Statement omitted a material fact as of the closing, (iii) any of Didi's representations and warranties in the underwriting agreement are inaccurate, including the absence of a material adverse event or adverse government regulatory action (iv) issuer's counsel did not provide satisfactory negative assurance letters, or (iv) Didi's officers didn't provide satisfactory officer certificates attesting to no material adverse events, including regulatory actions, as of the closing.[80]

173.    As disclosed in the Registration Statement, "[t]he underwriters are offering the ADSs subject to their receipt and acceptance of the ADSs and subject to prior sale. The underwriting agreement provides that the obligations of the several underwriters to pay for and

---

[78]  "Didi Caught As China And US Battle Over Data," *Financial Times* (July 6, 2021) (Exhibit 11).

[79]  "Chinese Regulators Target Ride-Hailing Company Didi Just Days After IPO, *Wall Street Journal* (July 2, 2021) (citing Bernstein analyst Cherry Leung). Attached hereto as Exhibit 18.

[80]  The Underwriting Agreement, filed with the SEC as Exhibit 1.1 to Didi's Amendment No. 2 to Form F-1 on June 28, 2021, is attached hereto as Exhibit 19 and incorporated by reference herein.

accept delivery of the ADSs offered by this prospectus are subject to the approval of certain legal matters by their counsel and to certain other conditions."

174.    Thus, the Registration Statement, and the underwriting agreement made clear that the Underwriters would not purchase the IPO shares from Didi and proceed to resell them to investors unless and until the Underwriters had done their due diligence and confirmed that all closing conditions—including the absence of material adverse events and that the Registration Statement did not contain an omission of material fact - as of the time of closing—had been met.

175.    Having learned that the CAC was punishing Didi by banning it from taking on any new customers while responding to a serious cybersecurity review of indefinite duration, deemed necessary by the CAC "to prevent national data security risks, safeguard national security and protect the public interest," the Underwriters had the opportunity to cancel the IPO and return investors their funds.  The Underwriters had several hours to decide whether or not to go forward with the IPO, close the transaction, accept delivery of the IPO shares, and wire the $4.4 billion to Didi.

176.    The Underwriters and Didi could have, before the market opened on July 2, notified the NYSE of the material adverse event and asked the NYSE to not allow any further trading in Didi shares pending the Underwriters and Didi cancelling the IPO closing, and unraveling investors' transactions.

177.    On July 2, prior to closing, the Underwriters, Didi, and their respective counsel, held a call – referred to as a bring-down due diligence call – where Underwriters asked the company a series of questions to verify that all of Didi's representations and warranties in the underwriting agreement were true and accurate as of the closing, as well as to verify that no material adverse events had occurred since the most recent diligence call immediately prior to

pricing the IPO. Such material events may include "a material development in the company's business or expectations regarding its future financial results, or a previously unforeseen regulatory issue arising."[81]

178.    The CAC's actions banning Didi from taking on any new customers pending its review was clearly a material adverse event providing a basis to cancel the IPO. And the Registration Statement was misleading for not disclosing the CAC's request to delay the IPO and the attendant risk Didi faced of heightened regulatory scrutiny, fines, and other business interruption as a result of its flouting the CAC's Directives.

179.    The Underwriters and Didi were faced with a Faustian Bargain.  They could hold their noses, steel their nerves, and proceed to close the IPO; the Underwriters could wire the $4.4 billion of investors' money to Didi and keep $90 million of underwriting commissions for themselves for six weeks of work.  Or the Underwriters and Didi could act in accordance with the underwriting agreement and their duties to IPO investors, refuse to close the transaction, and return the $4.4 billion to investors.

180.    Knowing that the wrath of the CAC was already upon Didi, the Officer Defendants, and the Underwriters decided to push forward and close the transaction on July 2.

**C.    Defendants' Omission of Material Facts Caused Didi's Share Price to Decline**

181.    When the Omitted Facts were revealed to the market in a series of news reports over the course of several weeks, Didi's share price declined.

182.    On July 2, 2021, prior to market open, the CAC posted on its website at 7:19 a.m.,

---

[81] "Strategies For Going Public," Deloitte & Touche LLP and Skadden, Arps, Slate, Meagher & Flom LLP. (Feb. 2020). https://www.skadden.com/insights/publications/2020/02/strategies-for-going-public.

and CNBC reported at 7:44 a.m., that Didi is subject to cybersecurity review by the CAC and that, until further notice, Didi is required to suspend new user registration in China.

183.    Didi's share price immediately began to decline in off-exchange after-market trading.  Didi's off-exchange price declined from about $16.88/share to $14.96/share when the NYSE opened for trading.

184.    Because of the adverse news, Didi's share price opened on the NYSE $1.44/share lower than its prior day's closing price of $16.40/share, opening at $14.96/share, 8.8% lower, and traded down as low as $14.60/share that day.

185.    On July 3, 2021, with the tide of public opinion quickly turning against Didi, company Vice President Li Min took to Weibo (a Twitter-like platform) to state that all domestic user data is stored on servers in China and that Didi would sue anyone who accused it of transferring such data to the U.S.

186.    On the morning of Sunday, July 4th, newswires began reporting an official announcement that the CAC posted to its website at 7:40 a.m. New York time:

> According to complaints that have been verified by testing, the "Didi Chuxing" app has serious problems in terms of legal and regulatory violations in the collection and use of personal information. Pursuant to relevant requirements of *Cybersecurity Law of the People's Republic of China*, State Internet Information Office has notified app stores to remove the "Didi Chuxing" app, and has required Didi Chuxing Technology Co., Ltd. to strictly comply with legal requirements, refer to relevant national standards, diligently correct existing problems, and thoroughly protect the security of personal information of its numerous users.

This affirmative measure to remove the main Didi Travel app from all app stores was a major blow to Didi because existing users could no longer download updated versions of the app.

187.    In a statement posted to its Weibo account, Didi abandoned the defiant tone taken the day before, when it had threatened to sue those who disparaged its protection of user data from cross-border disclosure, instead stating: "We sincerely thank the responsible departments for

guiding Didi to look into the risks." Didi promised to "conscientiously rectify" the problems.

188.    At 12:40 p.m., the *Wall Street Journal* reported upon the Didi app removal following the CAC's finding of "serious" legal and regulatory violations regarding the collection and use of personal data. The story suggested that Didi may have known it was not in compliance with user data laws: "A notice on Didi's app dated June 29, one day ahead of its stock market debut, said new changes to its user information and data privacy policy would come into effect on July 7."

189.    At 1:30 p.m. New York Time, July 4, 2021, Didi confirmed the escalation of the CAC's punitive measures in a press release titled "Didi Announces App Takedown in China" which stated, in relevant part, that:

> [A]ccording to the announcement posted by the Cyberspace Administration of China (the "CAC") on July 4, 2021, the CAC stated that it was reported and confirmed that the "Didi Chuxing" app had the problem of collecting personal information in violation of relevant PRC laws and regulations. Pursuant to the PRC's Cybersecurity Law, the CAC notified app stores to take down the "Didi Chuxing" app in China, and required the Company to strictly comply with relevant laws and regulations, follow the relevant standards set by the PRC government authorities, and rectify the problem to ensure the security of users' personal information.

> Once the "Didi Chuxing" app is taken down from app stores in China, the app can no longer be downloaded in China, although existing users who had previously downloaded and installed the app on their phones prior to the takedown may continue using it. The Company will strive to rectify any problems, improve its risk prevention awareness and technological capabilities, protect users' privacy and data security, and continue to provide secure and convenient services to its users. ***The Company expects that the app takedown may have an adverse impact on its revenue in China***.  (Emphasis added.)

190.    On July 5, 2021, Didi issued its first denial – of sorts.  Speaking to Reuters, Didi stated: "Prior to the IPO, Didi had no knowledge of the CAC's decisions, announced on July 2 and July 4, 2021, with respect to the cybersecurity review and suspension of new user registrations in China, and the removal of the Didi Chuxing app from the app stores in China, respectively."

Denying knowledge of the *form of Didi's punishment* for defying the CAC's directive to delay the IPO is hardly the same as denying that the CAC had instructed Didi not to go public in the U.S. until it was in compliance with the relevant cybersecurity laws and regulations.

191.    On July 5, 2021 (an NYSE trading holiday), the Wall Street Journal published an article titled "Chinese Regulators Suggested Didi Delay Its U.S. IPO: Ride-hailing giant, under pressure to reward shareholders, pushed ahead with NYSE listing despite concerns of China's cybersecurity watchdog" which reported the following, in pertinent part:

> ***Weeks before Didi Global Inc. [] went public in the U.S., China's cybersecurity watchdog suggested the Chinese ride-hailing giant delay its initial public offering and urged it to conduct a thorough self-examination of its network security, according to people with knowledge of the matter.***
>
> ***But for Didi, waiting would be problematic. In the absence of an outright order to halt the IPO, it went ahead.***
>
> The company, facing investor pressure to list after raising billions of dollars from prominent venture capitalists, wrapped up its pre-offering "roadshow" in a matter of days in June—much shorter than typical investor pitches made by Chinese firms. The listing on the New York Stock Exchange raised about $4.4 billion, making it the biggest stock sale for a Chinese company since Alibaba Group Holding Ltd. BABA[]'s IPO in 2014.
>
> Back in Beijing, officials, especially those at the Cyberspace Administration of China, remained wary of the ride-hailing company's troves of data potentially falling into foreign hands as a result of greater public disclosure associated with a U.S. listing, the people said.
>
> Didi's American depositary shares began trading in New York on Wednesday, just a day before the ruling Communist Party celebrated its centenary.
>
> The Cyberspace Administration waited a day after the major political event to deliver a one-two punch to the company. On Friday, it started its own cybersecurity review into Didi and blocked the company's app from accepting new users; and on Sunday, it ordered mobile app stores to pull Didi from circulation.  (Emphasis added.)

The reporters had reached out to Didi for comment but "Didi said in response to questions that it doesn't comment on speculation and had no knowledge before the IPO of the regulator's decisions

to put the company under cybersecurity review and to ban new downloads of its ride-hailing app."[82] It is notable that Didi's carefully worded denial was issued *before* any news broke that Didi was instructed by the CAC not to go public before completing a cybersecurity review, suggesting Didi was attempting to get its version out to the public before the Wall Street Journal article published its story.

192.    On July 6, 2021, Didi's shares opened for trading at $11.78/share, down $3.75/share from the $15.53/share closing price on July 2 as a result of the adverse news reports on July 4 and 5. Didi's share price would have fallen further had the Underwriters not presumably intervened and engaged in market stabilizing transactions to keep Didi's share price up.[83]

193.    On July 6, 2021, at 9:30 a.m. New York Time, the South China Morning Post reported:[84]

> **Didi Chuxing 'forced its way' to a New York listing, triggering data security review, sources say**
>
> Didi Chuxing pushed ahead with its listing in New York before the Cyberspace Administration of China (CAC) had fully cleared the ride-hailing giant's data security concerns, forcing Beijing to put it under a national security review and kick it off the country's app stores, according to two people familiar with the situation.
>
> One regulatory source in Beijing, who is not directly involved in the case but was briefed on discussions, said Didi had "forced its way" to go public in New York without completing a thorough data security assessment by CAC, a necessary step for Beijing amid its enhanced scrutiny of data security.

---

[82] L. Wei & K. Zhai, "Chinese Regulators Suggested Didi Delay Its U.S. IPO," *The Wall Street Journal*, (July 5, 2021 2:43 pm EDT) (Exhibit 13).

[83] "Strategies for Going Public", Fifth Edition, *Deloitte & Touche LLP and Skadden, Arps, Slate, Meagher & Flom LLP*, pages 14 55, 90; Initial Public Offerings, an Issuers Guide, *Mayer Brown LLP*, 2017, pages 21, 25, 31. *See also* Registration Statement at page 261.

[84] "Didi Chuxing 'forced its way' to a New York listing, triggering data security review, sources say" (July 6, 2021) (Exhibit 10).

But as a data assessment is not yet an institutionalised part of the listing process, Didi was able to go ahead with its US listing plan without complete clearance from CAC, which would include conducting a full body check of disclosed information to see whether an initial public offering (IPO) might impair China's data security, the source added.

PRC government so upset with Didi's actions that "The ruling Chinese Communist Party and the State Council, the cabinet, issued a new policy guideline on Tuesday night, saying China will change its rules around the overseas listings of Chinese businesses and empower domestic regulators and watchdogs to have a say in their listing." …

A second source close to CAC, who requested anonymity as the information is private, said that the investigation into Didi is focused on whether there is a security risk of "important data and the personal information of Chinese citizens going abroad".

China published a cybersecurity review regulation last year and created an office within CAC to coordinate among 12 ministries, including the Ministry of Public Security and the Ministry of State Security, over cybersecurity reviews. …

CAC has also accused Didi of a severe violation of laws and regulations in its collection and use of consumer data.

According to a research note by Gavekal analysts Ernan Cui and Thomas Gatley, published on Monday, Didi employees have shared information on Chinese social media saying that the company was under pressure from the cybersecurity regulator to delay its initial public offering but proceeded anyway.

"If this is the case, and top leaders have been angered, the firm could face more investigations and penalties," they wrote.

194.    Didi's share price continued to decline over the next two trading days as the adverse news of CAC regulatory action was more fully evaluated by the market, and as the market received new information, as discussed below.

195.    For example, on July 7, 2021, at 4:23 a.m., CNBC reported that the Didi mini-program was removed for new users from Tencent's WeChat and Ant Group's Alipay super-apps, which have 1 billion and 900 million users, respectively. This was a significant blow to Didi,

whose app could be accessed through the two super apps without a user having to download the Didi app. Since neither super-app is an app store *per se*, it appears that the removal was not required. [85]

196.    Later on July 7, Dow Jones reported on the negative impact the CAC's penalties would have on Didi's business:[86]

> **Didi's China Probe Adds to Business Challenges at Home and Abroad**
>
> Didi hogged 96% of China's ride-hailing market in 2018, according to researcher Deloitte. In recent years, rivals have whittled that down to around 80% to 90%, according to Cherry Leung, an analyst at Sanford C. Bernstein in Hong Kong. She estimates that Didi could lose about 6 million new customer installs over the period of the data security investigation, assuming the probe lasts the standard duration of six weeks.
>
> "Many competitors are looking for the right opportunity to play offense," said Tu Le, managing director of advisory firm Sino Auto Insights. "Before this, Didi was a healthy company. Now, they are wounded."

197.    Similarly, on July 7, Reuters reported:

> Didi Global Inc fell for the third consecutive session on Wednesday after China ordered the app removed from mobile app stores as part of a broader crackdown on China-based companies with overseas listings.
>
> In its fifth day of trading as a U.S.-listed company, the stock was last down 4.2%, about 28% below its $16.65 offer price.
>
> "For Didi, the situation is bleak, but for Chinese companies preparing to list in the U.S. it may be even bleaker," said Samuel Indyk, senior analyst at uk.Investing.com.

198.    On July 7, Didi's share price closed down $0.58 /share or 4.6%.  On July 8, Didi's

---

[85] A. Kharpal, "Didi removed from WeChat and Alipay apps for new users in another big blow," *CNBC.com* (July 6, 2021) (attached hereto as Exhibit 22). It appears as if the CAC closed that loophole on July 9, calling for the removal of Didi from super-apps.

[86] L. Lin & C. Koh Ping, "Didi's China Probe Adds to Business Challenges at Home and Abroad," *The Wall Street Journal*, (July 7, 2021). Attached hereto as Exhibit 23.

share price closed down another $0.70/share or 5.9%.

199.    In total, the adverse news from July 2 through July 7, caused Didi's share price to

decline a total of $5.19/share from $16.40/share on July 1 to $11.21 on July 8 or 31.6%.

200.    On July 9, 2021, the *Wall Street Journal* published a report that said in pertinent

part:

> BEIJING—China ordered mobile app stores to remove 25 more apps operated by Didi Global Inc.'s China arm, saying the apps illegally collect personal data, escalating its regulatory actions against the ride-hailing company.
>
> The apps newly targeted on Friday include Didi's app for drivers offering rides through its platform, an app for corporate users and a financing app. On Sunday, the Cyberspace Administration of China ordered mobile stores to remove Didi's main app in China.
>
> The cyber watchdog also banned websites and platforms from providing access to Didi-linked services in China, according to the watchdog's statement. Users who had already downloaded Didi's apps appeared unaffected
>
> *       *       *
>
> The latest regulatory actions could further dent Didi's business in its home market, which the company relies heavily on for revenue even as it expands into overseas markets.

By ordering the removal of apps used by drivers, the CAC made it impossible for new

drivers to sign up with Didi. Now Didi could add neither new users nor new drivers.

201.    On the next trading day, July 12, 2021, at 5:40 a.m. New York time, Didi issued

the following press release:

> BEIJING--(BUSINESS WIRE)--July 12, 2021
> Didi Global Inc. ("Didi" or the "Company") (NYSE: DIDI), the world's leading mobility technology platform, today announced that: According to the announcement posted by the Cyberspace Administration of China (the "CAC") on July 9, 2021, the CAC stated that it was confirmed that 25 apps operated by the Company in China, including the apps used by users and drivers, had the problem of collecting personal information in serious violation of relevant PRC laws and regulations. Pursuant to the PRC's Cybersecurity Law, the CAC notified app stores to take down these apps and cease to provide viewing and downloading service in China, and required the Company to strictly comply with relevant laws and

regulations, follow the relevant standards set by the PRC government authorities, and rectify the problem to ensure the security of users' personal information. ***The Company expects that the app takedown may have an adverse impact on its revenue in China***.

202.    On July 12, as a result of Didi's July 12 press release, indicating that the CAC's order to remove 25 additional apps from all app stores may have an adverse impact on revenues, Didi's share price opened lower at $11.73/share, down $0.30/share from the prior closing price. As the market continued to digest this adverse information, Didi's share price continued to decline on July 12 reaching a low of $11.12/share before closing at $11.16/share, down $0.87/share or 7.2% from its July 9 closing price of $12.03/share.

203.    On July 16, media reported that officials from seven government agencies – including, in addition to the CAC, such varied ministries as Natural Resources, Transport, and Taxation – raided the offices of Didi Global.[87] The Ministry of Public Security is in charge of China's domestic security, while the Ministry of State Security oversees China's civilian arm for intelligence gathering and counter-espionage. The *Wall Street Journal* reported that: "their participation signals the potentially serious nature of the investigation. Potential outcomes include financial penalties, suspensions of business licenses and criminal charges." Notably, personnel from the Ministries of State Security and Public Security were stationed inside of Didi's offices. The raid signaled to the market the serious and wide-ranging nature of the cybersecurity review resulting from Didi's failure to follow the CAC's directive to postpone its IPO.[88]

204.    On this news, Didi's share price declined from a closing price of $12.37 on July 15

---

[87] L. Lin, "China Sends State Security, Police Officials to Didi for Cybersecurity Probe," *Wall Street Journal* (July 16, 2021). Attached hereto as Exhibit 24.

[88] In addition to the cybersecurity review, the investigation also focused upon determining who at Didi was responsible for the decision to defy the CAC and moved forward with the IPO on June 30, 2021.

to a closing price of $11.97/share on July 16 and then to a closing price of $11.06/share the next

trading day, July 19—marking a 2-day decline of over 10.5%.

205.    On July 22, 2021, at 5:44 a.m. New York time, *Bloomberg News* reported:

Chinese regulators are considering serious, perhaps unprecedented, penalties for Didi Global Inc. after its controversial initial public offering last month, according to people familiar with the matter.

Regulators see the ride-hailing giant's decision to go public despite pushback from the Cyberspace Administration of China as a challenge to Beijing's authority, the people said, asking not to be named because the matter is private.

***

Regulators are weighing a range of potential punishments, including a fine, suspension of certain operations or the introduction of a state-owned investor, the people said. Also possible is a forced delisting or withdrawal of Didi's U.S. shares, although it's unclear how such an option would play out.

… Beijing is likely to impose harsher sanctions on Didi than on Alibaba Group Holding Ltd., which swallowed a record $2.8 billion fine after a months-long antitrust investigation and agreed to initiate measures to protect merchants and customers, the people said.

***

Regulators urged Didi to ensure the security of its data before proceeding with the IPO or to shift the location to Hong Kong or mainland China where disclosure risks would be lower, the people said. Regulators didn't explicitly forbid the company from going public in the U.S., but they felt certain Didi understood the official instructions, they said.

One person involved in the meetings, when asked why Didi didn't act on suggestions from regulators, referred to a proverb that you can't wake a person pretending to sleep.

***

Some regulatory officials expressed in private that they think Didi may have rushed its IPO out before China unveiled a new web security law, which could have hurt its valuation, one of the people said.

206.    On this July 22 news, Didi's shares opened at $10.86/share, down $0.64/share from

the prior day's close.  Didi's share price continued to decline on this adverse news reaching a low

of \$10.17/share before closing at \$10.20/share, down \$1.30/share or 11.3% from the prior day's close. On July 23, 2021, Didi's share price opened at \$8.98/share, down \$1.22/share from the prior day's closing price. Didi's share price continued to drop during trading hours on July 23, reaching a low of \$7.93/share and closing that day at \$8.06/share for a two-day decline of 29.9%.

207.    On September 20, 2021, at 10:46 a.m. New York Time, Dow Jones reported that "The founder and president of Didi Global reportedly has told some close associates that she intends to step down as the Chinese ride-hailing giant has rankled regulators since going public in June."

208.    This adverse news that Didi might lose its Co-founder and President because of Didi's failure to follow the CAC's Directive to postpone its IPO caused Didi's share price to drop \$0.55/share or 6.6% on September 20.

209.    On December 3, 3021, under intense pressure from the CAC and other PRC regulators resulting from Didi going forward with its IPO despite the CAC's Directive, Didi announced that it would delist its shares from NYSE and relist on the Hong Kong Exchange. On this news, Didi's share price declined \$1.73/share or 22.2% from the prior day's close.

210.    After the market closed on December 29, 2021, Didi reported its operating results for the second and third quarters of 2021. The impact of the CAC's ongoing investigation resulted in a lot of red ink: revenues dropped 11.5% as between the second and third quarter; Didi's loss for the quarter was \$4.7 billion; and the company burned \$2.1 billion in cash in six months.

211.    Today, Didi's ADSs now trade at \$4.50/share, a far cry from the IPO price of \$14 just six months ago.

### D.    Section 10(b) Allegations Against Didi Only

212.    The Registration Statement failed to disclose the Omitted Facts.

213.    Didi had a duty under Reg. S-K, Items 105 and 303/5(D), to disclose the Omitted Facts in the Registration Statement.

214.    Item 408 of Regulation C creates a duty for registrants to supply non-misleading registration statements. It states: "In addition to the information expressly required to be included in a registration statement, there shall be added such further information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 230.408.  Didi had a duty under Item 408 to disclose the Omitted Facts.

215.    Prior to the Effective Date, Didi and the Officer Defendants knew or recklessly disregarded that the CAC had directed Didi not to conduct an IPO in the United States until it had completed a thorough self-examination of its business, operations and policies to ensure compliance with all applicable laws and regulations concerning national security, network security, data security, and/or the collection and protection of private personal information, and to rectify any violations, to the CAC's satisfaction.

216.    Didi and the Officer Defendants also knew or recklessly disregarded the certain danger that the CAC and/or other PRC governmental agencies would impose harsh regulatory penalties against Didi that would seriously disrupt its business, and adversely impact Didi's financial performance and condition, and harm its reputation if Didi ignored the CAC's Directive.

217.    Didi and the Officer Defendants knew, or were severely reckless in not ascertaining, that Didi had an affirmative duty to disclose in the Registration Statement the Omitted Facts.

218.    Didi concealed this material adverse information from investors, omitted it from the Registration Statement, and disobeyed the CAC's Directives, causing the CAC to take

regulatory action that damaged Didi and caused its stock price to decline.

E.    **Section 10(b) Allegations Against the Underwriters and Didi Only**

219.    On July 2, 2021, having learned sometime between hours of 6:00 a.m. (when CAC informed Didi that it was imposing penalties) and 8:09 a.m. when Bloomberg news reported that the CAC was punishing Didi by banning it from taking on any new customers, and that it was subjecting Didi to a cybersecurity review, the Underwriters had the opportunity to cancel the IPO and return investors their funds.

220.    Prior to closing, as a condition precedent for the Underwriters to close the transaction and wire Didi the $4.4 billion in IPO funds, Didi, through its PRC counsel and U.S. counsel were required to provide the Underwriters with certain negative assurance letters, and in the case of Cheng, Liu and Zhuo, officer certificates, attesting that no material adverse event or omission to state a material fact existed, and that all of Didi's representations and warranties in the underwriting agreement were true and accurate as of the closing time.

221.    Didi, Cheng, Liu and Zhuo knew that they were required to provide officer certificates and negative assurances to the Underwriters as a condition of closing stating that they were not aware of any material adverse events, or government regulatory actions that would negatively impact Didi's business.  Didi, Cheng, Liu and Zhuo were under a duty to diligently investigate the reasons for the CAC's harsh actions on July 2 prior to closing.  Didi, Cheng, Liu and Zhuo knew or were reckless in not diligently investigating the reasons for the CAC's commencement of a cybersecurity review and banning new user registrations when the CAC contacted Didi at 6:00 a.m. on July 2 prior to closing.

222.    The Underwriters went forward and closed the IPO knowing at a minimum that Didi had, prior to the IPO closing on July 2, suffered a material adverse event, namely, the CAC

halting new user registration on Didi's platform and had commenced a cybersecurity review of Didi. Upon information and belief, Didi and the Officer Defendants delivered true and accurate officer certificates and negative assurance letters to the Underwriters at the closing informing the Underwriters that the Registration Statement omitted material facts, namely, that prior to the Effective Date, the CAC had issued the CAC Directives to Didi. These regulatory actions constituted serious governmental interference with Didi's ability to conduct its business, including the IPO, and the Underwriters knew or were reckless in not knowing that Didi's business, financial performance, and reputation would suffer a material loss that would surely impact its share price. Indeed, by the time the market opened on July 2, Didi's share price had already declined 8.8% as a result of this adverse news.

223. If Didi, Cheng, Liu and Zhuo did not diligently investigate and/or explain to the Underwriters the reason for the CAC's halting new user registration and placing it under cybersecurity review, Didi, Cheng, Liu and Zhuo's scienter is heightened further because of their continued concealment of the truth in the face of the CAC's harsh regulatory actions on July 2.

224. The Underwriters were under a duty to diligently investigate the reasons for the CAC's harsh actions on July 2 prior to closing. The Underwriters either learned the Omitted Facts prior to closing or they were reckless in not diligently investigating and learning the Omitted Facts, (*i.e.*, the reasons for the CAC's imposing a cybersecurity review and banning new user registrations) during the bring down due diligence call and in the review of the negative assurance letters and officer certificates as part of the closing process on July 2 and prior to closing the IPO.

225. If Didi, Cheng, Liu and Zhuo provided true and accurate negative assurance letters and officer certificates and told the truth to the Underwriters in the bring down due diligence call (or the Underwriters had already been aware of the Omitted Facts prior to the morning of July 2),

then the Underwriters knew or were reckless for not knowing that the CAC was furious with Didi for disobeying the CAC Directive and that even harsher penalties against Didi were likely to follow. Thus, the Underwriters' scienter is even greater for going forward with the IPO.

F.    **Insider Trading Allegations Against Didi and the Underwriters Only**

226.    Didi and the Underwriters had a duty under 17 C.F.R. §240.10b5-1 – Trading on material non-public information to ensure that Didi and the Underwriters disclosed the Omitted Facts in the Registration Statement.

227.    As the sellers of $4.4 billion of stock in the IPO, Didi and the Underwriters had a duty to either (a) refrain from selling stock in the IPO, or (b) to disclose in the Registration Statement the Omitted Facts.

228.    Didi and the Underwriters sold Didi shares at the time of the IPO and Plaintiffs and Class Members purchased Didi shares contemporaneously with Didi and the Underwriters' sale of Didi shares.

229.    Didi and the Underwriters made substantial profits from their sale of Didi shares contemporaneous with Plaintiffs and Class Members' purchases.

G.    **Additional Scienter Allegations**

230.    Xi Jinping is the paramount leader that dictates the law and policies in China. As such, as the global media has widely reported, it is reasonably foreseeable that defying Xi's directives will result in severe punishment to one's person or business. Didi's senior management – one of whom rose quickly to join the top ranks at both Alibaba and Alipay and the other a Harvard-educated, 12-year veteran of Goldman Sachs (and whose father founded Lenovo) – clearly knew or should have known that not following the CAC's Directives would result in substantial regulatory penalties.

231.    Careful to not run afoul of national, provincial, or local authorities, Didi maintains an enormous government affairs team of over 200 persons skilled in navigating the complexities of PRC government policies. This dedicated team, in addition to senior representatives of tech giants  Alibaba and Tencent serving on Didi's board of directors, would surely have understood the government's policies on cybersecurity as it relates to Didi going public in the U.S.[89]

232.    The Chairman and CEO of Alibaba, Defendant Zhang, who until December 29, 2021, served on Didi's board, knew from personal experience exactly what could happen if a company conducted an IPO without disclosing regulatory issues.  In 2015, it was revealed that two months prior to Alibaba's 2014 IPO, at which time Zhang served as the company's COO, Alibaba met with the State Administration for Industry and Commerce about numerous violations of law on its web platforms, including the sale of illegal and counterfeit items. The incident resulted in severe administrative guidance in China and a record-setting securities class action in the U.S.

233.    Prior to Didi's IPO, Zhang is reported to have "advised Didi Chairman Will Cheng and President Jean Liu—who also sit on the eight-member board—against rushing to go public in the midst of China's wide-ranging regulatory crackdown on the business practices of dozens of internet-technology companies."[90]  Cheng and Liu not only ignored the advice, but had not informed board-member Zhang of the CAC's directive prior to the IPO.

234.    Didi was motivated to conceal the Omitted Facts because it wanted to receive the

---

[89] "How Didi's govt relations team navigated myriad regulators, until IPO dustup," *Reuters*, (July 20, 2021 6:20 a.m. EDT) (Exhibit 7).

[90] J. Yang, "Rift Form's on Didi's Board Following Beijing's Regulatory Assault," *The Wall Street Journal* (Aug. 18, 2021) (Exhibit 17).  The article confirms an earlier report in the *South China Morning Post* "that the Tencent and Alibaba executives advised Didi to defer its New York listing." *See* "China's probe into ride hailing giant Didi Chuxing may lead to management reshuffle, sources say," *South China Morning Post* (Aug. 11, 2021) (Exhibit 15).

$4.4 billion in IPO proceeds.  If it had postponed its IPO, the window for China-based issuer IPOs in the U.S. may very well have closed because Didi would not be able to come into compliance with existing network and data security laws and personal user data protections prior to the effective dates of the more stringent DSL and PIPL and/or more restrictive U.S. laws applicable to China-based issuers.  In fact, only one of 17 IPOs in process at the time the CAC came down on Didi proceeded to a listing. There had been 34 listings of China-based issuers during the first half of 2021.

235.    Cheng and Liu were motivated to conceal the Omitted Facts because their stake in Didi became worth $4.4 billion and $1.1 billion respectively.  The lock-up period for their shares ended on December 28, 2021, and Cheng, Liu and other Didi insiders may now sell their shares publicly.

236.    In 2017, Didi granted $3 billion (USD) in stock options to its senior executives and directors, equivalent to 66.7 million shares, pursuant to an equity incentive plan. Didi did not identify the individual recipients of the options, which had already vested as of the date of Didi's IPO.[91]

237.    That PRC regulators were, as part of their investigations, interviewing Didi employees and other to ascertain the persons responsible for Didi's decision to force its way to list in New York, contrary to the Chinese regulators' verbal instructions, which officials characterized as a "deliberate act of deceit" shows that the CAC believes that its instructions to Didi were loud and clear and Didi was fully aware of CAC's directive to postpone the IPO until it had completed a thorough self-examination of its operations and policies to ensure compliance with all applicable

---

[91]  "China's probe into ride hailing giant Didi Chuxing may lead to management reshuffle, sources say, *South China Morning Post* (Aug. 11, 2021) (Exhibit 15).

laws and regulations concerning national security, network security, data security, and/or the collection and protection of private personal information, and to rectify any violations, to the CAC's satisfaction.  That Didi misled CAC to believe it would follow CAC's directive, and instead rushed through its IPO, further shows Didi's scienter.

238.    The Underwriters scienter is further established because they went forward with closing the IPO when they had a chance, upon learning of the material adverse events between 6:00 am and  8:09 a.m. on July 2, 2021, to cancel the IPO prior to its closing.

239.    The Underwriters were motivated to go forward with the IPO in face of the material adverse penalties imposed by CAC because they wanted to receive $90 million in underwriting fees.

240.    In addition, the Underwriters likely believed the costs of an investor lawsuit stemming from the IPO was less than costs to the Underwriters if they attempted to cancel the IPO and unwind the transactions. The underwriting agreement requires that Didi indemnify the Underwriters, so the Underwriters faced no serious financial liability for going forward with the IPO.

241.    "The [Underwriter's] silence on Didi Global Inc. is speaking volumes as its stock fluctuates well below last month's initial public offering price. A 25-day quiet period expired on [July 19]  for U.S. analysts at the banks that took Didi public on June 30. The milestone that typically prompts a wave of new, bullish research instead left traders wondering where to turn for more insight around the impact of China's broadening regulatory crackdown that began with the ride-hailing giant."[92]

---

[92]  D. Singer, "Didi's IPO Underwriters Go Silent as Volatility Dominates," *Bloomberg* (July 26, 2021). Attached hereto as Exhibit 25.

242.    That the Underwriters have refused to issue any research reports or make any public statements concerning Didi following its $4.4 billion IPO is unprecedented and supports the inference that the Underwriters sought to avoid drawing attention to their reckless decision to allow Didi to complete the IPO.

243.    The Underwriters and Didi were also motivated to go forward and close the IPO on July 2,  after Defendants learned that the CAC had prohibited Didi from registering new users because the lead underwriters Goldman Sachs, JPMorgan, Morgan Stanley, HSBC, Citigroup and Barclays had arranged a $1.5 billion revolving loan facility to Didi in April of 2021 with the expectation that Didi would have the $4.4 billion in proceeds from the IPO to service the loan.[93] Without the IPO proceeds, the loans from the Underwriters could be in jeopardy of default.

### H.    Presumption of Reliance Under *Affiliated Ute*

244.    In pursuing their Securities Exchange Act claims under Section 10(b), 20(a) and 20A, Plaintiffs are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants had a duty to disclose the Omitted Facts, that the Omitted Facts were material to investors, and that the omission of such information damaged the Class

### COUNT I
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Against Didi and the Underwriters

245.    Plaintiffs repeat and reallege every allegation contained above as if fully set forth herein.

---

[93] Q. Tong, L. Caiping, Y. Ruiyang, G. Cong, Q. Yunxu, L. Meihan & D. Jia, "Cover Series: How SoftBank's $11 Billion Bet on Didi Turned Sour (Part 2), *Caixin Global* (July 12, 2021) (attached hereto as Exhibit 26); M. Baigorri & V. Chan, "China's Didi Raises $1.5 Billion in Debt Ahead of IPO," *Bloomberg News* (April 9, 2021).

246.     This Count is asserted against Didi and the Underwriters for violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

247.     During the Class Period, Didi and the Underwriters drafted the Registration Statement and disseminated it to the Class.

248.     In violation of the above-described affirmative duties of disclosure, the Registration Statement omitted to disclose: (i) the CAC instructed Didi to postpone its IPO until Didi had completed a thorough self-examination of its business, operations and policies to ensure compliance with all applicable laws and regulations concerning national security, network security, data security, and/or the collection and protection of private personal information, and to rectify any violations, to the CAC's satisfaction; and (ii) Didi faced a high risk that CAC would impose harsh penalties against Didi that could harm its business, financial performance and reputation if it went forward with its IPO against the CAC's instructions.

249.     There are three separate theories of liability under Section 10(b) and Rule 10b-5.

**1.     Liability Against Didi for Not Disclosing that the CAC Had Directed Didi to Postpone the IPO Until It Had Fully Complied with the CAC Directives**

250.     Prior to the Effective Date, Didi knew or recklessly disregarded that the CAC had directed Didi not to conduct an IPO in the United States until it had completed a thorough self-examination of its business, operations and policies to ensure compliance with all applicable laws and regulations concerning national security, network security, data security, and/or the collection and protection of private personal information, and to rectify any violations, to the CAC's satisfaction. Didi knew or recklessly disregarded the risk that the CAC and/or other PRC governmental agencies would take strong regulatory actions against Didi that would seriously disrupt its business if Didi ignored its directive to delay the IPO.

251.    Didi knew, or was severely reckless in not ascertaining, that Didi had an affirmative duty to disclose in the Registration Statement the Omitted Facts.

252.    Didi concealed this material adverse information from investors, omitted it from the Registration Statement, and caused Didi to disobey the CAC's Directives, causing the CAC to take regulatory action that damaged Didi and caused its stock price to decline.  Didi thus violated Section 10(b)(2).

**2.    Liability Against Didi and Underwriters for Closing the IPO and Delivering the ADSs Knowing that the CAC Had Imposed Penalties Against Didi that Would Have a Material Adverse Impact on its Business**

253.    The Underwriters learned sometime between 6:00 a.m. and 8:09 a.m. New York time on July 2, 2021 that: (1) the CAC had ordered Didi not to accept any new customers and had commenced a cybersecurity review, and (2) these penalties would have a material adverse impact on Didi's business and financial performance. The Underwriters were not irrevocably committed to selling Didi' shares to investors in the IPO.  In reckless disregard of the material adverse effect the CAC penalties would have on Didi, the Underwriters went forward and closed the IPO during business hours on July 2, 2021, even though the Underwriters had the legal right under the underwriting agreement to cancel the IPO because of this material adverse event.

254.    The Underwriters violated Section 10(b) by closing the IPO when they had a chance, after learning of the material adverse events and that the Registration Statement omitted material facts, in the early morning on July 2, 2021, to cancel the IPO prior to its closing. Instead, the Underwriters went forward with the IPO knowing that the Registration Statement omitted material facts and that Didi had incurred, and might further incur, material regulatory penalties that would adversely impact its business, and financial results and cause a substantial decline in Didi's share price.

255.    By purchasing from Didi and selling to investors Didi ADSs on July 2, 2021, the Underwriters (i) violated Section 10(b)(2) because the Registration Statement omitted material facts, and (2)  engaged in an act or course of business which operated as a fraud or deceit on investors.

256.    Investors would not have purchased Didi ADSs had they known that the Underwriters had a contractual basis not to accept the shares due to the occurrence of a material adverse event between the effective date and the closing but did not avail themselves of that contractual right. By completing the closing and delivering the shares, the Underwriters defrauded and/or deceived investors who purchased shares whose true value was less than the initial public offering price.

257.    When the omitted adverse facts were revealed to the market in a series of news reports, Didi's share price immediately declined as a consequence.

258.    Didi is liable for the acts of the Defendants Cheng and Liu and Didi's other officers and employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

259.    The scienter of Defendants Cheng, Liu, Zhu and Zhuo and other Didi employees and agents is similarly imputed to Didi under *respondeat superior* and agency principles.

### 3. Section 10(b) and Rule 10(b)(5) Liability for Insider Trading Against Didi and the Underwriters

260.    Didi, through its officers and employees, was in possession of material non-public information at the time it sold shares in the IPO.

261.    Didi, through the Underwriters sold shares to investors in the IPO while in possession of material non-public information.

262.    The Underwriters were in possession of material nonpublic information at the time the Underwriters sold Didi shares to investors in the IPO.

263.    The Underwriters had the legal right not to close the IPO because the closing conditions had not been satisfied. The Underwriters were not irrevocably committed to selling Didi' shares to investors in the IPO. The Underwriters had the ability to cancel the IPO and avoid trading on inside information.

264.    Didi and the Underwriters are liable to all persons purchasing Didi shares contemporaneously with Didi and the Underwriters' sale of ADSs in the IPO.

**As to All Section 10(b) Claims**

265.    By reason of the foregoing, Didi and the Underwriters have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and members of the Class for substantial damages which they suffered in connection with their purchases of Didi's ADSs during the Class Period.

266.    This action was filed within five years of each Class member's purchase of Didi ADSs and within two years of the discovery of the Defendants' fraudulent statements.  It is therefore timely.

**COUNT II**
**Violation of Section 20A of The Exchange Act**
**Against DIDI and Underwriters**

267.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

268.    This count is against Didi and the Underwriters for insider trading violations of Section 20(A).

269.    Didi and the Underwriters violated Section 10(b)'s prohibitions against insider

trading.

270.    Didi, through its officers and employees, was in possession of material, nonpublic information at the time Didi sold shares in the IPO.

271.    The Underwriters were in possession of material nonpublic information at the time the Underwriters sold Didi shares to investors in the IPO.

272.    The Underwriters had the legal right not to close the IPO because the closing conditions had not been satisfied. The Underwriters were not irrevocably committed to selling Didi' shares to investors in the IPO.  The Underwriters had the ability to cancel the IPO and avoid trading on inside information.

273.    Each of the Plaintiffs purchased Didi ADSs contemporaneously with the sales by Didi and the Underwriters, as set forth in each Plaintiff's PSLRA Certification form filed with the Court, which are incorporated by reference herein.

274.    Plaintiffs and Class members who purchased shares of Didi ADSs contemporaneously with sales by Didi and the Underwriters suffered damages.

275.    This action was filed within five years of each Class member's purchase of Didi ADSs contemporaneous with Didi's and the Underwriters' sales of ADSs in the IPO and is therefore timely.

## COUNT III
### Violation of Section 20(a) of The Exchange Act
### Against Cheng and Liu

276.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

277.    At all relevant times, Cheng and Liu were in the senior most management positions of control and did control, Didi.  Cheng was Founder, Chairman of the Board and CEO of Didi.

Liu was Co-Founder, Director and President of Didi. Cheng and Liu also controlled Didi through their ownership of Didi shares and their voting control over Didi.[94]

278.    Cheng and Liu knew, or were severely reckless in not knowing, the Omitted Facts.

279.    Cheng and Lieu knew or were severely reckless in not knowing that Didi had an affirmative duty to disclose in the Registration Statement the Omitted Facts.

280.    Cheng and Liu knew, or were severely reckless in not ascertaining, that Didi was selling shares in the IPO while in possession of material non-public information. Didi had a duty to either postpone or cancel the IPO or to disclose the Omitted Facts.

281.    Didi violated Sections 10(b) and 20A. Cheng and Liu culpably participated in Didi's violation of Sections 10(b) and 20A.

282.    This action was filed within five years of each Class member's purchase of Didi ADSs and within two years of the discovery of the Defendants' fraudulent statements.

## IX.    SECURITIES ACT CLAIMS

283.    The claims alleged in this Section are based on principles of negligence and strict liability only. Only the allegations in paragraphs 1 through 137 above are realleged in this section pertaining to the Securities Act claims and only such paragraphs apply to the Securities Act Claims.

284.    None of the preceding allegations in the Complaint in paragraphs 138 through 282 that are set forth in the Class's claims under Sections 10(b), 20(a), and 20(A) of the Securities Exchange Act of 1934 apply to these Securities Act claims.

---

[94] Cheng's and Liu's control over Didi through their positions, and their share ownership and voting control is described in detail in the Registration Statement and is incorporated by reference herein.

A.    **Summary of Allegations Pertaining to the IPO**

285.    In the weeks leading up to the IPO, the CAC met in person with Didi and directed Didi to postpone its IPO in the United States until after Didi had completed a thorough self-examination of its business, operations and policies to ensure compliance with all applicable laws and regulations concerning national security, network security, data security, and/or the collection and protection of private personal information, and to rectify any violations, to the CAC's satisfaction.[95]

286.    As *The Wall Street Journal* explained:[96]

> **The Chinese officials urged the company to postpone the share sale** because Beijing was concerned that IPO documents required by U.S. regulators could have sensitive information and data it didn't want U.S. authorities to have.

> **The officials made clear to Didi**, according to the two people, **that the government** didn't intend to block the IPO, but **wanted the company to wait until it had carried out the proper security checks** and made sure the documents it would present to the U.S. regulators contained no sensitive information.

---

[95]  The CAC's instructions to Didi to postpone the IPO were independently reported in numerous international media. *See* J. Yang, K. Zhai & C. Driebusch, "Didi Tried Balancing Pressure From China and Investors. It Satisfied Neither," *The Wall Street Journal* (Jul. 9, 2021) (Exhibit 9); C. Feng, C. Pan, M. Hu & Z. Xin, "Didi Chuxing 'forced its way' to a New York listing, triggering data security review, sources say," *South China Morning Post* (July 6, 2021) (attached hereto as Exhibit 10); H. Lockett, T. Kinder, S. Yu, C. Shepherd, Y. Yang & J. Franklin, "Didi Caught As China And US Battle Over Data," *Financial Times* (July 6, 2021) (attached hereto as Exhibit 11); Bloomberg News, "China Weighs Unprecedented Penalty for Didi After U.S. IPO" *The Japan Times* (July 22, 2021, 5:44 AM EDT, Updated on July 22, 2021, 4:22 PM EDT) (attached hereto as Exhibit 12); L. Wei & K. Zhai, "Chinese Regulators Suggested Didi Delay Its U.S. IPO," *The Wall Street Journal* (July 5, 2021 2:43 pm ET) (attached hereto as Exhibit 13);  Nearly all of the many news reports on this point state the meeting between Didi and the CAC occurred "weeks" or in the "weeks" before the IPO. One source—a former director of the Publicity Department of the Central Committee of the CPC and currently an executive at a Chinese internet company—identifies June 21, 2021 as the specific date of the meeting, "*Interpretation on the Didi Incident*", an analysis circulated internally in Huaxi Securities, a Chinese investment bank. https://drive.google.com/file/d/18diceb2XXdsQG4tofHmTvGRxO8t1aWUY/view.

[96]  "Didi Tried Balancing Pressure From China," *The Wall Street Journal* (Jul. 9, 2021) (Exhibit 9).

The officials also wanted to address the issue of audit working papers, the two people said . . . Audit materials could contain raw data such as meeting logs, user information and email exchanges between the company and government agencies, among other things.

One person close to the company said Didi hasn't handed anything sensitive to U.S. regulators to date. ***Chinese officials, however, argue that it is for regulators, not the company, to decide what is sensitive.*** In China, the ride-hailing company is classified by law as a "critical infrastructure provider," language that signals national-security sensitivities.

Beijing's suggestion that Didi delay its IPO left the company having to decide whether to comply with U.S. or Chinese priorities.

Didi signaled to regulators that it would consider the request, and that it wouldn't be a problem to postpone the listing if needed, say people familiar with its communications with regulators.  (Emphasis supplied.)

287.    *Bloomberg* similarly reported on July 6, 2021, that "Chinese regulators asked Didi as early as three months ago to delay its landmark U.S. IPO because of national security concerns involving its huge trove of data, according to people familiar with the matter."[97]

288.    Another report, in the *South China Morning Post* confirmed a meeting between the CAC and Didi in Beijing. Meetings such as these are not always highly formal, but although the format of the CAC's meeting with Didi may have "produced no written records," there is no mistaking the message being given: "For the CAC, such sit-down discussions … constituted channels to formally deliver the regulator's instructions, with no room for defiance."[98]

---

[97]  China Cyber Watchdog Asked Didi to Delay IPO on Data Concern," *Bloomberg News* (July 6, 2021).    https://www.bloomberg.com/news/articles/2021-07-06/didi-slumps-after-china-regulators-order-stores-to-remove-app. Attached hereto as Exhibit 20.

[98]  M. Hu, M. Borak, C. Zhou, & Z. Xin, "China's regulators suspect Didi's US listing was 'deliberate act of deceit', a portrayal that shows severity of mistrust, sources say," *South China Morning Post* (July 9, 2021) ("Didi's US listing was 'deliberate act of deceit'") https://www.scmp.com/tech/policy/article/3140471/chinas-regulators-suspect-didis-us-listing-was-deliberate-act-deceit. Attached hereto as Exhibit 14.

289.    The CAC believed that Didi had agreed to comply with the CAC's Directive and would postpone its IPO.[99]

290.    Didi did not follow the CAC's directive. Instead, it conducted its $4.4 billion IPO on June 30, 2021.

291.    After the IPO, Didi employees shared information on Chinese social media saying that Didi was under pressure from the CAC to delay its initial public offering but proceeded anyway.[100]  Similarly, the *Financial Times* reported that "one person close to Didi acknowledged that the company had been advised by the CAC to delay its listing until it had conducted a data security review".[101]

292.    "Some officials have privately described Didi's move as *yang feng yin wei* – to comply publicly but defy privately – according to a source who was briefed, speaking on condition of anonymity for describing confidential discussions."[102]

293.    Chinese officials described Didi's actions as "forcing its way" to a listing on the NYSE against specific instructions to postpone the IPO until it had completed a through data security assessment by CAC, a necessary step for Beijing amid its enhanced scrutiny of data

---

[99]  M. Hu, M. Borak, C. Zhou & Z. Xin, "China's regulators suspect Didi's US listing was 'deliberate act of deceit', a portrayal that shows severity of mistrust, sources say," *South China Morning Post*  (July 9, 2021) (Exhibit 14).

[100]  C. Feng, C. Pan, M. Hu & Z. Xin, "Didi Chuxing 'forced its way' to a New York listing, triggering data security review, sources say, *South China Morning Post* (July 6, 2021) ("Didi Forced Its Way") (Exhibit 10) (citing a July 5 research note by Gavekal's Ernan Cui and Thomas Gatley).

[101] "Didi Caught As China And US Battle Over Data," *Financial Times* (July 6, 2021) (Exhibit 11).

[102]  M. Hu, M. Borak, C. Zhou, & Z. Xin, "China's regulators suspect Didi's US listing was 'deliberate act of deceit', a portrayal that shows severity of mistrust, sources say," *South China Morning Post* (July 9, 2021) (Exhibit 14).

security.[103,] According to an anonymous source close to CAC, the focus of the CAC's concern with the Didi IPO was that there was a potential security risk of "important data and the personal information of Chinese citizens going abroad." *Id*.

294.    In the aftermath, Chinese officials said they were quite certain that Didi understood their instructions to postpone its IPO until it had ensured the security of its data.[104]

295.    On June 30, 2021, the Underwriters offered 316.8 million shares at $14.00 per share for total proceeds of $4.4 billion (including the overallotment option) in the IPO.

296.    On June 30, Didi issued a terse press release announcing the IPO and stating that "[t]he closing of the offering is expected to occur on July 2, 2021, *subject to the satisfaction of customary closing conditions*." (Emphasis added.)

297.    On July 2, at 6:00 pm Beijing time (6:00 a.m. New York Time), the CAC contacted Didi senior management and warned them that in one hour the CAC would publicly order Didi to stop signing up new users and place it under cybersecurity review.[105]  The punishment was in response to Didi's refusal to comply with the CAC's Directives.  This punishment would have major financial consequences to Didi because it could no longer take on new customers, halting all growth and giving its competitors a chance to take new and existing customers and drivers away from Didi.

---

[103] "China's probe into ride hailing giant Didi Chuxing may lead to management reshuffle, sources say*," South China Morning Post*  (Aug. 11, 2021) (Exhibit 15).

[104]  "China weighs unprecedented penalty for Didi after US IPO," *Bloomberg* (July 22, 2021) (Exhibit 12).

[105]  "Didi Caught As China And US Battle Over Data", *Financial Times* (July 6, 2021) (Exhibit 11).

298.     At 7:19 pm Beijing time on July 2 (7:19 a.m. Eastern Daylight Savings time), the CAC posted a notice on its website that "In order to prevent national data security risks, safeguard national security and protect public interests, in accordance with the National Security Law of the People's Republic of China and the Cyber Security Law of the People's Republic of China, the Cyber Security Review Office will conduct a cyber security review on Didi Chuxing pursuant to the Cyber Security Review Measures. During the review, Didi Chuxing will halt new user registration in order to cooperate with the cyber security review and prevent further risks." The CAC also announced that Didi was no longer permitted to accept new user registrations.

299.     Before U.S. markets opened for trading on Friday, July 2, 2021, a number of prominent news outlets reported the CAC's actions against Didi:

> (a)     CNBC reported this news at 7:44 a.m. New York time.

> (b)     At 7:55 a.m. (New York Time), Reuters reported "China's cyberspace administration said on Friday it has launched a new investigation into ride-hailing giant Didi Global Inc to protect national security and the public interest."

> (c)     At 8:09 a.m. New York Time, *Bloomberg News* reported:

>> *Didi Dives as China Unveils New Cyber Probe After Mega IPO*

>> Didi Global Inc. tumbled Friday after China said its starting a cybersecurity review of the ride-hailing company just two days after it pulled off one of the biggest U.S. stock market debuts of the past decade.

>> The move is to prevent data security risks, safeguard national security and protect public interest, according to a statement from the Cyberspace Administration of China. Didi has halted new user registrations during the probe.

300.    By 8:51 a.m. on July 2, 2021, *Marketwatch* reported that Didi said it will fully cooperate and examine its risks."[106]

301.    When the news broke before 8:00 a.m. in New York, the IPO had not yet closed. Closing for the transaction was set for later that day on July 2.  The underwriting agreement contained the standard closing conditions that the Underwriters could cancel the transaction and not close if: (i) a material adverse event occurred, (ii) the Registration Statement omitted a material fact as of the closing, (iii) issuer's counsel did not provide satisfactory negative assurance letters, or (iv) Didi's officers didn't provide satisfactory officer certificates attesting to no material adverse events, including regulatory actions, as of the closing.[107]

302.    As disclosed in the Registration Statement, "[t]he underwriters are offering the ADSs subject to their receipt and acceptance of the ADSs and subject to prior sale. The underwriting agreement provides that the obligations of the several underwriters to pay for and accept delivery of the ADSs offered by this prospectus are subject to the approval of certain legal matters by their counsel and to certain other conditions."

303.    Thus, the Registration Statement, and the underwriting agreement made clear that the Underwriters would not purchase the IPO shares from Didi and proceed to resell them to investors unless and until the Underwriters had done their due diligence and confirmed that all

---

[106] Didi issued a press release at 11:03 a.m., confirming the CAC's announcement and stating: "DiDi will fully cooperate with the PRC government authority during the review. It plans to conduct a comprehensive examination of cybersecurity risks and continue to improve on its cybersecurity systems and technology capabilities."

[107]    The Underwriting Agreement, filed with the SEC as Exhibit 1.1 to Didi's Amendment No. 2 to Form F-1 on June 28, 2021, is attached hereto as <u>Exhibit 19</u> and incorporated by reference herein.

closing conditions—including the absence of material adverse events and that the Registration Statement did not contain an omission of material fact - as of the time of closing—had been met.

304.    The Underwriters had several hours to complete their due diligence at the closing, assure themselves the closing conditions were satisfied, and determine whether or not to go forward with the IPO, close the transaction, accept delivery of the IPO shares, and wire the $4.4 billion to Didi.

305.    On July 2, prior to closing, the Underwriters, Didi, and their respective counsel, held a call – referred to as a bring-down due diligence call – where Underwriters asked the company a series of questions to verify that all of Didi's representations and warranties in the underwriting agreement were true and accurate as of the closing, as well as to verify that no material adverse events had occurred since the most recent diligence call immediately prior to pricing the IPO. Such material events may include "a material development in the company's business or expectations regarding its future financial results, or a previously unforeseen regulatory issue arising."[108]

306.    The CAC's actions banning Didi from taking on any new customers and the imposition of the cybersecurity review were clearly a material adverse events that were not disclosed in the Registration Statement providing a basis to cancel the IPO.

307.    The Underwriters decided to close the transaction on July 2.

308.    That Sunday, July 4, Didi issued the following press release:

[A]ccording to the announcement posted by the Cyberspace Administration of China (the "CAC") on July 4, 2021, the CAC stated that it was reported and confirmed that the "Didi Chuxing" app had the problem of collecting personal

---

[108] "Strategies For Going Public," Deloitte & Touche LLP and Skadden, Arps, Slate, Meagher & Flom LLP. (Feb. 2020). https://www.skadden.com/insights/publications/2020/02/strategies-for-going-public.

information in violation of relevant PRC laws and regulations. Pursuant to the PRC's Cybersecurity Law, the CAC notified app stores to take down the "Didi Chuxing" app in China and required the Company to strictly comply with relevant laws and regulations, follow the relevant standards set by the PRC government authorities, and rectify the problem to ensure the security of users' personal information.

Once the "Didi Chuxing" app is taken down from app stores in China, the app can no longer be downloaded in China, although existing users who had previously downloaded and installed the app on their phones prior to the takedown may continue using it. The Company will strive to rectify any problems, improve its risk prevention awareness and technological capabilities, protect users' privacy and data security, and continue to provide secure and convenient services to its users. The Company expects that the app takedown may have an adverse impact on its revenue in China.

309.    On July 22, the *Wall Street Journal* reported that Chinese regulators are considering serious, perhaps unprecedented, penalties for Didi after disobeying the CAC's directive to postpone its IPO until it had completed a required cybersecurity review.[109]

310.    On December 3, 3021, under tremendous pressure from the CAC and other regulators, Didi filed a Form 6-K with the SEC announcing its plan to delist from the NYSE and relist on the Hong Kong Exchange.

311.    As of today, Didi's share price is $4.50/share, about a third of the IPO price.

**B.    Defendants Had a Duty to Disclose The Omitted Facts**

312.    Defendants omitted to disclose in the Registration Statement: (i) the CAC instructed Didi to postpone its IPO until Didi had completed a thorough self-examination of its business, operations and policies to ensure compliance with all applicable laws and regulations concerning national security, network security, data security, and/or the collection and protection of private personal information, and to rectify any violations, to the CAC's satisfaction; and (ii)

---

[109]  "China Weighs Unprecedented Penalty for Didi After US IPO," *Bloomberg* (July 22, 2021) (Exhibit 12).

Didi faced a high risk that CAC would impose harsh penalties against Didi that could harm its business, financial performance and reputation if it went forward with its IPO against the CAC's instructions (collectively, the "Omitted Facts").

313.    Defendants had a duty under Regulation S-K, Items 105, 303/5(D) and 408 to disclose the Omitted Facts in the Registration Statement. Each Defendant was legally responsible for the statements made in the Registration Statement.

314.    Each Defendant had the duty to make a reasonable investigation of Didi's business, including its regulatory affairs.  Each was required to exercise reasonable diligence to ensure that all material facts required to be stated in the Registration Statement were in fact disclosed, and Didi and each Individual Defendant was required to and did sign, and each Defendant did authorize, the filing of the Registration Statement. Each Defendant bears the burden of demonstrating their compliance with this duty.

**C.    Defendants Were Negligent in Exercising their Due Diligence Responsibilities and Preparing the Registration Statement**

315.    Didi, the Individual Defendants, and the Underwriters were negligent in preparing the Registration Statement, and negligent in performing due diligence in connection with the IPO in failing to discover and disclose the Omitted Facts.

316.    None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that all material facts required to be disclosed in the Registration Statement were disclosed.

317.    The Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, the Registration Statement, which failed to disclose the Omitted Facts. By reason of the conduct alleged herein, each Defendant violated the Securities Act.

## COUNT I
### Violations of §11 of the Securities Act
### Against All Defendants

318.    Plaintiffs repeat and re-allege the foregoing allegations in paragraphs 1 through 137 and 283 through 317. None of the preceding allegations in the Complaint in paragraphs 138 through 282 that are set forth in the Class's claims under Sections 10(b), 20(a), and 20(A) of the Securities Exchange Act of 1934 apply to these Securities Act claims.

319.    This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

320.    Didi is strictly liable for issuing, and all other Defendants are liable for negligently issuing, the Registration Statement that failed to disclose the material Omitted Facts that were required to be stated therein.

321.    Didi is the issuer of the shares in the IPO.  The Individual Defendants, the officers and directors of Didi just prior to the IPO, each signed the Registration Statement.  The Underwriters were the underwriters for the IPO.

322.    Plaintiffs purchased Didi ADSs pursuant to and traceable to the Registration Statement.

323.    The true value of Didi's ADS's at the time this lawsuit was filed was substantially below the IPO price.

324.    This claim is brought within one year after discovery of the omissions from the Registration Statement, and within three years of the effective date of the Registration Statement.

## COUNT II
### Violations of §12(a)(2) of the Securities Act
### Against the Underwriters and Didi

325.    Plaintiffs repeat and re-allege the foregoing allegations above. Plaintiffs repeat and re-allege the foregoing allegations in paragraphs 1 through 137 and 283 through 317. None of the

preceding allegations in the Complaint in paragraphs 138 through 282 that are set forth in the Class's claims under Sections 10(b), 20(a), and 20(A) of the Securities Exchange Act of 1934 apply to these Securities Act claims.

326.    The Underwriters and Didi were sellers, offerors, and/or solicitors of buyers of Didi ADSs offered pursuant to the Registration Statement for their own financial gain.

327.    The Underwriters are statutory sellers as they are in privity with Plaintiff Shereen El-Nahas and Daniil Alimov and with other members of the Class who purchased Didi shares directly from the various Underwriters in the IPO. Shereen El-Nahas and Daniil Alimov purchased shares directly from the Underwriters in the IPO.

328.    As the issuer of the ADSs in the IPO, Didi was a statutory seller pursuant to SEC Rule 159A which provides that "in a primary offering of securities," an issuer is a statutory seller for the purposes of Section 12(a)(2) "regardless of the underwriting method used to sell the issuer's securities." *See* 17 C.F.R. 230.159A.

329.    Didi and the Underwriters used the means and instrumentalities of transportation and communication in interstate commerce and of the mails, in offering, soliciting, and selling Didi ADSs to Plaintiffs and other members of the Class.

330.    Plaintiffs have two theories of liability under Section 12.

331.    <u>Theory one against Didi and the Underwriters</u>:  The Registration Statement failed to disclose material facts required to be stated therein.  Specifically, it failed to disclose the Omitted Facts.

332.    Neither Plaintiffs, nor any member of the Class knew, or in the exercise of reasonable care could have known, of the Omitted Facts.

333.    <u>Theory two against the Underwriters only</u>:  On July 2, 2021, the Underwriters had the opportunity to cancel the IPO and return investors their funds if the conditions for closing in the underwriting agreement were not satisfied.  One of the conditions for closing was that there must not be any omission of material fact in the Registration Statement.

334.    The Underwriters were negligent for going forward with the IPO without fully investigating whether the Registration Statement omitted material facts required to be stated therein.

335.    The Underwriters had a due diligence obligation prior to closing on July 2, to inquire of Didi as to whether any material adverse events or government regulatory actions had occurred between the Effective Date and the closing that might cause the Registration Statement to contain an omission of material fact.

336.    As stated in the Underwriting Agreement and the Registration Statement, the Underwriters did not have an irrevocable commitment to purchase the IPO shares from Didi or to sell the IPO shares to investors if the closing conditions were not met.

337.    The Underwriters negligently discharged their due diligence obligations during the closing process and closed the IPO without first determining whether a material adverse event had occurred between the Effective Date and closing that might cause the Registration Statement to omit material facts.

338.    This action was brought within one year after the discovery of the omissions in the Prospectus, and within three years after the sale of Didi ADSs pursuant to the Prospectus.

339.    Plaintiffs and the other members of the Class hereby tender their Didi ADSs and seek recission and return of the consideration they paid with interest, or seek rescissory damages or such other damages to the extent permitted by law.

## COUNT III
### Violations of §15 of the Securities Act
### Against Cheng and Liu

340.    Plaintiffs repeat and re-allege the foregoing allegations in paragraphs 1 through 137 and 283 through 317. None of the preceding allegations in the Complaint in paragraphs 138 through 282 that are set forth in the Class's claims under Sections 10(b), 20(a), and 20(A) of the Securities Exchange Act of 1934 apply to these Securities Act claims.

341.    This cause of action is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o against Cheng and Liu, each of whom was a control person of Didi during the relevant period.

342.    At all relevant times, Cheng and Liu were in the senior most management positions of control and did control, Didi.  Cheng and Liu also controlled Didi through their ownership of Didi shares and their voting control over Didi.[110]  Cheng was Founder, Chairman of the Board and CEO of Didi.  Liu was Co-Founder, Director and President of Didi.

343.    This claim is brought within one year after discovery of the omissions in the Registration Statement, and within three years of the effective date of the Registration Statement.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a)    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class Representatives;

---

[110] Cheng and Liu's control over Didi and their share ownership and voting control is described in detail in the Registration Statement and is incorporated by reference herein.

(b)    Awarding damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, together with interest thereon;

(c)    Awarding Plaintiffs and the other members of the Class prejudgment and post-interest; and

(d)    Awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: January 7, 2022                         Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ Laurence Rosen
Laurence M. Rosen
Phillip Kim
Jing Chen
Daniel Tyre-Karp
Robin Howald
275 Madison Ave, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
        lrosen@rosenlegal.com
        jchen@rosenlegal.com
        dtyrekarp@rosenlegal.com
        rhowald@rosenlegal.com

*Lead Counsel for Plaintiffs*

and

**GLANCY PRONGAY & MURRAY LLP**

Gregory Linkh
30 Park Ave, Suite 358
New York, NY 10169
Telephone: (212 682-5340

Fax: (212) 884-0988
Email: glinkh@glancylaw.com

*Additional Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 7, 2022, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.


_/s/ Laurence Rosen_