**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE DIDI GLOBAL INC. SECURITIES LITIGATION | Master Docket 1:21-cv-05807-LAK<br><br>This Document Relates To:  All Actions |

**MEMORANDUM OF LAW ON BEHALF OF DEFENDANT DIDI GLOBAL INC.**
**IN SUPPORT OF ITS MOTION TO DISMISS THE CONSOLIDATED AMENDED**
**CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

**Page**

I.      PRELIMINARY STATEMENT ................................................................................1

II.     STATEMENT OF FACTS ....................................................................................3

    A.     DiDi's Regulatory Environment .............................................................3

    B.     DiDi's IPO Disclosures...........................................................................5

    C.     DiDi's IPO and Subsequent Events ........................................................7

III.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE SECURITIES ACT.............12

    A.     Plaintiffs Fail to Plead a Material Omission in DiDi's Registration
        Statement with The Requisite Particularity Under Rule 9(b) ................13

        1.     Plaintiffs' Section 11 Claims Sound in Fraud...........................13

        2.     Plaintiffs Fail to Satisfy Rule 9(b)'s Heightened Pleading Standard........14

    B.     Plaintiffs Fail to Plead Actionable Omissions Because DiDi Had No Duty
        To Disclose Facts Beyond Its Robust Risk Disclosures .........................15

        1.     DiDi Had No General Duty To Disclose Discussions With
            Regulators .................................................................................16

        2.     DiDi Had No Duty To Disclose Under Item 303 .....................18

        3.     DiDi Had No Duty To Disclose Under Item 105 .....................21

        4.     DiDi Had No Duty To Disclose Under Item 408 .....................22

    C.     DiDi's Offering Documents Included Robust Risk Disclosures .........................23

IV.     PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE EXCHANGE ACT .............25

    A.     Plaintiffs Fail to Plead Any Actionable Omission of Material Fact ....................26

    B.     Plaintiffs Fail to Plead a "Strong Inference" of Scienter .......................26

        1.     Plaintiffs Fail to Plead Motive and Opportunity.......................26

        2.     Plaintiffs Fail to Plead Strong Circumstantial Evidence of
            Conscious Misbehavior or Recklessness ..................................29

    C.     Plaintiffs Fail to Plead Loss Causation .................................................33

    D.     Plaintiffs Fail to Plead a Section 20A Claim .......................................35

V.      CONCLUSION .................................................................................................35

# <u>TABLE OF AUTHORITIES</u>

**Page**

## Cases

*Acito v. IMCERA Grp., Inc.*,
   47 F.3d 47 (2d Cir. 1995)...................................................................................... 27

*In re Agria Corp. Sec. Litig.*,
   672 F. Supp. 2d 520 (S.D.N.Y. 2009)................................................................... 12

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007)................................................................................... 26

*In re Axis Cap. Holdings Ltd. Sec. Litig.*,
   456 F. Supp. 2d 576 (S.D.N.Y. 2006)................................................................... 27

*In re Banco Bradesco S.A. Sec. Litig.*,
   277 F. Supp. 3d 600 (S.D.N.Y. 2017)................................................................... 17

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
   980 F. Supp. 2d 564 (S.D.N.Y. 2013)................................................................... 19

*Blackmoss Investments Inc. v. ACA Cap. Holdings, Inc.*,
   2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) .......................................................... 19

*Caiafa v. Sea Containers Ltd.*,
   2008 WL 11516813 (S.D.N.Y. May 15, 2008) ...................................................... 12

*Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*,
   543 F. App'x 72 (2d Cir. 2013) ............................................................................ 34

*In re China Valves Tech. Sec. Litig.*,
   2012 WL 4039852 (S.D.N.Y. Sept. 12, 2012)....................................................... 14

*In re Citigroup, Inc. Sec. Litig.*,
   330 F. Supp. 2d 367 (S.D.N.Y. 2004).............................................................. 17, 18

*City of Omaha Police & Fire Retirement Sys. v. Evoqua Water Techs. Corp.*,
   2020 WL 1529371 (S.D.N.Y. Mar. 30, 2020) ...................................................... 14

*City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014)................................................................ 16, 17, 21

*In re Coty Inc. Sec. Litig.*,
   2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) ...................................................... 18

*Defer LP v. Raymond James Fin., Inc.*,
   654 F. Supp. 2d 204 (S.D.N.Y. 2009)................................................................... 26

*Diehl v. Omega Protein Corp.*,
   339 F. Supp. 3d 153 (S.D.N.Y. 2018).............................................................. 20, 22

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005).............................................................................................. 3

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011)........................................................ 27, 28, 29, 30, 32, 33

*Halperin v. eBanker USA.com, Inc.*,
  295 F.3d 352 (2d Cir. 2002)............................................................................................ 24

*Hershfang v. Citicorp*,
  767 F. Supp. 1251 (S.D.N.Y. 1991)................................................................................ 30

*In re HEXO Corp. Sec. Litig.*,
  524 F. Supp. 3d 283 (S.D.N.Y. 2021)...................................................................... 21, 28

*Holbrook v. Trivago N.V.*,
  2019 WL 948809 (S.D.N.Y. Feb. 26, 2019).................................................................. 19

*Hutchison v. Deutsche Bank Sec. Inc.*,
  647 F.3d 479 (2d Cir. 2011)..................................................................................... 12, 21, 22

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
  818 F.3d 85 (2d Cir. 2016)............................................................................................ 18, 22

*Jiajia Luo v. Sogou, Inc.*,
  465 F. Supp. 3d 393 (S.D.N.Y. 2020)................................................................ 14, 16, 24, 25

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001)................................................................................. 26, 29, 30, 31

*In re Keyspan Corp. Sec. Litig.*,
  383 F. Supp. 2d 358 (E.D.N.Y. 2003) ..................................................................... 27, 30, 35

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005)............................................................................................ 34

*Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*,
  902 F. Supp. 2d 329 (S.D.N.Y. 2012).......................................................................... 13

*In re Lions Gate Ent. Corp. Sec. Litig.*,
  165 F. Supp. 3d 1 (S.D.N.Y. 2016)........................................................................... 16, 17

*Local No. 38 Int'l Bhd. of Elec. Workers' Pension Fund v. Am. Exp. Co.*,
  724 F. Supp. 2d 447 (S.D.N.Y. 2010).................................................................... 3, 31, 33

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
  26 F. Supp. 3d 278 (S.D.N.Y. 2014)......................................................................... 3, 35

*Miller v. Lazard, Ltd.*,
  473 F. Supp. 2d 571 (S.D.N.Y. 2007).......................................................................... 15

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010)............................................................................................ 12

*In re Morgan Stanley Tech. Fund Sec. Litig.*,
  643 F. Supp. 2d 366 (S.D.N.Y. 2009).......................................................................... 16

*Mucha v. Volkswagen Aktiengesellschaft*,
  540 F. Supp. 3d 269 (E.D.N.Y. 2021)......................................................................... 20

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)..............................................................30, 31

*Nurlybayev v. ZTO Express (Cayman) Inc.*,
  2019 WL 3219451 (S.D.N.Y. July 17, 2019) ............................................22

*Olkey v. Hyperion 1999 Term Tr., Inc.*,
  98 F.3d 2, 5 (2d Cir. 1996)........................................................3, 13, 23

*Ong v. Chipotle Mexican Grill, Inc.*,
  294 F. Supp. 3d 199 (S.D.N.Y. 2018)...................................................24

*In re Optionable Sec. Litig.*,
  577 F. Supp. 2d 681 (S.D.N.Y. 2008)...................................................16

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
  538 F. Supp. 2d 662 (S.D.N.Y. 2008)...................................................20

*In re Pfizer, Inc. Sec. Litig.*,
  538 F. Supp. 2d 621 (S.D.N.Y. 2008)...................................................32

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*,
  694 F. Supp. 2d 287 (S.D.N.Y. 2010)........................................28, 29, 33

*In re Ply Gem Holdings, Inc. Sec. Litig.*,
  135 F. Supp. 3d 145 (S.D.N.Y. 2015)...................................................18

*In re Proshares Tr. II Sec. Litig.*,
  2020 WL 71007 (S.D.N.Y. Jan. 3, 2020) ..............................................24

*Rombach v. Chang*,
  355 F. 3d 164 (2d Cir. 2004)...............................................................13

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)..........................................................28, 33

*Rubinstein v. Credit Suisse Group AG*,
  457 F. Supp. 3d 289 (S.D.N.Y. 2020)...................................................21

*Rudman v. CHC Grp. LTD.*,
  217 F. Supp. 3d 718 (S.D.N.Y. 2016)...................................................18

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*,
  75 F.3d 801 (2d Cir. 1996).................................................................28

*Sapssov v. Health Mgmt. Assoc., Inc.*,
  608 Fed. App'x 855 (11th Cir. 2015) ....................................................34

*Schaffer v. Horizon Pharma PLC*,
  2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) .....................................19, 24

*Singh v. Cigna Corp.*,
  918 F.3d 57 (2d Cir. 2019)..................................................................25

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008).......................................25, 34, 35

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ............................................................................ 3, 26, 28, 33

*In re UBS AG Sec. Litig.*,
  2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) ................................................... 17

*Willard v. UP Fintech Holding Ltd.*,
  527 F. Supp. 3d 609 (S.D.N.Y. 2021) ......................................................... 18, 21

*In re XP Inc. Sec. Litig.*,
  524 F. Supp. 3d 23 (E.D.N.Y. 2021) ................................................................ 17

*Y-GAR Capital LLC v. Credit Suisse Grp. AG*,
  2020 WL 71163 (S.D.N.Y. Jan. 2, 2020) ......................................................... 13

*In re Yunji Inc., Sec. Litig.*,
  2021 WL 1439715 (E.D.N.Y. Mar. 31, 2021) .................................................... 19

## Rules and Regulations

17 C.F.R. § 229.303 ................................................................................................ 14

17 C.F.R. § 229.303(a)(3)(i) ................................................................................... 18

17 C.F.R. § 229.303(b) ........................................................................................... 18

17 C.F.R. § 230.408 .......................................................................................... 22, 23

17 C.F.R. § 240.10b-5 ............................................................................................ 13

Fed. R. Civ. P. Rule 8 ............................................................................................ 13

Fed. R. Civ. P. Rule 9(b) .................................................................................. *passim*

Fed. R. Civ. P. 12(b)(6) ............................................................................................ 1

Securities Act of 1933 Section 11 ............................................................................ 1

Securities Act of 1933 Section 12 ............................................................................ 1

Securities Act of 1933 Section 15 ............................................................................ 1

Sections Exchange Act of 1934 Section 10(b) ................................................ 25, 26, 35

Sections Exchange Act of 1934 20A ................................................................... 1, 35

Sections Exchange Act of 1934 20(a) ................................................................. 1, 35

Defendant DiDi Global Inc. ("DiDi" or the "Company") respectfully submits this Memorandum of Law in Support of Its Motion to Dismiss the Consolidated Amended Class Action Complaint (ECF No. 88) (the "Complaint" or "AC") pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state causes of action under Sections 11, 12, and 15 of the Securities Act of 1933, and Sections 10(b), 20A, and 20(a) of the Exchange Act of 1934.

## I.    PRELIMINARY STATEMENT

Plaintiffs in this action are sophisticated investors who saw the chance to invest in one of the world's fastest-growing ride hailing companies, DiDi, which operated primarily in the world's fastest-growing economy, China.  Soon after its initial public offering, DiDi was subject to a cybersecurity review by Chinese authorities, which required it to suspend new user registration in China.  When that announcement impacted the price of DiDi's American depositary shares trading in the United States, investors sought to recoup their investment losses by bringing this suit.

The resulting Complaint weaves together vague reporting, unsupported allegations, and broad generalizations about the Chinese government's tendency to go "beyond the letter of the law," "exercise absolute control," and use its "upper hand" to "severe[ly] punish[]" those who "defy[] President Xi's directives."  Relying on generalities, Plaintiffs allege that the Chinese government *must* have "directed DiDi to postpone its IPO in the United States" and that DiDi's failure to disclose that "directive" amounted to securities fraud.  But Plaintiffs rely almost entirely on news reports which claim only that the Chinese government "suggested" a cybersecurity self-assessment, "remained wary" of possible cybersecurity breaches, and sent "mixed signals" about DiDi's forthcoming IPO.  Plaintiffs' Complaint fails because Plaintiffs have not, and cannot, plead any detail that establishes the "directive" upon which their claims are based.

Rule 9(b) requires that Plaintiffs plead fraud with particularity, and the Private Securities Litigation Reform Act imposes additional exacting pleading requirements.  Despite Plaintiffs'

conclusory declaration that their Securities Act claims do not sound in fraud, even a cursory review of Plaintiffs' Complaint reveals that their Securities Act claims are premised on the ***exact same allegations*** as their fraud claims under the Exchange Act. Because Plaintiffs' Securities Act claims are premised on fraud, they, too, are subject to the heightened pleading requirements of Rule 9(b). Plaintiffs' failure to satisfy Rule 9(b) is fatal to the entirety of their Complaint.

Plaintiffs' Securities Act and Exchange Act claims are based exclusively on DiDi's alleged failure to disclose that the Cyberspace Administration of China "directed" DiDi to postpone its IPO pending a cybersecurity self-assessment. Critically, Plaintiffs fail to allege the "who, what, when, where, and why" of any "CAC Directive," as required by Rule 9(b). At most, Plaintiffs allege that DiDi received "suggestions" from regulators that DiDi should delay its IPO until the Company completed a cybersecurity review, and that regulators later suspended DiDi's operations for suspected regulatory non-compliance. These pleading failures doom Plaintiffs' Complaint.

Plaintiffs' claims also fail because Plaintiffs do not otherwise allege an actionable omission. Specifically, Plaintiffs fail to allege that DiDi had a duty to disclose any alleged directives under Regulation S-K, Items 303 and 105, or Regulation C, Item 408, because they cannot establish that DiDi ***knew*** moving forward with its IPO would result in punishment from the CAC that would materially impact DiDi's business.

Even had Plaintiffs established an affirmative duty to disclose any alleged directive from the Chinese government, the robust risk factors in DiDi's Offering Documents were sufficient to warn of the risks Plaintiffs claim ultimately occurred. DiDi's Offering Documents explicitly stated that "any failure . . . to comply with applicable laws or regulations or any other obligations relating to privacy, data protection or information security" or even "the perception or allegation" of failure could "result in investigations, fines, suspension of one or more of our apps, or other penalties by

government authorities." Those risk factors "warn[ed] investors of exactly the risk the plaintiffs claim was not disclosed." *Olkey v. Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 5 (2d Cir. 1996). Plaintiffs' omission claims are thus foreclosed as a matter of law.

Plaintiffs' Exchange Act claims fail for additional reasons: first, the Complaint does not give rise to a strong inference of scienter, and second, the Complaint fails to plead loss causation.

"[A]n inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). Plaintiffs set forth no allegations establishing motive and opportunity, and no allegations constituting strong circumstantial evidence of conscious misbehavior or recklessness. Instead, the Complaint rests on generalized and speculative pleading based on public news reporting. But Plaintiffs' vague and superficial allegations are insufficient to create a strong inference of scienter. *See Local No. 38 Int'l Bhd. of Elec. Workers' Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 461 (S.D.N.Y. 2010).

Plaintiffs' failure to plead specific facts showing loss causation is an equally compelling, independent ground for dismissal. The federal securities laws do not "provide investors with broad insurance against market losses." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005). Rather, Plaintiffs can recover only for losses caused by an alleged fraud. Here, Plaintiffs seek to recover for repeated drops in DiDi's ADS price divorced from the alleged "fraud." Statements that "disclose nothing new" to the market are not "corrective disclosures" under the securities laws. *See In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 300 (S.D.N.Y. 2014).

This Court should dismiss Plaintiffs' Complaint in its entirety.

## II.    STATEMENT OF FACTS

### A.    DiDi's Regulatory Environment

Often hailed as "the Uber of China," DiDi is a leading ride-hailing app that "enjoy[ed]

near-complete market dominance in China" at the time of its initial public offering ("IPO").  ¶ 3.[1] That market is evolving fast.  Even more than its counterparts operating in the United States, DiDi is subject to a perpetually-changing and often uncertain regulatory landscape.  Among other things, DiDi is required to comply with numerous Chinese laws and regulations governing data privacy, data security, cybersecurity, and national security.  ¶¶ 88–113.  In addition to written laws and regulations, "the PRC legal system is based, in part, on government policies and internal rules, *some of which are not published in a timely manner, or at all, but which may have retroactive effect*."  Ex. B (Prospectus) at 57.[2]  This patchwork of written and unwritten rules can swerve abruptly in response to shifts in policy directions and priorities from the Chinese Communist Party and the Chinese government.  This means that Chinese technology companies, including DiDi, are subject to an added layer of unpredictability with respect to regulatory compliance.  ¶¶ 117–21. Hence, as DiDi disclosed in its Offering Documents, it "*may not always be aware of any potential violation of these policies and rules*."  Ex. B at 57.

The Cyberspace Administration of China ("CAC") regulates internet and internet-based companies in China and is responsible for enforcing compliance with Chinese data security laws and policies.  ¶ 5.  The CAC is empowered "to close or suspend websites, close down businesses, revoke business licenses, and/or impose large fines or other draconian penalties if it determines that a business is violating any cybersecurity-related law or implementing regulation."  ¶ 6.  It also "wields authority beyond the letter of the law when providing regulatory guidance and issuing administrative directives to regulated businesses," including the authority to impose retroactive

---

[1]  References to "¶ __" are to the Complaint, a copy of which is attached as Exhibit A to the Declaration of Corey Worcester.  All emphasis is added and internal citations and quotations omitted unless otherwise noted.

[2]  Exhibits are to the Declaration of Corey Worcester, filed simultaneously herewith.

draconian penalties on companies for violations of new or unwritten rules. *See, e.g.*, ¶ 76.  From 2015 to 2017, the CAC shut down over 13,000 websites.  ¶ 122.  In recent years, "enforcement actions rose significantly," and in 2020 alone, the CAC shut down "a whopping 18,489" websites and suspended 1,994 others, marking a massive increase from prior years.  *Id.*

To navigate this complex regulatory system, DiDi, like many Chinese companies, maintains a large and dedicated government affairs team skilled in navigating the complexities of Chinese government policies.  ¶ 116.  DiDi has consistently and publicly demonstrated its willingness to cooperate with Chinese authorities. ¶ 112.  Still, like others of its industry peers in China, DiDi is subject to unpredictable shifts in regulatory expectations and enforcement priorities, as the Company disclosed to investors in its Offering Documents.  Ex. B at 57.

### B.    DiDi's IPO Disclosures

DiDi's Offering Documents contained sixty pages of risk factors.  Among them, DiDi highlighted risks specifically related to data privacy, data protection, and information security:

> ***Our business is subject to a variety of laws, regulations, rules, policies and other obligations regarding privacy, data protection and information security. . .*** We are subject to numerous laws and regulations that address privacy, data protection and the collection, storing, sharing, use, disclosure and protection of certain types of data in various jurisdictions. . . . including the Data Security Law promulgated by the Standing Committee of the National People's Congress of China in June 2021, which will take effect in September 2021. ***Interpretation, application and enforcement of these laws, rules and regulations evolve from time to time and their scope may continually change, through new legislation, amendments to existing legislation and changes in enforcement***. *Id.* at 27 (first emphasis in original).

DiDi explicitly warned investors that its efforts to comply with "laws, regulations, rules, policies and other obligations" regarding "privacy, data protection and information security"

> ***could fail to meet all of the requirements imposed on us by such laws, regulations or obligations***.  ***Any failure on our part to comply with applicable laws or regulations or any other obligations relating to privacy, data protection or information security, or any compromise of security. . . or the perception or allegation that any of the foregoing types of failure or compromise has occurred, could damage our reputation,*** discourage new and existing drivers and riders from using our platform ***or result in investigations, fines,***

> *suspension of one or more of our apps, or other penalties by government authorities* and private claims or litigation, any of which could materially adversely affect our business, financial condition and results of operations.  *Id.*

Indeed, DiDi disclosed not only that its noncompliance could have negative effects on its business, but that even "*the perception or allegation*" of noncompliance could result in "penalties by government authorities."  *Id.*

DiDi additionally disclosed that it had been the subject of regulatory action, including in the area of data privacy and security, as recently as three months before the IPO.  For example, in April 2021, DiDi and 30 other major Chinese internet companies were summoned to a meeting with the CAC and other regulators regarding potential violations of various laws, including data privacy laws.  *Id.* at 56.  DiDi was required to complete a self-inspection of its practices and submit to onsite inspections by regulators.  *Id.*  The Company disclosed that this inspection found compliance problems in its business practices and warned that regulators could identify further issues as the authorities considered and required ever more "privacy protection" measures:

> *[W]e cannot assure you that the regulatory authorities will be satisfied with our self-inspection results or that we will not be subject to any penalty with respect to any violations* of anti-monopoly, anti-unfair competition, pricing, advertisement, *privacy protection*, food safety, product quality, tax and other related laws and regulations. *We expect that these areas will receive greater and continued attention and scrutiny from regulators and the general public going forward. As a result, we may be subject to additional inspections and/or investigations* and may incur additional costs and expenses . . . If we are required to take any rectifying or remedial measures or are subject to any penalty, our reputation and business operations may be materially and adversely affected.   Ex. B at 56.

DiDi's Offering Documents (Registration Statement, as amended, and Prospectus) also disclosed the more general regulatory risks the Company faces, including that "the PRC legal system is based, in part, on government policies and internal rules, *some of which are not published in a timely manner, or at all, but which may have retroactive effect.  As a result, we may not always be aware of any potential violation of these policies and rules*."  *Id.* at 57.

6

DiDi warned that "considerable uncertainties still exist with respect to the interpretation and implementation of existing laws and regulations governing our business activities," and "we may become subject to additional laws and regulations that we are not subject to now," noting that "[a] large number of proposals" were then pending before Chinese legislative and regulatory bodies.  *Id.* at 25.  Similarly, "developments in our industry may lead to changes in PRC laws, regulations and policies or in the interpretation and application of existing laws, regulations and policies" which could necessitate changes in its business practices.  *Id.* at 57.

The Offering Documents also warned generally that "***[c]hanges in China's economic, political or social conditions or government policies could have a material adverse effect on our business, financial conditions and results of operations***," particularly given the "significant role" the Chinese government plays "in regulating industry development by imposing industrial policies." *Id.* at 55 (emphasis in original).  They noted, in particular, that "[p]olitical tensions between the United States and China have escalated," which could "adversely impact our business, financial condition, and results of operations."  *Id.* at 49.  It is with the benefit of these detailed and comprehensive risk disclosures that Plaintiffs chose to purchase DiDi ADS.

## C.     DiDi's IPO and Subsequent Events

On June 30, 2021, DiDi commenced the IPO, pricing its shares at $14.  ¶ 8.  Two days later, on July 2, 2021, prior to market open, the CAC announced a cybersecurity review into DiDi's business practices, during which DiDi would be required to halt new user registrations:

> In order to prevent national data security risks, safeguard national security and protect public interests, in accordance with the National Security Law of the People's Republic of China and the Cyber Security Law of the People's Republic of China, the Cyber Security Review Office will conduct a cyber security review on DiDi Chuxing pursuant to the Cyber Security Review Measures. During the review, DiDi Chuxing will halt new user registration in order to cooperate with the cyber security review and prevent further risks. ¶ 167.

The announcement was widely reported in U.S. news outlets before markets opened for

trading.  ¶ 168.  That day, DiDi's shares opened at $14.96, 8.8% lower than the prior day's closing price of $16.40, but still higher than its IPO price.  ¶ 184.  Shortly thereafter, DiDi issued a press release confirming that it would "fully cooperate with the PRC government authority during the review," "conduct a comprehensive examination of cybersecurity risks and continue to improve on its cybersecurity systems and technology capabilities."  ¶ 170; Ex. C (July 2, 2021 Form 6-K at 4).  DiDi's IPO closed on July 2, 2021 as scheduled, and its shares that day closed at $15.53 per share.  Ex. D (DiDi Historical Share Prices).

Two days later, on Sunday, July 4, 2021, the CAC announced that it had found "violations" in DiDi's "collection and use of personal information" and ordered DiDi's main app to be removed from app stores in China, preventing existing users from downloading updates to the app:

> According to complaints that have been verified by testing, the "DiDi Chuxing" app has serious problems in terms of legal and regulatory violations in the collection and use of personal information.  Pursuant to relevant requirements of *Cybersecurity Law of the People's Republic of China*, State Internet Information Office has notified app stores to remove the "DiDi Chuxing" app, and has required DiDi Chuxing Technology Co., Ltd. to strictly comply with legal requirements, refer to relevant national standards, diligently correct existing problems, and thoroughly protect the security of personal information of its numerous users.  ¶ 186.

DiDi disclosed the CAC's announcement in a press release on the same day and confirmed that it would continue to cooperate with regulators and resolve the issues identified by the CAC:

> The Company will strive to rectify any problems, improve its risk prevention awareness and technological capabilities, protect users' privacy and data security, and continue to provide secure and convenient services to its users.  The Company expects that the app takedown may have an adverse impact on its revenue in China.  ¶ 189.

On July 5, 2021 (a New York Stock Exchange ("NYSE") trading holiday), the *Wall Street Journal* published an article titled "Chinese Regulators Suggested DiDi Delay Its U.S. IPO."  AC Ex. 13.  The article reported that "[w]eeks before" the IPO, the CAC "***suggested*** the Chinese ride-hailing giant delay its initial public offering and urged it to conduct a thorough self-examination

8

of its network security, according to people with knowledge of the matter." *Id.* at 1. The article stated that while "*[i]t isn't known whether DiDi carried out its own review*," regulators "remained wary of the ride-hailing company's troves of data potentially falling into foreign hands as a result of greater public disclosure associated with a U.S. listing, the people said." *Id.* at 1–2. "According to people familiar with the discussions, *the company received mixed signals from different agencies*," but the article reported "*the absence of an outright order to halt the IPO*." *Id.* Indeed, "*[s]ome financial regulators have publicly expressed support for companies' overseas listings*, while also stressing the imperative of protecting sensitive data and networks." *Id.* In response to questions from reporters, DiDi responded "that it doesn't comment on speculation and had no knowledge before the IPO of the regulator's decisions to put the company under cybersecurity review and to ban new downloads of its ride-hailing app." *Id.* at 2. On July 6, 2021, DiDi's shares closed at $12.49, a nearly 20% drop from the July 2 closing price. ¶ 192; *see* Ex. D.

In the following days, other media outlets repeated the *Wall Street Journal*'s claims and speculated about what, if anything, the CAC told DiDi in the lead-up to its IPO. The *South China Morning Post*, for example, hypothesized that "[t]he crux of the controversy . . . was *a misinterpretation over the clarity and forcefulness* of the CAC's instruction to DiDi to postpone its New York listing." AC Ex. 14 at 3. Critically, however, "*[n]either DiDi nor the CAC . . . ever publicly acknowledged the existence of such a conversation*." *Id.* Still, media reports speculated as to whether any such conversation discouraging the Company from proceeding with its IPO ever took place, citing conflicting accounts from unnamed and vaguely described sources. Several sources claimed the CAC "*suggested*" that DiDi delay its IPO, but because such suggestions were not explicit, "executives did not think the agency had forbidden them to proceed." AC Ex. 12 at 1–2; *see* ¶¶ 142, 147, 149, 205.

Reports also began to circulate around the same time that "[t]he CAC itself has come under scrutiny because of the DiDi IPO, with a top party official having questioned why the agency hadn't blocked the company's offering." AC Ex. 12 at 1. The *South China Morning Post* claimed that the incident "casts the [CAC] in bad light, raising questions about its competence in ensuring cybersecurity and reining in big internet service providers like DiDi." AC Ex. 14 at 2. The incident also "exposed inconsistencies among different Chinese government agencies," AC Ex. 10 at 3, because unlike the CAC, other "regulators largely supported the idea of an IPO," AC Ex. 12 at 1, including "the China Securities Regulatory Commission and the National Development and Reform Commission, the top economic-planning agency." AC Ex. 9 at 4.

Adding to the confusion, several reports claimed that "the problem was broader still," AC Ex. 11 at 2, as "the timing of the action right after DiDi's record IPO suggests that Beijing is uncomfortable with large tech companies' New York listings during a time of escalating tech tension" between the United States and China. AC Ex. 20 at 2; *see* AC Ex. 6 at 3; AC Ex. 13 at 3–4. "One fund manager in Hong Kong even speculated that DiDi had been made an unwitting example by Beijing, in order to scare other companies." AC Ex. 11 at 3. Beijing's concerns were soon made clear—on July 6, 2021, Chinese legislators "issued a new policy guideline . . . saying China will change its rules around the overseas listing of Chinese businesses and empower domestic regulators and watchdogs to have a say in their listing." AC Ex. 10 at 2. Commentators assessed that the "sweeping crackdown" would impact the entire Chinese technology industry, which suddenly had to contend with "fresh cyber regulations that companies are broadly unprepared for." AC Ex. 11 at 2.

On July 12, 2021, before market open, DiDi issued a press release stating that the CAC had ordered 25 more DiDi apps removed from Chinese app stores:

[O]n July 9, 2021, the CAC stated that it was confirmed that 25 apps operated by the Company in China, including the apps used by users and drivers, had the problem of collecting personal information in serious violation of relevant PRC laws and regulations. Pursuant to the PRC's Cybersecurity Law, the CAC notified app stores to take down these apps and cease to provide viewing and downloading service in China, and required the Company to strictly comply with relevant laws and regulations, follow the relevant standards set by the PRC government authorities, and rectify the problem to ensure the security of users' personal information. The Company expects that the app takedown may have an adverse impact on its revenue in China.  ¶ 201.

On July 16, 2021, the CAC—then reportedly under scrutiny from party members in the wake of DiDi's IPO, AC Ex. 12 at 1—raided DiDi's offices along with six other government agencies.  ¶ 203.  Despite claims in the media that the CAC sat down with DiDi prior to the IPO, ¶ 144, this subsequent investigation is not alleged to have targeted any individuals in particular. Rather, according to public reporting, this weeks-long investigation involved "daily summons of mid-level managers for hours of questioning at short notice, even on weekends." ¶ 150.  The *Wall Street Journal* reported that "[t]he probe illustrates how the regulators are broadening the scope of cybersecurity reviews, which had focused on technology supply-chain risks in the past, to more broadly defined data-security risks."  AC Ex. 24 at 2.  That day, DiDi's share price closed at $11.97.

Over the course of the next few months, news outlets continued to publish reporting speculating that there may be "serious, ***perhaps unprecedented*** penalties" for DiDi resulting from DiDi's decision to go forth with its IPO "despite pushback" from the CAC, ¶ 205, and pondering unsubstantiated rumors that DiDi's President was considering stepping down, ¶ 207.

On December 3, 2021, in response to Chinese regulators, DiDi announced its plans to delist from the NYSE.  ¶ 21.  That day, DiDi's share price closed at $6.07.  *Id.*  Later that month, on December 29, 2021, DiDi reported a $4.7 billion Q3 2021 loss, largely due to Chinese regulatory actions.  ¶ 126.  This class action, alleging violations of the Securities Act of 1933 ("Securities Act"), and the Securities Exchange Act of 1934 ("Exchange Act"), followed.

### III.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE SECURITIES ACT

To plead a Section 11 claim, Plaintiffs must allege facts sufficient to show that the Offering Documents contained: (i) a misrepresentation of material fact; (ii) an omission of material fact in contravention of an affirmative legal disclosure obligation; or (iii) an omission of material information that was necessary to prevent other disclosures from being misleading. *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010). Plaintiffs do not and cannot meet this standard. Because Plaintiffs fail to plead a cognizable claim under Section 11, their Section 12(a)(2) claim also fails. *See, e.g.*, *In re Agria Corp. Sec. Litig.*, 672 F. Supp. 2d 520, 525 (S.D.N.Y. 2009) ("A plaintiff who fails to plead a § 11 claim necessarily fails to plead a § 12(a)(2) claim as well."). Nor can Plaintiffs state a claim for derivative liability under Section 15 of the Securities Act, since their assertions of primary liability must be dismissed. *See Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 490 (2d Cir. 2011).

Plaintiffs' Section 11 claim must be dismissed for three reasons. *First*, although Plaintiffs allege that the CAC "directed DiDi to postpone its IPO" and imposed harsh penalties for DiDi's refusal, Plaintiffs' threadbare Complaint fails to allege the "who, what, when, where, and why" of that supposed direction, as required by Rule 9(b). At most, Plaintiffs intimate that DiDi received vague "suggestions" from Chinese regulators that DiDi should delay its IPO. ¶ 142. Such conclusory and speculative allegations do not state a claim under Rule 9(b). Further, because Plaintiffs' Securities Act claims are subject to Rule 9(b), Plaintiffs must plead DiDi's scienter. *See, e.g.*, *Caiafa v. Sea Containers Ltd.*, 2008 WL 11516813, at *5 (S.D.N.Y. May 15, 2008). As discussed below in Section IV, Plaintiffs do not, and cannot, plead scienter. *Second*, Plaintiffs have not alleged an actionable omission because—to the extent Plaintiffs allege that DiDi had a duty to disclose information beyond DiDi's robust risk disclosures—Plaintiffs have not adequately alleged the source of any such affirmative legal obligation. A Section 11 claim based solely on

omissions cannot lie absent a duty to disclose. *Third*, Plaintiffs have not alleged an actionable omission because DiDi's Offering Documents "warn[ed] investors of exactly the risk the plaintiffs claim was not disclosed." *Olkey*, 98 F.3d at 5. Plaintiffs' claim fails where the risks allegedly withheld were amply disclosed to investors.

This Court should dismiss Plaintiffs' Securities Act claims in their entirety.

### A.    Plaintiffs Fail to Plead a Material Omission in DiDi's Offering Documents with The Requisite Particularity Under Rule 9(b)

Where, as here, "a [Securities] Act claim" is "predicated on fraud," Plaintiffs must meet Rule 9(b)'s heightened pleading standard, which requires pleading the circumstances of fraud with particularity. *See Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*, 902 F. Supp. 2d 329, 338 (S.D.N.Y. 2012); *see also Y-GAR Capital LLC v. Credit Suisse Grp. AG*, 2020 WL 71163, at *4 (S.D.N.Y. Jan. 2, 2020) (Section 11 claims sounding in fraud subject to Rule 9(b)). Despite their Securities Act claims indisputably sounding in fraud, Plaintiffs do not meet this standard.[3]

#### 1.    Plaintiffs' Section 11 Claims Sound in Fraud

Plaintiffs' Section 11 claim rests on the allegation that DiDi knew, but failed to disclose, the CAC's position on DiDi's IPO, ¶¶ 312-13, and therefore is "classically associated with fraud." *Rombach v. Chang*, 355 F. 3d 164, 172 (2d Cir. 2004). Indeed, the crux of Plaintiff's Section 11 claim is *identical* to Plaintiff's fraud claim under Rule 10b-5, 17 C.F.R. § 240.10b-5. *Compare, e.g.*, ¶¶ 285-314, *with* ¶¶ 138-218 (alleging that DiDi intentionally omitted material facts from investors concerning CAC suggestions). Plaintiffs' allegations that Defendants chose to move forward with DiDi's IPO and intentionally concealed the CAC's suggestions from the investing

---

[3]  Plaintiffs' assertions also fail to satisfy even the notice pleading requirements of Rule 8.

13

public are classic fraud allegations.[4]  *See In re China Valves Tech. Sec. Litig.*, 2012 WL 4039852, at *9 (S.D.N.Y. Sept. 12, 2012) (Kaplan, J.) (Securities Act claims "sound[ed] in fraud" and were thus subject to Rule 9(b) heightened pleading standards where plaintiff "fail[ed] to identify any factual basis upon which it pleads negligent or innocent conduct on the part of [defendant].").

Further, Plaintiffs elected to assert their omission claims under Item 303 of Regulation S-K, which requires Plaintiffs to plead that DiDi *knew*, but failed to disclose, material information.  17 CFR § 229.303; ¶¶ 312-13.  Allegations of knowledge and intent must be pleaded with particularity.  *See, e.g., Jiajia Luo v. Sogou, Inc.*, 465 F. Supp. 3d 393, 408 (S.D.N.Y. 2020) (plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind").  Because Plaintiffs' Section 11 claim hinges on the allegation that DiDi knowingly concealed material information, the claim sounds in fraud, and Plaintiffs must allege facts in support of their Section 11 claim with particularity.[5]

## 2.     Plaintiffs Fail to Satisfy Rule 9(b)'s Heightened Pleading Standard

Plaintiffs do not and cannot satisfy Rule 9(b)'s heightened pleading standard.  The crux of Plaintiffs' Section 11 claim is that DiDi concealed the "CAC Directives"—the allegedly material

---

[4]  *E.g.*, ¶ 285 (alleging that the CAC "directed DiDi to postpone its IPO" until after the Company conducted a cybersecurity self-assessment); ¶¶ 289-90 (alleging that the "CAC believed that DiDi had agreed to comply with the CAC's Directive and would postpone its IPO" and that "DiDi did not follow the CAC's directive.  Instead, it  conducted its $4.4 billion IPO on June 30, 2021."); ¶ 292 (alleging that officials described DiDi's decision to move forward with its IPO "as *yang feng yin wei*—to comply publicly but defy privately"); ¶ 293 (alleging that officials "described DiDi's actions as 'forcing its way' to a listing on the NYSE against specific instructions to postpone the IPO").

[5]  Plaintiffs cannot avoid Rule 9(b)'s heightened pleading standard by structuring the Complaint into separate sections or conclusory, self-serving disclaimers.  *See, e.g., City of Omaha Police & Fire Retirement Sys. v. Evoqua Water Techs. Corp.*, 2020 WL 1529371, at *11-12 (S.D.N.Y. Mar. 30, 2020) (applying Rule 9(b) to Section 11 claim where plaintiffs "separate[d] their claims under the Exchange Act from those under the Securities Act into different sections in the Complaint" and "expressly disclaim[ed] any allegation of fraud as to their Securities Act claims" because those "formalisms do not require the Court to apply Rule 8's more liberal standard").

fact that "the CAC *directed* DiDi to postpone its IPO in the United States until after DiDi had completed a thorough self-examination of its business, operations and policies to ensure compliance with all applicable laws and regulations concerning [cybersecurity]."  ¶¶ 10, 24. Plaintiffs rely on this defined term throughout the Complaint, but their premise is faulty: the Complaint is bereft of *any* particularized allegations to support Plaintiffs' assertion that the CAC issued *any* such directive.  Indeed, that assertion is belied by *other* facts alleged in the Complaint, including that: (i) the CAC "urged the company to postpone" its IPO, ¶ 286; (ii) "the government didn't intend to block the IPO, but wanted the company to wait until it carried out the proper security checks," ¶ 142; (iii) DiDi received "suggestions from regulators" that the Company delay its IPO, ¶¶ 142, 149, 191; and (iv) DiDi was "under pressure from the CAC to delay" its IPO, ¶ 147.  Thus, Plaintiffs' allegations directly undermine Plaintiffs' conclusory assertion that the CAC issued any "directive."  At most, Plaintiffs have pleaded that the CAC *encouraged*—but in no way *directed* or *required*—that DiDi postpone its IPO.

Nor can Plaintiffs save their claim through citations to public news articles.  *E.g.*, ¶¶ 285-88, 291.  These news articles are devoid of specific facts concerning when the CAC's alleged directive was made, what specifically was said, and to whom, and cannot, as a matter of law bolster—let alone form the basis of—Plaintiffs' floundering claims.  *See, e.g.*, *Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 586 (S.D.N.Y. 2007) ("[T]he news articles cited still must indicate particularized facts about Defendants' conduct in order to support the Plaintiffs' claims.").  Plaintiffs' have failed to plead their Securities Act claims with the requisite particularity.

### B.    Plaintiffs Fail to Plead Actionable Omissions Because DiDi Had No Duty To Disclose Facts Beyond Its Robust Risk Disclosures

Plaintiffs' Securities Act claims must also be dismissed because Plaintiffs fail to plead that DiDi had an affirmative legal obligation to make additional disclosures beyond the Offering

Documents' robust risk disclosures (discussed *infra*, Section III.C.).

Section 11 does not require disclosure of every fact that an investor might find interesting. Rather, it is well established that omissions are actionable under the federal securities laws "only when the [defendant] is subject to a duty to disclose the omitted facts." *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 11 (S.D.N.Y. 2016). Absent a duty to disclose, there is no liability under Section 11. *See, e.g.*, *In re Morgan Stanley Tech. Fund Sec. Litig.*, 643 F. Supp. 2d 366, 375 (S.D.N.Y. 2009) (no liability "even if the [omitted] information would have been material"); *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 692 (S.D.N.Y. 2008) (no liability even if "a reasonable investor would very much like to know that fact").

Plaintiffs set forth conclusory allegations that DiDi had a duty to disclose under Regulation S-K, Items 303 and 105, and Regulation C, Item 408. But Plaintiffs have not, and cannot, establish that DiDi had an affirmative duty to disclose any "suggestions from regulators" that DiDi delay its IPO. DiDi had no general duty to disclose a government inquiry or unadjudicated wrongdoing, and neither Regulation S-K nor Regulation C required DiDi to do so. Plaintiffs' allegations fail.

### 1. DiDi Had No General Duty To Disclose Discussions With Regulators

Plaintiffs' omissions claim rests on their faulty assertion that DiDi omitted material facts by failing to disclose the CAC's "suggestions" concerning compliance with cybersecurity regulations. This boils down to a demand that DiDi disclose the existence of discussions with regulators from which further "suggestions," governmental actions, or investigations might flow, but there is no generalized duty even to disclose the existence of an investigation or accusations of wrongdoing, much less alleged conversations. *See, e.g.*, *City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) ("Disclosure is not a rite of confession"; there is no duty "to disclose uncharged, unadjudicated wrongdoing"); *Jiajia Luo*, 465 F. Supp. 3d at 413 ("There is no free-standing obligation under [the] law to disclose even criminal

conduct that is uncharged—let alone insufficient regulatory compliance."); *see also In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 650 (S.D.N.Y. 2017) (there is "no affirmative duty to speculate or disclose uncharged, unadjudicated wrongdoing or mismanagement.").

In light of this well-settled authority, courts regularly dismiss claims premised on the failure to disclose ongoing regulatory investigations, *see, e.g.*, *In re XP Inc. Sec. Litig.*, 524 F. Supp. 3d 23, 37-38 (E.D.N.Y. 2021), or the failure to disclose alleged wrongdoing, *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004). This is because, "absent an express prior disclosure," which DiDi did not make, "a corporation has no affirmative duty to speculate or disclose uncharged, unadjudicated wrongdoings or mismanagement, illegal internal policies, or violations of a company's internal codes of conduct and legal policies." *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *31 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac*, 752 F.3d 173; *see also Lions Gate Ent. Corp.*, 165 F. Supp. 3d at 20 ("An SEC investigation could not be characterized as a 'known trend' or 'uncertainty' under Item 303.").

Plaintiffs cannot evade this clear standard with their conclusory allegations DiDi was obligated to disclose the "CAC Directives." Plaintiffs do not and cannot plead facts sufficient to support an allegation that there was any such "directive" by the CAC—even accepting the allegations of the Complaint as true, the news articles on which Plaintiffs premise their claim merely speculate that DiDi was "under pressure from the CAC to delay" its IPO because the Chinese government *might* ask DiDi to complete additional cybersecurity and national security reviews. ¶ 147. Such "pressure to delay," even if true, is nothing more than a communication during the course of ongoing discussions with regulators which, like an investigation, ***does not trigger any disclosure requirement***. Any follow-up or fallout from those discussions was, at the time of DiDi's IPO, hypothetical and speculative. And to the extent DiDi was defying some

regulatory "directive" or other requirement (it was not), the "federal securities laws do not require a company to accuse itself of wrongdoing." *In re Citigroup*, 330 F. Supp. 2d at 377.

### 2.   DiDi Had No Duty To Disclose Under Item 303

Item 303 compels disclosure of "unusual or infrequent events . . . that materially affected the amount of reported income from continuing operations"[6] and "*known* trends and uncertainties that have had or that the registrant *reasonably expects will have a material* favorable or unfavorable impact on net sales or revenues."[7]  *Rudman v. CHC Grp. LTD.*, 217 F. Supp. 3d 718, 730 (S.D.N.Y. 2016) (Kaplan, J.) (citing 17 C.F.R. § 229.303(a)(3)(i)–(ii)).  Item 303 "does *not* call for disclosure of any 'trend' or 'uncertainty,'" but rather only those that are both "presently known to management" *and* "reasonably likely to have material effects on the [issuer]'s financial condition or results of operations."  *Willard v. UP Fintech Holding Ltd.*, 527 F. Supp. 3d 609, 619 (S.D.N.Y. 2021); *see also Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016) (issuers need "disclose only those trends, events, or uncertainties that it ***actually knows of*** when it files the relevant report with the SEC.  It is ***not enough that [the issuer] should have known*** of the existing trend, event, or uncertainty.").[8]

---

[6]   Plaintiffs cannot establish a duty to disclose under subsection (a)(3)(i), which addresses unusual or infrequent events, because that subsection refers only to those events that *already* "materially *affected* the amount of *reported* income from continuing operations."  17 C.F.R. § 229.303(a)(3)(i).

[7]   Instruction 9 to Item 303 instructs foreign private issuers to "discuss briefly any pertinent governmental economic, fiscal, monetary, or political policies or factors that have materially affected or could materially affect, directly or indirectly, their operations or investments by United States."  ¶ 135 (citing 17 C.F.R. § 229.303(b) & Instruction ¶ 9).  A foreign issuer's duty to disclose under Instruction 9 is bound by legal authorities regarding Item 303.

[8]   *See also In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *5 (S.D.N.Y. Mar. 29, 2016) ("[M]erely pleading a trend's '*existence*' is insufficient to establish knowledge.") (emphasis in original); *In re Ply Gem Holdings, Inc. Sec. Litig.*, 135 F. Supp. 3d 145, 150 (S.D.N.Y. 2015) (dismissing Item 303 claim because "the Complaint fails to plead facts sufficient to permit the conclusion that the alleged omissions were 'reasonably likely to be material' at the time of the

Here, Plaintiffs allege no facts that establish the existence of a duty to disclose under Item 303, and their claim—premised entirely on fraud-by-hindsight—fails. *See Schaffer v. Horizon Pharma PLC*, 2018 WL 481883, at *14 (S.D.N.Y. Jan. 18, 2018) (dismissing Item 303 claims where plaintiffs failed to "plead, with any specificity, facts establishing that Defendants possessed any actual knowledge of the purported 'trend' or event."). *First*, Plaintiffs fail to allege that the CAC's suggestions constituted a "trend" or "uncertainty" for disclosure purposes under Item 303. Indeed, Plaintiffs plead essentially a single event—a suggestion from the CAC—which on its face cannot be a "trend." *See In re Yunji Inc., Sec. Litig.*, 2021 WL 1439715, at *7 (E.D.N.Y. Mar. 31, 2021) ("[A]n inquiry into the existence of a trend must account for both the type of trend alleged to exist and the amount of time it might take for said trend to manifest under the circumstances."); *see also id.* ("[T]he Cambridge Dictionary defines a trend as 'a general development or change in a situation,' which necessarily implicates the passage of time."); *Blackmoss*, 2010 WL 148617, at *10 (denying Item 303 claim alleging articles published before IPO constituted a "rising trend").

*Second*, Plaintiffs assert that DiDi's decision to move forward with the IPO was "reasonably likely" to have a material impact on DiDi's operations. The "'reasonably [likely]' standard suggests that there must [be] a fairly substantial probability that the known risk at issue will materialize and have a material impact—if not a more-likely-than-not standard, then something not too much below that." *Holbrook v. Trivago N.V.*, 2019 WL 948809, at *12 (S.D.N.Y. Feb. 26, 2019); *see also In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 584 (S.D.N.Y. 2013) (no Item 303 claim for failure to disclose pending lawsuit where "the imminence and amount of AIG's suit were insufficiently certain"). Courts have therefore held that

---

[offering]"); *Blackmoss Investments Inc. v. ACA Cap. Holdings, Inc.*, 2010 WL 148617, at *9 (S.D.N.Y. Jan. 14, 2010) (Item 303 "requires that a plaintiff plead, with some specificity, facts establishing that the defendant had actual knowledge of the purported trend.").

Item 303 should not be construed "so broad[ly] as to require defendants to disclose [speculative] uncertainties, nor [does] it require disclosure of uncharged, unadjudicated wrongdoing." *Mucha v. Volkswagen Aktiengesellschaft*, 540 F. Supp. 3d 269, 298 (E.D.N.Y. 2021) (citing *Diehl v. Omega Protein Corp.*, 339 F. Supp. 3d 153, 166-68 (S.D.N.Y. 2018)).

Plaintiffs fail to meet this "'reasonably likely' standard" because their allegations require significant speculation. Plaintiffs themselves allege that the Chinese government "didn't intend to block the IPO." ¶ 142. As such, far from disclosing a "reasonably likely outcome," Plaintiffs' Securities Act claim would have required DiDi to disclose its own speculation as to the meaning and impact—if any—of the CAC's suggestions, and to accuse itself of wrongdoing. This is not required. *See, e.g.*, *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 673 (S.D.N.Y. 2008) (holding that "'backwards' pleading—an attempt to allege liability for disclosures not made because the material fact was unknowable or had not even occurred as of the critical date," fails as a Securities Act claim). Plaintiffs likewise fail to allege that DiDi was not in compliance with Chinese cybersecurity laws and regulations, or that DiDi had any reason to think any self-assessment it already performed would be insufficient in the eyes of the CAC, which reduced even further the likelihood that the CAC would take action, much less the specific actions alleged here. In fact, Plaintiffs allege that DiDi was an ally in the PRC's cybersecurity endeavors, and often appeared as an ambassador to promote the importance of cybersecurity. *See* ¶¶ 110-11.[9] Nothing in the Complaint supports the conclusory assertion that Defendants knew that moving forward with the IPO was "reasonably likely" to have a material impact on its business.

*Third*, to the extent Plaintiffs allege that DiDi's decision to move forward with the IPO was

---

[9]    Tellingly, Plaintiffs do not, and cannot, allege that DiDi's statements about its cybersecurity compliance efforts were materially false or misleading.

"reasonably likely" to have a material impact on DiDi's operations, Plaintiffs have not pleaded that knowledge *as of the date of the Offering Documents.*  Specifically, Plaintiffs fail to allege that as of June 30, 2021—the date DiDi's Offering Documents became effective—Defendants *knew* that any of the CAC's suggestions were "reasonably likely to have material effects on [DiDi]'s financial condition or results of operations." *Willard*, 527 F. Supp. 3d at 619.  Indeed, a review of the Complaint reveals the absence of even the most basic allegations of knowledge: Plaintiffs do not allege when CAC met with DiDi to communicate its suggestions, who (including anyone from DiDi) was a part of those meetings, or what precisely was said during those meetings.  Critically, Plaintiffs also fail to allege that CAC told DiDi—prior to its Registration Statement becoming effective—that there would be any such impacts.  Those failures are fatal to Plaintiffs' claims.

### 3.    DiDi Had No Duty To Disclose Under Item 105

Plaintiffs' pleading failures are equally fatal to Plaintiffs' Item 105 claim.  Item 105 requires issuers to "disclose the most significant factors that make an investment in the registrant or offering speculative or risky." *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 302 (S.D.N.Y. 2021).  Disclosure under Item 105 "is not a rite of confession." *City of Pontiac*, 752 F.3d at 184. Like Item 303, to establish a duty to disclose under Item 105, Plaintiffs "must demonstrate actual knowledge of an existing trend, event, or risk []." *Rubinstein v. Credit Suisse Group AG*, 457 F. Supp. 3d 289, 300 (S.D.N.Y. 2020).  Events that are not "reasonably likely to be material under Item 303" do not qualify as the "most significant factors" rendering an offering speculative or risky under Item 105. *Hutchison*, 647 F.3d at 484 n.4.

To start, and as discussed in detail below, the risk factors in DiDi's Offering Documents satisfied any disclosure obligation under Item 105.  "Because Plaintiffs have failed to identify any trends, events, or uncertainties that were not already disclosed in the Offering Documents and which would have had a material impact on [DiDi's] revenues or operations, Plaintiffs have not

pleaded adequately that [DiDi] omitted information that it was required to disclose under either Item 303 or Item 503." *Nurlybayev v. ZTO Express (Cayman) Inc.*, 2019 WL 3219451, at *8 (S.D.N.Y. July 17, 2019); *see also Hutchison*, 647 F.3d at 484 n.4 (dismissing claims for violations of Item 503 (now 105) where plaintiffs focused primarily on defendants' obligations under Item 303 and advanced no argument unique to Item 105/503).

Moreover, Plaintiffs do not allege a single fact showing that (i) the CAC's alleged suggestion that DiDi postpone its IPO had any legal or factual basis; (ii) DiDi actually knew that the CAC would retaliate, particularly given the failure to plead a legal or regulatory reason to do so; (iii) DiDi knew what, if any, sanctions the CAC might impose; or (iv) DiDi actually knew that retaliation by the CAC would be reasonably likely to have a material effect on DiDi's financial condition or results of operations.  There is no duty to disclose where, as here, Plaintiffs' claim hinges on "an attenuated chain of contingencies."  *Diehl*, 339 F. Supp. 3d at 167.

Plaintiffs' generalized allegations that China is an authoritarian state, that the "CAC wields authority beyond the letter of the law," ¶¶ 73-77, and that failing to abide by a suggestion (even one that lacks any legal basis) from a government agency would wreak havoc on a large company, fail to make up for the lack of specific allegations in the Complaint.  At best, these assertions request an inference that DiDi "should have known" the potential consequences, but it is "not enough" under Items 105 or 303 "that [the issuer] should have known" of a trend or risk.  *Indiana Pub. Ret. Sys.*, 818 F.3d at 95.  Plaintiffs fail to allege a duty to disclose under Regulation S-K.

### 4.      DiDi Had No Duty To Disclose Under Item 408

Finally, Plaintiffs—apparently as an afterthought—assert that DiDi also breached a disclosure duty under Item 408 of Regulation C, 17 C.F.R. § 230.408.  Plaintiffs do not allege a single fact in support of the existence of a purported duty under Item 408, nor could they.  Item 408 provides that issuers must include in registration statements "such further information, if any,

as may be necessary to make the required statements, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 230.408.  But Plaintiffs fail to plead any statements that were rendered misleading as a result of the alleged omissions in the Registration Statement or otherwise.  Plaintiffs therefore fail to allege a duty to disclose under Item 408.

### C.    DiDi's Offering Documents Included Robust Risk Disclosures

Even if Plaintiffs' conclusory allegations were sufficient to state a claim under Rule 9(b) (they are not), Plaintiffs' claim that DiDi failed to disclose the risk that the government might take action fails because DiDi's Offering Documents did, in fact, "warn investors of *exactly the risk* the plaintiffs claim was not disclosed."  *Olkey*, 98 F.3d at 5.

Plaintiffs allege that DiDi's Offering Documents failed to disclose the "Omitted Facts"— that the CAC "instructed" or "directed" DiDi "to postpone its IPO" pending a cybersecurity review. ¶ 312.  But as explained above, Plaintiffs fail to plead that there was any "directive," a failure that is similarly fatal to their definition of "Omitted Facts."  Instead, all Plaintiffs actually allege is a failure to disclose a risk that the Chinese government might act.  DiDi's Offering Documents addressed these very risks—including the possibility that the Chinese government might suspend DiDi's business operations—which bars Plaintiffs' claims as a matter of law.

DiDi's Offering Documents—which form the entire basis of Plaintiffs' Section 11 claim— includes over *sixty* pages of detailed risk disclosures.  Ex. B at 24-85.  Most importantly, the Offering Documents expressly disclose the risk that Chinese regulators might impose "penalties including . . . [the] suspension of business operation [and] shut-down of the websites" for "the perception of" non-compliance with laws regarding internet security and protection of personal information.  *Id*. at 196.  In other words, DiDi expressly disclosed the very risk of intervention by the Chinese regulators that Plaintiffs allege was omitted.  Because DiDi's Registration Statement warned of the exact risk that later materialized (*after* the Offering Documents became effective),

Plaintiffs' Section 11 claim must be dismissed.  *See Jiajia Luo*, 465 F. Supp. 3d at 411; *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 361 (2d Cir. 2002) (dismissing Section 11 claim where "[t]he allegedly omitted facts were either disclosed or implied in the offering memoranda").[10]

DiDi's Offering Documents are replete with disclosures that give the lie to Plaintiffs' Section 11 allegations.  Among other robust disclosures, the Offering Documents expressly state that DiDi's business "is subject to a variety of laws, regulations, rules, policies and other obligations regarding privacy, data protection and information security," and that "[d]espite our efforts to comply with applicable laws, regulations and other obligations relating to privacy, data protection and information security, it is possible that our practices, offerings or platform could fail to meet all of the requirements imposed on us by such laws, regulations or obligations."  Ex. B at 27.  The Offering Documents further disclose that:

> ***Any failure on our part to comply with applicable laws or regulations or any other obligations relating to privacy, data protection or information security, or any compromise of security . . . or the perception or allegation that any of the foregoing types of failure or compromise has occurred,*** . . . could damage our reputation, discourage new and existing drivers and riders from using our platform or result in investigations, fines, suspension of one or more of our apps, ***or other penalties by government authorities*** and private claims or litigation, any of which could materially adversely affect our business, financial condition and results of operations.

*Id.*  DiDi went on to explain to investors that "[t]he PRC government has enacted various laws and regulations with respect to internet security and protection of personal information from any inappropriate collection activities, abuse or unauthorized disclosure.  Internet information in the

---

[10]    *See also, e.g.*, *In re Proshares Tr. II Sec. Litig.*, 2020 WL 71007, at *9 (S.D.N.Y. Jan. 3, 2020) (no Item 105 claim where registration statement provided "ample warning" of risks); *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 235-36 (S.D.N.Y. 2018) (no Item 303/503 claim where company made general disclosure that its restaurants "have been associated with customer illness" on a "small number of occasions"); *Schaffer*, 2018 WL 481883, at *14 (no Item 303/503 claim where company disclosed it was charging higher prices than competition and may not be able to execute business plan successfully).

PRC is regulated and restricted from a national security standpoint," *id.* at 196, and that any failure to comply with those laws and regulations could result in "administrative penalties including, without limitation, fines, suspension of business operation, shut-down of the websites, revocation of licenses and even criminal liabilities," *id.*

DiDi also repeatedly and expressly informed investors about the uncertainties and risks of the Chinese legal and regulatory landscape, including that:

- DiDi's "business is subject to numerous legal and regulatory risks that could have an adverse impact on our business and future prospects," *id.* at 25;

- "Uncertainties with respect to the PRC legal system could adversely affect us . . . The PRC legal system is evolving rapidly, and the interpretations of many laws, regulations and rules may contain inconsistencies and enforcement of these laws, regulations and rules involves uncertainties," *id.* at 57; and

- "Although we have taken measures to comply with the laws and regulations applicable to our business operations and to avoid conducting any non-compliant activities under these laws and regulations, the PRC governmental authorities may promulgate new laws and regulations regulating our business," *id*.

In sum, DiDi's Offering Documents "warned of the exact risk that was threatened and later materialized." *Jiajia Luo*, 465 F. Supp. 3d at 411.  Plaintiffs thus fail to state a material omission from DiDi's Offering Documents, and their Securities Act claims must be dismissed.

## IV.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE EXCHANGE ACT

To state a claim under Section 10(b) of the Exchange Act, Plaintiffs must allege, among other things, (i) a material misrepresentation or omission, (ii) scienter, and (iii) loss causation. *Singh v. Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019).  Plaintiffs' Exchange Act claims are subject to the heighted pleading requirements of the PSLRA and Rule 9(b), which require that Plaintiffs "state with particularity the circumstances constituting fraud."  *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 259 (S.D.N.Y. 2008).  The PSLRA further requires that the Complaint

"state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

### A.  Plaintiffs Fail to Plead Any Actionable Omission of Material Fact

Plaintiffs' Exchange Act claims are predicated on the same alleged "Omitted Facts" as their Securities Act claims and thus fail for the same reasons demonstrated above. *Supra* Section III.  This alone warrants dismissal of Plaintiffs' Exchange Act claims.

### B.  Plaintiffs Fail to Plead a "Strong Inference" of Scienter

Even had Plaintiffs alleged an actionable omission, the Complaint does not allege facts sufficient to "give rise to a strong inference of fraudulent intent" as is required to state a claim under Section 10(b). *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001).  "To qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007).  Plaintiffs may satisfy this requirement by alleging facts (i) showing motive and opportunity or (ii) constituting strong circumstantial evidence of conscious misbehavior or recklessness. *ATSI*, 493 F.3d at 99.  Plaintiffs allege neither.

#### 1.  Plaintiffs Fail to Plead Motive and Opportunity

Plaintiffs allege that "DiDi was motivated to conceal the Omitted Facts because it wanted to receive the $4.4 billion in IPO proceeds," and that Defendants Cheng and Liu were motivated "because their stake in DiDi became worth $4.4 billion and $1.1 billion respectively." ¶¶ 234–35. However, "[m]otives that are generally possessed by most corporate directors and officers do not suffice." *Kalnit*, 264 F.3d at 139.  "Rather, plaintiff must allege that defendants benefitted in some concrete and personal way from the purported fraud." *Defer LP v. Raymond James Fin., Inc.*, 654 F. Supp. 2d 204, 217–18 (S.D.N.Y. 2009) (Kaplan, J.).  Plaintiffs' assertion "that the alleged fraud enabled [Defendants] to complete business transactions, or enabled Individual Defendants to gain

by increased value of stock options, is insufficient to allege motive." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 592 (S.D.N.Y. 2011); *see also Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) ("If scienter could be pleaded on that basis alone, virtually every company . . . that experiences a downturn in stock price could be forced to defend securities fraud actions.").

To the extent Plaintiffs rely on allegations of insider sales to support a strong inference of scienter, this argument also fails.  ¶¶ 226–29.  "For insider sales to raise an inference of improper motive, they must be 'suspicious' or 'unusual.'"  *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 381 (E.D.N.Y. 2003).  "Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling."  *Id.* at 382.  Plaintiffs do not allege that ***any*** Individual Defendant or other insider traded his or her own shares during the Class Period, and Plaintiffs admit that any initial profit realized by DiDi's offering of shares in the IPO "was short-lived"—although the Company received $4.4 billion in IPO proceeds, the $4.7 billion in losses incurred as a result of the subsequent regulatory actions were even higher.  ¶¶ 126, 165, 234.

Plaintiffs also cannot show that the "timing" of any transaction was so "unusual or suspicious" that it must have been "calculated to maximize personal benefit from inside information."  *In re Axis Cap. Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 595–96 (S.D.N.Y. 2006).  As Plaintiffs admit, Defendant Cheng and Liu's shares, as well as those of its early investors, were subject to a six-month lock-up period that lasted until December 28, 2021, after DiDi announced its plans to delist from the NYSE.  ¶¶ 67, 235.  "It defies reason that an entity looking to profit on a fraudulently inflated stock price would" launch an IPO, triggering this lock-

27

up, "*while knowing that the information illuminating the fraud was seeping into the market.*"
*Glaser*, 772 F. Supp. 2d at 593 (emphasis in original).[11]

Plaintiffs' various allegations about the timing of the IPO similarly do not support a strong
inference of scienter.  To start, Plaintiffs allege that DiDi accelerated the IPO, launching it on
the eve of a major Chinese holiday when "government workers suspend[ed] their daily work."  ¶¶
155–56.  This argument fails on its own terms because—as Plaintiffs admit—regulators returned
to work *before* the close of the IPO, and the CAC never forbade DiDi from going public in the
U.S.  ¶¶ 172, 205.  Plaintiffs' claim that the IPO was timed to pre-date the enactment of more
restrictive laws such as the Data Security Law, ¶¶ 152–53, 234, is equally unavailing because DiDi
disclosed in the Offering Documents that such laws were forthcoming.  Ex. B at 27, 196.

Plaintiffs' theory of motive is thus not "cogent and at least as compelling as any opposing
inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.  "It is nonsensical to impute dishonest
motives to the Individual Defendants when each of them suffered significant losses in their stock
holdings and executive compensation." *Plumbers & Steamfitters Loc. 773 Pension Fund v.
Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010); *see Rombach v.
Chang*, 355 F.3d 164, 177 (2d Cir. 2004) (no motive where "defendants were among [the] largest
shareholders and shared the pain when the company failed.").  The only plausible inference from
the facts alleged in the Complaint is that Defendants believed the IPO would be successful and not
hindered by any imminent regulatory issues.

---

[11]    *See also In re HEXO Corp. Sec. Li*tig., 524 F. Supp. 3d 283, 313 (S.D.N.Y. 2021)
(allegation that "individual defendants held options with high strike prices" was insufficient to
alleged motive where "it is not ever alleged that the Exchange Act Individual Defendants exercised
their options"); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*,
75 F.3d 801, 814 (2d Cir. 1996) ("[T]he fact that other defendants did not sell their shares during
the relevant class period sufficiently undermines plaintiffs' claim regarding motive.").

      **2.**     **Plaintiffs Fail to Plead Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness**

Because Plaintiffs fail to plead motive, "the strength of the circumstantial allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142. Where, as here, Plaintiffs allege fraud on the basis of a material omission, they must "present facts indicating a clear duty to disclose," *id*. at 144, which, as already shown above, Plaintiffs fail to do (*supra* Section III). Plaintiffs fail to allege recklessness, much less conscious misbehavior.

To establish recklessness, Plaintiffs must plead "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* This requires an allegation that Defendants had "knowledge of facts or access to information contradicting their public statements." *Id.* Relying solely on news articles published ***after*** the IPO, Plaintiffs assert that "DiDi knew or recklessly disregarded that the CAC had directed DiDi not to conduct an IPO in the United States until it had completed a thorough self-examination of its business," and "that the CAC and/or other PRC governmental agencies would take strong regulatory actions against DiDi that would seriously disrupt its business if DiDi ignored its directive to delay the IPO." ¶ 250. These allegations fail.

*First*, "media reports that do not indicate particularized facts, but instead provide only generalized forecasting and speculation, do not support scienter allegations." *Glaser*, 772 F. Supp. 2d at 596 n.16; *see Plumbers*, 694 F. Supp. 2d at 300 ("generalized forecasting and speculation about a looming subprime crisis" is insufficient). Here, Plaintiffs' cited sources are plainly speculative. These articles present conflicting accounts, most of which allege, *at most*, that the regulatory fallout that succeeded DiDi's IPO may have been caused by a "***misinterpretation*** over the clarity and forcefulness of the CAC's instruction." AC Ex. 14 at 3. None of the sources are described "with sufficient particularity to support the probability that a person in the position

occupied by the source would possess the information alleged." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000). Instead, the articles attribute facts to "sources" or "people familiar with the matter," AC Ex. 14 at 3; AC Ex. 15 at 1; AC Ex. 17 at 2, which is plainly insufficient to satisfy the stringent pleading requirements for scienter under the PSLRA, *see Glaser*, 772 F. Supp. 2d at 589 (source who was "intimately involved" with matter "is not described sufficiently so that his allegations support an inference of scienter"). At bottom, "[o]ther than quoting a newspaper article's reference to what unnamed [sources] 'assume' about the opinions of unnamed 'regulators,' the complaint contains no factual allegation that specific regulators issued a specific warning" to DiDi about delaying its IPO. *Hershfang v. Citicorp*, 767 F. Supp. 1251, 1256 (S.D.N.Y. 1991). The articles cited in the Complaint do nothing more than confirm that "***[n]either DiDi nor the CAC . . . ever publicly acknowledged the existence of such a conversation***." AC Ex. 14 at 3.

*Second*, none of the articles or anonymous sources cited in the Complaint set forth particularized facts showing that any Individual Defendants had "knowledge of facts or access to information contradicting their public statements." *Kalnit*, 264 F.3d at 142. Generic and speculative claims that "DiDi was fully aware" or that regulators "felt certain DiDi understood" are insufficient to plead scienter under Rule 9(b) or the PSLRA. ¶¶ 205, 237. *See Glaser*, 772 F. Supp. 2d at 591 ("[C]onclusory statements that defendants 'were aware' of certain information, and . . . that defendants 'would have' or 'should have' had such knowledge is insufficient."). Rather, Plaintiffs "must specifically identify the reports or statements containing this information." *Keyspan*, 383 F. Supp. 2d at 388; *Glaser*, 772 F. Supp. 2d at 590 (recklessness allegations "insufficient absent some allegation that the witness communicated with the individual defendants"). Plaintiffs allege that sources "confirmed a meeting between the CAC and DiDi in Beijing," which curiously "produced no written records." ¶¶ 144, 288. These allegations are "so

vague as to be meaningless," because they do not explain "what specific contradictory information Individual Defendants received or when they received it," or "how extensively or in what manner the [information was] discussed."[12]  *Loc. No. 38*, 724 F. Supp. 2d at 461.  It is thus impossible to determine based on the allegations in the Complaint whether DiDi's decision to move forward with the IPO constituted "an extreme departure from the standards of ordinary care."  *Kalnit*, 264 F.3d at 142.  If the CAC only "suggested" that DiDi delay its IPO, as Plaintiffs allege, ¶ 191, then DiDi's decision was not reckless, because—by many accounts—key agencies, including "the top economic-planning agency, appeared supportive of its listing."  AC Ex. 9 at 4; *see* AC Ex. 13 at 2 (DiDi "received mixed signals from different agencies"); AC Ex. 17 at 2 (similar).  Although Plaintiffs allege that "it is reasonably foreseeable that defying President Xi's directives will result in severe punishment to one's . . . business," ¶ 114, *none* of their sources allege that a "directive" was ever given—rather, they confirm that the CAC "didn't intend to block the IPO."  ¶ 142; *see* AC Ex. 12 at 1 (noting "a top party official" questioned why the CAC "*hadn't* blocked" the IPO).[13]

*Third*, numerous allegations contained in the articles Plaintiffs cite undermine claims of recklessness.  For example, Plaintiffs ignore reporting that "the CAC itself has come under scrutiny

---

[12]     Plaintiffs allege that "a former director of the Publicity Department of the Central Committee of the CPC [who is also] currently an executive at a Chinese internet company" claimed that the meeting took place on June 21, 2021.  ¶ 142 n.58.  This allegation, buried in a footnote, conflicts with other allegations in the Complaint that the meeting occurred "as early as three months" before the IPO.  *Id.* ¶ 143.  Plaintiffs do not allege that this unnamed individual was affiliated with either the CAC or DiDi, and do not otherwise allege facts to show that "a person in the position occupied by the source would possess the information alleged."  *Novak*, 216 F.3d at 314.  Plaintiffs plead no facts to establish the reliability of the document on which this assertion relies, nor do they plead any particularized information about this meeting.  *See id.*

[13]     Plaintiffs' assertion that Defendant Zhang "is reported to have advised DiDi Chairman Will Cheng and President Jean Liu . . . against rushing to go public in the midst of China's wide-ranging regulatory crackdown on . . . dozens of internet-technology companies" fails for the same reasons.  ¶¶ 154, 233.  This allegation also does not establish any Defendant's knowledge of the CAC's desire for DiDi to delay the IPO—to the contrary, the Complaint alleges that Defendant Zhang had no knowledge of this fact prior to the IPO.  *Id.*

because of the DiDi IPO, with a top party official having questioned why the agency hadn't blocked the company's offering."  AC Ex. 12 at 1.  Such allegations clearly undercut Plaintiffs' claim of scienter.  Moreover, several outlets reported that "[i]t is unclear whether DiDi applied for a review before its IPO."  AC Ex. 13 at 1–2; *see* AC Ex. 11 at 4.  Hence, even assuming *arguendo* the CAC suggested DiDi delay its IPO pending a review, it is unclear whether DiDi had satisfied, or reasonably believed it had satisfied, the conditions allegedly laid out by the CAC before its IPO.  Tellingly, Plaintiffs do not—and cannot—set forth any fact alleging that DiDi knew it was not in compliance with any cybersecurity review requirements.

   *Finally*, Plaintiffs' allegation that Defendants "were under a duty to diligently investigate the reasons for the CAC's harsh actions on July 2 prior to closing" similarly fails to establish recklessness.  ¶ 221; *see* ¶ 251.  Plaintiffs admit that shortly after the CAC announced its investigation, DiDi stated that it would "fully cooperate" with authorities and "conduct a comprehensive examination of cybersecurity risks."  *Id.* ¶ 170.  Plaintiffs do not allege that this statement was false.  The fact that DiDi immediately investigated the reasons for the CAC's actions "cut[s] against the inference of scienter."  *Glaser*, 772 F. Supp. 2d at 589 (that defendants "were taken by surprise" by inquiries and "conducted extensive investigations" undermines inference of fraudulent intent).  Moreover, "plaintiffs cannot rely on information generally known or available to the public to support circumstantial scienter allegations."  *Id.* at 588.  As Plaintiffs acknowledge, when trading opened on July 2, the market was already aware of the CAC's actions.  ¶¶ 167–69.  *See In re Pfizer, Inc. Sec. Litig.*, 538 F. Supp. 2d 621, 637 (S.D.N.Y. 2008) ("That the information was publicly available . . . weakens any inference that defendants intended to defraud the market") (Kaplan, J.).  To the extent Plaintiffs argue that DiDi knew more about the CAC's intent than what the public knew, the Complaint alleges no facts to support Plaintiffs' speculation.

Like Plaintiffs' motive allegations, none of Plaintiffs' theories of recklessness passes muster. *Tellabs*, 551 U.S. at 314.  Defendants' "conduct during the Class Period was not consistent with fraud." *Plumbers*, 694 F. Supp. 2d at 302.  Not only did DiDi candidly disclose adverse regulatory actions against it as recently as three months before the IPO, Ex. B at 57, but the Complaint admits that for years and immediately after the IPO, DiDi has made "public displays of cooperation" with government directives, ¶¶ 107–12, 170.  *See Rombach*, 355 F.3d at 176–77 (recklessness inference "is weakened by [defendants'] disclosure of certain financial problems prior to the deadline").  In light of the foregoing, Plaintiffs' speculation that Defendants would knowingly and publicly defy the Chinese government just before its high-profile IPO—while their shares were subject to a six-month lock-up period, no less—is as illogical as it is suicidal.  Even after the IPO launched, the CAC did not point to any pre-IPO directive that DiDi defied or use its "immense power" to stop the IPO before it closed.  *See* ¶ 6.  *See Glaser*, 772 F. Supp. 2d at 598 (nonfraudulent inference "supported. . . by the fact[] that . . . [parties] denied the vague internet rumors concerning their relationship and contract renewal").  The CAC also did not accuse anyone of flouting the alleged directive.  ¶ 150.  *See Loc. No. 38*, 724 F. Supp. 2d at 462 ("if 'detailed' reports were circulated . . . [the witness] should be able to identify the names and contents of these documents, or recount specific meetings at which the Individual Defendants actually received contradictory information.").  The more compelling inference is that DiDi reasonably and genuinely believed, amidst the cacophony of voices by the relevant Chinese regulators, that it was not prohibited by regulators to proceed with the IPO.  AC Ex. 12 at 1.

## C.    Plaintiffs Fail to Plead Loss Causation

To establish loss causation, Plaintiffs must adequately allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, "*i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively

affected the value of the security. Otherwise, the loss in question was not foreseeable." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005). A disclosure "constitutes a sufficient foundation for loss causation allegations only if it somehow reveals to the market that a defendant's prior statements were not entirely true or accurate." *In re Take–Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 283 (S.D.N.Y. 2008); *see also Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72, 75 (2d Cir. 2013) (no loss causation where plaintiff did "not identify how the alleged corrective disclosures even purported to reveal some then-undisclosed *fact* with regard to the specific misrepresentations alleged in the complaint.").

Here, Plaintiffs fail to adequately allege any corrective disclosure. For example, Plaintiffs allege that on July 2 and 3, 2021, news outlets reported that the CAC was initiating a cybersecurity review of DiDi, ¶ 182, but Plaintiffs fail to allege how this disclosure was corrective of the "Omitted Facts." Indeed, elsewhere, Plaintiffs allege that the market learned that the CAC "directed" DiDi to delay its IPO on July 5, ¶ 191; in other words, the "Omitted Facts" did not become clear until days after the first purported corrective disclosure. Plaintiffs' assertion as to July 5 is similarly flawed because, as explained in detail above, Plaintiffs fail to plead that there was any "directive" that DiDi delay its IPO.

Plaintiffs similarly set forth no facts supporting their assertion that events on other alleged disclosure dates alerted the market to previously undisclosed facts. *See* ¶¶ 195-211. "[B]ecause a corrective disclosure must reveal a previously concealed truth, it obviously must disclose new information, and cannot be merely confirmatory." *Sapssov v. Health Mgmt. Assoc., Inc.*, 608 Fed. App'x 855, 863 (11th Cir. 2015). Plaintiffs allege that price declines followed certain public reports, but nowhere plead that these reports revealed previously undisclosed "Omitted Facts" about DiDi. At most, Plaintiffs allege that the Chinese government *continued* to retaliate against

DiDi for its decision to move forward with the IPO. The mere fact that DiDi's stock price continued to decline over several months is not sufficient to plead loss causation. *See In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 300 (S.D.N.Y. 2014) (holding statement that caused stock price decline revealed no new information to market).

### D.   Plaintiffs Fail to Plead a Section 20A Claim

Plaintiffs fail to state a claim for insider trading under Section 20A because they fail to state a claim under Section 10(b). *See Keyspan*, 383 F. Supp. 2d at 389. Plaintiffs' Section 20A claim fails for the additional reason that they fail to allege that any Defendant traded on material nonpublic information, because the CAC's regulatory action was known to the public prior to the close of the IPO, and, as shown above, Plaintiffs fail to show DiDi had access to any nonpublic information. *Take-Two*, 551 F. Supp. 2d at 309–10. To the extent Plaintiffs' 20A claim is predicated on alleged insider trading while failing to disclose material information, that argument is baseless because, as discussed above, Plaintiffs fail to allege any duty to disclose.

Because Plaintiffs fail to allege violations of Sections 10(b) and 20A, they fail to state a claim for control person liability under Section 20(a).

## V.   CONCLUSION

For the reasons discussed herein, DiDi Global respectfully seeks dismissal of the Consolidated Amended Class Action Complaint, with prejudice.

Dated: March 8, 2022
        New York, New York

Respectfully submitted,

*/s/ Corey Worcester*

Corey Worcester
Renita Sharma
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10038
Tel: (212) 849-7000
Fax: (212) 849-7100
coreyworcester@quinnemanuel.com
renitasharma@quinnemanuel.com

Scott Musoff
Robert Fumerton
Michael Griffin
Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, New York 10001
Tel: (212) 735-3000
Fax: (212) 735-2000
scott.musoff@skadden.com
robert.fumerton@skadden.com
michael.griffin@skadden.com

*Counsel for Defendant DiDi Global Inc.*