**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE DIDI GLOBAL INC. SECURITIES LITIGATION | Master Docket 1:21-cv-05807-LAK<br><br>This Document Relates To:  All Actions |

**MEMORANDUM OF LAW ON BEHALF OF DEFENDANT DIDI GLOBAL INC. IN SUPPORT OF ITS MOTION TO DISMISS THE CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT**

# **TABLE OF CONTENTS**

**Page**

I.  PRELIMINARY STATEMENT ..................................................................................1

II.  STATEMENT OF FACTS ......................................................................................3

    A.  DiDi's Regulatory Environment ................................................................3

    B.  DiDi's IPO Disclosures.............................................................................4

    C.  DiDi's IPO and Subsequent Events .........................................................6

III.  PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE SECURITIES ACT..............10

    A.  Plaintiffs Fail to Plead a Material Omission in DiDi's Offering Documents with The Requisite Particularity Under Rule 9(b) ................................11

    B.  Plaintiffs Fail to Plead Actionable Omissions Because DiDi Had No Duty To Disclose Facts Beyond Its Robust Risk Disclosures .........................14

        1.  DiDi Had No General Duty To Disclose Discussions With Regulators ................................................................................14

        2.  DiDi Had No Duty To Disclose Under Item 303 .....................16

        3.  DiDi Had No Duty To Disclose Under Item 105 .....................19

        4.  DiDi Had No Duty To Disclose Under Item 408 .....................20

    C.  DiDi's Offering Documents Included Robust Risk Disclosures ...........20

    D.  Plaintiffs Fail to Allege Actionable False Statements in the Underwriting Agreement ..........................................................................................22

IV.  PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE EXCHANGE ACT ..............24

    A.  Plaintiffs Fail to Plead Any Actionable Omission of Material Fact ......25

    B.  Plaintiffs Fail to Plead a "Strong Inference" of Scienter .....................25

        1.  Plaintiffs Fail to Plead Motive and Opportunity.....................25

        2.  Plaintiffs Fail to Plead Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness ..................................27

    C.  Plaintiffs Fail To Plead Loss Causation.................................................33

    D.  Plaintiffs Fail to Plead Claims Under Section 20A and Section 20(a) .................35

V.  CONCLUSION....................................................................................................35

## TABLE OF AUTHORITIES

**Page**

### Cases

*Abuhamdan v. Blyth, Inc.*,
  9 F. Supp. 3d 175 (D. Conn. 2014).........................................................35

*Acito v. IMCERA Grp., Inc.*,
  47 F.3d 47 (2d Cir. 1995)......................................................................26

*In re Agria Corp. Sec. Litig.*,
  672 F. Supp. 2d 520 (S.D.N.Y. 2009)....................................................11

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007).........................................................25, 29, 32

*In re Banco Bradesco S.A. Sec. Litig.*,
  277 F. Supp. 3d 600 (S.D.N.Y. 2017)....................................................15

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
  980 F. Supp. 2d 564 (S.D.N.Y. 2013)....................................................17

*Blackmoss Investments Inc. v. ACA Cap. Holdings, Inc.*,
  2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) ......................................16, 17

*Caiafa v. Sea Containers Ltd.*,
  2008 WL 11516813 (S.D.N.Y. May 15, 2008) .......................................11

*Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*,
  543 F. App'x 72 (2d Cir. 2013)..............................................................34

*In re China Valves Tech. Sec. Litig.*,
  2012 WL 4039852 (S.D.N.Y. Sept. 12, 2012).........................................12

*In re Citigroup, Inc. Sec. Litig.*,
  330 F. Supp. 2d 367 (S.D.N.Y. 2004).................................................15, 16

*City of Omaha Police & Fire Retirement Sys. v. Evoqua Water Techs. Corp.*,
  2020 WL 1529371 (S.D.N.Y. Mar. 30, 2020) ........................................13

*City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014)...............................................................14, 19

*In re Coty Inc. Sec. Litig.*,
  2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) ........................................16

*Defer LP v. Raymond James Fin., Inc.*,
  654 F. Supp. 2d 204 (S.D.N.Y. 2009).................................................25, 26

*Diehl v. Omega Protein Corp.*,
  339 F. Supp. 3d 153 (S.D.N.Y. 2018).................................................18, 20

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005).................................................................................2

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011).................................................. 26, 27, 28, 29, 31, 32, 33

*Halperin v. eBanker USA.com, Inc.*,
  295 F.3d 352 (2d Cir. 2002)................................................................................. 21

*Hershfang v. Citicorp*,
  767 F. Supp. 1251 (S.D.N.Y. 1991)...................................................................... 29

*In re HEXO Corp. Sec. Litig.*,
  524 F. Supp. 3d 283 (S.D.N.Y. 2021).......................................................... 12, 19, 27

*Holbrook v. Trivago N.V.*,
  2019 WL 948809 (S.D.N.Y. Feb. 26, 2019) ........................................................ 17

*Hutchison v. Deutsche Bank Sec. Inc.*,
  647 F.3d 479 (2d Cir. 2011)........................................................................... 11, 19

*In re IAC/InterActiveCorp Sec. Litig.*,
  695 F. Supp. 2d 109 (S.D.N.Y. 2010).................................................................. 35

*In re IBP, Inc. S'holders Litig.*,
  789 A.2d 14 (Del. Ch. 2001).......................................................................... 23, 24

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
  818 F.3d 85 (2d Cir. 2016)............................................................................ 16, 20

*Jaroslawicz v. M & T Bank Corp.*,
  2017 WL 1197716 (D. Del. Mar. 30, 2017) ........................................................ 23

*Jiajia Luo v. Sogou, Inc.*,
  465 F. Supp. 3d 393 (S.D.N.Y. 2020)........................................................ 13, 15, 21, 22, 24

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001)............................................................... 25, 28, 29, 30

*In re Keyspan Corp. Sec. Litig.*,
  383 F. Supp. 2d 358 (E.D.N.Y. 2003) ...................................................... 26, 29, 35

*Ladmen Partners, Inc. v. Globalstar, Inc.*,
  2008 WL 4449280 (S.D.N.Y. 2008)..................................................................... 13

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005)........................................................................... 33, 34

*Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*,
  902 F. Supp. 2d 329 (S.D.N.Y. 2012).................................................................. 12

*In re Lions Gate Ent. Corp. Sec. Litig.*,
  165 F. Supp. 3d 1 (S.D.N.Y. 2016)................................................................. 14, 15

*Local No. 38 Int'l Bhd. of Elec. Workers' Pension Fund v. Am. Exp. Co.*,
  724 F. Supp. 2d 447 (S.D.N.Y. 2010).............................................................. 30, 33

*Miller v. Lazard, Ltd.*,
  473 F. Supp. 2d 571 (S.D.N.Y. 2007).................................................................. 14

*In re Morgan Stanley Info. Fund Sec. Litig.*,
   592 F.3d 347 (2d Cir. 2010) ................................................................ 11

*In re Morgan Stanley Tech. Fund Sec. Litig.*,
   643 F. Supp. 2d 366 (S.D.N.Y. 2009) .................................................. 14

*Mucha v. Volkswagen Aktiengesellschaft*,
   540 F. Supp. 3d 269 (E.D.N.Y. 2021) ................................................. 17

*Newmont Mining Corp. v. AngloGold Ashanti Ltd.*,
   2020 WL 1285543 (S.D.N.Y. Mar. 18, 2020) ............................... 23, 24

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) .......................................................... 28, 30

*Nurlybayev v. ZTO Express (Cayman) Inc.*,
   2019 WL 3219451 (S.D.N.Y. July 17, 2019) ...................................... 19

*In re Optionable Sec. Litig.*,
   577 F. Supp. 2d 681 (S.D.N.Y. 2008) .................................................. 14

*Olkey v. Hyperion 1999 Term Tr., Inc.*,
   98 F.3d 2 (2d Cir. 1996) .............................................................. 11, 20

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
   538 F. Supp. 2d 662 (S.D.N.Y. 2008) .................................................. 18

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
   307 F. Supp. 3d 583 (S.D. Tex. 2018) ................................................. 23

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*,
   694 F. Supp. 2d 287 (S.D.N.Y. 2010) ...................................... 27, 28, 32

*In re Ply Gem Holdings, Inc. Sec. Litig.*,
   135 F. Supp. 3d 145 (S.D.N.Y. 2015) .................................................. 16

*In re Proshares Tr. II Sec. Litig.*,
   2020 WL 71007 (S.D.N.Y. Jan. 3, 2020) ............................................ 21

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ...................................................... 12, 27, 33

*Rubinstein v. Credit Suisse Group AG*,
   457 F. Supp. 3d 289 (S.D.N.Y. 2020) .................................................. 19

*Rudman v. CHC Grp. LTD.*,
   217 F. Supp. 3d 718 (S.D.N.Y. 2016) .................................................. 16

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*,
   75 F.3d 801 (2d Cir. 1996) .................................................................. 27

*Schaffer v. Horizon Pharma PLC*,
   2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) .................................. 16, 21

*Scott v. Gen. Motors Co.*,
   46 F. Supp. 3d 387 (S.D.N.Y. 2014) .................................................... 24

*In re Sec. Cap. Assurance Ltd. Sec. Litig.*,
  2011 WL 4444206 (S.D.N.Y. Sept. 23, 2011) ........................................................ 35

*Singh v. Cigna Corp.*,
  918 F.3d 57 (2d Cir. 2019) ..................................................................................... 24

*In re Take–Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008) ......................................................... 33, 34, 35

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007) .................................................................................. 2, 25, 27, 32

*In re UBS AG Sec. Litig.*,
  2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) ...................................................... 15

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223, 261-62 (2d Cir. 2016) ..................................................................... 34

*Willard v. UP Fintech Holding Ltd.*,
  527 F. Supp. 3d 609 (S.D.N.Y. 2021) ............................................................. 16, 18

*In re XP Inc. Sec. Litig.*,
  524 F. Supp. 3d 23 (E.D.N.Y. 2021) ..................................................................... 15

*Y-GAR Capital LLC v. Credit Suisse Grp. AG*,
  2020 WL 71163 (S.D.N.Y. Jan. 2, 2020) ............................................................. 12

*In re Yunji Inc., Sec. Litig.*,
  2021 WL 1439715 (E.D.N.Y. Mar. 31, 2021) ...................................................... 17

### Statutes and Rules

17 C.F.R. § 229.303 ......................................................................................... 12, 16

17 C.F.R. § 230.408 ............................................................................................... 20

17 C.F.R. § 240.10b-5 ........................................................................................... 12

Fed. R. Civ. P. 12(b)(6) ........................................................................................... 1

Fed. R. Civ. P. Rule 8 ...................................................................................... 12, 13

Fed. R. Civ. P. Rule 9(b) ................................................................................. *passim*

Sections Exchange Act of 1934 Section 10(b) ................................................. *passim*

Sections Exchange Act of 1934 Section 20(a) ................................................... 1, 35

Sections Exchange Act of 1934 Section 20A .................................................... 1, 35

Securities Act of 1933 Section 11 ................................................................... *passim*

Securities Act of 1933 Section 15 ......................................................................... 11

Securities Act of 1933 Section 12 ......................................................................... 11

Defendant DiDi Global Inc. ("DiDi" or the "Company") respectfully submits this Memorandum of Law in Support of Its Motion to Dismiss the Second Amended Class Action Complaint (ECF No. 106) ("Complaint" or "SAC") pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state causes of action under Sections 11, 12, and 15 of the Securities Act of 1933, and Sections 10(b), 20A, and 20(a) of the Securities Exchange Act of 1934.

## I.   PRELIMINARY STATEMENT

Plaintiffs are sophisticated investors who invested in one of the world's fastest-growing ride hailing companies, DiDi, which operates primarily in the world's fastest-growing economy, China. Soon after its initial public offering, DiDi was subject to a cybersecurity review by Chinese authorities, which required DiDi to suspend new user registration in China. The announcement of that review allegedly impacted the price of DiDi's American depositary shares trading in the United States. Plaintiffs seek to recoup their investment losses by bringing this suit.

Plaintiffs posit the following theory of fraud: DiDi and its officers knowingly ignored the government's "directive" to suspend DiDi's IPO and crushed their own value in the stock they held. The foundation of Plaintiffs' irrational theory of self-harm is that the CAC "directed" DiDi not to move forward with the IPO—indeed, the term "CAC Directives" suffuses the Complaint.

The Complaint, however, does not rely on a single document or witness to support its claim of a directive—it weaves together unsupported allegations and generalizations about the Chinese government's tendency to go "beyond the letter of the law," "exercise absolute control," and use its "upper hand" to "severe[ly] punish[]" those who "defy[] President Xi's directives." Relying solely on generalities and post-IPO public news reports, Plaintiffs allege that the CAC *must* have "directed DiDi to postpone its IPO" and that DiDi's failure to disclose that "Directive" amounts to securities fraud. Plaintiffs' own Complaint belies these allegations: the news reports state only that the CAC "suggested" a cybersecurity self-assessment and sent "mixed signals" about DiDi's

1

forthcoming IPO.  *Post-hoc* speculation falls far short of establishing any "CAC Directive."

Under Rule 9(b), Plaintiffs must plead fraud with particularity; the Private Securities Litigation Reform Act ("PSLRA") imposes additional exacting pleading requirements.  Plaintiffs' Securities Act and Exchange Act claims are premised on identical allegations and sound in fraud, and are ***both*** therefore subject to Rule 9(b) and the PSLRA's heightened pleading requirements. Plaintiffs' claims do not meet this standard.  They fail to allege an actionable omission or actionable false statements: Plaintiffs do not adequately allege that DiDi had a duty to disclose any alleged "Directives," and Plaintiffs' claims that representations and warranties in the Underwriting Agreement between DiDi and the underwriters of its IPO were materially false or misleading because of events disclosed ***after*** the Offering Documents became effective fail on their face.

Plaintiffs' Exchange Act claims fail for additional reasons: the Complaint fails to plead both scienter and loss causation.  "[A]n inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 314 (2007). Plaintiffs' superficial and speculative pleading based on news articles is insufficient to create the requisite strong inference.  Indeed, the questions of who said what to DiDi, when, and where are left unanswered.  Nothing in the Complaint even ventures a guess as to any one of these questions.

Plaintiffs' failure to plead loss causation is an independent ground for dismissal.  The securities laws do not "provide investors with broad insurance against market losses."  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005).  Plaintiffs can recover only for losses caused by fraud.  Here, they seek insurance for repeated drops in DiDi's ADS price divorced from the alleged "fraud," which fails under both a corrective disclosure theory and materialization of the risk theory.  This Court should dismiss Plaintiffs' Complaint in its entirety.

## II.   STATEMENT OF FACTS

### A.   DiDi's Regulatory Environment

Often hailed as "the Uber of China," DiDi is a leading ride-hailing app that "enjoy[ed] near-complete market dominance in China" at the time of its initial public offering ("IPO").  ¶ 3.[1] Even more than its counterparts operating in the United States, DiDi is subject to a perpetually-changing and often uncertain regulatory landscape.  Among other things, DiDi is required to comply with numerous Chinese laws and regulations governing data privacy, data security, cybersecurity, and national security.  ¶¶ 97-126.  In addition to written laws and regulations, "the PRC legal system is based, in part, on government policies and internal rules, ***some of which are not published in a timely manner, or at all, but which may have retroactive effect***."  Ex. B (Prospectus) at 57.  This collection of written and unwritten rules can swerve abruptly in response to shifts in policy directions and priorities from the Chinese Communist Party and the government. Chinese technology companies, including DiDi, are thus subject to additional unpredictability with respect to regulatory compliance.  ¶¶ 117-23.  Hence, as DiDi disclosed in its Offering Documents, it "***may not always be aware of any potential violation of these policies and rules***."  Ex. B at 57.

The Cyberspace Administration of China ("CAC") regulates internet and internet-based companies in China and is responsible for enforcing compliance with Chinese data security laws and policies.  ¶ 5.  The CAC has "wide discretion" to, "among other things . . . close businesses, shut down or suspend websites, remove mobile apps from app stores, and to prohibit the business from taking on customers if the CAC believes the business is violating laws and/or regulations concerning national security, cybersecurity, data security, and/or personal privacy."  ¶ 6.  It also "wields authority ***beyond the letter of the law*** when providing regulatory guidance and issuing

---

[1]   References to "¶ __" are to the SAC, attached as Exhibit A to the Declaration of Corey Worcester.  Emphasis is added and internal citations and quotations omitted unless otherwise noted.

administrative directives to regulated businesses," including the authority to impose retroactive draconian penalties on companies for violations of new or unwritten rules.  ¶ 85.  From 2015 to 2017, the CAC shut down over 13,000 websites.  ¶ 136.  In recent years, "enforcement actions rose significantly," and in 2020 alone, the CAC shut down "a whopping 18,489" websites and suspended 1,994 others, marking a massive increase from prior years.  *Id.*

To address this complex regulatory system, DiDi, like many Chinese companies, maintains a large and dedicated government affairs team skilled in navigating the complexities of Chinese government policies.  ¶ 130.  DiDi has consistently demonstrated its willingness to cooperate with Chinese authorities.  ¶¶ 123-26.  Still, like its industry peers in China, DiDi is subject to unpredictable shifts in regulatory expectations and enforcement priorities, as the Company disclosed to investors.  Ex. B at 57.

### B.     DiDi's IPO Disclosures

DiDi's Offering Documents contained sixty pages of risk factors.  Among them, DiDi highlighted risks specifically related to data privacy, data protection, and information security:

> ***Our business is subject to a variety of laws, regulations, rules, policies and other obligations regarding privacy, data protection and information security. . .*** We are subject to numerous laws and regulations that address privacy, data protection and the collection, storing, sharing, use, disclosure and protection of certain types of data in various jurisdictions. . . . including the Data Security Law promulgated by the Standing Committee of the National People's Congress of China in June 2021, which will take effect in September 2021. ***Interpretation, application and enforcement of these laws, rules and regulations evolve from time to time and their scope may continually change, through new legislation, amendments to existing legislation and changes in enforcement***. *Id.* at 27 (first emphasis in original).

DiDi explicitly warned investors that its efforts to comply with "laws, regulations, rules, policies and other obligations" regarding "privacy, data protection and information security"

> ***could fail to meet all of the requirements imposed on us by such laws, regulations or obligations***.  ***Any failure on our part to comply with applicable laws or regulations or any other obligations relating to privacy, data protection or information security, or any compromise of security. . . or the perception or allegation that any of the foregoing types***

> *of failure or compromise has occurred, could damage our reputation,* discourage new and existing drivers and riders from using our platform *or result in investigations, fines, suspension of one or more of our apps, or other penalties by government authorities* and private claims or litigation, any of which could materially adversely affect our business, financial condition and results of operations.  *Id.*

Indeed, DiDi disclosed not only that its noncompliance could have negative effects on its business, but that even "*the perception or allegation*" of noncompliance could result in "penalties by government authorities."  *Id.*

DiDi additionally disclosed that it had been the subject of regulatory scrutiny, including relating to privacy and security, as recently as three months before the IPO.  For example, in April 2021, DiDi and 30 other major Chinese internet companies were summoned to a meeting with the CAC and other regulators regarding potential violations of various laws, including data privacy laws.  *Id.* at 56.  DiDi was required to complete a self-inspection of its practices and submit to onsite inspections by regulators.  *Id.*  DiDi disclosed that this inspection found compliance problems in its business practices and warned that regulators could identify further issues as the authorities considered and required ever more "privacy protection" measures:

> [W]e cannot assure you that the regulatory authorities will be satisfied with our self-inspection results or that we will not be subject to any penalty with respect to any violations of . . . *privacy protection*, . . . and other related laws and regulations. *We expect that these areas will receive greater and continued attention and scrutiny from regulators and the general public going forward. As a result, we may be subject to additional inspections and/or investigations* and may incur additional costs and expenses . . . If we are required to take any rectifying or remedial measures or are subject to any penalty, our reputation and business operations may be materially and adversely affected.  *Id.*  at 56.

DiDi's Offering Documents (Registration Statement, as amended, and Prospectus) also disclosed the more general regulatory risks the Company faces, including that "the PRC legal system is based, in part, on government policies and internal rules, *some of which are not published in a timely manner, or at all, but which may have retroactive effect.  As a result, we may not always be aware of any potential violation of these policies and rules*."  *Id.* at 57.

5

DiDi warned that "considerable uncertainties still exist with respect to the interpretation and implementation of existing laws and regulations governing our business activities," and "we may become subject to additional laws and regulations that we are not subject to now," noting that a "large number of proposals" were then pending before legislative and regulatory bodies. *Id.* at 25; *see also id.* at 57 ("developments in our industry may lead to changes in PRC laws, regulations and policies or in the interpretation and application of existing laws, regulations and policies").

The Offering Documents also warned generally that "*[c]hanges in China's economic, political or social conditions or government policies could have a material adverse effect on our business, financial conditions and results of operations*," particularly given the "significant role" the Chinese government plays "in regulating industry development by imposing industrial policies." *Id.* at 55 (emphasis in original). They noted, in particular, that "[p]olitical tensions between the United States and China have escalated," which could "adversely impact our business, financial condition, and results of operations." *Id.* at 49. It is with the benefit of these detailed and comprehensive risk disclosures that Plaintiffs chose to purchase DiDi ADSs.

### C.     DiDi's IPO and Subsequent Events

On June 30, 2021, DiDi commenced the IPO, pricing its shares at $14. ¶ 44. In connection with the IPO, DiDi entered into an Underwriting Agreement governing the underwriters' role in the IPO and the allocation of risk between issuer and underwriters. SAC Ex. 19. The form Underwriting Agreement was attached as an exhibit to the Offering Documents.

Two days later, on July 2, 2021, before market open, the CAC announced a cybersecurity review of DiDi's practices, during which DiDi would be required to halt new user registrations:

> [T]o prevent national data security risks, safeguard national security and protect public interests, in accordance with the National Security Law of the [PRC] and the Cyber Security Law of the People's Republic of China, the Cyber Security Review Office will conduct a cyber security review on DiDi Chuxing pursuant to the Cyber Security Review Measures. During the review, DiDi Chuxing will halt new user registration in order to

cooperate with the cyber security review and prevent further risks.  ¶ 204.

The announcement was widely reported in U.S. news outlets before markets opened for trading.

¶¶ 205-09.  According to news reports, CAC regulations provided that DiDi should receive results

of the CAC's review within 45 days, which at least one analyst predicted could prevent up to 6

million new customers from enrolling.  SAC Exs. 25 at 2; 27 at 2.  By contrast, DiDi at the time

had nearly 500 million existing customers with 41 million daily transactions.  Ex. B at 1, 4.  That

day, DiDi's shares opened at $14.96, 8.8% lower than the prior day's closing price of $16.40, but

still higher than its IPO price.  ¶ 227.  DiDi issued a press release confirming that it would "fully

cooperate with the PRC government authority during the review," and "conduct a comprehensive

examination of cybersecurity risks and continue to improve on its cybersecurity systems and

technology capabilities."  ¶ 210; Ex. C (July 2, 2021 Form 6-K at 4).  DiDi's IPO closed on July

2, 2021 as scheduled, and its shares closed at $15.53 per share.  Ex. D (Historical Share Prices).

Two days later, on Sunday, July 4, 2021, the CAC announced that DiDi's Travel app

"violated laws and regulations in collecting and using personal information" and ordered that the

app be removed from app stores in China, preventing existing users from downloading updates:

> Based on reports, and after tests and investigations, the "DiDi Travel" app was found to
> have seriously violated laws and regulations in collecting and using personal information.
> According to the relevant provisions of the *Cybersecurity Law of the People's Republic of
> China*, the Cyberspace Administration of China notifies all app stores to remove the "DiDi
> Travel" app and requires DiDi Travel Technology Co., Ltd. to strictly follow the legal
> requirements and national standards to rectify existing problems, to effectively protect the
> safety of personal information of all users.  ¶ 229.

DiDi disclosed the CAC's announcement the same day and confirmed that it would

continue to cooperate with regulators and work to resolve the issues identified by the CAC:

> The Company will strive to rectify any problems, improve its risk prevention awareness
> and technological capabilities, protect users' privacy and data security, and continue to
> provide secure and convenient services to its users.  The Company expects that the app
> takedown may have an adverse impact on its revenue in China.  ¶ 232.

7

On July 5, 2021 (a New York Stock Exchange ("NYSE") trading holiday), the *Wall Street Journal* published an article titled "Chinese Regulators Suggested DiDi Delay Its U.S. IPO." SAC Ex. 18. The article reported that "[w]eeks before" the IPO, the CAC "***suggested*** [DiDi] delay its initial public offering and urged it to conduct a thorough self-examination of its network security, according to people with knowledge of the matter." *Id.* at 1. It stated further that while "***[i]t isn't known whether DiDi carried out its own review***," regulators "remained wary" of "data potentially falling into foreign hands as a result of greater public disclosure associated with a U.S. listing, the people said." *Id.* at 1-2. "According to people familiar with the discussions, ***the company received mixed signals from different agencies***," but the article reported "***the absence of an outright order to halt the IPO***." *Id.* Indeed, "***[s]ome financial regulators have publicly expressed support for companies' overseas listings***, while also stressing the imperative of protecting sensitive data and networks." *Id.* DiDi responded "that it doesn't comment on speculation and had no knowledge before the IPO of the regulator's decisions to put the company under cybersecurity review and to ban new downloads of its ride-hailing app." *Id.* at 2. On July 6, 2021, DiDi's shares closed at $12.49, a nearly 20% drop from the July 2 closing price. Ex. D.

Thereafter, media outlets repeated the *Wall Street Journal*'s reporting and speculated about what, if anything, the CAC told DiDi in the lead-up to the IPO. The *South China Morning Post*, for example, hypothesized that "[t]he crux of the controversy . . . was ***a misinterpretation over the clarity and forcefulness*** of the CAC's instruction to DiDi to postpone its New York listing." SAC Ex. 21 at 3. Critically, however, "***[n]either DiDi nor the CAC . . . ever publicly acknowledged the existence of such a conversation***." *Id.* Still, media reports speculated as to whether any such conversation discouraging the Company from proceeding with its IPO ever took place, citing conflicting accounts from unnamed and vaguely described sources. Several sources claimed the

8

CAC "*suggested*" that DiDi delay its IPO, but because such suggestions were not explicit, "executives did not think the agency had forbidden them to proceed." SAC Exs. 17 at 1-2; 18 at 1; *see* ¶ 184 ("Regulators didn't explicitly forbid the company from going public in the U.S.").

Reports also circulated that "[t]he CAC itself has come under scrutiny because of the DiDi IPO, with a top party official having questioned why the agency hadn't blocked the company's offering."  SAC Ex. 17 at 1.  The *South China Morning Post* claimed that the incident "casts the [CAC] in bad light, raising questions about its competence in ensuring cybersecurity and reining in big internet service providers like DiDi."  SAC Ex. 21 at 2.  The incident also "exposed inconsistencies among different Chinese government agencies," SAC Ex. 15 at 3, because unlike the CAC, other "regulators largely supported the idea of an IPO," SAC Ex. 17 at 1.

Several reports claimed that "the problem was broader still," SAC Ex. 16 at 2, as "the timing of the action right after DiDi's record IPO suggests that Beijing is uncomfortable with large tech companies' New York listings during a time of escalating tech tension" between the United States and China.  SAC Ex. 20 at 2; *see* SAC Exs. 3 at 3; 18 at 3–4.  "One fund manager in Hong Kong even speculated that DiDi had been made an unwitting example by Beijing, in order to scare other companies."  SAC Ex. 16 at 3.  Beijing's concerns were soon made clear—on July 6, 2021, Chinese legislators "issued a new policy guideline . . . saying China will change its rules around the overseas listing of Chinese businesses and empower domestic regulators and watchdogs to have a say in their listing."  SAC Ex. 15 at 2.  Commentators noted that the "sweeping crackdown" would impact the entire Chinese technology industry, which suddenly had to contend with "fresh cyber regulations that companies are broadly unprepared for."  SAC Ex. 16 at 2.

On July 12, 2021, before market open, DiDi issued a press release stating that the CAC had ordered 25 more DiDi apps removed from Chinese app stores:

Pursuant to the PRC's Cybersecurity Law, the CAC notified app stores to take down these [25] apps and cease to provide viewing and downloading service in China, and required the Company to strictly comply with relevant laws and regulations, follow the relevant standards set by the PRC government authorities, and rectify the problem to ensure the security of users' personal information. The Company expects that the app takedown may have an adverse impact on its revenue in China.  ¶ 248.

On July 16, 2021, the CAC—then reportedly under scrutiny from party members in the wake of DiDi's IPO, SAC Ex. 17 at 1—raided DiDi's offices along with six other government agencies.  ¶ 251.  Despite claims in the media that the CAC sat down with DiDi before the IPO, this subsequent investigation is not alleged to have targeted any individuals in particular.  Rather, according to public reporting, this weeks-long investigation involved "daily summons of mid-level managers for hours of questioning at short notice, even on weekends."  ¶ 186.  The *Wall Street Journal* reported that "[t]he probe illustrates how the regulators are broadening the scope of cybersecurity reviews . . . to more broadly defined data-security risks."  SAC Ex. 28 at 2.  That day, DiDi's share price closed at $11.97.

Thereafter, news outlets continued to speculate that there may be "serious, perhaps unprecedented penalties" for DiDi resulting from its decision to go forth with its IPO "despite pushback" from the CAC, ¶ 253, and pondering unsubstantiated rumors that DiDi's President was considering stepping down, ¶ 255.  On December 3, 2021, in response to Chinese regulators, DiDi announced its plans to delist from the NYSE.  ¶ 21.  That day, DiDi's share price closed at $6.07. *Id.*  On December 29, 2021, DiDi reported a $4.7 billion Q3 2021 loss, largely due to regulatory actions.  ¶ 22.  To date, the CAC's review has not been completed.  ¶ 261.  In April 2022, DiDi released its Q4 2021 financial results showing a further net loss of $60 million.  ¶ 260.

## III.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE SECURITIES ACT

To plead a Section 11 claim, Plaintiffs must allege facts sufficient to show that the Offering Documents contained: (i) a misrepresentation of material fact; (ii) an omission of material fact in

contravention of an affirmative legal disclosure obligation; or (iii) an omission of material information that was necessary to prevent other disclosures from being misleading. *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010). Plaintiffs do not meet this standard. Because Plaintiffs fail to plead a cognizable claim under Section 11, their Section 12(a)(2) claim also fails. *See, e.g.*, *In re Agria Corp. Sec. Litig.*, 672 F. Supp. 2d 520, 525 (S.D.N.Y. 2009). Nor can Plaintiffs state a claim for derivative liability under Section 15 of the Securities Act since their assertions of primary liability must be dismissed. *See Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 490 (2d Cir. 2011).

Plaintiffs' Section 11 claim should be dismissed for four reasons. *First*, Plaintiffs do not allege the "who, what, when, where, and why" of a supposed "CAC Directive" as required by Rule 9(b). At most, Plaintiffs intimate that DiDi received vague "suggestions" from Chinese regulators that DiDi should delay its IPO. ¶ 253. Such conclusory allegations do not state a claim under Rule 9(b). Further, because Plaintiffs' Securities Act claims are subject to Rule 9(b), they must plead DiDi's scienter. *See, e.g.*, *Caiafa v. Sea Containers Ltd.*, 2008 WL 11516813, at *5 (S.D.N.Y. May 15, 2008). They do not. *Second*, Plaintiffs have not alleged an actionable omission because they do not adequately allege the source of any such affirmative legal obligation. *Third*, DiDi's Offering Documents "warn[ed] investors of exactly the risk the plaintiffs claim was not disclosed." *Olkey v. Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 5 (2d Cir. 1996). Plaintiffs' claim fails where the risks allegedly withheld were amply disclosed to investors. *Finally*, Plaintiffs' claims that statements in the Underwriting Agreement were false fail because they were not false or misleading and cannot provide the basis for a Securities Act claim in any event.

### A.    Plaintiffs Fail to Plead a Material Omission in DiDi's Offering Documents with The Requisite Particularity Under Rule 9(b)

Where, as here, "a [Securities] Act claim" is "predicated on fraud," Plaintiffs must meet

Rule 9(b)'s heightened pleading standard, which requires pleading the circumstances of fraud with particularity. *See Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*, 902 F. Supp. 2d 329, 338 (S.D.N.Y. 2012); *Y-GAR Capital LLC v. Credit Suisse Grp. AG*, 2020 WL 71163, at *4 (S.D.N.Y. Jan. 2, 2020) (Section 11 claims sounding in fraud subject to Rule 9(b)).  Despite their Securities Act claims indisputably sounding in fraud, Plaintiffs do not meet this standard.[2]

Plaintiffs' Section 11 claim rests on the allegation that DiDi knew, but failed to disclose, the CAC's position on DiDi's IPO, ¶¶ 387-89, and therefore is "classically associated with fraud."[3] *Rombach v. Chang*, 355 F. 3d 164, 172 (2d Cir. 2004); *see In re China Valves Tech. Sec. Litig.*, 2012 WL 4039852, at *9 (S.D.N.Y. Sept. 12, 2012) (Kaplan, J.) (Securities Act claims "sound[ed] in fraud" and were thus subject to Rule 9(b) heightened pleading standards"); *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 300 (S.D.N.Y. 2021) (Securities Act claim sounded in fraud where complaint alleged that defendants knew but failed to disclose facts in registration statement). Indeed, the crux of Plaintiff's Section 11 claim is **identical** to Plaintiff's fraud claim under Rule 10b-5, 17 C.F.R. § 240.10b-5.  *Compare, e.g.*, ¶¶ 173-87, *with* ¶¶ 332-44 (alleging that DiDi intentionally omitted material facts from investors concerning CAC suggestions).

Further, Plaintiffs elected to assert their omission claims under Item 303 of Regulation S-K, which requires Plaintiffs to plead that DiDi **knew**, but failed to disclose, material information. 17 CFR § 229.303; ¶¶ 155-57.  Allegations of knowledge and intent must be pleaded with

---

[2]  Plaintiffs' assertions fail to satisfy even the notice pleading requirements of Rule 8.

[3]  *E.g.*, ¶ 296 (the CAC "directed DiDi to postpone its IPO" until after the Company conducted a cybersecurity self-assessment); ¶¶ 338-39 (the "CAC believed that DiDi had agreed to comply with the CAC's Directives and would postpone its IPO" and that "DiDi did not follow the CAC's directive.  Instead, it  conducted its $4.4 billion IPO on June 30, 2021."); ¶ 340 (officials described DiDi's decision to move forward with its IPO "as *yang feng yin wei*—to comply publicly but defy privately" and "described DiDi's actions as 'forcing its way' to a listing on the NYSE against specific instructions to postpone the IPO").

particularity.  *See, e.g., Jiajia Luo v. Sogou, Inc.*, 465 F. Supp. 3d 393, 408 (S.D.N.Y. 2020) (plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind"); *Ladmen Partners, Inc. v. Globalstar, Inc.*, 2008 WL 4449280, at *13 (S.D.N.Y. 2008) ("[A]llegations of knowing and deliberate misrepresentations fundamentally sound in fraud.").  Because Plaintiffs' Section 11 claim hinges on the allegation that DiDi knowingly concealed material information and thus sounds in fraud, and Plaintiffs must allege facts in support of their Section 11 claim with particularity.[4]

Plaintiffs do not satisfy Rule 9(b)'s heightened pleading standard.  The crux of Plaintiffs' Section 11 claim is that DiDi concealed the "CAC Directives"—the allegedly material fact that "the CAC ***directed*** DiDi to postpone its IPO" until after DiDi had completed a self-examination to ensure compliance with cybersecurity laws and regulations.  ¶¶ 10, 31.  Plaintiffs rely on this defined term throughout the Complaint, but their premise is faulty: the Complaint is bereft of particularized allegations supporting Plaintiffs' assertion that the CAC issued ***any*** such directive. Indeed, that conclusory assertion is belied by ***other*** facts alleged in the Complaint, including that: (i) the CAC "urged [DiDi] to postpone" its IPO, ¶ 335; (ii) "the government didn't intend to block the IPO, but wanted [DiDi] to wait until it carried out the proper security checks," *id.*; (iii) DiDi received "suggestions from regulators" that it delay its IPO, ¶¶ 184, 253; and (iv) DiDi was "under pressure from the CAC to delay" its IPO, ¶ 182.  At most, Plaintiffs have pleaded that the CAC ***encouraged***—but in no way ***directed*** or ***required***—DiDi to postpone its IPO.

---

[4]  Plaintiffs cannot evade Rule 9(b)'s heightened pleading standard by structuring the Complaint into separate sections or with conclusory, self-serving disclaimers.  *See, e.g., City of Omaha Police & Fire Retirement Sys. v. Evoqua Water Techs. Corp.*, 2020 WL 1529371, at *11-12 (S.D.N.Y. Mar. 30, 2020) (applying Rule 9(b) to Section 11 claim where plaintiffs "separate[d] their claims under the Exchange Act from those under the Securities Act into different sections in the Complaint" and "expressly disclaim[ed] any allegation of fraud as to their Securities Act claims" because those "formalisms do not require the Court to apply Rule 8's more liberal standard").

Nor can Plaintiffs save their claim by relying on news articles. *E.g.*, ¶¶ 332-37. These articles are devoid of particularized facts concerning when the alleged directive was made, what specifically was said, and to whom, and cannot as a matter of law bolster—let alone form the basis of—Plaintiffs' claim. *See, e.g.*, *Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 586 (S.D.N.Y. 2007). Plaintiffs fail to plead their Securities Act claims with the requisite particularity.

**B.      Plaintiffs Fail to Plead Actionable Omissions Because DiDi Had No Duty To Disclose Facts Beyond Its Robust Risk Disclosures**

Plaintiffs' Securities Act claims must also be dismissed because Plaintiffs fail to plead that DiDi had an affirmative legal obligation to make additional disclosures beyond the Offering Documents' robust risk disclosures (*infra* Section III.C.). Section 11 does not require disclosure of every fact that an investor might find interesting. Rather, omissions are actionable under the securities laws "only when the [defendant] is subject to a duty to disclose the omitted facts." *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 11 (S.D.N.Y. 2016). Absent a duty to disclose, there is no liability under Section 11. *See, e.g.*, *In re Morgan Stanley Tech. Fund Sec. Litig.*, 643 F. Supp. 2d 366, 375 (S.D.N.Y. 2009) (no liability "even if the [omitted] information would have been material"); *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 692 (S.D.N.Y. 2008) (no liability even if "a reasonable investor would very much like to know that fact").

**1.      DiDi Had No General Duty To Disclose Discussions With Regulators**

Plaintiffs' omissions claim rests on the faulty assertion that DiDi omitted material facts by failing to disclose the CAC's "suggestions" concerning compliance with cybersecurity regulations. This boils down to a demand that DiDi disclose the existence of discussions with regulators from which further "suggestions," governmental actions, or investigations might flow. But there is no generalized duty to disclose the existence of an investigation or accusations of wrongdoing, much less alleged "suggestions." *E.g.*, *City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*,

752 F.3d 173, 184 (2d Cir. 2014) (no duty "to disclose uncharged, unadjudicated wrongdoing"); *Jiajia Luo*, 465 F. Supp. 3d at 413 ("no free-standing obligation . . . to disclose even criminal conduct that is uncharged—let alone insufficient regulatory compliance."); *see also In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 650 (S.D.N.Y. 2017) ("no affirmative duty to speculate or disclose uncharged, unadjudicated wrongdoing or mismanagement").

Courts regularly dismiss claims premised on the failure to disclose ongoing regulatory investigations, *see, e.g.*, *In re XP Inc. Sec. Litig.*, 524 F. Supp. 3d 23, 37-38 (E.D.N.Y. 2021), or the failure to disclose alleged wrongdoing, *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004). This is because, "absent an express prior disclosure"—which DiDi did not make—there is "no affirmative duty to speculate or disclose uncharged, unadjudicated wrongdoings or mismanagement, illegal internal policies, or violations of a company's internal codes of conduct and legal policies." *In re UBS AG Sec. Litig*., 2012 WL 4471265, at *31 (S.D.N.Y. Sept. 28, 2012); *see also Lions Gate*, 165 F. Supp. 3d at 20 ("An SEC investigation could not be characterized as a 'known trend' or 'uncertainty' under Item 303.").

Plaintiffs cannot evade this clear standard through conclusory allegations that DiDi was obligated to disclose the "CAC Directives." No such CAC "directive" is alleged to have existed; even accepting the allegations of the Complaint as true, the news articles on which Plaintiffs premise their claim merely speculate that DiDi was "under ***pressure*** from the CAC to delay" its IPO because the government *might* ask DiDi to complete additional cybersecurity reviews. ¶ 182. Such "pressure" to delay, even if true, is nothing more than a communication during the course of ongoing discussions with regulators which, like an investigation, does not trigger a disclosure obligation. Any fallout from those discussions was, at the time of DiDi's IPO, speculative. And, to the extent DiDi was defying some "directive" or other requirement (it was not), the "securities

15

laws do not require a company to accuse itself of wrongdoing." *Citigroup*, 330 F. Supp. 2d at 377.

### 2.     DiDi Had No Duty To Disclose Under Item 303

Item 303 compels disclosure of "unusual or infrequent events . . . that materially affected the amount of reported income from continuing operations"[5] and "*known* trends and uncertainties that have had or that the registrant *reasonably expects will have a material* favorable or unfavorable impact on net sales or revenues."[6] *Rudman v. CHC Grp. LTD.*, 217 F. Supp. 3d 718, 730 (S.D.N.Y. 2016) (Kaplan, J.) (citing 17 C.F.R. § 229.303(a)(3)(i)–(ii)).  Item 303 "does ***not*** call for disclosure of any 'trend' or 'uncertainty,'" rather only those that are both "***presently known*** to management" ***and*** "reasonably likely to have ***material*** effects on the [issuer]'s financial condition or results of operations."  *Willard v. UP Fintech Holding Ltd.*, 527 F. Supp. 3d 609, 619 (S.D.N.Y. 2021); *see also Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016) (issuers need "disclose only those trends, events, or uncertainties that it ***actually knows of*** when it files the relevant report with the SEC.  It is not enough that [the issuer] ***should*** have known").[7]

Plaintiffs allege no facts establishing a duty to disclose under Item 303, and their claim— premised entirely on fraud-by-hindsight—fails.  *See Schaffer v. Horizon Pharma PLC*, 2018 WL

---

[5]  Plaintiffs cannot establish a duty to disclose under C.F.R. § 229.303(a)(3)(i), which addresses unusual or infrequent events, because that subsection refers only to those events that *already* "materially *affected* the amount of *reported* income from continuing operations."

[6]   Instruction 9 to Item 303 instructs foreign private issuers to "discuss briefly any pertinent governmental economic, fiscal, monetary, or political policies or factors that have materially affected or could materially affect, directly or indirectly, their operations or investments by United States." ¶ 155 (citing 17 C.F.R. § 229.303(b) & Instruction ¶ 9).  A foreign issuer's duty to disclose under Instruction 9 is bound by legal authorities regarding Item 303.

[7]   *See also In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *5 (S.D.N.Y. Mar. 29, 2016) ("[M]erely pleading a trend's '*existence*' is insufficient to establish knowledge.") (emphasis in original); *In re Ply Gem Holdings, Inc. Sec. Litig.*, 135 F. Supp. 3d 145, 150 (S.D.N.Y. 2015) (dismissing Item 303 claim because "the Complaint fails to plead facts sufficient to permit the conclusion that the alleged omissions were 'reasonably likely to be material' at the time of the [offering]"); *Blackmoss Investments Inc. v. ACA Cap. Holdings, Inc.*, 2010 WL 148617, at *9 (S.D.N.Y. Jan. 14, 2010) (Item 303 "requires that a plaintiff plead, with some specificity, facts establishing that the defendant had actual knowledge of the purported trend.").

481883, at *14 (S.D.N.Y. Jan. 18, 2018) (dismissing Item 303 claims where plaintiffs failed to "plead, with any specificity, facts establishing that Defendants possessed any actual knowledge of the purported 'trend' or event."). *First*, Plaintiffs fail to allege that the CAC's suggestions constituted a "trend" or "uncertainty" for disclosure purposes under Item 303. Indeed, Plaintiffs plead a single event—a suggestion from the CAC—which on its face cannot be a "trend." *See In re Yunji Inc., Sec. Litig.*, 2021 WL 1439715, at *7 (E.D.N.Y. Mar. 31, 2021) ("[A]n inquiry into the existence of a trend must account for both the type of trend alleged to exist and the amount of time it might take for said trend to manifest under the circumstances."); *see also id.* ("[A] trend [is] 'a general development or change in a situation,' which necessarily implicates the passage of time"); *Blackmoss*, 2010 WL 148617, at *10 (denying Item 303 claim alleging articles published *before* IPO constituted a "rising trend").[8]

*Second*, Plaintiffs assert that DiDi's decision to move forward with the IPO was "reasonably likely" to have a material impact on DiDi's operations. The "'reasonably [likely]' standard suggests that there must [be] a fairly substantial probability that the known risk at issue will materialize and have a material impact—if not a more-likely-than-not standard, then something not too much below that." *Holbrook v. Trivago N.V.*, 2019 WL 948809, at *12 (S.D.N.Y. Feb. 26, 2019); *see also In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 584 (S.D.N.Y. 2013) (no Item 303 claim for failure to disclose pending lawsuit where "the imminence and amount of AIG's suit were insufficiently certain"). Courts have therefore held that Item 303 should not be construed "so broad[ly] as to require defendants to disclose [speculative] uncertainties, nor [does] it require disclosure of uncharged, unadjudicated wrongdoing." *Mucha*

---

[8] Plaintiffs' reliance on the SEC January 2002 Release, *see* ¶ 151, is thus irrelevant, and decades-old staff guidance has no authoritative force or governance in this instance or otherwise. *See generally Jiajia Luo*, 465 F. Supp. 3d at 412-13 (dismissing Item 303 claim).

*v. Volkswagen Aktiengesellschaft*, 540 F. Supp. 3d 269, 298 (E.D.N.Y. 2021) (citing *Diehl v. Omega Protein Corp.*, 339 F. Supp. 3d 153, 166-68 (S.D.N.Y. 2018)).

Plaintiffs' allegations hinge on speculation and do not meet the "reasonably likely" standard—even Plaintiffs allege that the Chinese government "didn't intend to block the IPO." ¶ 175. Far from disclosing a "reasonably likely outcome," Plaintiffs' Securities Act claim would have required DiDi to disclose its own speculation as to the meaning and impact—if any—of the CAC's suggestions, and to accuse itself of wrongdoing. This is not required. *See, e.g.*, *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 673 (S.D.N.Y. 2008) ("'backwards' pleading—an attempt to allege liability for disclosures not made because the material fact was unknowable or had not even occurred as of the critical date," fails as a Securities Act claim). Plaintiffs likewise fail to allege that DiDi was not in compliance with Chinese cybersecurity laws and regulations, or that DiDi had any reason to think that any self-assessment it already had performed would be insufficient in the eyes of the CAC—reducing even further the likelihood that the CAC would take action, much less the specific actions Plaintiffs allege here. In fact, Plaintiffs allege that DiDi was an *ally* in the PRC's cybersecurity endeavors, and often appeared as an ambassador to promote the importance of cybersecurity. *See* ¶¶ 124-25. Nothing in the Complaint supports the conclusory assertion that DiDi knew that moving forward with the IPO was "reasonably likely" to have a material impact on its business.

*Third*, Plaintiffs have not pleaded DiDi's knowledge of material impact **as of the date of the Offering Documents.** Specifically, Plaintiffs do not allege that as of June 29, 2021—the date DiDi's Offering Documents became effective—DiDi *knew* that any of the CAC's suggestions were "reasonably likely to have material effects on [DiDi]'s financial condition or results of operations." *Willard*, 527 F. Supp. 3d at 619. Indeed, a review of the Complaint reveals the absence of even

the most basic allegations of knowledge: Plaintiffs do not allege when CAC met with DiDi to communicate its suggestions, who (including anyone from DiDi) was a part of those meetings, or what precisely was said during those meetings. Critically, Plaintiffs also fail to allege that the CAC told DiDi—before its Registration Statement became effective—that there would be any such impacts. Those failures are fatal to Plaintiffs' disclosure claims.

### 3. DiDi Had No Duty To Disclose Under Item 105

Plaintiffs' pleading failures are equally fatal to their Item 105 claim. Item 105 requires issuers to "disclose the most significant factors that make an investment in the registrant or offering speculative or risky." *HEXO*, 524 F. Supp. 3d at 302. Disclosure under Item 105 "is not a rite of confession." *City of Pontiac*, 752 F.3d at 184. Like Item 303, to establish a duty to disclose under Item 105, Plaintiffs "must demonstrate actual knowledge of an existing trend, event, or risk []." *Rubinstein v. Credit Suisse Group AG*, 457 F. Supp. 3d 289, 300 (S.D.N.Y. 2020). Events that are not "reasonably likely to be material under Item 303" do not qualify as the "most significant factors" rendering an offering speculative or risky under Item 105. *Hutchison*, 647 F.3d at 484 n.4.

To start, the risk factors in DiDi's Offering Documents satisfied any disclosure obligation under Item 105. "Because Plaintiffs have failed to identify any trends, events, or uncertainties that were not already disclosed in the Offering Documents and which would have had a material impact on [DiDi's] revenues or operations, Plaintiffs have not pleaded adequately that [DiDi] omitted information that it was required to disclose under either Item 303 or Item 503." *Nurlybayev v. ZTO Express (Cayman) Inc.*, 2019 WL 3219451, at *8 (S.D.N.Y. July 17, 2019); *see also Hutchison*, 647 F.3d at 484 n.4 (dismissing Item 503 (now 105) claims where plaintiffs focused on defendants' obligations under Item 303 and advanced no argument unique to Item 105/503).

Moreover, Plaintiffs do not allege a single fact showing that (i) the CAC's alleged suggestion that DiDi postpone its IPO had any legal or factual basis; (ii) DiDi actually knew that

the CAC would retaliate, particularly given the failure to plead a legal or regulatory reason to do so; (iii) DiDi knew what, if any, sanctions the CAC might impose; or (iv) DiDi actually knew that retaliation by the CAC would be reasonably likely to have a material effect on DiDi's financial condition or results of operations.  There is no duty to disclose where, as here, Plaintiffs' claim hinges on "an attenuated chain of contingencies."  *Diehl*, 339 F. Supp. 3d at 167.

Plaintiffs' generalized allegations that China is an authoritarian state, the "CAC wields authority beyond the letter of the law," ¶¶ 82-87, and failing to abide by a suggestion (even one that lacks any legal basis) from a government agency would wreak havoc on a large company, fail to make up for the lack of specific allegations.  These assertions, at best, seek an impermissible inference that DiDi "should have known" the potential consequences, but it is "not enough" under Items 105 or 303 that DiDi "should have known" of a trend or risk.  *Pub. Ret. Sys.*, 818 F.3d at 95.

### 4.    DiDi Had No Duty To Disclose Under Item 408

Finally, Plaintiffs—apparently as an afterthought—assert that DiDi breached a disclosure duty under Item 408 of Regulation C, 17 C.F.R. § 230.408.  ¶¶ 363-64.  Item 408 provides that issuers must include in registration statements "such further information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they were made, not misleading."  Plaintiffs summarily assert—without *any* explanation as to how or why under Rule 9(b)—that DiDi's failure to disclose the "CAC Directives" rendered the risk factors in DiDi's Registration Statement misleading.  ¶¶ 362-64.  Plaintiffs supply *nothing* in support of this claim; indeed Plaintiffs do not even quote any specific language in any specific risk factor that was apparently misleading in light of any purported omission.  *See id*.  This claim fails.

### C.    DiDi's Offering Documents Included Robust Risk Disclosures

Plaintiffs' claim also fails because DiDi's Offering Documents "warn[ed] investors of *exactly the risk* the plaintiffs claim was not disclosed."  *Olkey*, 98 F.3d at 5.  Plaintiffs allege that

DiDi's Offering Documents failed to disclose the "Omitted Facts," but as explained above, Plaintiffs fail to plead that there was any "directive," a failure that is similarly fatal to their definition of "Omitted Facts."  Instead, all Plaintiffs allege is a failure to disclose a risk that the Chinese government *might* act.  Because DiDi's Offering Documents addressed the very risks about which Plaintiffs complain—including the possibility that the Chinese government might suspend DiDi's business operations—Plaintiffs' claims are barred as a matter of law.

DiDi's Offering Documents include over *sixty* pages of detailed risk disclosures.  Ex. B at 24-85.  The Offering Documents expressly disclose the risk that Chinese regulators might impose "penalties including . . . [the] suspension of business operation [and] shut-down of the websites" for "the perception of" non-compliance with laws regarding cybersecurity and protection of personal information.  *Id*. at 196.  In other words, DiDi expressly disclosed the very risk of intervention by the Chinese regulators that Plaintiffs allege was omitted.  Their Section 11 claim must be dismissed.  *See Jiajia Luo*, 465 F. Supp. 3d at 411; *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 361 (2d Cir. 2002) (dismissing Section 11 claim where "[t]he allegedly omitted facts were either disclosed or implied in the offering memoranda").[9]

DiDi's Offering Documents are replete with other disclosures that give the lie to Plaintiffs' Section 11 allegations.  They expressly state that DiDi's business "is subject to a variety of laws, regulations, rules, policies and other obligations regarding privacy, data protection and information security," and that "[d]espite our efforts to comply with applicable laws, regulations and other obligations relating to privacy, data protection and information security, it is possible that our

---

[9]  *See also, e.g.*, *In re Proshares Tr. II Sec. Litig.*, 2020 WL 71007, at *9 (S.D.N.Y. Jan. 3, 2020) (no Item 105 claim where registration statement provided "ample warning" of risks); *Schaffer*, 2018 WL 481883, at *14 (no Item 303/503 claim where company disclosed it was charging higher prices than competition and may not be able to execute business plan successfully).

practices, offerings or platform could fail to meet all of the requirements imposed on us by such laws, regulations or obligations." Ex. B at 27.  The Offering Documents further disclose that:

> ***Any failure on our part to comply with applicable laws or regulations or any other obligations relating to privacy, data protection or information security, or any compromise of security* . . . *or the perception or allegation that any of the foregoing types of failure or compromise has occurred,*** . . . could damage our reputation, . . . or result in investigations, fines, suspension of one or more of our apps, ***or other penalties by government authorities*** and private claims or litigation, any of which could materially adversely affect our business[.]

*Id.*  DiDi also explained to investors that "[t]he PRC government has enacted various laws and regulations with respect to internet security and protection of personal information . . . Internet information in the PRC is regulated and restricted from a national security standpoint," *id.* at 196, and that any failure to comply could result in "penalties including, without limitation, fines, suspension of business operation, shut-down of the websites, revocation of licenses and even criminal liabilities," *id.*  DiDi further informed investors about the uncertainties and risks of the Chinese legal and regulatory landscape, including that its "business is subject to numerous legal and regulatory risks that could have an adverse impact on our business and future prospects," *id.* at 25; "Uncertainties with respect to the PRC legal system could adversely affect us . . . [it] is evolving rapidly, and the interpretations of many laws, regulations and rules may contain inconsistencies and enforcement of these laws, regulations and rules involves uncertainties," *id.* at 57; and that "the PRC . . . may promulgate new laws and regulations regulating our business," *id*.  DiDi's Offering Documents "warned of the exact risk that was threatened and later materialized." *Jiajia Luo*, 465 F. Supp. 3d at 411.  Plaintiffs fail to allege a material omission.

### D.    Plaintiffs Fail to Allege Actionable False Statements in the Underwriting Agreement

As an additional alleged basis for Section 11 liability, Plaintiffs advance the novel argument that statements in DiDi's Underwriting Agreement were not "true and correct."  ¶¶ 367-

80.  These claims fail.  *First*, as further explained by the underwriters in their motion to dismiss, statements in DiDi's Underwriting Agreement are not actionable—they are representations and warranties made between DiDi and the underwriters of DiDi's IPO intended solely for the benefit of the underwriters.  *See* SAC Ex. 19 (agreement "inure[s] solely to the benefit of the Underwriters").  The Underwriting Agreement does not contain statements of factual certainty made for the benefit of investors.  Representations and warranties in contracts attached to a Registration Statement cannot support Plaintiffs' private securities claims.  *See In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 637-38 (S.D. Tex. 2018); *see also Jaroslawicz v. M & T Bank Corp.*, 2017 WL 1197716, at *5 (D. Del. Mar. 30, 2017) (statements in merger agreement attached to SEC filing not actionable because they "were not intended by the parties . . . to be characterizations of the actual state of facts or conditions" of the companies).

*Second*, Plaintiffs have not adequately pleaded that any statements in the Underwriting Agreement were false.  *See* ¶¶ 367-80.  Because Plaintiffs have not pleaded any "CAC Directives" and there was no duty to disclose, *supra* Section III.A., B., Plaintiffs cannot state a claim under the Securities Act for the purported omission of these "facts" from the Underwriting Agreement. Similarly, Plaintiffs' allegation that the "July 2 Penalties" rendered statements in the Underwriting Agreement false is unavailing—Plaintiffs do not plead that the July 2 Penalties constituted a "material adverse event" that rendered those representations false.  *See* ¶¶ 374-76.  An event does not have a material adverse effect unless it "substantially threaten[s] the overall earnings potential" of a company, and does so "in a durationally-significant manner."  *In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 68 (Del. Ch. 2001); *accord Newmont Mining Corp. v. AngloGold Ashanti Ltd.*, 2020 WL 1285543, at *24 (S.D.N.Y. Mar. 18, 2020).  Here, Plaintiffs allege only that the halt on new user registration—expected to last just 45 days, SAC Exs. Ex. 25, 27—would preclude additional

growth by approximately 6 million new users (just one percent of DiDi's 493 million global users). ¶ 221. These allegations are insufficient. *See IBP*, 789 A.2d at 69 (64% decrease in year-over-year earnings not material adverse event); *Newmont*, 2020 WL 1285543, at *24 (downturn not significant when company's output recovered after two months).

And to the extent Plaintiffs seek to rely on news from *after* the IPO closed to establish that statements in the Underwriting Agreement were material, *see, e.g.*, ¶¶ 165-67, 380, such allegations amount to nothing more than fraud by hindsight and cannot form the basis of securities fraud. *See Scott v. Gen. Motors Co*., 46 F. Supp. 3d 387, 393-94 (S.D.N.Y. 2014) (plaintiff "may not . . . state viable Section 11 claims by relying solely on hindsight to prove a misstatement").

*Finally*, Plaintiffs allege no facts suggesting that DiDi knew of the July 2 Penalties before they were publicly disclosed. *See* Section IV.B., *infra*. Rather, the July 2 Penalties were announced the same day DiDi learned of them—*before market open*. *See* ¶¶ 162, 216 (DiDi "learned on July 2 that the CAC was punishing DiDi).[10] There is no securities fraud liability where there is no concealment of material facts and thus no misstatement or omission. *See Jiahia Luo*, 465 F. Supp. 3d at 406 ("It is not sufficient that, at some point after the registration statement became effective, [a] subsequent event made it no longer accurate.").

## IV.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE EXCHANGE ACT

To state a claim under Section 10(b) of the Exchange Act, Plaintiffs must allege, among other things, (i) a material misrepresentation or omission; (ii) scienter; and (iii) loss causation. *Singh v. Cigna Corp*., 918 F.3d 57, 62 (2d Cir. 2019). Plaintiffs' Exchange Act claims are subject to the heighted pleading requirements of the PSLRA and Rule 9(b). Beyond Rule 9(b), the PSLRA

---

[10]   Notably, Lead Plaintiff continued to purchase DiDi ADS through July 20. And, as Plaintiffs allege, the July 2 Penalties were announced prior to market open that day, so no investor who purchased DiDi ADS on July 2 or later did so without the benefit of that knowledge.

requires that a Complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Moreover, the PSLRA requires that Plaintiffs establish scienter by "stat[ing] with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.*

### A.     Plaintiffs Fail to Plead Any Actionable Omission of Material Fact

Plaintiffs' Exchange Act claims are predicated on the same alleged conduct as their Securities Act claims and fail for the reasons discussed above.  This alone warrants dismissal.

### B.     Plaintiffs Fail to Plead a "Strong Inference" of Scienter

Plaintiffs' Exchange Act claims also fail because they do not allege facts sufficient to "give rise to a strong inference of fraudulent intent" as is required to state a claim under Section 10(b). *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001).  "To qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007).  Plaintiffs may satisfy this requirement by alleging facts (i) showing motive and opportunity or (ii) constituting strong circumstantial evidence of conscious misbehavior or recklessness. *ATSI*, 493 F.3d at 99.  Plaintiffs allege neither.

#### 1.     Plaintiffs Fail to Plead Motive and Opportunity

Plaintiffs' allegations that DiDi was motivated to conceal the "Omitted Facts" because it wanted to receive its IPO proceeds, and that Defendants Cheng and Liu were motivated because their stake in DiDi rose significantly, ¶¶ 285-86; *see* ¶ 290, do not establish scienter because "[m]otives that are generally possessed by most corporate directors and officers do not suffice," *Kalnit*, 264 F.3d at 139; *see also Defer LP v. Raymond James Fin.*, *Inc.*, 654 F. Supp. 2d 204, 217-

18 (S.D.N.Y. 2009) (Kaplan, J.) ("[P]laintiff must allege that defendants benefitted in some concrete and personal way from the purported fraud.").  Here, Plaintiffs' assertion that the alleged fraud enabled DiDi "to complete business transactions, or enabled [Defendants] to gain by increased value of [stock], is insufficient to allege motive."  *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 592 (S.D.N.Y. 2011); *see also Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) ("If scienter could be pleaded on that basis alone, virtually every company . . . that experiences a downturn in stock price could be forced to defend securities fraud actions.").

To the extent Plaintiffs rely on allegations of insider sales to support a strong inference of scienter as to the Company, this argument also fails.  ¶¶ 268–72.  As explained above, *supra* Section III.A, Plaintiffs fail to allege any particularized facts demonstrating that DiDi or any person whose knowledge could be imputed to the Company had knowledge of the alleged "Omitted Facts" that Plaintiffs claim constituted material non-public information.  ¶ 268.  Moreover, "[f]or insider sales to raise an inference of improper motive, they must be 'suspicious' or 'unusual.'"  *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 381 (E.D.N.Y. 2003).  "Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling."  *Id.* at 382.  Here, the Complaint **admits** that any initial profit realized by the Company "was short-lived"—although the Company raised $4.4 billion in IPO proceeds, the $4.7 billion in losses incurred in Q3 2022 as a result of the subsequent regulatory actions were even higher.  ¶¶ 140, 201.  Nor does the Complaint allege particularized facts showing a "suspicious or unusual" "number of insiders selling."  *Keyspan*, 383 F. Supp. 2d at 381.  Rather, the Complaint **admits** that the shares of DiDi's officers and early investors were subject to a six-month lock-up period that lasted until December 28, 2021, after DiDi announced its plans to delist

from the NYSE.  ¶¶ 21, 76, 286. "It defies reason that an entity looking to profit on a fraudulently inflated stock price would" launch an IPO, triggering this lock-up, "while knowing that the information illuminating the fraud was seeping into the market." *Glaser*, 772 F. Supp. 2d at 593.[11]

Plaintiffs' various allegations about the timing of the IPO similarly do not support a strong inference of scienter.  To start, Plaintiffs allege that DiDi accelerated the IPO, launching it on the eve of a major Chinese holiday when "government workers suspend[ed] their daily work."  ¶¶ 192–93.  This argument fails on its own terms because—as Plaintiffs admit—regulators returned to work **before** the close of the IPO, and the CAC "didn't explicitly forbid the company from going public in the U.S."  ¶¶ 13, 184.  Plaintiffs' suggestion that the IPO was timed to pre-date the enactment of more restrictive laws, ¶¶ 188-89, 285, is equally unavailing because DiDi disclosed in the Offering Documents that such laws were forthcoming.  Ex. B at 27, 196.

Plaintiffs' theory of motive is thus not "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.  "It is nonsensical to impute dishonest motives to . . . Defendants when each of them suffered significant losses in their stock holdings and executive compensation."  *Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010); *see Rombach*, 355 F.3d at 177 (no motive where "defendants were among [the] largest shareholders and shared the pain when the company failed.").  The only plausible inference is that Defendants believed the IPO would be successful and not hindered by any imminent regulatory issues.

### 2.    Plaintiffs Fail to Plead Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness

---

[11]    *HEXO*, 524 F. Supp. 3d at 313 (allegation that "individual defendants held options with high strike prices" was insufficient to allege motive where "it is not ever alleged that . . . Defendants exercised their options"); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 814 (2d Cir. 1996) ("[T]he fact that . . . defendants did not sell their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding motive.").

Because Plaintiffs fail to plead motive, "the strength of the circumstantial allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142. Where, as here, Plaintiffs allege fraud on the basis of a material omission, they must "present facts indicating a clear duty to disclose," *id.* at 144, which they fail to do (*supra* Section III.B). Plaintiffs fail to allege recklessness, much less conscious misbehavior. To establish recklessness, Plaintiffs must plead "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* Plaintiffs must allege that Defendants had "knowledge of facts or access to information contradicting their public statements." *Id.* Plaintiffs fail to meet these stringent pleading requirements.

### (a)    Plaintiffs' Allegations Against DiDi Only Fail

Relying solely on news articles published ***after*** the IPO, Plaintiffs assert that DiDi knew or recklessly disregarded that the CAC had directed DiDi to postpone its IPO in the United States pending a cybersecurity review to ensure compliance with all applicable laws and regulations, and knew or recklessly disregarded the risk that the government would impose regulatory penalties against DiDi that would materially impact DiDi's business. ¶¶ 264-65. This claim fails.

*First*, "media reports that do not indicate particularized facts, but instead provide only generalized forecasting and speculation, do not support scienter allegations." *Glaser*, 772 F. Supp. 2d at 596 n.16; *see Plumbers*, 694 F. Supp. 2d at 300 ("generalized forecasting and speculation about a looming subprime crisis" is insufficient). Here, Plaintiffs' cited sources are plainly speculative. These articles present conflicting accounts, most of which allege, *at most*, that the regulatory fallout that succeeded DiDi's IPO may have been caused by a "*misinterpretation* over the clarity and forcefulness of the CAC's instruction." SAC Ex. 21 at 3. None of the sources is described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak v. Kasaks*, 216 F.3d 300,

28

314 (2d Cir. 2000). Instead, the articles attribute facts to "sources" or "people familiar with the matter," SAC Exs. 21 at 3; 23 at 1; 24 at 2, which is plainly insufficient to satisfy the stringent pleading requirements for scienter under the PSLRA. *See Glaser*, 772 F. Supp. 2d at 589 (source who was "intimately involved" with matter "is not described sufficiently so that his allegations support an inference of scienter"). At bottom, "[o]ther than quoting a newspaper article's reference to what unnamed [sources] 'assume' about the opinions of unnamed 'regulators,' the complaint contains no factual allegation that specific regulators issued a specific warning" to DiDi about delaying its IPO. *Hershfang v. Citicorp*, 767 F. Supp. 1251, 1256 (S.D.N.Y. 1991). The articles cited in the Complaint do nothing more than confirm that "*[n]either DiDi nor the CAC . . . ever publicly acknowledged the existence of such a conversation*."[12] SAC Ex. 21 at 3.

*Second*, none of the articles or anonymous sources cited in the Complaint sets forth particularized facts showing that any Individual Defendants had "knowledge of facts or access to information contradicting their public statements." *Kalnit*, 264 F.3d at 142. Generic and speculative claims that "DiDi was fully aware" or that regulators "felt certain DiDi understood" are insufficient to plead scienter under Rule 9(b). ¶¶ 184, 291. *See Glaser*, 772 F. Supp. 2d at 591 ("[C]onclusory statements that defendants 'were aware' of certain information, and . . . that defendants 'would have' or 'should have' had such knowledge is insufficient."). Rather, Plaintiffs "must specifically identify the reports or statements containing this information." *Keyspan*, 383

---

[12] Plaintiffs' attacks on DiDi's "carefully worded" denials of the CAC's July 2 and 4, 2021 orders are unavailing. Instead of alleging DiDi's scienter with the particularity required under the PSLRA, *ATSI*, 493 F.3d at 99, Plaintiffs instead improperly attempt to shift the burden to DiDi, ¶¶ 234-35 ("Denying knowledge of the form of DiDi's punishment . . . is hardly the same as denying that the CAC had instructed DiDi not to go public in the U.S."), ¶¶ 234-35, but fall far short of alleging scienter with the requisite particularity, *ATSI*, 493 F.3d at 99. Further, Plaintiff's rhetoric is belied by other allegations, which detail at length DiDi's long record of "public displays of cooperation" with government directives, ¶¶ 123, 126, and the necessity that all "businesses are required to accord [Chinese] government agencies and officials great respect and deference," ¶¶ 82-86.

F. Supp. 2d at 388.  Plaintiffs allege that unnamed sources "confirmed a meeting between the CAC and DiDi in Beijing," which curiously "produced no written records."  ¶¶ 177, 337.  These allegations are "so vague as to be meaningless," because they do not explain "what specific contradictory information . . . Defendants received or when they received it," or "how extensively or in what manner the [information was] discussed."[13]  *Local No. 38 v. Am. Exp. Co.*, 724 F. Supp. 2d 447 (S.D.N.Y. 2010).  It is thus impossible to determine based on Plaintiffs' allegations whether DiDi's decision to move forward with the IPO constituted "an extreme departure from the standards of ordinary care."  *Kalnit*, 264 F.3d at 142.  If the CAC only "suggested" that DiDi delay its IPO, as Plaintiffs allege, ¶ 235, then DiDi's decision was not reckless, because—by many accounts—key agencies, including "the top economic-planning agency, appeared supportive of its listing."  SAC Exs. 14 at 4; 18 at 2 (DiDi "received mixed signals from different agencies"); 24 at 2 (similar).  Although Plaintiffs allege that "it is reasonably foreseeable that defying President Xi's directives will result in severe punishment to one's . . . business," ¶ 281, *none* of their sources alleges that a "directive" was ever given—rather, the sources confirm that "[r]egulators didn't explicitly forbid the company from going public in the U.S."  ¶ 184; *see* SAC Exs. 14 at 4 ("The officials made clear to DiDi . . . that the government didn't intend to block the IPO"); 17 at 1 (noting "a top party official" questioned why the CAC "*hadn't* blocked" the IPO).[14]

---

[13] Plaintiffs allege that "a former director of the Publicity Department of the Central Committee of the CPC [who is also] currently an executive at a Chinese internet company" claimed that the meeting took place on June 21, 2021.  ¶ 175 n.67.  This allegation conflicts with other allegations in the Complaint that the meeting occurred "as early as three months" before the IPO.  *Id.* ¶ 176.  Plaintiffs do not allege that this unnamed individual was affiliated with either the CAC or DiDi, and do not otherwise allege facts to show that "a person in the position occupied by the source would possess the information alleged."  *Novak*, 216 F.3d at 314.

[14] Plaintiffs' assertion that Defendants Lau and Zhang "are reported to have 'advised DiDi Chairman Will Cheng and President Jean Liu . . . against rushing to go public in the midst of China's wide-ranging regulatory crackdown on . . . dozens of internet-technology companies'"

*Finally*, numerous allegations contained in the articles Plaintiffs cite undermine their claims of recklessness.  For example, Plaintiffs ignore reporting that "the CAC itself has come under scrutiny because of the DiDi IPO, with a top party official having questioned why the agency hadn't blocked the company's offering."  SAC Ex. 17 at 1.  Such allegations clearly undercut Plaintiffs' claim of scienter.  Moreover, several outlets reported that "[i]t is unclear whether DiDi applied for a review before its IPO."  SAC Ex. 16 at 4; *see* SAC Ex. 11 at 2.  Hence, even assuming *arguendo* that the CAC suggested DiDi delay its IPO pending a review, it is unclear whether DiDi had satisfied, or reasonably believed it had satisfied, the conditions allegedly laid out by the CAC before its IPO.  Tellingly, Plaintiffs do not—and cannot—set forth any fact alleging that DiDi knew it was not in compliance with any cybersecurity review requirements.

(b)     Plaintiffs' Allegations Against the Officer Defendants and DiDi Fail

Plaintiffs further argue that Defendants DiDi, Cheng, Liu, and Zhuo knew that they were required to provide officer certificates to the Underwriters as a condition of closing, and had a duty to, but did not, diligently investigate the "July 2 Penalties."  *See* ¶ 276.  This claim fails.

Plaintiffs admit that shortly after the CAC's announcement on July 2, DiDi stated that it would "fully cooperate" with authorities and "conduct a comprehensive examination of cybersecurity risks."  *Id.* ¶ 210.  Plaintiffs do not allege that this statement was false, and the fact that DiDi immediately investigated the reasons for the CAC's actions "cut[s] against the inference of scienter."  *Glaser*, 772 F. Supp. 2d at 589 (that defendants "were taken by surprise" by inquiries and "conducted extensive investigations" undermines inference of fraudulent intent).

Plaintiffs also allege that when the CAC informed DiDi it was under cybersecurity review

---

fails for the same reasons.  ¶ 284.  This allegation also does not establish any specific knowledge of the CAC's desire for DiDi to delay the IPO—to the contrary, the Complaint admits that Defendants Lau and Zhang had no knowledge of this fact before the IPO.  *Id.*

and was prohibited from taking on new users, the CAC told DiDi this was because DiDi defied the "Directives," ¶ 274, but the Complaint fails to "state with particularity all facts"—or indeed, *any* facts—"on which that belief is formed," as required under the PSLRA.  *ATSI*, 493 F.3d at 99. Plaintiffs fail to allege *who* spoke to the CAC July 2 or *what* message was communicated, let alone that such a message was conveyed to any DiDi executives before closing.  *See Glaser*, 772 F. Supp. 2d at 590 (recklessness allegations "insufficient absent some allegation that the witness communicated with the individual defendants.").  Hence, Plaintiffs fail to establish that before closing, DiDi and its executives knew or were reckless in not knowing that the CAC's July 2 order (which only applied to *new* customers, ¶ 273), would have a "material adverse effect" on the Company requiring disclosure in their certificates to the Underwriters, SAC Ex. 19 at 12, given that by Plaintiffs' own admission, DiDi "enjoy[ed] *near-complete market dominance* in China" at the time of its IPO.  ¶ 3.  In fact, despite widespread reporting of the CAC's July 2 announcement, ¶¶ 205–09, DiDi's shares opened at $14.96 on July 2—*higher* than its IPO price of $14.  ¶ 227.

(c)    <u>Plaintiffs' Theories of Recklessness Are Neither Cogent Nor Compelling</u>

None of Plaintiffs' allegations presents a strong inference of recklessness that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.   Given Plaintiffs' repeated assertions that Defendants were aware of the severe consequences of defying any government suggestion—including and up to shutting down DiDi's entire businesses, ¶¶ 82-86, 214, 281-84—Plaintiffs' speculation that Defendants would knowingly and publicly defy the Chinese government just before DiDi's high-profile IPO—while their shares were subject to a six-month lock-up period, no less—is as illogical as it is suicidal.

Further, Defendants' "conduct during the Class Period was not consistent with fraud." *Plumbers*, 694 F. Supp. 2d at 302.  Not only did DiDi candidly disclose a regulatory investigation

a month before the IPO, ¶ 288, Plaintiffs also admit that for years and immediately after the IPO, DiDi made "public displays of cooperation" with government directives, ¶¶ 123, 126. These allegations belie any claim of fraud. *See Rombach*, 355 F.3d at 176-77 (recklessness inference "weakened by [defendants'] disclosure of certain financial problems prior to the deadline"). Even after the IPO launched, the CAC *never* publicly acknowledged any alleged "Directive" that DiDi defied, nor did it use its "immense power" to stop the IPO before it closed. SAC Ex. 21 at 3; ¶ 6; *see also Glaser*, 772 F. Supp. 2d at 598 (nonfraudulent inference supported where parties "denied the vague internet rumors concerning their relationship and contract renewal"). Despite raiding DiDi's offices, the CAC did not accuse anyone of flouting the alleged "Directive." ¶ 251; *see Loc. No. 38*, 724 F. Supp. 2d at 462 ("if 'detailed' reports were circulated . . . [the witness] should be able to identify the names and contents of these documents, or recount specific meetings at which the [defendants] actually received contradictory information."). The *only* compelling inference is that DiDi reasonably and genuinely believed, amidst the cacophony of voices by the relevant Chinese regulators, that it was not prohibited by regulators to proceed with the IPO. SAC Ex. 12.

### C. Plaintiffs Fail To Plead Loss Causation

To establish loss causation, Plaintiffs must adequately allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, "*i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security. Otherwise, the loss in question was not foreseeable." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005). A disclosure suffices for pleading loss causation "only if it somehow reveals . . . that a defendant's prior statements were not entirely true or accurate." *In re Take–Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 283 (S.D.N.Y. 2008).

Plaintiffs' novel hybrid corrective disclosure and materialization of the risk theory does not support that Defendants "concealed something from the market that, when disclosed,

33

negatively affected the value of the security." *Lentell*, 396 F.3d at 173.  Indeed, Plaintiffs fail to allege any corrective disclosure at all, rendering their claims inactionable. *Take–Two*, 551 F. Supp. 2d at 283; *see also Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp*., 543 F. App'x 72, 75 (2d Cir. 2013) (no loss causation where plaintiff did "not identify how the alleged corrective disclosures even purported to reveal some then-undisclosed *fact* with regard to the specific misrepresentations alleged in the complaint.").  Plaintiffs allege, for example, that on July 2 and 3, 2021, news outlets reported that the CAC was initiating a cybersecurity review of DiDi, but do not explain how these disclosures revealed any alleged omission.  ¶¶ 225-29. Elsewhere, Plaintiffs allege that investors first learned that DiDi "disobeyed the CAC's Directives" on July 5.  ¶ 16.  The myriad other disclosures to which Plaintiffs point—occurring through ***April 2022***—are likewise not "corrective": they disclosed no new information regarding any alleged omission.  ¶¶ 237-60.

Further, apparently realizing the market events alleged in their first complaint were not "corrective disclosures," Plaintiffs now contend that news of the CAC's actions and DiDi's disclosures concerning the impact on its business constituted a materialization of the allegedly concealed risk that DiDi failed to disclose the "Directives."  *See* ¶¶ 224-59.  But a market event does not become a disclosure simply by renaming it a "materialization" of risk—*Lentell* held that a disclosure, however it occurs, must provide ***new*** information to the market, and the Second Circuit has reiterated that "'corrective disclosure' and 'materialization of risk'" do not "create fundamentally different pathways for proving loss causation," such that "[w]hether the truth comes out by way of a corrective disclosure describing the precise fraud inherent in the alleged misstatements, or through events constructively disclosing the fraud, does not alter the basic loss-causation calculus."  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261-62 (2d Cir. 2016); *see also*

*Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 209 (D. Conn. 2014) (no loss causation where there was "nothing in the Complaint to suggest that" stock price decline "was caused by the materialization of a *concealed* risk as opposed to a *disclosed* risk").  In light of the continued news reporting over the months following the IPO, Plaintiffs cannot seriously argue that any risk continued to be concealed.  Merely emphasizing public information is not a disclosure.  *See In re Sec. Cap. Assurance Ltd. Sec. Litig.*, 2011 WL 4444206, at *6 (S.D.N.Y. Sept. 23, 2011) (downgrades that merely "highlighted the magnitude of the risk" could not "have disclosed previously unknown subprime exposures").

### D.    Plaintiffs Fail to Plead Claims Under Section 20A and Section 20(a)

Because Plaintiffs do not plead a violation of Section 10(b), they likewise fail to state a claim for insider trading under Section 20A.  *See Keyspan*, 383 F. Supp. 2d at 389.  Plaintiffs' Section 20A claim must also be dismissed because Plaintiffs do not allege that DiDi traded on material nonpublic information—the CAC's regulatory action was known to the public before the close of the IPO, and, as shown above, Plaintiffs do not adequately allege that DiDi had access to any nonpublic information.  *See Take-Two*, 551 F. Supp. 2d at 309-10.  To the extent Plaintiffs' 20A claim is predicated on alleged insider trading while failing to disclose material information, that argument is likewise baseless because Plaintiffs do not plead a duty to disclose.  Because Plaintiffs fail to allege violations of Sections 10(b) and 20A, they fail to state a claim for control person liability under Section 20(a).

## V.    CONCLUSION

DiDi respectfully seeks dismissal of the Complaint.  Further, because Plaintiffs fail to state viable claims and because further amendment would be futile, DiDi seeks dismissal with prejudice.  *See, e.g.*, *In re IAC/InterActiveCorp Sec. Litig.*, 695 F. Supp. 2d 109, 125 (S.D.N.Y. 2010) (dismissal with prejudice where plaintiffs amended once and further amendments would be futile).

Dated: June 3, 2022
       New York, New York

Respectfully submitted,

*/s/ Corey Worcester*

Corey Worcester
Renita Sharma
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10038
Tel: (212) 849-7000
Fax: (212) 849-7100
coreyworcester@quinnemanuel.com
renitasharma@quinnemanuel.com

Scott Musoff
Robert Fumerton
Michael Griffin
Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, New York 10001
Tel: (212) 735-3000
Fax: (212) 735-2000
scott.musoff@skadden.com
robert.fumerton@skadden.com
michael.griffin@skadden.com

*Counsel for Defendant DiDi Global Inc.*