**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE DIDI GLOBAL INC. SECURITIES LITIGATION | Master Docket 1:21-cv-05807-LAK

This Document Relates to: All Actions |

**MEMORANDUM OF LAW IN SUPPORT OF
THE UNDERWRITERS' MOTION TO DISMISS**

**O'MELVENY & MYERS LLP**

7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

400 South Hope Street
Los Angeles, CA 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

*Attorneys for Defendants Goldman Sachs
(Asia) L.L.C., Morgan Stanley & Co. LLC,
J.P. Morgan Securities LLC, BofA Securities
Inc., Barclays Capital Inc., China
Renaissance Securities (US) Inc., Citigroup
Global Markets Inc., HSBC Securities (USA)
Inc., UBS Securities LLC, and Mizuho
Securities USA LLC*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..............................................................................................1

STATEMENT OF FACTS ..................................................................................................4

      A.     The Underwriting Agreement for DiDi's IPO ............................................5

      B.     The CAC July 2 CAC Announcement and IPO Closing ............................6

      C.     Plaintiffs' Claims Against the Underwriters...............................................7

ARGUMENT.......................................................................................................................8

    I.     The Underwriting Agreement's terms do not provide the basis for a
        Securities Act claim. .................................................................................9

      A.     The language and context of the Underwriting Agreement show
            that DiDi's  contractual representations and warranties in the
            Underwriting Agreement were made solely to and for the benefit
            of the Underwriters, not investors in DiDi's ADS......................................9

      B.     The text and structure of the Securities Act and accompanying
            regulations show that Congress did not intend to impose Securities
            Act liability for breaches of issuers' contractual representations
            and warranties in underwriting agreements ...............................................11

      C.     Section 12(a)(2) does not impose liability for documents that were
            not part of the IPO prospectus ...................................................................14

    II.    There can be no Section 11 liability for developments after the
        Registration Statement's Effective Date....................................................15

CONCLUSION....................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ..................................................................................4

*Delfonce v. Eltman Law, P.C.*,
  2017 WL 639249 (E.D.N.Y. Feb. 16, 2017) ........................................................4

*Gotham Holdings, LP v. Health Grades, Inc.*,
  534 F. Supp. 2d 442 (S.D.N.Y. 2008) ................................................................15

*Gustafson v. Alloyd Co., Inc.*,
  513 U.S. 561 (1995)............................................................................................14

*In re Elan Corp. Sec. Litig.*,
  543 F. Supp. 2d 187 (S.D.N.Y. 2008) ..................................................................4

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
  307 F. Supp. 3d 583 (S.D. Tex. 2018)..................................................3, 9, 10, 11

*Jaroslawicz v. M&T Bank Corp.*,
  2017 WL 1197716 (D. Del. Mar. 30, 2017) ........................................................10

*Russello v. United States*,
  464 U.S. 16 (1983)..............................................................................................13

*Sec. & Exch. Comm'n v. Rajaratnam*,
  918 F.3d 36 (2d Cir. 2019) ................................................................................13

**Statutes**

15 U.S.C § 77g(a) ........................................................................................................12

15 U.S.C. § 77aa .........................................................................................................11

15 U.S.C § 77aa(17) ................................................................................................3, 12

15 U.S.C § 77aa(24) ................................................................................................3, 13

15 U.S.C § 77aa(28) ..........................................................................................3, 12, 13

15 U.S.C § 77aa(30) ................................................................................................3, 13

15 U.S.C. § 77k..........................................................................................................4, 15

15 U.S.C § 77k(a) .........................................................................................................13

15 U.S.C. § 77j(a)(1) .....................................................................................................14

15 U.S.C. § 77l(a)(2) .....................................................................................................14

**Other Authorities**

*Notice of Effectiveness*, SEC,
  https://www.sec.gov/Archives/edgar/data/0001764757/999999999521002583/
  9999999995-21-002583-index.htm ................................................................6, 15

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT 6/1/2022

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

**Regulations**

17 CFR § 229.601......................................................................................................................11, 12

Defendants Goldman Sachs (Asia) L.L.C., Morgan Stanley & Co. LLC, J.P. Morgan Securities LLC, BofA Securities Inc., Barclays Capital Inc., Citigroup Global Markets Inc., China Renaissance Securities (US) Inc., HSBC Securities (USA) Inc., UBS Securities LLC, and Mizuho Securities USA LLC (the "Underwriters"), who served as underwriters for DiDi's June 30, 2021 initial public offering, respectfully submit this Memorandum of Law in Support of their Motion to Dismiss the Second Amended Complaint under Federal Rule of Civil Procedure 12(b)(6), for failure to state claims under Sections 11 and 12 of the Securities Act.[1]

## PRELIMINARY STATEMENT

Plaintiffs' claims against the Underwriters arise out of the Cyberspace Administration of China ("CAC") announcing on July 2, 2021—two days after DiDi's IPO had launched but hours before it was to close—that DiDi would have to suspend registering new users pending the CAC's review of DiDi's cybersecurity practices.  This is Plaintiffs' second attempt to state claims against the Underwriters for that post-IPO-launch development.  Previously, Plaintiffs claimed that the Underwriters should be held liable because the Underwriters (i) knew about the so-called CAC Directive—i.e., that the CAC had allegedly asked DiDi to postpone its IPO pending a cybersecurity review; and (ii) declined to exercise their Underwriting Agreement right

---

[1] As used in this brief, (i) the "SAC" is the May 6, 2022 Second Amended Complaint (ECF No. 106), attached as Exhibit A to the June 3, 2022 Declaration of Jonathan Rosenberg, Esq., submitted with this motion; (ii) the "Securities Act" is the Securities Act of 1933; (iii) the "Exchange Act" is the Securities Exchange Act of 1934; (iv) the "DiDi Brief" is the June 3, 2022 Memorandum of Law on behalf of DiDi Global, Inc., in Support of its Motion to Dismiss the Amended Complaint (ECF No. 113); (v) the "Underwriting Agreement" is the June 29, 2021 underwriting agreement between DiDi and its underwriters, the form of which is attached to the Second Amended Complaint as Exhibit 19; (vi) citations to "Ex." are to exhibits to the June 3, 2022 Declaration of Jonathan Rosenberg, Esq., filed with this motion; and (vii) citations to "DiDi Ex." are to exhibits to the June 3, 2022 Declaration of Corey Worcester in Support of DiDi's Motion to Dismiss (ECF No. 114).  Unless otherwise noted, capitalized terms have the same meaning as in the DiDi Brief and all emphasis is added and all internal citations and quotations are omitted.

to abort the IPO before it closed on July 2.  After the Underwriters showed in their March 8, 2022 motion to dismiss that Plaintiffs had failed to plead a factual or legal basis for either theory, Plaintiffs withdrew them both.

In their Second Amended Complaint, Plaintiffs again try to plead two liability theories against the Underwriters.  The first is again based on the CAC Directive, but Plaintiffs no longer allege that the Underwriters knew about that alleged Directive.  Rather, Plaintiffs assert Securities Act Sections 11 and 12(a)(2) claims against the Underwriters based on the Directive's omission from the Offering Documents.  As explained in the DiDi Brief, that theory does not state a claim, because the SAC fails to plead facts showing that the CAC directed DiDi to postpone the IPO or that DiDi had any duty to disclose its alleged pre-IPO discussions with the CAC, and that the Offering Documents adequately disclosed the risks about which Plaintiffs complain.  Plaintiffs' second theory against the Underwriters, also brought under Securities Act Sections 11 and 12(a)(2), is based on alleged misrepresentations, not in the IPO Registration Statement or Prospectus, but in the Underwriting Agreement between DiDi and the Underwriters.  According to Plaintiffs, (i) DiDi's contractual representations and warranties in the Underwriting Agreement were rendered false by the CAC Directive and the July 2 CAC announcement; and (ii) those allegedly false representations by DiDi can be the basis of Securities Act liability against the Underwriters, simply because the Underwriting Agreement was among the contracts that had to be attached as an exhibit to the IPO Registration Statement. As explained in the DiDi Brief, this second theory fails as well, because the SAC fails to plead facts showing that DiDi's contractual representations and warranties were false.  But as shown in this brief, Plaintiffs' second theory also independently fails because DiDi's representations and warranties in the Underwriting Agreement cannot provide the basis for a Securities Act claim.

First, the language and context of the Underwriting Agreement show that DiDi's representations and warranties were made solely to and for the benefit of the Underwriters. Those representations and warranties were designed to *protect*, and cannot form the basis for liability *against*, the Underwriters. The Underwriting Agreement, in fact, disclaimed all third-party rights, and thus the representations and warranties in that agreement were not made to DiDi's IPO investors. These are among the reasons why, in the only decision to rule on this issue, *In re Plains All American Pipeline, L.P. Securities Litigation*, 307 F. Supp. 3d 583 (S.D. Tex. 2018), *aff'd on other grounds sub nom. Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777 Fed. App'x 726 (5th Cir. 2019), the court held that Securities Act liability cannot be based on an issuer's alleged misrepresentations in an underwriting agreement.

Second, the language and context of the Securities Act further show that Congress did not intend to create Securities Act liability for misstatements in underwriting agreements. The only disclosure about underwriters that Congress requires to be included in the text of the Registration Statement are the "commissions or discounts paid or to be paid, directly or indirectly, by the issuer to the underwriters." 15 U.S.C § 77aa(17). Congress chose not to require including in the Registration Statement's text the substance of any issuer representation or warranty to its underwriters. That choice shows that Congress did not intend those contractual representations to be a basis for Securities Act liability. And as the district court held in *Plains All American Pipeline*, the mere fact that Congress also requires issuers to attach as an exhibit to their offering registration statement a copy of their underwriting agreement (15 U.S.C § 77aa(28))—as it requires with many other issuer contracts (15 U.S.C § 77aa(24), (30))—does not import into the text of the registration statements the numerous and varied representations and warranties in those contacts. 307 F. Supp. 3d at 638. Any other interpretation would lead to the incongruous

3

and unfair exposure of underwriters to liability not only for contractual representations made for their own benefit, but also for myriad other contractual representations made by other parties in contracts to which the underwriters were not even a party.

Third, the Securities Act does not require that underwriting agreements be attached as an exhibit to the IPO Prospectus (as opposed to the Registration Statement). Because Section 12(a)(2) claims are linked exclusively to the IPO prospectus, the Underwriting Agreement here cannot support Section 12(a)(2) liability on this basis as well.

Finally, the July 2 CAC announcement cannot support a Section 11 claim because Section 11 liability is limited to untrue or misleading statements in a Registration Statement "when such part became effective." 15 U.S.C. § 77k. The Registration Statement became effective on June 29, three days before the CAC announcement. That DiDi's IPO had not closed at the time of that announcement does not open the door to Section 11 liability for that post-effective date development.

## STATEMENT OF FACTS[2]

The Underwriters adopt and incorporate by reference the Statement of Facts in the DiDi Brief (*see* DiDi Br. pp. 3–10), and include relevant additional facts here.

---

[2] The facts in this section are drawn from the allegations in the SAC and "documents attached as exhibits or incorporated into the complaint by reference, matters of which judicial notice may be taken, [and] documents integral to the complaint." *Delfonce v. Eltman Law, P.C.*, 2017 WL 639249, at *2 (E.D.N.Y. Feb. 16, 2017), *aff'd*, 712 F. App'x 17 (2d Cir. 2017). The Court may also consider "legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). This includes documents relied on, but not attached to, the SAC. *See In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 196 n.7, 206 (S.D.N.Y. 2008) (court on motion to dismiss can consider document cited in, but not attached to, complaint).

A.      **The Underwriting Agreement for DiDi's IPO**

DiDi and its underwriters entered into the Underwriting Agreement to govern the

underwriters' role in DiDi's IPO, the form of which was attached as an exhibit to the Offering

Documents.  (SAC Ex. 19.)  The Underwriting Agreement spans more than 40 pages with

exhibits, and allocates risk and rights between DiDi and its underwriters through numerous

mutual promises.  (*See, e.g.*, SAC Ex. 19 §§ 1 (DiDi representations); 6(e) (underwriter

representation); 9(a), (b) (mutual indemnification provisions).)  The Underwriting Agreement

includes a commitment by the underwriters to distribute 316.8 million ADS, with a fee of

approximately 28 cents per ADS sold.  (*See* DiDi Ex. B cover page; SAC ¶¶ 63 n.7, 342, & Ex.

19 § 2.)  Neither party makes any commitments to investors, and in fact the Underwriting

Agreement expressly disclaims granting any rights to third parties, including ADS purchasers:

> This Agreement shall be binding upon, and inure solely to the
> benefit of, the Underwriters, the Company and, to the extent
> provided in Sections 9 and 11 hereof, the officers and directors of
> the Company and each person who controls the Company or any
> Underwriter, and their respective heirs, executors, administrators,
> successors and assigns, and no other person shall acquire or have
> any right under or by virtue of this Agreement.  No purchaser of any
> of the ADSs from any Underwriter shall be deemed a successor or
> assign by reason merely of such purchase.

(SAC Ex. 19 § 14.)

DiDi made sixty-nine representations and warranties in the Underwriting Agreement,

preceded by the following: "The Company represents and warrants to, and agrees with, each of

the Underwriters."  (*Id*. at § 1.)  The Underwriters' obligation to deliver ADS is subject, "in [the

Underwriters'] discretion," to the condition that each of those sixty-nine contractual

representations and warranties is correct at closing.  (*Id*. § 8.)  These included that:

- The information in the offering documents were not inaccurate when filed and would not contain any untrue statement of material fact as of closing. (*Id.* §§ 1(iii), (iv).)

- There had not been a material adverse event since the date of the offering documents, nor had DiDi "sustained any material loss or interference with its business from . . . governmental action, order or decree," nor were there any government investigations that have a material adverse effect on DiDi or otherwise were required to be disclosed in the Offering Documents. (*Id.* § 1(v), 1(xxxv).)

- DiDi is "in material compliance" with "appliable laws . . . , internal policies, and contractual obligations relating to the privacy and security of IT Systems and Personal Data and to the protection of such IT Systems and Personal Data from unauthorized use, access, misappropriation or modification." (*Id.* § 1(Lii).)

Lead underwriters also have "in their sole discretion" the power to "waive on behalf of the Underwriters compliance with any conditions to the obligations of the Underwriters hereunder." (*Id.* § 8.)

**B.      The CAC July 2 CAC Announcement and IPO Closing**

On June 29, 2021, the ADS were priced, the Underwriting Agreement was signed, and the SEC deemed the Registration Statement effective.[3] The IPO launched on June 30. (*See* DiDi Ex. B; SAC ¶ 192.) But the IPO had not yet closed when the CAC announced its investigation

---

[3] While the CAC includes one allegation that the Registration Statement was declared effective on June 30 (SAC ¶ 197), elsewhere it correctly alleges that the effective date was June 29 (*id.* ¶¶ 56, 58, 77), which is the date supported in SEC public records, *see Notice of Effectiveness*, SEC, https://www.sec.gov/Archives/edgar/data/0001764757/999999999521002583/9999999995-21-002583-index.htm (noting June 29, 2021 effective date).

of DiDi on July 2 at 7:19 a.m. EDT, before trading began in the United States.  (SAC ¶¶ 13,

204.)  The CAC announced that it was "conduct[ing] a cyber security review" of DiDi, during

which DiDi would not be allowed to accept new user registrations.  (*Id.* at ¶¶ 204, 344.)

The Underwriters closed the IPO on July 2 after the bringdown due diligence call.  (SAC

¶ 223.)  DiDi's ADS closed that day at $15.53.  (*See* DiDi Ex. D.)

###### C.       Plaintiffs' Claims Against the Underwriters

Plaintiffs in the SAC have significantly narrowed their claims against the Underwriters.

First, Plaintiffs have dropped all Exchange Act securities fraud claims against the

Underwriters.  In the previous Consolidated Amended Complaint, Plaintiffs alleged that the

Underwriters violated Exchange Act (i) Section 10(b), by closing the IPO on July 2, after

learning about the CAC Directive and after an alleged material adverse event had occurred—the

CAC's July 2 announcement (*see* Dkt. 88 ¶¶ 253–59); and (ii) Sections 10(b) and 20A, by selling

DiDi ADS in the IPO while allegedly in possession of material nonpublic information—the CAC

Directive (*id*. ¶¶ 260–275).  After the Underwriters showed that those frivolous claims were

factually and legally flawed (*see* Dkt. 95 at 16–24), Plaintiffs dropped them.

Second, Plaintiffs' Securities Act claims included a novel theory that the Underwriters

violated Section 12(a)(2) by closing the IPO instead of declaring a material adverse event and

unwinding the IPO.  (*See* Dkt. 88 ¶¶ 305–307, 333–39.)  After the Underwriters showed that

Section 12(a)(2) provides no basis for any such failure-to-abort claim (*see* Dkt. 95 at 15),

Plaintiffs dropped that claim, too.

Plaintiffs' claims against the Underwriters are now limited to Securities Act claims.

Plaintiffs allege that the Underwriters violated Securities Act Sections 11 and 12(a) because

(i) the Offering Documents did not disclose the CAC Directive—the lone claim against the

Underwriters salvaged from the Consolidated Amended Complaint (SAC ¶¶ 374, 386); and

(ii) the CAC Directive and the CAC's July 2 announcement rendered false several representations DiDi made *in the Underwriting Agreement*, a contract between DiDi and the Underwriters that was attached as an exhibit to the Registration Statement —a new Securities Act theory that Plaintiffs are asserting for the first time (*id.* at ¶¶ 359–66, 375, 387).

## ARGUMENT

### THE SECURITIES ACT CLAIMS SHOULD BE DISMISSED

As DiDi shows in its brief, the Securities Act claims based on the CAC Directive should be dismissed because:

> (i)   the SAC fails to plead—under either Rule 9(b), which applies because the Securities Act claims sound in fraud, or Rule 8—that the CAC directed DiDi to postpone the IPO (DiDi Br. at 11–14);
>
> (ii)   the SAC likewise fails to plead a duty to disclose the alleged CAC Directive in the Offering Documents (*id.* at 14–20); and
>
> (iii)   the Offering Documents adequately disclosed the risks about which Plaintiffs complain (*id.* at 20–22).

DiDi also shows that the Securities Act claims based on the July 2 CAC announcement should likewise be dismissed because that announcement did not render any representations in the Underwriting Agreement materially false or misleading.  (*Id.* at 22–24.)  The Underwriters adopt those arguments, which require that the Securities Act claims be dismissed against the Underwriters as well.

The Underwriters submit this separate brief to explain additional reasons that the Securities Act claims fail.

*First*, the SAC does not state a Securities Act claim to the extent it is based on allegations that the CAC Directive or July 2 CAC announcement rendered false or misleading DiDi's representations and warranties in the Underwriting Agreement:

- Given the language, context, and structure of the Underwriting Agreement and the Securities Act and regulations, DiDi's contractual representations and warranties cannot support Securities Act liability because they were (i) made solely for the benefit of the Underwriters, DiDi's contracting counterparty, not DiDi's IPO investors; and (ii) not incorporated in the text of the Registration Statement for the IPO; and

- Section 12(a)(2) does not impose liability for documents, like the Underwriting Agreement, that were not included in the IPO prospectus.

*Second*, the July 2 CAC announcement cannot support a Section 11 claim for the additional reason that Section 11 does not impose liability for developments that post-date the Registration Statement's effective date.

## I.     The Underwriting Agreement's terms do not provide the basis for a Securities Act claim.

### A.     The language and context of the Underwriting Agreement show that DiDi's contractual representations and warranties in the Underwriting Agreement were made solely to and for the benefit of the Underwriters, not investors in DiDi's ADS

The court in *In re Plains All American Pipeline Securities Litigation* held that representations and warranties in an underwriting agreement cannot provide the basis for a Securities Act claim. As the court reasoned, the context of the issuer's statements in the underwriting agreement for the offering "indicates that they were made as contractual representations to a counterparty, not as statements of certainty made to the investing public." 307 F. Supp. 3d at 638. This Court likewise should reject Plaintiffs' Securities Act claims to the extent they are based on the Underwriting Agreement, because that contract's language and context show that DiDi's contractual representations were made solely to and for the benefit of the Underwriters, not the investing public.

9

The Underwriting Agreement's plain language makes that intent clear.  DiDi's sixty-nine

representations and warranties in that contract are preceded by the following: "The Company

represents and warrants to, and agrees with, each of the Underwriters."  (SAC Ex. 19 § 1.)  By

the agreement's plain terms, therefore, DiDi's representations and warranties are contractual

protections for the Underwriters.  And the Underwriting Agreement reinforces the limited

contractual scope of these representations and warranties by providing that all its terms shall

"inure **solely** to the benefit of, the Underwriters, the Company," and certain related entities, and

that "**no other person**"—which necessarily includes the investing public— "shall acquire or have

any right under or by virtue of this Agreement."  (*Id.* § 14.)  *See In re Plains All American*

*Pipeline*, 307 F. Supp. 3d at 638 ("caution that the descriptions were made 'solely for the

benefit' of the Underwriters and that 'no other person shall acquire or have any right under or by

virtue of this Agreement" supports conclusion that issuer's representations and warranties in

underwriting agreement not actionable under the Securities Act).  DiDi's investors, therefore,

could not even be third-party beneficiaries of the Underwriting Agreement; they surely cannot be

allowed to base Securities Act claims on those contractual representations.

In this regard, the court's decision in *Plains All American Pipeline* is supported by the

analogous decision in *Jaroslawicz v. M&T Bank Corp.*, 2017 WL 1197716, at *5 (D. Del. Mar.

30, 2017).  Like the Underwriting Agreement here, the merger agreement in *Jaroslawicz*

provided that the representations and warranties in the merger agreement "were made solely for

the benefit of the parties to the merger agreement" and that "[i]nvestors are not third-party

beneficiaries under the merger agreement."  *Id*.  The court held that "[n]o reasonable shareholder

would look at this disclaimer and then rely on the representations and warranties contained in

[the merger agreement] to understand the actual condition of [the company]."  *Id.*  So, too, here,

10

the representations and warranties were made to the Underwriters and inured solely to their

benefit, and the Underwriting Agreement expressly disclaimed any third-party rights or benefits.

The context of the Underwriting Agreement further shows that DiDi's contractual

representations and warranties were not made to the investing public.  *First*, the contracting

parties made certain representations and warranties to each other, mostly to allocate risk between

them.  It would turn the structure and purpose of the Underwriting Agreement on its head if (i)

DiDi were deemed strictly liable to investors for ***the Underwriters' breach*** of their contractual

representations and (ii) the Underwriters were deemed strictly liable to investors for ***DiDi's***

***breach*** of its contractual representations.  *Second*, the only remedy expressly provided in the

Underwriting Agreement for breaching DiDi's representations or warranties is to allow the

Underwriters, in their sole discretion, to refuse to close the IPO.  (SAC Ex. 19 § 8.)  Allowing

investors to second-guess the Underwriters' judgment and sue for damages from DiDi and the

Underwriters alike would undermine the contracting parties' delegation of remedial discretion to

the Underwriters.

> **B.**     **The text and structure of the Securities Act and accompanying regulations**
> **show that Congress did not intend to impose Securities Act liability for**
> **breaches of issuers' contractual representations and warranties in**
> **underwriting agreements**

Plaintiffs argue that the SEC's requirement of IPO issuers to disclose their agreements

with underwriters "demonstrate[s] the importance of the underwriting agreement to investors for

evaluating the risks, quality, and nature of the securities offering."  (SAC ¶ 367 (citing SEC

Regulation § 229.601 (Item 601) Exhibits).)  The court in *Plains All American Pipeline* rejected

that argument: "the fact that the agreements must be filed with the SEC does not make the

statements ones that warrant or guarantee facts to investors."  307 F. Supp. 3d at 638.  The text

and structure of the Securities Act support the court's reasoning*,* and show that Congress did not

11

intend to impose Securities Act liability based on representations and warranties in underwriting agreements.

Schedule A of the Securities Act sets forth the information an issuer must include in its registration statement (15 U.S.C. §§ 77g(a); 77aa), and addresses an issuer's relationship with its underwriters twice—in paragraphs 17 and 28. Under paragraph 17, the issuer must disclose "all commissions or discounts paid or to be paid, directly or indirectly, by the issuer to the underwriters." *See* 15 U.S.C § 77aa(17). DiDi thus included in its Registration Statement a section disclosing the "total underwriting discounts and commissions to be paid to the underwriters." (DiDi Ex. B (Registration Statement) at 259.) Under paragraph 28 of Schedule A, the issuer must, in addition to the paragraph 17 substantive disclosure, file "a copy of any agreement or agreements (or, if identical agreements are used, the forms thereof) made with any underwriter, including all contracts and agreements referred to in paragraph (17) of this schedule." *See* 15 U.S.C § 77aa(28). The SEC's regulatory requirement in Item 601 (17 CFR § 229.601), referenced in the SAC, to include an issuer's underwriting agreements simply tracks the statutory requirement in Schedule A to disclose underwriting agreements (15 U.S.C § 77aa(28)).

The text and structure of Schedule A show that Congress did not provide for wholesale incorporation in public offering registration statements of all the terms contained in underwriting agreements. Rather, it required incorporation of *one term* as a substantive disclosure—the underwriters' compensation (discounts and commissions). *See* 15 U.S.C § 77aa(17). But Congress enumerated no other term from those agreements. Had Congress intended to incorporate into registration statements the substance of the issuer's representations or warranties to its underwriters, it would have said so expressly, just as it did in paragraph 17 for the issuer's

12

compensation arrangements with its underwriters. *See, e.g.*, *Sec. & Exch. Comm'n v. Rajaratnam*, 918 F.3d 36, 43 (2d Cir. 2019) ("[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acted intentionally and purposely in the disparate inclusion and exclusion." (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983))).  And the additional requirement to file the entire underwriting agreement as an exhibit (15 U.S.C § 77aa(28)), does not make the representations in that contract part of the representations in the Registration Statement.  Section 11 of the Securities Act limits liability to "statements," 15 U.S.C § 77k(a), and merely attaching a copy of a document as an exhibit does not qualify the entire content of that document as "statements" to investors for the offering.

This interpretation is consistent with the Securities Act's disclosure regime for the issuer's other material contracts, in addition to those with underwriters.  Paragraph 24 of Schedule A, for example, requires issuers to disclose the "dates of and parties to, and the general effect concisely stated of every material contract made, not in the ordinary course of business." 15 U.S.C § 77aa(24).  And paragraph 30 requires filing "a copy of all material contracts referred to in paragraph (24)." *Id.* § 77aa(30).  Congress again coupled a substantive disclosure requirement—the date, parties, and general effect of material contracts—with a ministerial requirement to file a "copy" of the underlying contract.  It wrote into (i) paragraph 24 the substantive contractual terms that issuers needed to summarize in the text of the registration statement, and (ii) paragraph 30 the requirement to attach a copy of the summarized contract to allow investors the benefit of viewing that contract for themselves.  The former can provide a basis for Securities Act liability, the latter cannot.

13

The absurdity of Plaintiffs' argument is further seen from reviewing the contractual representations and warranties in other contracts filed under Schedule A and Item 601.  DiDi filed, for example, the form of a revolving credit facility contract where it made dozens of representations to its lenders, including regarding the priority of the lenders among other unsecured creditors, or that DiDi had obtained certain insurance.  (*See* Ex. C § 19.)  And DiDi filed the form of its contracts with its executives, who represented to DiDi that their employment would not breach any other contract binding the executive.  (*See* Ex. B § 4.)  The mere public filing of those contracts as exhibits cannot be enough to allow DiDi's investors to state a Securities Act claim if, for example, the credit facility lenders did not get their warranted priority versus other lenders, or a DiDi executive had an undisclosed contract that was breached by his DiDi employment.

C.     **Section 12(a)(2) does not impose liability for documents that were not part of the IPO prospectus**

DiDi's alleged breach of the Underwriting Agreement cannot form the basis of a Securities Act Section 12(a)(2) claim (SAC ¶ 394) for the additional reason that the Underwriting Agreement is not part of the prospectus.  It is axiomatic that Section 12(a) liability is limited to offering or selling securities by means of a false or misleading prospectus.  *See Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 571 (1995) (noting "§12(2) [is] for liability based on misstatements in prospectuses"); *see also* 15 U.S.C. § 77*l*(a)(2).  While the Securities Act defines the prospectus to include many of the documents in a registration statement, it expressly excludes copies of any underwriting agreement.  *See* 15 U.S.C. § 77j(a)(1) (prospectus "need not include the documents referred to in paragraph[] (28) . . . of schedule A of section 77aa," i.e., "any agreement or agreements . . . made with any underwriter").  That is why DiDi attached the Underwriting Agreement to the Registration Statement, but not the Prospectus.  (*See* DiDi Ex.

B.)  Thus, for this reason as well, the Underwriting Agreement cannot provide a basis for Section

12(a)(2) liability.  *See Gotham Holdings, LP v. Health Grades, Inc.*, 534 F. Supp. 2d 442, 444–

45 (S.D.N.Y. 2008) (dismissing Section 12(a)(2) claim when alleged misleading statements

made in connection with sale of defendant's stock were "not about the prospectus itself").

**II.      There can be no Section 11 liability for developments after the Registration
            Statement's Effective Date.**

Plaintiffs cannot state a Section 11 claim based on the July 2 CAC announcement (SAC

¶ 384), because it occurred after the Registration Statement's effective date.  Section 11 liability

is limited to untrue or misleading statements in a Registration Statement "*when such part became*

*effective.*"  15 U.S.C. § 77k.  The Registration Statement became effective on June 29.  (*See*

*Notice of Effectiveness, supra* note 3.)  Plaintiffs do not allege that there was any CAC

announcement or initiative at that point that would have rendered anything in the Registration

Statement false or misleading.  The CAC's actions three days later, could not have rendered

anything in the Registration Statement false or misleading, because they occurred after "such

part became effective."  Thus, the July 2 CAC announcement cannot support a Section 11 claim.

**CONCLUSION**

For the foregoing reasons, and those in the DiDi Brief, the Court should grant the

Underwriters' motion to dismiss with prejudice the SAC.

DATED:          June 3, 2022                    Respectfully submitted,

_/s/ Jonathan Rosenberg_____

**O'MELVENY & MYERS LLP**

Jonathan Rosenberg
Abby F. Rudzin
Shane A. Hunt
Times Square Tower, 7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
jrosenberg@omm.com
arudzin@omm.com
shunt@omm.com

William K. Pao (*pro hac vice*)
400 South Hope Street
Los Angeles, CA 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
wpao@omm.com

*Attorneys for Defendants Goldman Sachs (Asia)
L.L.C., Morgan Stanley & Co. LLC, J.P. Morgan
Securities LLC, BofA Securities Inc., Barclays Capital
Inc., Citigroup Global Markets Inc., China
Renaissance Securities (US) Inc., HSBC Securities
(USA) Inc., UBS Securities LLC, and Mizuho
Securities USA LLC*