USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __3/14/2024__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE DIDI GLOBAL INC. SECURITIES
LITIGATION

Master Docket
21-cv-05807 (LAK)

This document applies to:          All Actions

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# OPINION DENYING
# DEFENDANTS' MOTIONS TO DISMISS


Appearances:

Laurence M. Rosen
Phillip Kim
Jing Chen
Daniel Tyre-Karp
Robin Bronzaft Howald
THE ROSEN LAW FIRM, P.A.

Gregory Linkh
GLANCY PRONGAY & MURRAY LLP

*Attorneys for Plaintiffs*

Corey Worcester
Renita Sharma
QUINN EMANUEL URQUHART & SULLIVAN, LLP

Scott Musoff
Robert Fumerton
Michael Griffin
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*Attorneys for Defendant Didi Global Inc.*

Jonathan Rosenberg
Abby F. Rudzin
Shane A. Hunt
William K. Pao (*pro hac vice*)
O'MELVENY & MYERS LLP
*Attorneys for Defendants Goldman Sachs (Asia)*
*L.L.C., Morgan Stanley & Co. LLC, J.P. Morgan*
*Securities LLC, BofA Securities Inc., Barclays*
*Capital Inc., Citigroup Global Markets Inc., China*
*Renaissance Securities (US) Inc., HSBC Securities*
*(USA) Inc., UBS Securities LLC, and Mizuho*
*Securities USA LLC*

Corey Worcester
Renita Sharma
QUINN EMANUEL URQUHART & SULLIVAN, LLP
*Attorneys for Defendants Will Wei Cheng, Jean*
*Qing Liu, Stephen Jingshi Zhu, Alan Yue Zhuo, and*
*Daniel Yong Zhang*

Sheryl Shapiro Bassin
Ignacio E. Salceda (*pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI, P.C.
*Attorneys for Defendant Zhiyi Chen*

Matthew S. Kahn
Michael D. Celio (*pro hac vice*)
Kevin J. White
GIBSON DUNN & CRUTCHER LLP
*Attorneys for Defendant Martin Chi Ping Lau*

Corey Worcester
Renita Sharma
QUINN EMANUEL URQUHART & SULLIVAN, LLP
*Attorneys for Defendants Adrian Perica and*
*Kentaro Matsui*

Jeffrey T. Scott
Andrew M. Kaufman
SULLIVAN & CROMWELL LLP
*Attorneys for Defendant Kentaro Matsui*

LEWIS A. KAPLAN, *District Judge.*

This putative class action concerns purchases of Didi Global Inc. ("Didi") securities during and immediately following Didi's initial public offering ("IPO"). Plaintiffs bring numerous claims pursuant to the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"). This matter is before the Court on the defendants' motions to dismiss the Second Amended Complaint ("SAC") for failure to state a claim upon which relief may be granted.[1] For the reasons that follow, the motions are denied.

*Facts*

I.      *The Parties*

A.      *Plaintiffs*

Plaintiffs[2] purchased American Depository Shares ("ADS") of Didi "pursuant and traceable to [Didi's] Registration Statement during the Class Period and [were] damaged thereby."[3]

B.      *Defendants*

Defendant Didi is incorporated in the Cayman Islands and has its principal place of

---

[1]      Dkt 112 (Didi Mot.); Dkt 115 (Underwriters Mot.); Dkt 128 (Cheng *et al*. Mot.); Dkt 130 (Lau Mot.); Dkt 151(Matsui & Perica Mot.).

[2]      Junhong Cao, Shereen El-Nahas, Daniil Alimov, Alaka Holdings Ltd., Bosco Wang, and Njal Larson.  SAC ¶¶ 43–46.

[3]      *Id*.  As it must, the Court accepts as true the factual allegations put forth in plaintiffs' second amended complaint.

2

business in Beijing, China.[4]  It offers internet-enabled services including, most significantly, a ride-hailing service.[5]  Although Didi operates in more than a dozen countries, the vast majority of its revenues result from its operations in China.[6]

Plaintiffs named also several Didi executives ("Officer Defendants")[7] and directors (together with the Officer Defendants, "Individual Defendants").[8]  In addition, plaintiffs named the underwriters of Didi's IPO ("Underwriters").[9]

II.     *Substantive Allegations*

The Second Amended Complaint alleges that Didi omitted material facts from its public filings with the Securities and Exchange Commission ("SEC") made in connection with its

---

[4]
    *Id*. at ¶ 48.

[5]
    *Id*. at ¶¶ 3, 47.

[6]
    *Id*. at ¶ 47.

[7]
    Will Wei Cheng, Jean Qing Liu, and Alan Yue Zhuo.  *Id*. at ¶¶ 50–51, 54–55.  Although the SAC includes Didi in its definition of "Officer Defendants," the Court excludes the company for clarity, because Cheng, Liu, and Zhuo filed a motion to dismiss separate from Didi's motion to dismiss.

[8]
    Stephen Jingshi Zhu, Zhiyi Chen, Kentaro Matsui, Martin Chi Ping Lau, Adrian Perica, and Daniel Yong Zhang.  *Id*. at ¶¶ 52, 56–61.

[9]
    Goldman Sachs (Asia) L.L.C., Goldman Sachs & Co. LLC, Morgan Stanley & Co. LLC, J.P. Morgan Securities LLC, BofA Securities, Inc., Barclays Capital Inc., Citigroup Global Markets Inc., HSBC Securities (USA) Inc., UBS Securities LLC, Mizuho Securities USA LLC, and China Renaissance Securities (US) Inc.  *Id*. at ¶¶ 63–75.

3

2021 IPO and listing on the New York Stock Exchange.  Specifically, plaintiffs allege that Didi was

required but failed to disclose that the Chinese government had directed it to postpone its IPO until

it had resolved various cybersecurity and privacy concerns.  Plaintiffs plead as well that Didi's

disregard for this directive, its subsequent IPO, and the penalties subsequently imposed on Didi by

the Chinese government harmed shareholders.

> A.      *Internet Regulation in China*

Plaintiffs allege that the Chinese government exercises "complete control" over

"Chinese commerce, the internet in China, and internet-based businesses."[10]  Beginning in

approximately 2012, the Chinese government began to tighten its historically "lax" regulation of the

internet[11] by "enact[ing] a series of laws pertaining to cybersecurity and data protection."[12]  Among

other things, the Chinese government created the Cyberspace Administration of China ("CAC"), a

"government agency responsible for regulating the internet, internet-based businesses and their

activities, and the collection, storage, and protection of any type of digital information."[13]  "The CAC

has the expansive power to close or suspend websites, close down businesses, revoke business

---

[10]      *Id*. at ¶ 4.

[11]      *Id*. at ¶ 87.

[12]      *Id*. at ¶ 97.

[13]      *Id*. at ¶¶ 5, 88.

4

licenses, and/or impose large fines or other draconian penalties."[14]

Furthermore, the contours of the CAC's regulatory authority are not well delineated. "Chinese regulatory agencies such as the [CAC] have tremendous power over the corporations they regulate . . . . [T]he CAC wields authority beyond the letter of the law when providing regulatory guidance and issuing administrative directives to regulated businesses."[15]  In the years immediately preceding Didi's IPO, the CAC exercised its broad authority with increasing frequency.  For example, in 2021 alone it shut down 18,489 websites "because they had 'violated laws.'"[16]

B.      *Didi's Initial Public Offering*

Against this backdrop, Didi decided to offer its American Depository Shares to the public and list on a U.S. stock exchange.  Before it did so, however, "the CAC directed Didi to postpone its IPO in the United States until after Didi had completed — to the CAC's satisfaction — a thorough self-inspection of its business, operations and policies."[17]  This self-inspection was to include "a cybersecurity review, to ensure compliance with all applicable laws and regulations concerning national security, network security, data security, and/or the collection and protection of

---

[14]     *Id*. at ¶ 129.

[15]     *Id*. at ¶ 85.

[16]     *Id*. at ¶ 136 (quoting CAC website).

[17]     *Id.* at ¶ 10.

5

private personal information."[18]  The SAC and this opinion refer to the CAC's instructions to Didi

as the "CAC Directives" or the "Directives."  According to the SAC, "[t]he Securities Act and

Exchange Act obligated Defendants to disclose" in its registration statement (1) the CAC Directives

and (2) that "Didi faced a high risk that CAC would impose harsh penalties against Didi that could

harm its business, financial performance, and its reputation if it went forward with its IPO against

the CAC's Directives."[19]  The SAC and this opinion refer to the CAC Directives and the potential

penalties for disregarding them as the "Omitted Facts."[20]

Although Didi did not disclose the CAC Directives publicly, it privately gave "the

CAC the impression that it would follow the Directives."[21]  Instead, it moved forward with the IPO

and listed on the New York Stock Exchange on June 30, 2021.[22]  The offering of 316.8 million Didi

ADS at $14 per share raised more than $4 billion.[23]

---

[18]
    *Id.*

[19]
    *Id.* at ¶ 31.

[20]
    *Id.*

[21]
    *Id.* at ¶ 11.

[22]
    *Id.* at ¶¶ 8, 49.

[23]
    *Id.* at ¶ 342.

On July 2, 2021, the CAC "set about to punish Didi for disobeying the Directives."[24] It announced that it was "prohibiting Didi from registering any new customers" and subjecting it to a cybsersecurity review.[25]  Two days later, it announced further measures, including prohibiting Didi's existing customers from downloading Didi's primary app, Didi Travel, and requiring Didi to remove the app from app stores in China.[26]  The CAC explained that "it was imposing these penalties on Didi due to serious violations of laws and regulations."[27]  Then came "July 5 news reports that Didi had disobeyed the CAC's Directives that Didi postpone its IPO."[28]

As a result of these events, Didi's stock fell by 20 percent on July 6, 2021.[29]  In the weeks following this "massive . . . sell-off,"[30] the Chinese government imposed further penalties on Didi, and Didi's stock price continued to fall.[31]  By July 23, 2021, Didi ADS had fallen by more than

---

[24]  *Id.* at ¶ 13.

[25]  *Id.*

[26]  *Id.* at ¶ 14.

[27]  *Id.* (internal quotation marks omitted).

[28]  *Id.* at ¶ 16.

[29]  *Id.* at ¶ 15.

[30]  *Id*. at ¶ 16.

[31]  *Id.* at ¶¶ 17–18.

40 percent from the IPO price.[32]

Acceding to "pressure from the CAC and other [Chinese government] officials angry that Didi had violated the CAC Directives, Didi announced a plan to delist from the [New York Stock Exchange] on December 3, 2021."[33]  Later that month, Didi reported that its revenue dropped significantly between the second and third quarters of 2021 "due primarily to declines in Didi's core ride-hailing business in China."[34]  Didi reported also a third quarter loss of $4.7 billion.[35]  At the time the SAC was filed, Didi continued to be traded on the New York Stock Exchange at a price per ADS of $1.94, or 14 percent of the IPO price.[36]

III.     *The Second Amended Complaint*

Based on these substantive allegations, plaintiffs assert six causes of action.  Under the Securities Act, they allege a Section 11 claim against all defendants, a Section 12 claim against Didi and the Underwriters, and a Section 15 claim against Cheng and Liu as controlling persons of

---

[32]

   *Id.* at ¶ 18.

[33]

   *Id.* at ¶ 21.

[34]

   *Id.* at ¶ 22.

   Didi's IPO spanned the last day of the second quarter and the first two days of the third quarter.

[35]

   *Id.*

[36]

   *Id.* at ¶ 29.

8

Didi.  Under the Exchange Act, plaintiffs allege a Section 10(b) and Rule 10b-5 claim against Didi and the Officer Defendants, a Section 20A claim against Didi, and a Section 20(a) claim against Cheng and Liu as controlling persons of Didi.

*Discussion*

I.     *Legal Standard*

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient facts "to state a claim to relief that is plausible on its face."[37]  In most cases, a claim is facially plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[38]  This pleading requirement is not onerous — it is satisfied by "a short and plain statement of the claim showing that the pleader is entitled to relief."[39]  Complaints alleging securities fraud, however, are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b).[40]  "Rule 9(b) . . . require[s] a securities fraud complaint to '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state

---

[37]     *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[38]     *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

[39]     Fed. R. Civ. P. 8(a)(2).

[40]     *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009).

where and when the statements were made, and (4) explain why the statements were fraudulent.'"[41] With regard to Rule 9(b), the Court of Appeals has cautioned that, "[a]lthough pleading standards are heightened for securities fraud claims, 'we must be careful not to mistake heightened pleading standards for impossible ones.'"[42]

        In deciding a motion to dismiss, a court "accept[s] as true all factual allegations and draw[s] from them all reasonable inferences" in the plaintiff's favor, but it is "not required to credit conclusory allegations or legal conclusions couched as factual allegations."[43]  "A complaint 'is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.'"[44]

---

[41] *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462–63 (2d Cir. 2019) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).

[42] *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 150 (2d Cir. 2021) (quoting *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 161 (2d Cir. 2021)).

[43] *Hernandez v. United States*, 939 F.3d 191, 198 (2d Cir. 2019) (quoting *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014)).

[44] *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)); *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (in securities action, court may consider "any . . . legally required public disclosure documents filed with the SEC").

II.     Securities Act Claims

    A.     Elements

        The Securities Act of 1933 governs the "process by which securities are first offered

to the public."[45]   Section 11 of the Act pertains to misstatements and omissions in a security's

registration statement.[46]   To state a claim under Section 11, a plaintiff must allege that: "(1) she

purchased a registered security . . . ; (2) the defendant participated in the offering . . . ; and (3) the

registration statement 'contained an untrue statement of a material fact or omitted to state a material

fact required to be stated therein or necessary to make the statements therein not misleading.'"[47]

Section 12(a)(2) imposes liability in "similar circumstances"[48] where a person offers or sells a

security using a "prospectus or oral communication" that contains a material misstatement or

omission.[49]   And Section 15, in turn, imposes derivative liability on any person who "controls any

---

[45]

    1 Thomas Lee Hazen, *Treatise on The Law of Securities Regulation* § 1:12 (7th ed. 2016).

[46]

    A registration statement contains detailed disclosures required by law and filed with the
    SEC.   *See In re Facebook, Inc., Initial Pub. Offering Derivative Litig.*, 797 F.3d 148, 152
    (2d Cir. 2015) (explaining that a "[r]egistration [s]tatement is a disclosure document that
    requires a public company to, *inter alia*, detail its current business model and its competition,
    provide a prospectus of the planned security, provide information on the offering price and
    methodology for setting the price, disclose risks, and disclose material dealings between the
    company and its directors").

[47]

    *In re China Valves Tech. Sec. Litig.*, 979 F. Supp. 2d 395, 414 (S.D.N.Y. 2013) (first
    alteration in original) (quoting 15 U.S.C. § 77k(a)).

[48]

    *Id.*

[49]

    15 U.S.C. § 77l(a).

11

person liable under Sections [11] or [12] . . . unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist."[50]

Although fraud is not an element of Section 11 or Section 12, where a claim brought under either section is "premised on allegations of fraud," it is subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b).[51]  In assessing whether Rule 9(b) applies, courts consider the "conduct alleged" and not whether the "allegations [are] styled or denominated as fraud."[52]  If a Section 11 or Section 12 claim does not sound in fraud, the ordinary notice pleading standard of Rule 8 applies.

B.      *Whether Rule 9(b) Applies*

The Court first must answer the threshold question of whether the Section 11 and Section 12 claims sound in fraud and thus are subject to Rule 9(b).  Didi argues that plaintiffs' "claim [as to Didi] rests on the allegation that DiDi knew, but failed to disclose, the CAC's position

---

[50]      *Id*. at § 77o.

[51]      *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004).

[52]      *Id.*

on DiDi's IPO and therefore is classically associated with fraud."[53]  Plaintiffs dispute this, noting

that the SAC separates its Securities Act and Exchange Act claims and arguing that the former

contains no allegations of fraud.[54]

The Securities Act claims against Didi sound in fraud because they "are almost a

mirror image of their Exchange Act claims."[55]  Both claims rest on allegations that Didi (1) was

directed by the CAC not to proceed with its planned IPO, (2) knew that disregarding this directive

and proceeding with the IPO could result in harsh penalties imposed by the Chinese government,

and (3) concealed these facts by failing to disclose them in its offering documents.  Indeed,

specifically with regard to the Securities Act claims, plaintiffs allege that "the CAC met in person

---

[53]

Dkt 113 (Didi Mem.) at 12 (internal citation and quotation marks omitted).

Didi's arguments are made in regard to Section 11.  "Because Plaintiffs fail to plead a cognizable claim under Section 11," Didi contends, "their Section 12(a)(2) claim also fails." *Id*. at 11 (citing *In re Agria Corp. Sec. Litig.*, 672 F. Supp. 2d 520, 525 (S.D.N.Y. 2009) ("A plaintiff who fails to plead a § 11 claim necessarily fails to plead a § 12(a)(2) claim as well." (quoting *Rubin v. MF Glob., Ltd.*, 634 F. Supp. 2d 459, 466 n.3 (S.D.N.Y. 2009), *aff'd in part, vacated in part sub nom. Iowa Pub. Employees' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137 (2d Cir. 2010)))).

[54]

Dkt 137 (Pls. Mem.) at 14.

[55]

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 402 (S.D.N.Y. 2020); *see Rombach*, 355 F.3d at 171 ("[T]he heightened pleading standard of Rule 9(b) applies to Section 11 . . . claims insofar as the claims are premised on allegations of fraud.  By its terms, Rule 9(b) applies to 'all averments of fraud.'  This wording is cast in terms of the conduct alleged, and *is not limited to allegations styled or denominated as fraud*." (emphasis added) (citation omitted)).

13

with Didi and directed Didi to postpone its IPO in the United States"[56] and that Didi "conceal[ed]"

these facts, thereby rendering the risk disclosures in its IPO offering documents "misleading."[57]

Such allegations are "classically associated with fraud."[58]

It is of no moment that the SAC's Securities Act counts purport to disclaim fraud

because "misleading statements and omissions alleged for both" the Securities Act and Exchange

Act "claims pertain to the exact same underlying events."[59]  Nor can plaintiffs evade Rule 9(b) by

recasting their Securities Act claims against Didi as sounding in negligence.[60]  While the complaint

alleges that "Didi . . . w[as] negligent in preparing the Registration Statement,"[61] such rote and non-

---

[56]

    SAC ¶ 332.

[57]

    *Id*. ¶ 364.

[58]

    *Rombach*, 355 F.3d at 172 (rejecting plaintiffs' assertion "that their Section 11 claims 'do[] not sound in fraud'" because "the wording and imputations of the complaint are classically associated with fraud: that the Registration statement was 'inaccurate *and* misleading;' that it contained '*untrue* statements of material facts;' and that 'materially *false* and *misleading* written statements' were issued" (alteration in original)).

[59]

    *Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*, 902 F. Supp. 2d 329, 339 (S.D.N.Y. 2012), *aff'd sub nom. IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383 (2d Cir. 2015); *see In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 300 n.17 (S.D.N.Y. 2021) (applying Rule 9(b) because, "[t]hough plaintiffs separate their claims under the Securities Act and the Exchange Act and disclaim fraud as a basis for their Securities Act claims, their claims rest on the same theory").

[60]

    Dkt 137 (Pls. Mem.) at 14.

[61]

    SAC ¶ 381.

14

specific pleading is insufficient where the substance of the allegations underlying the Securities Act claims, if true, would constitute fraud.[62]  "[T]he Court's inquiry focuses . . . on the conduct alleged, not the labels attached."[63]  The Court holds that plaintiffs' Section 11 and Section 12 claims against Didi sound in fraud and therefore are subject to Rule 9(b).

The claims against the other defendants differ.  Plaintiffs do not allege that any of the Individual Defendants or the Underwriters had actual knowledge of the CAC Directives.  Rather, they allege that "none of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that all material facts required to be disclosed . . . were disclosed and that there were no untrue statements of material fact."[64]  Such allegations do not make out the *scienter* that is a distinguishing element of fraud.[65]

---

[62]

    *Rombach*, 355 F.3d at 171 (in assessing whether Rule 9(b) applies, courts consider the "conduct alleged" and not whether the "allegations [are] styled or denominated as fraud").

[63]

    *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 436 (S.D.N.Y. 2009).

[64]

    SAC ¶ 382.

[65]

    *See* Dkt 137 (Pls. Mem.) at 16.

    Although the SAC makes the same allegation against Didi, it cannot avoid Rule 9(b) as to its Securities Act claims against Didi for the reasons explained above.  Briefly, given that the Securities Act claims allege that Didi had actual knowledge of the CAC Directives, plaintiffs cannot plausibly assert that such claims sound in negligence.  This finding is consistent with Rule 9(b)'s purpose to "protect[] against damage to professional reputations resulting from allegations of moral turpitude."  *Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1036 n.25 (4th Cir. 1997) (quoting *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 549 (8th Cir. 1997)).  The Securities Act claims' threat to Didi's reputation justify imposing a heightened pleading standard; the claims as to the other defendants do not pose

15

Accordingly, the Section 11 and Section 12 claims against all defendants other than Didi are subject to Rule 8 alone.  Hence, the motions to dismiss of the Individual Defendants and Underwriters are denied to the extent that they are premised on plaintiffs' purported failure to meet the Rule 9(b) pleading standard.

C.      *Plaintiffs Satisfy Rule 9(b) as to Didi*

Didi contends that the Second Amended Complaint does not satisfy Rule 9(b) because it fails to explain why Didi's statements were fraudulent, to wit, that plaintiffs did not allege sufficiently the existence of the CAC Directives.[66]  For the reasons that follow, the Court holds that plaintiffs adequately allege both that the CAC directed Didi not to proceed with the IPO and that Didi failed to disclose this fact.

Focusing on the specific word *directive*, Didi argues first that the existence of the CAC Directives is "belied by other facts alleged in the Complaint," including that news articles incorporated into the SAC reported that the CAC "urged," "suggest[ed]," and "pressure[d]" Didi to postpone its IPO.[67]  "At most," Didi concludes, "[p]laintiffs have pleaded that the CAC *encouraged*

---

a similar threat and thus application of Rule 9(b) to them is not indicated.

[66]     Dkt 113 (Didi Mem.) at 13–14.

[67]     Dkt 113 (Didi Mem.) at 13 (emphasis omitted) (internal quotation marks omitted).

— but in no way *directed* or *required* — DiDi to postpone its IPO."[68]  The semantic distinction Didi

draws is not a meaningful one in this context.  It is reasonable to infer — particularly given the

SAC's other allegations that the Chinese government often works coercively[69] — that an urge,

suggestion, or pressure from the Chinese government is tantamount to a directive.[70]  In any case,

plaintiffs allege that the CAC "*directed*" Didi to delay its IPO, notwithstanding other allegations that

characterized the interaction between the regulator and company slightly differently.[71]

      Didi argues next that the SAC "is bereft of particularized allegations supporting

[p]laintiffs' assertion that the CAC" "directed DiDi to postpone its IPO."[72]  To plead "circumstances

constituting [securities] fraud . . . with particularity,"[73] a plaintiff is required not only to identify

specifically false or misleading statements, but also to "demonstrate with specificity *why and how*"

---

[68]

    *Id.*

[69]

    *See, e.g.*, SAC ¶¶ 82–86, 131–135.

[70]

    *Cf. United States v. Malik*, 16 F.3d 45, 49–50 (2d Cir. 1994) (noting that "[a]n absence of explicitly threatening language does not preclude the finding of a threat" and rejecting "rigid adherence to the literal meaning of a communication without regard to its reasonable connotations derived from its ambience").

[71]

    SAC ¶ 175 (emphasis added).

[72]

    Dkt 113 (Didi Mem.) at 13 (emphasis omitted).

[73]

    *In re Synchrony Fin. Sec. Litig.*, 988 F.3d at 169 (second alteration in original) (quoting *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)).

17

those statements are false.[74]  Plaintiffs carry this burden.  They allege that "[i]n the weeks leading

up to the IPO, the CAC met in person with Didi and directed Didi to postpone its IPO in the United

States until Didi completed . . . a thorough . . . cybersecurity review, to ensure compliance with all

applicable laws and regulations."[75]  The SAC incorporates numerous, detailed, and consistent news

reports from reputable publications reporting that, among other things, the CAC "suggested" that

Didi "delay its initial public offering and urged it to conduct a thorough self-examination of its

network security."[76]  Plaintiffs argue also that the speed with which the CAC sanctioned Didi

following its IPO and the severity of those sanctions confirm that the CAC had warned Didi not to

proceed.[77]  The Court is obliged to accept the truth of these purely factual and sufficiently

particularized allegations for purposes of this motion.[78]

>Accordingly, the Court concludes that the SAC's allegations of fraud satisfy the Rule

---

[74]

>*Rombach*, 355 F.3d at 174 (emphasis added); *see Yourish v. California Amplifier*, 191 F.3d 983, 993 (9th Cir. 1999) (plaintiff "must set forth, as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading when made" (internal quotation marks omitted)).

[75]

>SAC ¶ 332; *see id.* at ¶¶ 332–337, 341.

[76]

>Dkt 106-1 (SAC Exs.) at 97; *see also, e.g.*, Dkt 106-1 at 23, 91.

[77]

>Dkt 137 (Pls. Mem.) at 27 n.16; *see* SAC ¶¶ 343–344.

[78]

>*See Qihoo 360 Tech. Co.*, 19 F.4th at 150–51 (holding that allegations substantiated by two news articles and circumstantial evidence satisfied Rule 9(b)).

18

9(b) standard.[79]

### D.   Materiality

To state a Securities Act claim based on an omission, a plaintiff must allege also that the registration statement omitted "a material fact required to be stated therein or necessary to make the statements therein not misleading."[80]   An omitted fact is material if there is "a substantial likelihood that . . . [it] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[81]   As materiality "is a mixed question of law and fact,"[82] "a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a

---

[79]

Didi contends also that plaintiffs fail to state a Section 11 claim because they do not allege *scienter*.  The parties dispute whether Securities Act claims to which Rule 9(b) applies must allege *scienter*.  *See* Dkt 113 (Didi Mem.) at 11; Dkt 143 (Didi *et al*. Reply) at 27; Dkt 137 (Pls. Mem.) at 17–18.  But no party identifies, nor could this Court find, controlling authority on this issue.  In any event, it need not resolve the question here because it holds that the SAC pleads *scienter* as to the Section 11 claims for the same reasons it pleads *scienter* as to the Exchange Act claims.  *See infra* III.B.1.

[80]

15 U.S.C. § 77k(a).

[81]

*Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)) (adopting standard for claims arising under Section 10(b) and Rule 10b-5 of the Exchange Act); *see Rombach*, 355 F.3d at 178 n.11 (noting that the same standard applies to claims arising under Section 11).

[82]

*Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002).

reasonable investor that reasonable minds could not differ on the question of their importance."[83]

Didi contends that plaintiffs fail to plead a material omission because the company's disclosure of regulatory risk in fact did warn investors of the risks that plaintiffs here claim were not disclosed and because, in any case, the company had no obligation to disclose the alleged CAC Directives.[84]  The Court rejects these arguments for the reasons that follow.

1.    *Sufficiency of Risk Disclosures*

The alleged omission was not material, Didi contends, because its "Offering Documents addressed the very risks about which Plaintiffs complain — including the possibility that the Chinese government might suspend DiDi's business operations."[85]  Thus, the question presented is whether a trier of fact reasonably might conclude that the CAC Directives were material in light of Didi's related but less specific risk disclosures.

Didi identifies several general risks disclosed in its prospectus which, it says, disclosed in substance the risks on which the plaintiffs' claims are based.  For example, the prospectus disclosed that:

---

[83]

 *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi.*, 553 F.3d at 197 (internal quotation and alteration marks omitted); *see Qihoo 360 Tech. Co.*, 19 F.4th at 151 (noting that materiality "will rarely be dispositive in a motion to dismiss" (internal quotation marks omitted)).

[84]

 *See* Dkt 113 (Didi Mem.) at 14–22.

[85]

 Dkt 113 (Didi Mem.) at 21.

> "Any failure on our part to comply with applicable laws or
> regulations or any other obligations relating to privacy, data
> protection or information security, . . . or the perception or allegation
> that any of the foregoing types of failure or compromise has
> occurred, could . . . result in investigations, fines, suspension of one
> or more of our apps, or other penalties by government authorities."[86]

In addition, Didi points out that its prospectus made general disclosures about "uncertainties and risks of the Chinese legal and regulatory landscape."[87]

These disclosures were inadequate because they made no mention of the CAC Directives. "[G]eneric warning[s] . . . will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability."[88] Didi's disclosures warned only of the general risk that its failure to comply with applicable laws and regulations jeopardized its future operations. They made no mention of the far more specific risk, known to Didi, that the company, in proceeding with the IPO, was defying the Chinese government's directives and thus inviting its wrath. Nor did they disclose that, in asking Didi to postpone its IPO until it had ensured

---

[86]    Dkt 114-2 (Didi Prospectus) at 42.

[87]    Dkt 113 (Didi Mem.) at 22.

[88]    *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 251 (2d Cir. 2014).

compliance with applicable data and privacy laws, the Chinese government had suggested strongly

that it did not think that Didi was fully compliant with those laws.  This information might well have

been of interest to a potential investor.  Just as "[c]autionary words about future risk cannot insulate

from liability the failure to disclose that the risk has transpired,"[89] so too the amorphous discussion

of a generic risk cannot insulate an issuer from liability when it fails to disclose a *specific* known

risk.[90]  In sum, Didi's disclosures were not sufficiently specific to support its claim that no

reasonable investor could have found the CAC Directives well worth knowing.

### 2.    *Affirmative Obligation to Disclose Omitted Facts*

Didi argues next that the alleged omissions were not material because securities laws

did not require their disclosure.  "For an omission to be actionable, the securities laws must impose

a duty to disclose the omitted information."[91]  "Such a duty may arise when there is a corporate

insider trading on confidential information, a statute or regulation requiring disclosure, or a

---

[89]

  *Rombach*, 355 F.3d at 173.

[90]

  *Cf. Rudman v. CHC Grp. Ltd.*, 217 F. Supp. 3d 718, 728 (S.D.N.Y. 2016) ("[A] warning that revenues could decline if a major customer canceled or failed to renew its contract could be materially misleading if the company fails to disclose that such a customer had attempted [to] cancel its contract prior to the offering.").

[91]

  *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002); *see Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011).

22

corporate statement that would otherwise be inaccurate, incomplete, or misleading."[92]

Plaintiffs assert that three SEC regulations obliged Didi to disclose the CAC Directives: Regulation S-K Items 303 and 105[93] as well as Rule 408.[94]  The Court considers each in turn.

### a. Item 303

Item 303 requires registration statements to include a "discussion and analysis" of "material information relevant to an assessment of the financial condition and results of operations of the registrant."[95]  This "must focus specifically on material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."[96]  Furthermore, "[i]f the registrant is a foreign private issuer," the registrant must disclose "pertinent governmental economic, fiscal, monetary, or political policies or factors that have materially affected or could materially

---

[92]

    *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (internal quotation and alteration marks omitted); *see In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993).

[93]

    17 C.F.R. §§ 229.303, 229.105.

[94]

    *Id*. at § 230.408; SAC ¶ 362.

[95]

    17 C.F.R § 229.303(a).

[96]

    *Id*.

affect, directly or indirectly, its operations."[97]   In elaborating on these requirements, the Second

Circuit has noted approvingly SEC guidance that management must disclose a "known trend . . . or

uncertainty" unless it determines either that the trend or uncertainty "is not reasonably likely to

occur" or that, should the trend or uncertainty come to fruition, it is "not reasonably likely" to have

a material effect on the registrant.[98]

       Plaintiffs plausibly allege that Didi management was aware of the CAC Directives,

as explained above.  They plead also that Didi knew that defying the Directives would be reasonably

likely to result in harsh government sanctions that would materially impair the company's operations

and financial performance.   Specifically, the SAC alleges that defying Chinese government

directives "result[s] in severe punishment,"[99] that the CAC has "expansive power to close or suspend

websites, close down businesses, revoke business licenses, and/or impose large fines or other

draconian penalties if it determines that a business is violating any cybersecurity-related law,"[100] and

that the Chinese government previously wielded these authorities to retaliate against companies that

---

[97]
    17 C.F.R. § 229.303(b) Instruction 9.

[98]
    Management's Discussion and Analysis of Financial Condition and Results of Operations, Exchange Act Release No. 6835, 43 SEC Dkt 1330, 1989 WL 1092885, at *6 (May 18, 1989)); *see Stratte-McClure*, 776 F.3d at 101.

[99]
    SAC ¶ 128.

[100]
    *Id*. at 129.

24

defied it.[101]  The SAC also identifies several examples of high-flying technology companies that were subjected to investigations and sanctions after running afoul of the Chinese government.[102] Indeed, in one such example, the Chinese government halted a large technology company's planned IPO.[103]

In addition, plaintiffs allege that these instances were not isolated.  They note that the Chinese government shuttered tens of thousands of websites in the years before Didi's IPO, "demonstrat[ing] that the CAC wielded significant power to direct the actions of businesses, such as Didi, that fell within its purview."[104]  Plaintiffs further plead that Didi management was aware of these risks because "Didi maintains an enormous government affairs team" familiar with Chinese government policies and practices.[105]

Last, plaintiffs sufficiently allege that Didi management knew that regulatory sanctions on Didi were reasonably likely to have a material effect on its bottom line.  Indeed, Didi's risk disclosures acknowledged that the company's opportunities to expand its customer base in

---

[101]

    *Id*. at ¶¶ 131–137.

[102]

    *Id*.

[103]

    *Id*. at ¶ 131.

[104]

    *Id*. at ¶ 137.

[105]

    *Id*. at ¶ 130.

China could be curtailed significantly if the CAC exercised its "expansive power"[106] to restrict Didi's business and that its "business and financial results . . . [in that event would be] materially and adversely impacted."[107]

In sum, plaintiffs plausibly allege that Didi management was aware of the CAC Directives, that the company was reasonably likely to be sanctioned by the Chinese government were it to disobey, and that the resulting sanctions were reasonably likely to have a material effect on Didi.  As such, Item 303 obligated management to disclose the Omitted Facts.

### b.    Item 105

Substantially for the same reasons, plaintiffs plausibly allege that Didi was required to disclose the Omitted Facts by Item 105, which mandates the disclosure of "the material factors that make an investment in the registrant or offering speculative or risky."[108]

---

[106]

*Id*. at ¶ 129.

[107]

*Id*. at ¶ 167 (quoting Form F-1/A, filed June 28, 2021 at 10, 24).

[108]

17 C.F.R. § 229.105(a); *see* FAST Act Modernization and Simplification of Regulation S–K, 84 FR 12674, 12716-17 (Apr. 2, 2019) (recodifying Item 503 as Item 105).

The parties dispute whether plaintiffs had to allege that Didi had actual knowledge of the Omitted Facts to state a claim based on an Item 105 obligation.  Dkt 137 (Pls. Mem.) at 29; Dkt 143 (Didi *et al*. Reply) at 13–14.  The Court need not resolve this question because, as explained above, plaintiffs plausibly plead that Didi had actual knowledge.

c.      *Rule 408*

Finally, Rule 408 provides that, "[i]n addition to the information expressly required . . . in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made, not misleading."[109]  In other words, "[e]ven when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth."[110]  On this score, the SAC alleges: "Didi's concealment of the Omitted Facts rendered the lengthy disclosures in the Registration Statement of risk factors related to government regulation of Didi's business misleading in the light of the circumstances under which they were made."[111]

This allegation is sufficient.  Plaintiffs plausibly allege that Didi's extensive discussion of regulatory risk was misleading because it suggested that the CAC had not directed Didi to postpone its IPO.  For example, Didi disclosed that the CAC summoned "30 major internet companies in China, including" Didi and ordered them "to conduct a self-inspection within one month to identify and correct possible violations of anti-monopoly, anti-unfair competition, tax and other related laws and regulations and submit their compliance commitments for public

---

[109]      17 C.F.R. § 230.408(a).

[110]      *Meyer*, 761 F.3d at 250.

[111]      SAC ¶ 364.

supervision."[112]  Didi continued, "[a]s of the date of this prospectus, we have completed the

self-inspection."[113]  It is arguable that this disclosure was misleading because a reasonable investor

could have concluded that other significant contacts with regulators, particularly orders from the

CAC to conduct another self-inspection, would have been disclosed as well.[114]

F.     *Underwriting Agreement*

One of plaintiffs' theories of Securities Act liability is that Didi's IPO underwriting

agreement contained material misrepresentations.  Didi and the Underwriters contend that, as a

matter of law, Securities Act claims cannot be based on misstatements or omissions contained within

underwriting agreements and, alternatively, that Didi's underwriting agreement did not contain

misstatements or omissions.  The underwriting agreement, which was effective as of June 29 and

filed on July 2, 2021, included representations by Didi, which the Officer Defendants certified were

true, that among other things, Didi's offering documents did not omit material information, Didi was

not the subject of any government actions or investigations, and Didi was in compliance with

---

[112]

Dkt 114-2 (Didi Prospectus) at 71.

[113]

Dkt 114-2 (Didi Prospectus) at 71.

[114]

*Compare Meyer*, 761 F.3d at 247 (holding that "failure to disclose ongoing, serious pollution problems rendered misleading statements in a prospectus describing prophylactic measures taken to comply with Chinese environmental regulations"), *with Singh v. Cigna Corp.*, 918 F.3d 57, 64 (2d Cir. 2019) (holding that "simple and generic" assurances of compliance were not misleading).

28

applicable privacy and cybersecurity laws and regulations.[115]

     *1.    Section 11*

        *a.    Section 11 Claim May Be Based on Underwriting Agreement*

Defendants argue that a Section 11 claim cannot be based on a misrepresentation or omission in an underwriting agreement that is filed with but "not incorporated in the text of [a] [r]egistration [s]tatement."[116]  As far as the Court can determine, this question has not been answered definitively in this circuit.  For the reasons that follow, the Court holds that Section 11 claims may be predicated upon misrepresentations or omissions contained in underwriting agreements filed with registration statements.

     "We begin, as in all matters of statutory interpretation, with the text of the relevant statute."[117]  "If the statutory language is unambiguous, we construe the statute according to the plain meaning of its words."[118]  The statutory language relevant here unambiguously creates Securities Act liability for misrepresentations or omissions in underwriting agreements.  Section 11 of the Act provides for a right of action if "*any* part of the registration statement" contained a material

---

[115]

      SAC ¶¶ 81, 277, 307, 370, 374–376, 378; Dkt 137 (Pls. Mem.) at 46–51.

[116]

      Dkt 116 (Underwriters Mem.) at 9.

[117]

      *United States v. Francis*, 77 F.4th 66, 71 (2d Cir. 2023).

[118]

      *United States ex rel. Wood v. Allergan, Inc.*, 899 F.3d 163, 171 (2d Cir. 2018) (internal quotation marks omitted).

misstatement or omission.[119]   The Act, in turn, defines "registration statement" to include "any report, document, or memorandum filed as part of such statement or incorporated therein by reference."[120]   And Schedule A, which lists information required "in" registration statements, expressly includes "a copy of any agreement . . . made with any underwriter."[121]   In sum: (1) a Section 11 claim may be based on misrepresentations or omissions contained in a registration statement; (2) a registration statement includes reports and documents filed as part of it; and (3) an underwriting agreements is "in" a registration statement.   This language is clear on its face.

The Underwriters disagree, arguing that "[t]he text and structure of the Securities Act and accompanying regulations show that Congress did not intend to impose Securities Act liability for breaches of issuers' contractual representations and warranties in underwriting agreements."[122] The Underwriters' interpretation is based primarily on Schedule A's requirement that a company's registration statement disclose the compensation paid to its underwriters.   They contend that the fact that the Act independently specifies this fee amount indicates that Congress did not intend for

---

[119]   15 U.S.C. § 77k(a) (emphasis added).

[120]   *Id*. at § 77b(a)(8).

[121]   *Id*. at § 77aa(28); *see Yates v. United States*, 574 U.S. 528, 540 (2015) ("While [statutory] headings are not commanding, they supply cues . . . ."); *id.* at 552 (Alito, *J.*, concurring) (observing that "[t]itles can be useful devices to resolve doubt about the meaning of a statute," particularly where they "reinforce[] what the text . . . suggest[s]").

[122]   Dkt 116 (Underwriters Mem.) at 11.

registration statements to include the entire underwriting agreement.[123]  In support, the Underwriters

quote the Second Circuit's decision in *SEC v. Rajaratnam*, which itself quoted the Supreme Court's

decision in *Russello v. United States* that, "[w]here Congress includes particular language in one

section of a statute but omits it in another section of the same Act, it is generally presumed that

Congress acted intentionally and purposely in the disparate inclusion and exclusion."[124]

      This argument is unpersuasive, and the cases on which it relies are inapposite.  As

an initial matter, Congress *did* include underwriting agreements in Schedule A.  That it mandated

different manners of disclosure for an agreement and a fee amount says little if anything about

Congress's intent.  This fact also distinguishes *Rajartnam* and *Russello*, both of which interpreted

statutory provisions that entirely omitted critical language that was included in related provisions.

What is more, *Russello* was based on the rationale that courts should "not presume to ascribe"

"differing [statutory] language . . . to a simple mistake in draftsmanship."[125]  Here, a plain reading

of Schedule A requires no such presumption because there is a far more likely explanation for why

Congress prescribed differing manners of disclosure for the underwriting fee and underwriting

---

[123]

      Dkt 116 (Underwriters Mem.) at 12–13 ("Had Congress intended to incorporate into registration statements the substance of the issuer's representations or warranties to its underwriters, it would have said so expressly, just as it did . . . for the [underwriting fee].").

[124]

      *Id*. at 13 (alteration in original) (quoting *Rajaratnam*, 918 F.3d 36, 43 (2d Cir. 2019); *see Russello*, 464 U.S. 16, 23 (1983)).

[125]

      *Russello*, 464 U.S. at 23.

agreement: including the lengthy agreement in the body of the registration statement would be impractical but including the underwriting fee is easy.  Last, a fulsome reading of *Russello* and *Rajartnam* cuts against the Underwriters' preferred statutory construction because those cases primarily relied on a plain reading of the statutory language and only engaged in the analysis that the Underwriters cite for confirmation.[126]  As explained above, a plain reading of the Securities Act favors plaintiffs.

The Underwriters argue also that a plain reading of Section 11 must be rejected because it would lead to absurd results.  Concluding otherwise, they say, would open the door to all manner of claims for misrepresentations contained in various other, allegedly inconsequential documents filed with registration statements.[127]  But this eventuality would be unlikely because such claims would fail for lack of materiality.[128]

---

[126]

       *See Rajaratnam*, 918 F.3d 42–43 (noting that its expansive interpretation of a damages provision based upon a "plain reading" of the statute was "confirmed" by Congress's use of more restrictive language "elsewhere in the federal securities laws"); *Russello*, 464 U.S. at 21–23 (assessing first the "ordinary meaning" of the statutory text before noting that its resulting conclusion was "fortified" by the principle that Congress is purposeful in using different statutory language in different provisions).

[127]

       Dkt 116 (Underwriters Mem.) at 14.

[128]

       *See* 15 U.S.C. § 77k(a).

       The Underwriters' illustrative example makes this point, albeit implicitly.  They note that Schedule A required Didi to file with its registration statement a "revolving credit facility contract . . . [containing] dozens of representations to its lenders, including regarding the priority of the lenders among other unsecured creditors."  Dkt 116 (Underwriters Mem.) at 14.  The Underwriters argue that a Section 11 claim cannot be based on such a representation because it would be absurd "to allow . . . investors to state a Securities Act claim if . . . the

Focusing next on the underwriting agreement's terms, defendants argue that it cannot form the basis of Section 11 liability because the representations and warranties it contained "were made solely to and for the benefit of the Underwriters, not investors in Didi's ADS."[129]  This argument is unpersuasive because a party's intention in entering a contract is not dispositive of whether that contract was included in a registration statement, the pertinent question here.[130]  Nor can the agreement's provision disclaiming third-party reliance insulate the defendants from liability, as the Underwriters argue also.  This is not a contract action, and "it is a plausible inference that a reasonable investor would believe that the statements and representations made to the [U]nderwriter[s] were truthful and could be relied upon."[131]

The Court rejects also the Underwriters' argument that permitting representations in an underwriting agreement to form the basis of a Section 11 action would be illogical because it

---

credit facility lenders did not get their warranted priority versus other lenders."  *Id*.  The trouble with this argument is that the purportedly absurd claim almost certainly would fail because the relative priority of creditors is not material.

[129]    Dkt 116 (Underwriters Mem.) at 9.

[130]    *See* 15 U.S.C. § 77k(a) (providing that Section 11 claims may be based on misstatements or omissions contained in "any part of the registration statement").

[131]    *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1179 (D. Or. 2015); *see Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 741 (9th Cir. 2008) (holding that a securities fraud claim may be predicated on the representations and warranties contained in a merger agreement attached to a Form 10-K, notwithstanding a provision disclaiming reliance by a non-party to the agreement, because a reasonable investor could rely upon them); *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 299 (S.D.N.Y. 2010) (citing *Glazer* approvingly).

would make Didi "strictly liable to investors for *the Underwriters' breach* of their contractual representations and . . . the Underwriters . . . strictly liable to investors for *DiDi's breach* of its contractual representations."[132]   Plaintiffs' Section 11 claim is not based on Underwriters representations.  In any event, it is not apparent how an underwriter's statement, the falsity of which the issuer was unaware, could amount to a material misstatement.  More, the Underwriters' obverse premise — that permitting a Section 11 claim predicated on misrepresentations in the underwriting agreement would make them strictly liable for Didi's misrepresentations — is incorrect because Section 11 imposes strict liability on issuers alone.[133]   Underwriters may defeat such a claim by showing that they reasonably concluded that Didi's representations were truthful.[134]

Last, the Court notes that the risk of holding that documents filed in registration statements, including underwriting agreements, are beyond the reach of Section 11 securities actions is manifest.  Doing so would enable issuers to make material misstatements in such agreements with an eye toward influencing investors without incurring Section 11 liability.

A Section 11 action can be predicated on misrepresentations or omissions in an

---

[132]

Dkt 116 (Underwriters Mem.) at 11 (emphasis added).

[133]

*See* 15 U.S. Code § 77k(b)(3); *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010).

[134]

*See In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 659 (S.D.N.Y. 2004) ("Section 11 provides an affirmative defense of 'due diligence,' which is available to defendants other than the issuer of the security.").

underwriting agreement filed with a registration statement.

    *b.*  *SAC Alleges Underwriting Agreement Contained False Statements*

    Defendants contend that even if misstatements in Didi's underwriting agreement were actionable, plaintiffs' theory of liability still would fail because plaintiffs have not pled that any statements in the agreement "were false when made."[135]  The Court disagrees — the SAC sufficiently alleges that several of Didi's representations were false.

    Didi stated in the underwriting agreement that, "[a]s of the . . .  Effective Date and . . . Closing Date, the Registration Statement and Prospectus did not and will not . . . omit to state a material fact."[136]  Plaintiffs sufficiently allege that this was false "because Didi had a duty to disclose the Omitted Facts in the Registration statement and Prospectus and had not so disclosed them."[137]

    Also according to the SAC, Didi represented further in the underwriting agreement that it had not "sustained any material loss or interference with its business from . . . governmental

---

[135]

  Dkt 143 (Didi *et al*. Reply) at 22.

[136]

  *Id*. at ¶ 370 (internal quotation marks and emphasis omitted); *see also id*. at ¶ 369 (similarly certifying that Didi's prospectus was accurate when filed).

[137]

  *Id*. at ¶ 371.

  Defendants' responses — that plaintiffs fail to allege that this representation was false because they "have not pleaded any 'CAC Directives' and there was no duty to disclose [them]" (Dkt 113 (Didi Mem.) at 23) — have already been rejected by this Court.  *Supra* II.C–D.

action, order or decree"[138] and that "[t]here are no" undisclosed "governmental actions . . . including . . . inquiries or investigations" involving the Company that would "have a Material Adverse Effect" on it.[139]  The SAC sufficiently alleges that these representations were false in light of the Omitted Facts.  Didi argues that these allegations do not suffice because "[p]laintiffs do not plead that the July 2 Penalties constituted a 'material adverse event.'"[140]  Not so.  The SAC alleges: "The July 2 Penalties, which affected more than two dozen Didi apps in China, had a material adverse effect."[141]

The SAC states as well that Didi represented in the underwriting agreement that it was "in material compliance with all applicable laws . . . orders, rules and regulations of any . . . governmental or regulatory authority . . . relating to the privacy and security of IT Systems and Personal Data."[142]  Plaintiffs allege that this representation was false in light of several CAC announcements in early July, which they say, evidenced material violations of cybersecurity laws as of the effective date.[143]  Didi dismisses this allegation as an impermissible accusation of "fraud

---

[138]    SAC ¶ 374 (internal quotation marks omitted).

[139]    *Id*. at ¶ 376 (internal quotation marks omitted).

[140]    Dkt 113 (Didi Mem.) at 23.

[141]    SAC ¶ 163; *see id*. At ¶¶ 144, 158, 160–170; Dkt 137 (Pls. Mem.) at 46.

[142]    SAC ¶ 378.

[143]    *Id*. at ¶¶ 379–380.

by hindsight," noting that "no facts suggest[] that DiDi knew of the July 2 Penalties before they were publicly disclosed."[144]   But Didi mischaracterizes the relevance of the CAC announcements.   They are not relevant to show Didi knew about but failed to disclose the CAC's forthcoming announcements.   Rather, they are relevant because they support the inference that if Didi was not in material compliance in early July, it was more than likely not in compliance in late June, when the registration statement became effective.[145]

### 2.   Section 12

Section 12(a)(2) creates a private right of action against any person who "offers or sells a security . . . *by means of a prospectus* or oral communication, which includes an untrue statement of a material fact or omits to state a material fact."[146]   The SAC alleges that Didi and the Underwriters were liable under Section 12 for misrepresentations in the underwriting agreement.[147] But Underwriters point out, and plaintiffs concede, that this theory of liability is not viable because

---

[144]

Dkt 113 (Didi Mem.) at 24.

[145]

*See United States v. Consol. Laundries Corp.*, 291 F.2d 563, 569 (2d Cir. 1961) ("[T]he subsequent existence of a fact supports the inference of its earlier existence, when the subsequent condition is one which ordinarily would not exist unless it had also existed at the earlier time.").

[146]

15 U.S.C. § 77l(a)(2) (emphasis added).

[147]

SAC ¶ 401.

37

that agreement is not included in Didi's prospectus.[148]   Consequently, plaintiffs cannot base their

Section 12 claim on any alleged misstatements or omissions contained therein.   The Section 12

claim is not dismissed, however, because plaintiffs sufficiently plead an alternative theory of

liability based on material omissions in the registration statement.[149]

### III.   Exchange Act Claims

#### A.   Elements

As compared to the Securities Act, which regulates the registration of public

securities offerings, the Securities Exchange Act of 1934 ("Exchange Act") "governs day-to-day

securities transactions," imposing ongoing "registration and reporting requirements on securities

issuers."[150]   Section 10(b) of the Exchange Act makes it unlawful for any person to "use or employ,

in connection with the purchase or sale of any security[,] . . . any manipulative or deceptive device

or contrivance in contravention of such rules and regulations as the Commission may prescribe."[151]

The SEC's implementing regulation, Rule 10b-5, proscribes "any device, scheme, or artifice to

defraud" and makes it unlawful to "make any untrue statement of a material fact or to omit to state

---

[148]

See Dkt 116 (Underwriters Mem.) at 14–15; Dkt 137 (Pls. Mem.) at 46 n.30.

[149]

SAC ¶ 400.

[150]

2 Thomas Lee Hazen, *Treatise on The Law of Securities Regulation* § 9:2 (7th ed. 2016).

[151]

15 U.S.C. § 78j(b).

38

a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."[152]

Section 20A "provides an express private right of action for those who trade contemporaneously with an inside trader."[153] And Section 20(a) makes executives vicariously liable as "'controlling person[s]' . . . for their company's violations of the Exchange Act."[154] Claims under Section 20A and Section 20(a) of the Exchange Act both "must plead as a predicate an independent violation of the Exchange Act."[155]

B.      *Section 10(b) and Rule 10b-5*

"To state a claim under Section 10(b) and Rule 10b-5, 'a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that

---

[152]

17 C.F.R. § 240.10b-5(a)–(b).

[153]

*Steginsky v. Xcelera Inc.*, 741 F.3d 365, 372 (2d Cir. 2014) (citing 15 U.S.C. § 78t–1).

[154]

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir 2015) (internal quotation marks omitted) (first alteration in original) (quoting 15 U.S.C. § 78t(a)).

[155]

*Qihoo 360 Tech. Co.*, 19 F.4th at 152 (internal quotation marks omitted) (quoting *Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 704 (2d Cir. 1994)).

the plaintiff's reliance was the proximate cause of its injury.'"[156]  Such claims must satisfy both the

heightened pleading requirements of Rule 9(b), discussed above,[157] and the Private Litigation

Securities Reform Act of 1995 ("PSLRA").  The PSLRA requires that a Section 10(b)/Rule 10b-5

claim "state with particularity facts giving rise to a strong inference that the defendant acted with

the required state of mind"[158] — that is, with "a mental state embracing intent to deceive,

manipulate, or defraud,"[159] or "recklessness"[160] — in order sufficiently to plead *scienter*.

Didi and the Officer Defendants contend that plaintiffs fail to state a claim under

Section 10(b) and Rule 10b-5 for three reasons.  First, Didi reiterates its argument, made in the

context of the Securities Act, that the SAC does not allege an actionable omission of material fact.

For the reasons explained above, the Court rejects this argument.[161]  Second, Didi and the Officer

---

[156]

    *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 212 (2d Cir. 2020) (quoting *ATSI Commc'ns, Inc.*, 493 F.3d at 105).

[157]

    *Supra* I.

[158]

    15 U.S.C. § 78u–4(b)(2)(A).  Because "the PSLRA did not change the basic pleading standard for scienter in this circuit," this Court, consistent with the practice of other courts in this district and circuit, considers pre-PSLRA case law.  *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (internal quotation marks omitted).

[159]

    *New Eng. Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158, 177 (2d Cir. 2023) (internal quotation marks omitted).

[160]

    *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 194 (2d Cir. 2008).

[161]

    *Supra* II.C–D.

Defendants argue that the SAC does not satisfy the PSLRA's *scienter* requirement.  Third, Didi contends that the SAC does not sufficiently plead loss causation.  For the reasons explained below, the Court rejects these latter two arguments as well.

> ### 1.    Scienter

To plead the requisite "strong inference" of *scienter*, plaintiffs must allege "facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."[162]  "Although 'the requisite intent of the alleged speaker of the fraud need not be alleged with great specificity,' the 'inference of scienter must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'"[163]  The *scienter* inquiry is holistic, based on "all of the facts alleged, taken collectively," and should "not . . . scrutinize[]" "individual allegation[s] . . . in isolation."[164]

With respect to a corporate defendant, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite

---

[162]    *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi.*, 553 F.3d at 198.

[163]    *New Eng. Carpenters*, 80 F.4th at 177 (first quoting *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996), and then quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007)).

[164]    *Tellabs*, 551 U.S. at 322–23.

scienter.  In most cases, the most straightforward way to raise such an inference . . . [is] to plead it for an individual defendant."[165]  With respect to individual defendants, plaintiffs must "plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible."[166]

          *a.*    *Didi's* Scienter

Plaintiffs allege that Didi and corporate officers Cheng and Liu, whose *scienter* may be ascribed to Didi,[167] had both motive and opportunity to commit the alleged fraud.  A defendant has an opportunity to commit fraud where he has access to but fails to disclose information on which the fraud claim is based.[168]  As the Court already has explained, plaintiffs plead that Didi and the Officer Defendants had access to the Omitted Facts, thereby satisfying the opportunity prong.[169]  Thus, the dispositive question is whether plaintiffs' pleading satisfies the motive prong.  The Court

---

[165]
    *Teamsters Loc. 445 Freight Div. Pension Fund*, 531 F.3d at 195; *see also id.* ("[I]t is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant.").

[166]
    *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009).

[167]
    SAC ¶ 312.

[168]
    *See Stevelman v. Alias Rsch. Inc.*, 174 F.3d 79, 86 (2d Cir. 1999) ("'Opportunity' can be inferred from the . . . officers' access to financial information . . . to which the general public did not have access.").

[169]
    *Supra* II.C.

holds that it does.

      The SAC alleges that "Didi was motivated to conceal the Omitted Facts because it wanted to receive the $4.4 billion in IPO proceeds" and that "Cheng and Liu were motivated to conceal the Omitted Facts because their stake[s] in Didi became worth $4.4 billion and $1.1 billion[,] respectively."[170]  Defendants contend that these allegations are insufficient because a general economic motive does not support an inference that they intended to commit fraud.[171]

      It is true that a *general* economic motive does not support an inference of fraudulent intent.  This rule reflects the concern that such a "generalized motive . . . could be imputed to any publicly-owned, for-profit endeavor," thereby rendering "the motive requirement . . . meaningless."[172]  This does not mean, however, that economic motives may never, in combination with opportunity, satisfy the *scienter* requirement.  Relevant here, the *scienter* requirement is met where a plaintiff alleges that a defendant stood to benefit economically "in some concrete and

---

[170]

      SAC ¶¶ 285–286.

[171]

      Dkt 113 (Didi Mem.) at 25–26 (quoting *Kalnit*, 264 F.3d at 139 and citing *Defer LP v. Raymond James Fin., Inc.*, 654 F. Supp. 2d 204, 218 (S.D.N.Y. 2009)).

[172]

      *Chill*, 101 F.3d at 268 & n.5; *see, e.g.*, *Kalnit*, 264 F.3d at 140; *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 95 (S.D.N.Y. 2015) (noting that "claims that amount to no more than allegations of a general business motive to make a profit . . . cannot support an inference of scienter" "because it is assumed that all commercial businesses seek to make money" (internal quotation marks omitted)).

personal way from the purported fraud."[173]

In this case, plaintiffs plead a concrete and personal economic motive. Their allegations are specific to defendants' circumstances as a Chinese technology company and its corporate officers attempting to list on an American exchange at a moment when the Chinese government appeared poised to "crack[ ]down" on Chinese technology companies and "the window for high valuation Chinese IPOs in the United States could close very soon."[174]  Disclosing the CAC's Directives and complying with it, plaintiffs allege, could have caused Didi "a lengthy delay . . . and perhaps an inability to move forward in the U.S. at all."[175]

These allegations closely mirror those that the Second Circuit held were sufficient to plead motive in *Novak*.  In that case, the court explained that the *scienter* "requirement [is] generally met when corporate insiders were alleged to have misrepresented to the public material facts about the corporation's performance or prospects in order to keep the stock price artificially

---

[173]

> *Novak*, 216 F.3d at 307–08; *see ABF Cap. Mgmt. v. Askin Cap. Mgmt., L.P.*, 957 F. Supp. 1308, 1331 (S.D.N.Y. 1997) (allegations of "extraordinary" economic motives sufficiently pled *scienter*); *City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 422 (S.D.N.Y. 2011) ("The defendants' argument essentially amounts to a claim that an interest in stock sold in an IPO or significant public offering could *never* qualify as motive for purposes of scienter.  This is plainly incompatible with the holding by the Court of Appeals." (citing *Kalnit*, 264 F.3d at 139)).

[174]

> SAC ¶ 188.

[175]

> SAC ¶ 188.

high while they sold their own shares at a profit."[176]   Here, of course, the allegations center on an

omission rather than a misrepresentation and an IPO rather than an already publicly traded company,

but such distinctions are irrelevant to whether the alleged motive is sufficiently concrete and

particularized.   At base, the *specific* economic motives alleged in the SAC are not so general that

they could be imputed to any company or its officers.   Accordingly, they do not implicate the

concern underlying the rule disallowing plaintiffs from pleading *scienter* based on general economic

motives.

Didi and the Officer Defendants argue also that a fraudulent motive cannot be

imputed to them because their profits were "short-lived" and they ultimately suffered economic

losses as a result of the IPO.[177]   This argument fails because, as plaintiffs observe, it "confuses

expected with realized benefits."[178]   That defendants apparently misjudged the Chinese

government's response to Didi's IPO does not absolve them.   Additionally, the cases on which Didi

relies are inapposite.   For example, it quotes *Plumbers & Steamfitters Local 773 Pension Fund v.*

*Canadian Imperial Bank of Commerce* for the proposition that an inference of *scienter* does not

---

[176]

   *Novak*, 216 F.3d at 308; *see also Sharette*, 127 F. Supp. 3d at 96 (holding that plaintiffs
   sufficiently pled motive where they alleged that fraud "improve[d]" defendants' "ability to
   access a specific and extremely profitable market").

[177]

   Dkt 113 (Didi Mem.) at 26–27; *see* Dkt 129 (Cheng *et al*. Mem.) at 5.

[178]

   Dkt 137 (Pls. Mem.) at 74 (quoting *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 97 (2d
   Cir. 2016)).

follow where defendants "suffered significant losses."[179]  In that case, however, the court found that

there was no allegation that either the company defendant or any of the officer defendants stood to

benefit from the fraud.  In fact, four of the five defendants in that case actually *purchased* company

stock during the period in which they were allegedly defrauding investors by concealing information

that reflected *negatively* on the company's prospects.[180]  Here, by contrast, plaintiffs allege that

"[d]efendants hoped to sell their inflated shares when the lock-up ended and were hoping the CAC's

punishment would still allow them to . . . profit."[181]  This theory is cogent and "at least as compelling

as any opposing inference of nonfraudulent intent."[182]  "The fact that things did not turn out as

planned does not exonerate [the defendants]."[183]  The SAC pleads both motive and opportunity,

thereby satisfying the *scienter* pleading requirement.

       Plaintiffs contend in the alternative that they plead *scienter* by alleging strong

circumstantial evidence of, at the least, recklessness.  Having held that the SAC adequately pleads

*scienter* on a motive and opportunity theory, the Court considers this alternative theory only

---

[179]

    Dkt 113 (Didi Mem.) at 27 (quoting 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010)).

[180]

    *Plumbers*, 694 F. Supp. 2d at 298–99.

[181]

    Dkt 137 (Pls. Mem.) at 74.

[182]

    *New Eng. Carpenters*, 80 F.4th at 177 (quoting *Tellabs*, 551 U.S. at 314).

[183]

    Dkt 137 (Pls. Mem.) at 74.

briefly.[184]

Scienter based on recklessness may be pled by alleging that a defendant "knew facts or had access to information suggesting that their public statements were not accurate[] or . . . failed to check information they had a duty to monitor."[185]   In this case, the SAC contains ample allegations from which to infer scienter as to Didi.   It alleges that "Didi knew or recklessly disregarded" that: (1) "the CAC had directed Didi to postpone its IPO"; (2) defying this direction risked "harsh regulatory penalties"; and (3) it "had an affirmative duty to disclose in the Registration Statement the Omitted Facts" but failed to do so.[186]   In addition, plaintiffs allege that when the CAC directed Didi not to proceed with the IPO, "Didi led the CAC to believe that it would comply."[187] They allege also that the rushed nature of the IPO suggests that Didi was attempting to go public

---

[184]

    Furthermore, where a plaintiff makes some showing of motive, courts should be correspondingly more liberal in finding that recklessness has been alleged.  See ECA, Loc. 134 IBEW Joint Pension Tr. of Chi., 553 F.3d at 198–99.

[185]

    Employees' Ret. Sys. of Gov't of the Virgin Islands, 794 F.3d at 306 (internal quotation marks omitted).

    "[S]ection 10(b)'s scienter requirement . . . may be established through a showing of reckless disregard for the truth, that is, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care."  SEC v. Obus, 693 F.3d 276, 286 (2d Cir. 2012) (internal quotation marks omitted); accord SEC v. O'Brien, No. 21-cv-9575 (DLC), 2023 WL 3645205, at *9 (S.D.N.Y. May 25, 2023).

[186]

    SAC ¶¶ 264–266.

[187]

    Id. at ¶ 179; see id. at ¶¶ 175–177.

"before the regulatory environment deteriorated and the IPO window closed."[188]  Last, they allege

that the CAC's "swift and severe reaction to Didi's IPO" indicates that Didi had told the CAC that

it would not move forward with the listing but did anyway.[189]

       In addition to these statements, which allege, at the least, that Didi itself was reckless,

the SAC's allegations that Didi's executives were at least reckless (discussed in the section that

immediately follows) is ascribed to Didi.

       *b.*    *Officer Defendants'* Scienter

       Plaintiffs allege that Cheng, Liu, and Zhuo also acted with *scienter*.  As explained

above, the SAC alleges that Cheng and Liu had both motive and opportunity to commit the alleged

fraud.  The SAC alleges also that Cheng, Liu, and Zhuo acted at least recklessly.  For example, it

states that "Cheng, Liu, and Zhuo *knowingly* issued false and misleading officer certificates to the

Underwriters to persuade them to close the IPO[,] falsely attesting that the July 2 Penalties did not

and would not have a material adverse effect on Didi's business."[190]  In the alternative, plaintiffs

allege that Cheng, Liu, and Zhuo were *reckless* in failing to "diligently investigat[e]" "the reasons

---

[188]       Dkt 137 (Pls. Mem.) at 63.

[189]       *Id*. at 66.

[190]       SAC ¶ 289 (emphasis added).

for the CAC's harsh actions on July 2" prior to providing the officer certificates to Underwriters.[191]

These allegations of *scienter* suffice.

####     2.     *Loss Causation*

To state Exchange Act claims, plaintiffs must allege also that their losses were caused by defendants' omission.[192]   "[A] misstatement or omission is the [cause] of an investment loss if the risk that caused th[at] loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged."[193]   A plaintiff has pled causation where she sufficiently alleges that the "misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."[194]   Such a disclosure may be made either directly (a so-called corrective disclosure) or by a course of events that constructively reveals the undisclosed risk (a so-called materialization of the risk).[195]   What matters is that the market has learned of a previously undisclosed risk.  How it learns of it is immaterial.

---

[191]

       *Id*. at ¶ 276 (emphasis added).

[192]

       *See* 15 U.S.C. § 78u–4*; Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp.*, Inc., 343 F.3d 189, 196 (2d Cir. 2003); 4 Thomas Lee Hazen, *Treatise on The Law of Securities Regulation* § 12:93 (7th ed. 2016) ("[I]t is sufficient that the misrepresentation be a substantial factor, but not necessarily the primary factor in causing the loss.").

[193]

       *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).

[194]

       *Id*.; *see In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261 (2d Cir. 2016).

[195]

       *Vivendi*, 838 F.3d at 261–62.

Plaintiffs allege that both types of disclosure caused their harm. According to the SAC, news reports regarding the CAC's pre-IPO communications with Didi amounted to a "corrective disclosure partially revealing the Omitted Facts."[196]  Further, plaintiffs allege that the CAC's "regulatory actions and penalties [against Didi] were a materialization of the concealed risk that Didi's flouting the CAC Directives posed for IPO Investors."[197]  As a consequence of both types of disclosure, plaintiffs allege, Didi's share price declined, thereby causing them harm.

Didi finds fault with both types of alleged disclosure. It argues that the disclosures in the news reports were "not 'corrective'" because "they disclosed no new information regarding any alleged omission."[198]  This argument is conclusory and at odds with the SAC which, as Didi itself acknowledges, pleads that "investors *first* learned that DiDi 'disobeyed the CAC's Directives' on July 5."[199]  The existence of the Omitted Facts was new.

Didi argues also that plaintiffs fail to plead causation under a materialization of risk theory. Its rationale seems to be that the post-IPO events plaintiffs identify as having revealed the omitted risk of going public — *i.e.*, the CAC's sanctioning of Didi — was not "*new* information to

---

[196]  SAC ¶ 240.

[197]  *Id*. at ¶ 224.

[198]  Dkt 113 (Didi Mem.) at 34.

[199]  *Id*. (emphasis added) (quoting SAC ¶ 16).

the market" because it had been revealed by "news reporting over the months following the IPO."[200]

This argument fails for at least three reasons.  First, the SAC alleges that developments almost

*immediately following* the IPO began to manifest the risk that Didi allegedly concealed.  It could not,

therefore, have been entirely duplicative of reporting published over the course of the *following*

*months*.  Second, the argument is difficult to square with Didi's immediately preceding argument

that the very same news reports were not corrective disclosures because they were not 'news.'  And,

third, loss causation may be predicated on both corrective and constructive disclosures, particularly

where, as here, the full contours of the allegedly fraudulent omission emerged in dribs and drabs.[201]

In sum, plaintiffs met their burden of pleading that their loss "caused by the alleged fraud result[ed]

from the 'relevant truth . . . leak[ing] out.'"[202]  Plaintiffs state a Section 10b claim.[203]

---

[200]

Dkt 113 (Didi Mem.) at 34–35.

[201]

*See Vivendi*, 838 F.3d at 261("[O]ur past holdings do not suggest that 'corrective disclosure' and 'materialization of risk' create fundamentally different pathways for proving loss causation.").

[202]

*Id.* (second modification in original) (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005)).

[203]

Plaintiffs contend also that defendants fail in their principal briefs to address two of their theories of Section 10(b) liability — that Didi traded on insider information in violation of Rule 10b5-1 and that Didi and the Officer Defendants engaged in a scheme to deceive in violation of Rule 10b-5(a)&(c) — and are therefore precluded from contesting either theory. Dkt 137 (Pls. Mem.) at 52–53. Didi disputes this, but it also suggests that the Court entertain more specific arguments raised for the first time in its reply.  Dkt 143 (Didi *et al*. Reply) at 38–42 & 40 n.35.  The Court declines this invitation.  The Court has considered defendants' arguments to the extent that they were contained in their memoranda in support of their motions to dismiss.

*C.*     *Section 20A*

Didi's contention regarding the Section 20A claim — relegated to just three sentences — also fails.[204]   First, contrary to Didi's assertion, the SAC pleads a predicate Exchange Act violation.[205]   Second and also contrary to Didi's assertion, plaintiffs plead that Didi traded on material nonpublic information that it had a duty to disclose for the reasons explained above and articulated in plaintiffs' opposition.[206]

*D.*     *Section 20(a)*

The Officer Defendants argue that, "[b]ecause Plaintiffs fail to allege primary violations of Sections 10(b) . . . , they fail to state a claim for derivative control person liability under Section 20(a) of the Exchange Act . . . against Cheng and Liu."[207]   This argument is unavailing because, as explained at length above, plaintiffs allege a primary Exchange Act violation.[208]

---

[204]     Dkt 113 (Didi Mem.) at 35.

[205]     *Supra* III.B.

[206]     Dkt 137 (Pls. Mem.) at 80–84.

[207]     Dkt 129 (Cheng *et al.* Mem.) at 4 n.5.

[208]     *Supra* III.B.

52

*Conclusion*

For the foregoing reasons, defendants' motions to dismiss[208] are denied.

SO ORDERED.

Dated:          March 14, 2024

_____

Lewis A. Kaplan
United States District Judge

---

[208] Dkt 112 (Didi Mot.); Dkt 115 (Underwriters Mot.); Dkt 128 (Cheng *et al.* Mot.); Dkt 130 (Lau Mot.); Dkt 151(Matsui & Perica Mot.).