UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

IN RE DIDI GLOBAL INC. SECURITIES

LITIGATION

----------------------------------------------------------------X

**VALERIE FIGUEREDO, United States Magistrate Judge.**

**TO: THE HONORABLE LEWIS A. KAPLAN, United States District Judge.**

      Named Plaintiffs Shereen El-Nahas, Alaka Holdings Ltd., Bosco Wang, Daniil Alimov, and Njal Larson (collectively, "Plaintiffs") commenced this action against Defendants DiDi Global Inc. ("DiDi"); Will Wei Cheng, Alan Yue Zhuo, Jean Qing Liu (collectively, the "Officer Defendants"); Goldman Sachs (ASIA) L.L.C., Morgan Stanley & Co. LLC, J.P. Morgan Securities LLC, Bofa Securities, Inc., Barclays Capital Inc., Citigroup Global Markets Inc., HSBC Securities (USA) Inc., UBS Securities LLC, Mizuho Securities USA LLC, and China Renaissance Securities (US) Inc. (collectively, the "Underwriter Defendants"); and Stephen Jingshi Zhu, Zhiyi Chen, Martin Chi Ping Lau, Kentaro Matsui, Adria Perica, Daniel Yong Zhang, China Renaissance Securities (Hong Kong) Limited, China International Capital Corporation Hong Kong Securities Limited, Guotai Junan Securities (Hong Kong) Limited, Bocci Asia Limited, Bocom International Securities Limited, CCB International Capital Limited, CLSA Limited, CMB International Capital Limited, Futu Inc., ICBC International Securities Limited, and Tiger Brokers (NZ) Limited. Plaintiffs, who are purchasers of DiDi's American Depositary Shares ("ADS"), allege that DiDi violated the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act") in connection with its Initial Public Offering ("IPO") on June 30, 2021. See ECF No. 106. Presently before the Court is Plaintiffs' motion for class certification under Federal Rule of Civil Procedure 23. ECF No. 261.

**21-CV-5807 (LAK) (VF)**

**REPORT &
RECOMMENDATION**

For the reasons set forth below, I respectfully recommend that Plaintiffs' motion for class certification be **GRANTED in part and DENIED in part**.

## BACKGROUND[1]

I.    Factual Background

This case arises from Plaintiffs' claims related to their purchase of DiDi ADS, during and immediately following DiDi's IPO, from June 30, 2021, to July 21, 2021. ECF No. 106 at ¶ 1. DiDi is a ride-hailing business, headquartered in the People's Republic of China, that runs almost entirely on an internet-based platform for all aspects of its operations. Id. at ¶¶ 3, 7, 48. By March 2021, DiDi boasted 377 million active users in China. Id. at ¶ 3.

In early 2021, DiDi began the process of listing on the New York Stock Exchange (the "NYSE"), and commenced its IPO on June 30, 2021, pricing its shares at $14. Id. at ¶¶ 44, 49, 339, 342. In the Registration Statement for the IPO, DiDi disclosed that it had two meetings with Chinese regulators on April 21, 2021, and May 14, 2021. Id. at ¶¶ 287-88. The Registration Statement did not, however, disclose DiDi's meeting and discussions with the branch of the Chinese Government that regulates the internet and internet-based businesses, the Cyberspace Administration of China (the "CAC"). Id. at ¶¶ 5, 10, 288.

The CAC was established to manage cybersecurity regulation, control internet content and data, and supervise law enforcement with respect to internet content in China. Id. at ¶¶ 88, 97. It has the power to close or suspend websites, close down businesses, revoke business

---

[1] The facts recounted herein are those relevant to the instant motion. A complete recitation of the factual background of this case is included in the opinion and order of the Honorable Lewis A. Kaplan on the motion to dismiss the Second Amended Complaint. See ECF No. 158. For purposes of this motion, I accept as true all factual allegations in the Second Amended Complaint (ECF No. 106). See In re Polaroid ERISA Litig., 240 F.R.D. 65, 74 (S.D.N.Y. 2006) ("In considering a motion for class certification, courts must accept the allegations in the complaint as true.").

licenses, and impose large fines or other penalties on businesses it determines are violating any cybersecurity laws. Id. at ¶¶ 6, 129.

Over the last decade, China has enacted a series of laws pertaining to data protection and cybersecurity. Id. at ¶ 97. Under the Cybersecurity Law, the CAC is empowered to conduct a national security review, or require self-inspection, of the network products and services that may impact national security, of all businesses that may be deemed to be critical information infrastructure operators. Id. at ¶¶ 101-07. Because "apps" have become the main platform for mobile-internet services in China, the CAC promulgated certain regulations that prohibit app-service providers, like DiDi, from engaging in activities that may jeopardize national security and require that they secure personal user information. Id. at ¶¶ 113-15, 120-22. Of the various laws that apply to DiDi's business, at least five relate to data storage and cybersecurity. Id. at ¶ 97.

At the meeting that was not disclosed in the Registration Statement, the CAC had directed DiDi to postpone its IPO until it had completed a thorough internal cybersecurity review to ensure its operations complied with all relevant cybersecurity and data-protection laws. Id. at ¶¶ 10, 159. DiDi was thus on notice that regulators believed DiDi's operations may not comply with relevant laws and regulations. Id. at ¶ 159. Although Didi had given the CAC the impression that it would follow its directive, DiDi went forward with the IPO on the morning of June 30, 2021. Id. at ¶ 11.

Attached to the Registration Statement was an Underwriting Agreement, which stated that DiDi's offering documents did not contain any untrue statements of material fact or omissions of material facts. Id. at ¶¶ 368-70. DiDi also represented and warranted in the Underwriting Agreement that, since the date of the latest audited financial statements included in

the Registration Statement, DiDi had not "sustained any material loss or interference with its business from . . . governmental action, order[,] or decree" or any "material adverse change or effect on, or any development involving a prospective material adverse change or effect, in or affecting" its business. Id. at ¶¶ 374-75.

Further, the Officer Defendants provided Officer Certificates, as required by the Underwriting Agreement, attesting that the representations and warranties in the Underwriting Agreement were true and correct as of the closing date and that all of the conditions for closing had been satisfied, including that no material adverse event had occurred prior to closing, the prospectus did not, as of closing, contain any omission of a material fact, and that no governmental action or inquiry had occurred that could have a material effect on DiDi's business as of the closing time. Id. at ¶¶ 275-77. The IPO closed on July 2, and at closing, the Officer Defendants provided knowingly false officer certificates. Id. at ¶ 277.

Also on July 2, 2021, the CAC informed DiDi that the company was under cybersecurity review, during which time DiDi could not accept new customers. Id. at ¶¶ 13, 273, 343. That same day, the CAC announced on its website that DiDi was under cybersecurity review and was prohibited from registering new customers. Id. at ¶¶ 13, 225. Before trading opened on the NYSE on July 2, the CAC's announcement was reported by a U.S. news outlet. Id. at ¶ 13.

On July 4, 2021, the CAC announced that DiDi was in serious violation of relevant Chinese laws and regulations because its ride-sharing app collected and used personal information in violation of cybersecurity and related laws. Id. at ¶¶ 229, 379. The CAC ordered DiDi to remove the "DiDi Travel app" (DiDi's primary app) from all app stores in China and prohibited existing customers from downloading DiDi's app. Id. at ¶¶ 14, 229, 379.

Also on July 4, 2021, multiple media sources reported on the CAC's announcement that it had banned DiDi from app stores due to the cybersecurity risk it posed to customers. Id. at ¶¶ 231-32. News of the CAC's penalties caused the price of DiDi ADS to decline. Id. at ¶¶ 15, 226-27.

On July 5, 2021, the Wall Street Journal reported that weeks before DiDi's IPO, the CAC had suggested that DiDi should delay its IPO and urged it to conduct a thorough self-examination of its network security. Id. at ¶ 235. On July 6, 2021, the South China Morning Post reported that DiDi had "forced its way" to a listing on the NYSE without completing a thorough and mandatory data-security assessment as requested by the CAC. Id. at ¶ 239. Between July 9 and July 12, 2021, it was announced that the CAC had ordered the takedown of an additional 25 apps operated by DiDi, including apps for drivers offering rides through DiDi's platform, because they collected personal information in violation of Chinese laws and regulations. Id. at ¶¶ 247-48, 379. By ordering the removal of apps used by drivers, the CAC made it impossible for new drivers to sign up with DiDi. Id. at ¶ 247. On July 22, 2021, Bloomberg News reported that the CAC was considering serious penalties against DiDi, including requiring DiDi to delist its ADS from the NYSE. Id. at ¶¶ 18, 253.

II.    Procedural Background

Plaintiffs commenced this suit on July 6, 2021, against DiDi, the Officer Defendants, several of DiDi's Directors (and together with the Officer Defendants, the "Individual Defendants")[2], and the Underwriter Defendants, who were the underwriters of DiDi's IPO. See ECF No. 1. On January 7, 2022, pursuant to a stipulation and order (ECF No. 73), Plaintiffs filed

---

[2] The DiDi Directors who are Defendants in this action are: Stephen Jingshi Zhu, Zhiyi Chen, Kentaro Matsui, Martin Chi Ping Lau, Adrian Perica, and Daniel Yong Zhang. ECF No. 106 at ¶¶ 52, 56-61.

an amended complaint. ECF No. 88. Pursuant to a subsequent stipulation and order (ECF No. 105), Plaintiffs filed a Second Amended Complaint on May 5, 2022, which is the operative complaint. ECF No. 106.

In the Second Amended Complaint, Plaintiffs allege that DiDi "omitted material facts" from its public filings with the SEC made in connection with its 2021 IPO and listing of its ADS on the NYSE. Id. at ¶¶ 9-10, 31, 145-70. Specifically, Plaintiffs contend that DiDi was required to, but failed to, disclose two material facts in its Registration Statement: (1) that the CAC had directed it to postpone its IPO until DiDi completed a thorough self-inspection of its business, operations, and policies; and (2) that it faced a high risk that the CAC would impose harsh penalties that could harm DiDi's business, financial performance, and its reputation if it went forward with its IPO against the CAC's directive. Id. at ¶¶ 10, 31.

Plaintiffs also assert that DiDi engaged in insider trading when it went forward with the IPO without first disclosing the material facts related to the CAC directive. Id. at ¶¶ 300-05. And as against the Officer Defendants only, Plaintiffs allege that they engaged in a scheme to deceive the Underwriter Defendants when they delivered false Officer Certificates to induce the Underwriter Defendants to close the IPO. Id. at ¶¶ 306-12.

Plaintiffs assert six causes of action. Under the Exchange Act, Plaintiffs assert a Section 10(b) and Rule 10b-5 claim against DiDi and the Officer Defendants in Count I (id. at ¶¶ 293-315); a Section 20A claim against DiDi in Count II (id. at ¶¶ 316-22); and a Section 20(a) claim against Will Wei Cheng, DiDi's co-founder and chief executive officer, and Jean Qing Liu, DiDi's co-founder and president, in Count III (id. at ¶¶ 323-29). The Section 10(b) and Rule 10b-5 claim in Count I is premised on three different theories of liability: DiDi failed to disclose material information in its offering documents in violation of Rule 10b-5(b) (id. at ¶¶ 262-67);

DiDi engaged in insider trading because it did not disclose the material non-public information (id. at ¶¶ 268-72); and the Officer Defendants and DiDi engaged in a scheme, in violation of Rule 10b-5(a) and (c), by which they failed to disclose material information to the Underwriter Defendants to induce them to close the IPO (id. at ¶¶ 273-80). Under the Securities Act, Plaintiffs assert a Section 11 claim against all Defendants in Count IV (id. at ¶¶ 384-93); a Section 12 claim against DiDi and the Underwriter Defendants in Count V (id. at ¶¶ 394-404); and a Section 15 claim against Cheng and Liu in Count VI (id. at ¶¶ 405-08).

On June 3, 2022, DiDi and the Underwriter Defendants separately moved to dismiss the Second Amended Complaint. ECF Nos. 112, 115. The Individual Defendants filed their own motion to dismiss the Second Amended Complaint on July 22, 2022. ECF No. 128. On March 14, 2024, Judge Kaplan denied all of the motions to dismiss. ECF No. 158. Defendants filed their respective answers to the Second Amended Complaint on May 3, 2024, and the parties proceeded to discovery, which is still ongoing. See ECF Nos. 169, 171, 174-81, 183, 192.

On January 6, 2025, Plaintiffs filed the instant motion, seeking class certification, the appointment as class representatives of Njal Larson, Shereen El-Nahas, Alaka Holdings Ltd. ("Alaka"), Bosco Wang, and Daniil Alimov, and appointment of The Rosen Law Firm, P.A. as class counsel. See ECF No. 261. Plaintiffs seek to certify a class consisting of all persons and entities who purchased DiDi ADS during the period of June 30, 2021, through and including July 21, 2021. ECF No. 263 at 10.[3] On January 21, 2025, Defendants filed their opposition brief to Plaintiffs' motion for class certification. ECF No. 322. On January 23, 2025, Plaintiffs' motion was referred to the undersigned for a Report and Recommendation. ECF No. 280. On April 22,

---

[3] The page numbers referenced herein for citations to the electronic docket ("ECF") are to the electronically generated page numbers in those documents.

2025, Plaintiffs filed their reply brief.[4] ECF No. 355. On May 19, 2025, Defendants filed a sur-reply, addressing new arguments raised in Plaintiffs' reply brief. ECF No. 376. On June 6, 2025, Plaintiffs also filed a sur-reply. ECF No. 400. On June 27, 2025, the Court held oral argument on the class-certification motion. See ECF No. 444, June 27, 2025 Tr. ("Tr.").

## LEGAL STANDARD

Federal Rule of Civil Procedure 23 governs the requirements for class certification. Under Rule 23(a), "[c]lass certification is appropriate if the following four factors are met: '(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.'" Wood v. Mike Bloomberg 2020, Inc., 746 F. Supp. 3d 185, 194 (S.D.N.Y. 2024) (citing Fed. R. Civ. P. 23(a)). Courts read an "implied requirement of ascertainability" into Rule 23 such that members of the proposed class must be "objectively determinable." In re Initial Pub. Offerings Sec. Litig., 471 F.3d 24, 30 (2d Cir. 2006). Additionally, "the proposed class must satisfy at least one of the three requirements listed in Rule 23(b)." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 345 (2011). Rule 23(b), in relevant part, states that a "class action may be maintained if Rule 23(a) is satisfied and if: . . . the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

---

[4] Plaintiffs filed their original reply brief on April 9, 2025. Plaintiffs then sought leave to file an amended reply brief, which the Court granted. ECF No. 353. The undersigned relies only on Plaintiffs' amended reply brief in this Report and Recommendation.

Plaintiffs "bear[ ] the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met." <u>Myers v. Hertz Corp.</u>, 624 F.3d 537, 547 (2d Cir. 2010). "Although the Court must resolve factual disputes relevant to satisfying each Rule 23 requirement, '[t]he certifying court should not make any factual findings or merits determinations that are not necessary to the Rule 23 analysis, and any factual determinations made at the certification stage are not binding on a subsequent fact-finder, even the certifying court.'" <u>Schear v. Food Scope Am., Inc.</u>, 297 F.R.D. 114, 123 (S.D.N.Y. 2014) (quoting <u>Flores v. Anjost Corp.</u>, 284 F.R.D. 112, 122 (S.D.N.Y. 2012)). "Doubts concerning the propriety of class certification should be resolved in favor of class certification." <u>Long v. HSBC USA Inc.</u>, No. 14-CV-6233 (HBP), 2015 WL 5444651, at *6 (S.D.N.Y. Sept. 11, 2015). Further, "[m]erits questions may be considered [only] to the extent . . . that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." <u>Amgen Inc. v. Conn. Ret. Plans and Tr. Fund</u>, 568 U.S. 455, 466 (2013).

## DISCUSSION

Plaintiffs seek to certify a class of all persons and entities who purchased DiDi ADS and were damaged thereby, during the period of June 30, 2021, through and including July 21, 2021. ECF No. 263 at 10. Defendants do not contest that under Rule 23, the proposed class satisfies the requirements of Rule 23(a)(1)-(3)—namely, numerosity, commonality, and typicality—for all of the claims asserted in the Second Amended Complaint. <u>See</u> ECF No. 322 at 19-30, 39-42. Instead, as it pertains to the requirements in Rule 23(a), Defendants challenge only the adequacy of one of the proposed class representatives under Rule 23(a)(4), arguing that Alaka is not an adequate class representative because it lacks basic knowledge about the allegations and has

failed to demonstrate the requisite level of involvement in the suit. Id. at 39-42. Defendants raise

no challenge to the adequacy of the other proposed class representatives.

Plaintiffs seek class certification under Rule 23(b)(3), and as to that requirement,

Defendants raise no argument for the Securities Act claims in Counts IV, V, and VI. Defendants

limit their challenge to the Exchange Act claims in Counts I, II, and III. ECF No. 322. As to

those claims, Defendants' argument rests entirely on whether individual issues of reliance will

predominate over common issues; Defendants raise no argument concerning the superiority

element of Rule 23(b)(3). Id. at 19-30. Concerning the predominance requirement in Rule

23(b)(3), Defendants contend that Plaintiffs cannot rely on the Affiliated Ute presumption of

reliance for the Exchange Act claims because the claims rely primarily on misrepresentations of

material facts, and not an omission. Id.

Separately, Defendants also challenge the proposed class period, arguing that it is

overbroad and should be limited to purchasers of DiDi ADS from June 30, 2021, through and

including July 5, 2021, because any allegedly false or misleading statements were cured by July

6, 2021. Id. at 30-38. Specifically, Defendants contend that by July 6, publicly available

information made clear that DiDi faced a high risk of penalties stemming from the CAC's

investigation; the disclosures after July 6 did not provide any new information that would have a

curative effect on the ADS price; and the disclosure on July 22 of the possibility of a specific

penalty (delisting from the NYSE) is of no consequence. Id. at 33-35.

As it concerns the class period, I respectfully recommend that the class period extend

from June 30, 2021, through and including July 21, 2021, as requested by Plaintiffs. As it

concerns class counsel and class representatives, I recommend that the Court appoint Njal

Larson, Shereen El-Nahas, Alaka Holdings Ltd., Bosco Wang, and Daniil Alimov as class representatives. I further recommend that The Rosen Law Firm be appointed class counsel.

For Plaintiffs' Securities Act claims, I respectfully recommend that the Court certify a class of all persons and entities who purchased DiDi ADS and were damaged thereby during the class period, because the requirements of Rule 23(a)(1)-(3) and Rule 23(b)(3) are satisfied, and Defendants do not argue otherwise. Finally, for Plaintiffs' Exchange Act claims, I recommend that the Court certify a class of all persons and entities who purchased DiDi ADS and were damaged thereby during the class period, for Plaintiffs' Sections 10(b) claim in Count I premised on alleged violations of Rule 10b-5(a) and (c) under a scheme liability theory, and the Section 20(a) claim in Count III. I recommend that class certification be denied for Plaintiffs' Section 10(b) claim in Count I premised on misstatements in the offering documents and insider trading by DiDi, and for Plaintiffs' Section 20A claim in Count II.

I.    Class Definition

The Court is not bound by the class definition proposed in the complaint and may modify the class definition. See In re Chicago Bridge & Iron Co. N.V. Sec. Litig., No. 17-CV-1580 (LGS), 2019 WL 5287980, at *40 (S.D.N.Y. Oct. 18, 2019). "In the case of a securities-fraud class action, courts are required to cut off the class period on the date of a statement or event that cures the market." Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC, 310 F.R.D. 69, 97 (S.D.N.Y. 2015) (cleaned up). The class period therefore "ends on the date 'when the full truth has been disclosed to the market.'" Pirnik v. Fiat Chrysler Automobiles, N.V., 327 F.R.D. 38, 48 (S.D.N.Y. 2018) (quoting In re SCOR Holding (Switz.) AG Litig., 537 F. Supp. 2d 556, 583 (S.D.N.Y. 2008)).

"If there is 'no substantial doubt as to the curative effect'" of an announcement or corrective disclosure, the Court may shorten the class period to the first announcement that effectively cures the market. In re Virtus Inv. Partners, Inc. Sec. Litig., No. 15-CV-1249 (WHP), 2017 WL 2062985, at *7 (S.D.N.Y. May 15, 2017). "However, whether a particular announcement actually cured a prior misrepresentation is a sensitive issue to rule on at [the class certification stage] because it comes so close to assessing the ultimate merits in the case." Id. (alterations, internal quotation marks, and citations omitted); see also In re Chicago Bridge & Iron Co. N.V. Sec. Litig., 2019 WL 5287980, at *40 ("Where, however, there is an issue of fact as to whether a particular disclosure cured the market or a disagreement as to the precise day on which the truth was known, a broader time period should be certified."). Consequently, at the class certification stage, courts "often limit their analysis to a determination of whether there is a substantial question of fact as to whether the release cured the market or was itself misleading." In re Virtus Inv. Partners, Inc. Sec. Litig., 2017 WL 2062985, at *7 (internal alterations and quotation marks omitted). "If questions of fact remain as to whether the disclosure completely cured the market, a broader class period should be certified." In re Grupo Televisa Sec. Litig., No. 18-CV-1979 (LLS), 2022 WL 2829253, at *1 (S.D.N.Y. July 20, 2022); Sjunde AP-Fonden v. Gen. Elec. Co., 341 F.R.D. 542, 549 (S.D.N.Y. 2022) (certifying class through final corrective disclosure, which was months after the initial corrective disclosure); Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC, 328 F.R.D. 86, 100 (S.D.N.Y. 2018) (certifying proposed class period and explaining that "[w]hether the February or March disclosures cured the prior misstatements is a merits issue"); see also Sayce v. Forescout Techs., Inc., 754 F. Supp. 3d 878, 896-97 (N.D. Cal. 2024) (explaining that arguments concerning the "impact or lack of impact of different disclosures on the market are generally reserved for the merits stage") (internal quotation marks

and citations omitted). "Only on clear, unambiguous disclosures is it appropriate to modify the class." In re Chicago Bridge & Iron Co. N.V. Sec. Litig., 2019 WL 5287980, at *40 (internal quotation marks omitted).

Defendants argue that the class period should end, at the latest, on July 5, 2021. ECF No. 322 at 30. According to Defendants, before the market opened on July 6, 2021, it had become publicly known that the CAC had directed DiDi to postpone its IPO until completion of a self-inspection, that DiDi had violated that directive, and that DiDi faced a high risk of harsh penalties for failing to comply with the CAC directive. Id. at 31-35. In other words, the market knew by July 6, 2021, of the material information that DiDi had allegedly failed to disclose in its offering documents, and those prior news reports had a curative effect on the price of DiDi ADS. Id. at 32-33.

To be sure, Plaintiffs allege that various news agencies began reporting on DiDi's undisclosed meeting with the CAC as early as July 2, 2021, when CNBC reported that DiDi was subject to a cybersecurity review by the CAC and was required to suspend new user registrations. ECF No. 106 at ¶ 225. Following that news, other media sources reported, as early as July 4, 2021, that DiDi's app had been removed from all app stores, and that DiDi had been told by the CAC to delay the IPO, causing the price of DiDi ADS to drop 20% when the market opened on July 6, 2021. Id. at ¶¶ 15-16, 229, 231-32, 235, 237-39. Although Defendants argue that news reports after July 6, 2021, did not provide any new information to the market that could have a curative effect on the share price (ECF No. 322 at 35), it was not until July 22, 2021, that it was *first* announced to the market that DiDi could be forced to delist from the NYSE as a penalty for violating the CAC directive. ECF No. 106 at ¶¶ 253-54. The disclosures prior to July 22 indicated that DiDi faced a high risk of substantial penalties, including

investigations, fines, or suspensions of one or more of its apps from the app store, but none of those earlier news reports indicated that DiDi could face delisting as a penalty. Id. at ¶¶ 204, 206-10, 225, 229, 231-32, 235, 239, 242, 247 251; see also Pirnik, 327 F.R.D. at 48 (extending class period through the final disclosure because "it was reasonable for an investor to be uncertain as to the full extent of FCA's regulatory violations" before that date).

Further, the July 22 news caused the price of DiDi ADS to drop nearly 30% between July 22 and July 23. ECF No. 106 at ¶ 254; see also In re Aphria, Inc. Sec. Litig., 342 F.R.D. 199, 208 (S.D.N.Y. 2022) (concluding that issue of fact existed as to whether disclosure was fully curative based, in part, on substantial drop in stock price). And, prior to July 22, DiDi had not issued an unequivocal disclosure or indicated that investors should not rely on its public statements. See ECF No. 106 at ¶ 234, 248; see also Sayce v. Forescout Techs, Inc., 754 F. Supp. 3d 878, 897 (N.D. Cal. 2024) (stating that courts shorten class periods when defendants explicitly disclose to investors that they should not rely on public statements).

Defendants contend that once it was disclosed that DiDi faced a high risk of substantial penalties, the alleged omission was remedied and disclosure of a specific penalty, such as delisting, is of no consequence. ECF No. 322 at 35. This argument is particularly persuasive here, where there is no allegation that DiDi knew (but withheld) that it could potentially face delisting. But ultimately the corrective effect earlier disclosures had on the price of DiDi ADS and whether those disclosures "reveal[ed] the falsity" of Defendants' challenged statements is a question of loss causation, which goes to the merits of Plaintiffs' claim and is not appropriate for consideration at this stage. See Diabat v. Credit Suisse Grp. AG, No. 23-CV-5874 (CM), 2024 WL 4252502, at *146-47 (S.D.N.Y. Sept. 19, 2024) (explaining that corrective disclosures are

relevant to determining loss causation and pointing out that an alleged corrective disclosure that does not reveal the falsity of the challenged statement cannot establish loss causation).[5]

Here, one of Plaintiffs' experts opined that the price drop of over 30% between July 22 and July 23, following the new disclosure of the possibility of delisting, was statistically significant and not the result of random chance alone. See ECF No. 345-1 at ¶¶ 6, 9, 12-13, 15, 17 (declaration of Plaintiffs' expert opining on the statistical significance of the price drop in DiDi ADS). And another expert opined  ECF No. 345-2 at ¶¶ 8, 23-26.

At this stage, an issue of fact exists as to whether the disclosures prior to the July 22 news report were only partially corrective (as alleged by Plaintiffs, see ECF No. 106 at ¶¶ 236, 240) or had a fully curative effect on the price of the ADS shares, as Defendants contend. At a minimum, the statistically significant price drop between July 22 and July 23 raises a substantial doubt as to the curative effect of the disclosures prior to July 6, and whether earlier disclosures fully corrected any misinformation on the market. See, e.g., In re Interpublic Sec. Litig., No. 02-CV-6527 (DLC), 2003 WL 22509414, at *5 (S.D.N.Y. Nov. 6, 2003) ("Class certification of

---

[5] In cases where courts have shortened a class period at the class-certification stage, the defendant itself made a public disclosure revealing all previously withheld information. See, e.g., In re SunEdison, Inc. Sec. Litig., 329 F.R.D. 124, 134 (S.D.N.Y. 2019) (shortening class period to earlier disclosure where the defendant "revealed" previously undisclosed information in an SEC filing); In re Alstom SA Sec. Litig., 253 F.R.D. 266, 291 (S.D.N.Y. 2008) (holding that class period ended on the date company disclosed accounting error, rather than the date the SEC announced its formal investigation in light of the company's disclosure); In re Fed. Nat. Mortg. Ass'n Sec., Derivative & "ERISA" Litig., 247 F.R.D. 32, 39-40 (D.D.C. 2008) (ending class period on date the issuer "disavowed the accuracy of its financial statements" even though additional accounting irregularities later came to light).

a broader class period is appropriate when questions of fact remain as to whether a purportedly curative press release effected a complete cure of the market or was itself fraudulent."); Sjunde, 341 F.R.D. at 549 (defining class period through the date of the final alleged corrective disclosure because plaintiffs alleged that the final alleged disclosure revealed more than previous disclosures, and explaining that, at the class certification stage, "no more is required"). If, after a more fulsome record, it can be determined that an earlier disclosure fully cured the market, the Court can later modify the class period. See People United for Child., Inc. v. City of New York, 214 F.R.D. 252, 257 n.6 (S.D.N.Y. 2003) ("The Court remains free to modify the scope of the class later in the litigation should subsequent developments require such action."); M.G. v. New York City Dep't of Educ., 162 F. Supp. 3d 216, 231-32 (S.D.N.Y. 2016) (explaining that "even after a certification order is entered, the judge remains free to modify it in light of subsequent developments in the litigation") (cleaned up) (internal quotation marks and citations omitted).

II.    Prerequisites for Class Certification under Rule 23(a)

"Under Rule 23(a), a class must meet the requirements of numerosity, commonality, typicality, and adequacy, as well as an implied requirement of ascertainability." Shi Ming Chen v. Human Manor Enterprise, Inc., No. 17-CV-802 (GBD) (GWG), 2021 WL 2282642, at *2 (S.D.N.Y. June 4, 2021) (cleaned up). Plaintiffs contend that all of Rule 23(a)'s requirements are satisfied. See ECF No. 263 at 11. Defendants do not dispute that the requirements of numerosity, commonality, typicality, and ascertainability are met. See ECF No. 322. Defendants contest only whether Alaka is an adequate class representative, as required by Rule 23(a)(4). Id. at 39-42. As discussed below, the proposed class satisfies the requirements of Rule 23(a), and Alaka is an adequate class representative.

A.  *Numerosity and Ascertainability*

Under Rule 23(a)(1), Plaintiffs must show that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). In the Second Circuit, "numerosity is presumed at a level of 40 members." Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995). Although Plaintiffs "must show some evidence of or reasonably estimate the number of class members," Moreira v. Sherwood Landscaping Inc., No. 13-CV-2640 (AKT), 2015 WL 1527731, at *7 (E.D.N.Y. Mar. 31, 2015) (internal quotation marks and citation omitted), the Court is "empowered to make common sense assumptions to support a finding of numerosity.'" Morris v. Alle Processing Corp., No 8-CV-4874 (JMA), 2013 WL 1880919, at *7 (E.D.N.Y. May 6, 2013) (quoting Nicholson v. Williams, 205 F.R.D. 92, 98 (E.D.N.Y. 2001)).

Plaintiffs contend that numerosity is satisfied because the Underwriter Defendants sold 316.8 million ADS to a geographically dispersed group of investors, likely ranging in the thousands. ECF No. 263 at 19; ECF No. 264-20. Additionally, from June 30, 2021, through July 21, 2021, DiDi ADS was actively traded on the NYSE, where the daily trading volume ranged from 15 to 288 million ADS. ECF No. 263-1 at 56.

"In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." In re Facebook, Inc., IPO Sec. & Derivative Litig., 312 F.R.D. 332, 341 (S.D.N.Y. 2015) (internal quotation marks and citations omitted). Here, millions of DiDi ADS traded on the NYSE during the relevant period, likely to thousands of distinct individuals or entities. The proposed class therefore satisfies the numerosity requirement. See id. (finding numerosity satisfied where 421,233,615 shares were sold in defendant's IPO); In re Deutsche Telekom Ag Sec. Litig., 229 F. Supp. 2d 277, 281 (S.D.N.Y.

17

2002) (holding that numerosity requirement was satisfied where the number of shareholders who bought stock during the class period was estimated to be in the thousands).

Additionally, class membership is readily ascertainable because it includes purchasers of DiDi ADS during a specific time period, and class membership can be determined by looking at trading records. See Fogarazzao v. Lehman Bros., Inc., 232 F.R.D. 176, 183 (S.D.N.Y. 2005) (concluding that proposed class did not present "unusual difficulties" in ascertaining class membership where class was composed of investors who purchased stock in specific company); In re Initial Pub. Offering Sec. Litig., 671 F. Supp. 2d 467, 492 (S.D.N.Y. 2009) (rejecting argument that class membership could not be ascertained because "a quick look at trading records would show" whether an individual or entity was a member in securities class action); In re Aphria, Inc. Sec. Litig., 342 F.R.D. 199, 205 (S.D.N.Y. 2022) (finding that a class was ascertainable because the "proposed [c]lass definition [was] limited by time period, specifie[d] [defendant's] securities, and only include[d] members who purchased or acquired on a domestic exchange or transaction").

B. *Commonality*

To satisfy the commonality requirement in Rule 23(a)(2), Plaintiffs "must demonstrate that there are questions of law or fact common to the class." Martinenko v. 212 Steakhouse, Inc., No. 22-CV-518 (JLR) (RWL), 2023 WL 2919766, at *6 (S.D.N.Y. Apr. 12, 2023), adopted by, 2023 WL 3160118 (S.D.N.Y. Apr. 27, 2023) (internal quotation marks omitted) (quoting Fed. R. Civ. P. 23(a)(2)). All that is needed to satisfy the commonality requirement is "a single common legal or factual question." Jackson v. Bloomberg, L.P., 298 F.R.D. 152, 162 (S.D.N.Y. 2014) (internal quotation marks and citations omitted). In securities class actions, "where putative class members have been injured by similar material misrepresentations and omissions, the

commonality requirement is satisfied." <u>Fogarazzao</u>, 232 F.R.D. at 180; <u>see also</u> <u>In re Allergan PLC Sec. Litig.</u>, No. 18-CV-12089 (CM) (GWG), 2021 WL 4077942, at *6 (S.D.N.Y. Sept. 8, 2021) (same); <u>In re Pfizer Inc. Sec. Litig.</u>, 282 F.R.D. 38, 44 (S.D.N.Y. 2012) (same).

In most securities class actions, as here, "[n]otwithstanding any unique facts as to any Plaintiff, the success or failure of any and all investor claims necessarily turns on several determinative liability questions." <u>In re Facebook</u>, 312 F.R.D. at 341; <u>see also</u> <u>Tsereteli v. Residential Asset Securitization Tr. 2006-A8</u>, 283 F.R.D. 199, 206 (S.D.N.Y. 2012) ("Commonality is plainly satisfied [where] the alleged misrepresentations in the prospectus relate to all the investors, [because the] existence and materiality of such misrepresentations obviously present important common issues.") (internal quotation marks and citations omitted). The following issues of fact and law, among others, are common to all members of the proposed class in this securities-fraud class action: whether DiDi's Registration Statement was misleading because it omitted material facts (ECF No. 106 at ¶ 31); whether there were material misstatements in the Underwriting Agreement (<u>see, e.g.</u>, <u>id.</u> at ¶ 216); whether DiDi and the Officer Defendants engaged in a scheme to deceive the Underwriter Defendants to close the IPO by issuing false Officer Certificates (<u>id.</u> at ¶¶ 273-80); whether DiDi and the Officer Defendants acted with scienter; and whether members of the proposed class sustained damages as a result of the alleged misconduct (<u>see, e.g.</u>, <u>id.</u> at ¶¶ 281-91). Because there are common questions of fact and law that are determinative of Defendants' liability, the commonality requirement is satisfied. <u>See</u> <u>Tsereteli</u>, 283 F.R.D. at 207 (finding commonality requirement satisfied where "the central issue [wa]s whether the [o]ffering [d]ocuments contain[ed] material misstatements or omissions").

C.  *Typicality*

Under Rule 23(a)(3), "'the claims or defenses of the representative parties [must be] typical of [those] of the class.'" Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg, 290 F.R.D. 409, 419 (S.D.N.Y. 2012) (quoting Fed. R. Civ. P. 23(a)(3)). The commonality and typicality requirements for class certification "tend to merge," Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 157 n.13 (1982), but "typicality is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability," Brooklyn Ctr. for Indep. of the Disabled, 290 F.R.D. at 419 (internal quotation marks and citation omitted). "Cases within this Circuit have repeatedly emphasized that '[t]ypicality under Rule 23(a)(3) should be determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members.'" In re NIO, Inc. Sec. Litig., No. 19-CV-1424 (NGG) (JRC), 2023 WL 5048615, at *6 (E.D.N.Y. Aug. 8, 2023) (quoting Trinidad v. Breakaway Courier Sys., Inc., No. 05-CV-4116 (RWS), 2007 WL 103073, at *6 (S.D.N.Y. Jan. 12, 2007)).

Plaintiffs point to a common series of events underlying all of their securities-fraud claims—namely, the IPO and DiDi's alleged misstatement or omission in the offering documents concerning the CAC directive. ECF No. 106 at ¶¶ 120-292. That is sufficient to satisfy the typicality requirement, and Defendants do not contend otherwise. See Tsereteli, 283 F.R.D. at 208 (holding that the typicality requirement was met where the lead plaintiff pointed "both to a common series of events . . . and to common legal claims of violations of Sections 11 and 12 of the Securities Act"); In re Globalstar, 2004 WL 2754674, at *4 (finding typicality requirement satisfied where "[t]he claims of the plaintiffs and the prospective class members alike require[d] showing the distribution of materially false and misleading information, leading to the artificial

inflation of the price of . . . securities, and resulting harm" and "[t]he proof and legal theories offered by the plaintiffs would necessarily include the same offerings needed by the class members").

    D. *Adequacy*

"Under Rule 23(a)(4), adequacy is evaluated in two ways: (1) by looking to the qualifications of plaintiffs' counsel; and (2) by examining the interests of the named plaintiffs." Wood, 746 F. Supp. 3d at 198 (internal quotation marks and citation omitted). To satisfy the adequacy requirement, a proposed class representative must "possess the same interest[s] and suffer the same injur[ies] as the class members." In re Literary Works in Electronic Database Copyright Litig., 654 F.3d 242, 249 (2d Cir. 2011) (alterations in original, citations omitted); Denney v. Deutsche Bank AG, 443 F.3d 253, 268 (2d Cir. 2006) (stating that the "proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members") (citations omitted).

    To begin, Defendants do not dispute that proposed class counsel is "qualified, experienced, and able to conduct the proposed litigation." ECF No. 263 at 22. Plaintiffs' lead counsel, attorneys at the Rosen Law Firm, have extensive experience pursuing and defending class-action claims in federal court. See ECF No. 264-26. The Rosen Law Firm is therefore adequately qualified to represent the proposed class here.

    With regards to the adequacy of the class representatives, Defendants challenge Alaka, arguing that Alaka has "demonstrated an utter lack of knowledge regarding the allegations in this action and a failure to participate as a representative," making it unfit to serve as a class representative. ECF No. 322 at 39. Defendants contend that Alaka's representative, ▮▮ ▮

▮ ▮ ▮ ▮ ▮ ▮ ▮ ▮ ▮ ▮ ▮ ▮ ▮ ▮ ▮ ▮ ▮

███ ██ ██ █████ ███ ██ ██ ███ <u>Id.</u> at 40. Plaintiffs respond that Alaka lost a

substantial amount in the IPO, which is evidence of its strong interest in obtaining the most

favorable outcome possible for the class, and that the deposition of Alaka's representative

████ ██ ██ ████ ██ ██ ███ ECF No. 355 at 14-15.

As an initial matter, the fact that the representative who testified on behalf of Alaka may

be "unaware or uninformed of certain facts about this suit" is not itself disqualifying. <u>Tsereteli</u>,

283 F.R.D. at 209; <u>Haw. Structural Ironworkers Pension Tr. Fund, Inc.</u>, 338 F.R.D. at 213. The

Supreme Court has "expressly disapproved of attacks on the adequacy of a class representative

based on the representative's ignorance." <u>Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.</u>, 222

F.3d 52, 61 (2d Cir. 2000) (citing <u>Surowitz v. Hilton Hotels Corp.</u>, 383 U.S. 363, 370-74 (1966)).

Moreover, the deposition of Alaka's representative viewed holistically demonstrates his



<u>See, e.g.</u>, ECF No. 346-4 at 54 (indicating that representative ████

<u>id.</u> at 71 (noting that Alaka's representative ███ ██

<u>id.</u> at 31-32 (testifying that ██

Additionally, Alaka has engaged in motion practice

(<u>see, e.g.</u>, ECF Nos. 53, 261, 285) and conducted discovery throughout the course of this

litigation (<u>see, e.g.</u>, ECF No. 194). <u>See</u> <u>Tsereteli</u>, 283 F.R.D. at 209 (concluding that lead

plaintiff was adequate where it "conducted discovery, engaged in motion practice, and protected

the interests of . . . the prospective class throughout the more than three years th[e] case ha[d]

been before the [c]ourt").

What's more, Alaka suffered a substantial financial loss as a result of the conduct alleged here and there is no indication that its interests are antagonistic to the interests of other class members. See Prefontaine v. Rsch. in Motion Ltd., No. 11-CV-4068 (RJS), 2012 WL 104770, at *3 (S.D.N.Y. Jan. 5, 2012) (finding a class representative adequate because, "given [his] losses, there is no indication that he would not vigorously pursue all claims on behalf of the plaintiff class"); In re Arotech Corp. Sec. Litig., No. 07-CV-1838 (RJD)(VVP), 2010 WL 2301195, at *4 (E.D.N.Y. June 7, 2010) (explaining that the key consideration for determining adequacy is whether the class representative's interests are aligned with those of the class members).

Lastly, "[e]ven where parties are uninformed, adequacy rightly is found where a great deal of reliance on expert counsel is to be expected." Tsereteli, 283 F.R.D. at 209 (internal quotation marks and alterations omitted). Lead counsel here is amply qualified and capable of prosecuting this class action, and the class representatives can rely on counsel's wealth of experience. Accordingly, the adequacy requirement is satisfied with regards to Alaka.

III.    Predominance Requirement for Class Certification under Rule 23(b)

"Once a party seeking class certification has demonstrated that the Rule 23(a) prerequisites have been satisfied, they must show that the action is one of the kinds that may be 'maintained' under Rule 23(b)." Haw. Structural Ironworkers Pension Tr. Fund, Inc., 338 F.R.D. at 213 (quoting Fed. R. Civ. P. 23(b)). Plaintiffs contend that the class satisfies Rule 23(b)(3) (see ECF No. 263 at 2-3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). As to the superiority requirement, Defendants raise no challenge to the superiority of a class action for adjudicating the claims here. ECF No. 322. As to

23

the predominance requirement, Defendants do not dispute that common issues predominate for the Securities Act claims in Counts IV, V, and VI.[6] As such, I recommend that for the claims in Counts IV, V, and VI, a class of all persons and entities who purchased DiDi ADS and were damaged thereby, during the period of June 30, 2021, through and including July 21, 2021, be certified.

Turning to the Exchange Act claims in Counts I, II, and III, Defendants argue that Rule 23(b)(3)'s predominance requirement is not met. ECF No. 322 at 19-30. Defendants contend that the claims under Sections 10(b) and 20A of the Exchange Act do not satisfy the predominance requirement, because Plaintiffs' claims will require individualized, rather than class-wide, proof of each class member's reliance on the alleged misstatements in the offering documents. ECF No. 322 at 19-30. Conversely, Plaintiffs argue that their Exchange Act claims satisfy the predominance requirement because the claims involve "primarily omissions" and are thus entitled to a presumption of reliance under Affiliated Ute v. United States, 406 U.S. 128, 153 (1972). ECF No. 263 at 24-37.

For the reasons explained below, Plaintiffs can rely on the Affiliated Ute presumption to prove reliance class-wide for their Section 10(b) claim premised on a theory of scheme liability. See infra Section III.A.iii. The Affiliated Ute presumption of reliance also applies to the Section

---

[6] Materiality for Securities Act claims can be subject to generalized proof. See In re IndyMac Mortgage-Backed Sec. Litig., 286 F.R.D. 226, 241-42 (S.D.N.Y. 2012) (explaining that materiality in Securities Act case is established objectively and "can be proven on a class-wide basis"). And scienter, reliance, or loss causation do not need to be proven for a Securities Act claim. Id. at 236 (discussing elements of Section 11 and Section 12 Securities Act claims). As such, courts certify class actions in cases raising a violation of the Securities Act where, as here, the Securities Act claims arise from a "common nucleus of operative facts." See, e.g., In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig., 209 F.R.D. 353, 360 (S.D.N.Y. 2002) (holding that predominance was met for Securities Act claims because the claims "all arise out of a common nucleus of operative fact, namely whether defendants violated the securities laws in the issuance of the registration statement" and "[a]ny individual questions of law or fact are clearly subordinate").

20(a) claim in Count III. See infra Section III.C. However, the Affiliated Ute presumption does not apply to Plaintiffs' Section 10(b) claim in Count I, premised on insider trading or misrepresentations in the offering documents. See infra Sections III.A.i, ii. The presumption also does not apply to the Section 20A claim in Count II. See infra Section III.B.

A. *The Section 10(b) Claim against DiDi and the Officer Defendants*

Beginning with Plaintiffs' Section 10(b) claim in Count I, a securities-fraud claim under Section 10(b) requires proof of "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 810 (2011) (internal quotation marks and citations omitted). The elements of falsity, materiality, and loss causation are amenable to class-wide proof, Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 475 (2013), and they are not challenged by Defendants here. As such, whether the predominance requirement under Rule 23(b) is satisfied turns on the element of reliance in the Exchange Act claims. A plaintiff's burden with respect to the element of reliance "varies depending on whether a fraudulent representation or omission is alleged." Benjamin v. Kim, No. 95-CV-9597 (LMM), 1999 WL 249706, at *10 (S.D.N.Y. Apr. 28, 1999).

 Plaintiffs assert three theories of liability to support their Section 10(b) claim. First, Plaintiffs allege that DiDi failed to disclose the CAC directive that it postpone the IPO until it conducted a satisfactory self-inspection, in violation of Rule 10b-5(b). ECF No. 106 at ¶¶ 296-99; see also Tr. at 6-7. Second, Plaintiffs assert that DiDi engaged in insider trading. ECF No. 106 at ¶¶ 268-72, 300-05. And third, Plaintiffs assert that DiDi and the Officer Defendants engaged in a scheme to deceive the Underwriters into closing the IPO by delivering Officer

Certificates that falsely attested that the conditions for closing had been satisfied, in violation of Rule 10b-5(a) and (c). Id. at ¶¶ 306-12. I begin with whether common issues predominate for Plaintiffs' Section 10(b) claim premised on their first theory of liability against DiDi, and then turn to whether common issues predominate for Plaintiffs' Section 10(b) claim based on their other theories of liability (insider trading and scheme liability).

      i.   Reliance for Plaintiffs' Section 10b-5(b) theory of liability

As it pertains to Plaintiffs' first theory of liability, whether common issues predominate for class certification hinges on whether the Section 10(b) claim relies primarily on a misrepresentation or an omission. If the claim "primarily [involves] a failure to disclose," or, simply put, an omission, Plaintiff can invoke a presumption of reliance and need not show "positive proof of reliance." Affiliated Ute v. United States, 406 U.S. 128, 153 (1972). In such circumstances, "reliance on the omission can be presumed from its materiality" and "materiality can be assessed on a class-wide basis." Puddu v. NYGG (Asia) Ltd., No. 15-CV-8061 (DLC), 2022 WL 2304248, at *3 (S.D.N.Y. June 27, 2022). However, if Plaintiffs' claim primarily concerns half-truths or misrepresentations, the Affiliated Ute presumption does not apply. Waggoner v. Barclays PLC, 875 F.3d 79, 96 (2d Cir. 2017) (explaining that the Affiliated Ute presumption does not apply to omissions that cause affirmative statements to become "half-truths" or "misstatements whose only omission is the truth that the statement misrepresents"). Plaintiffs would therefore need individualized proof to satisfy the element of reliance for each class member, such that individual issues would predominate and preclude class certification.[7]

---

[7] Courts recognize a rebuttable presumption of reliance—separate from the Affiliated Ute presumption—for cases involving allegations of misrepresentations under the fraud-on-the-market theory. See Basic Inc. v. Levinson, 485 U.S. 224, 246-49 (1988) (holding that a presumption of reliance applies where a plaintiff alleges that misrepresentations were made in connection with securities sold in an efficient market). Plaintiffs do not invoke the Basic

See Youngers v. Virtus Inv. Partners Inc., No. 15-CV-8262 (WHP), 2017 WL 2062986, at *3 (S.D.N.Y. May 15, 2017) (denying class certification under Rule 23(b) because, "[w]ithout a class-wide presumption of reliance, each plaintiff will have to prove reliance individually" and "individual issues of reliance will predominate"); see also Puddu, 2022 WL 2304248, at *3 ("To obtain class certification, reliance must generally be proven via a method commonly applicable to the entire class."). Of course, "the Affiliated Ute presumption can still apply when a complaint alleges both misstatements and omissions," so long as the claims "are based *primarily* on the omissions."[8] Puddu, 2022 WL 2304248, at *4 (emphasis added); see also Fogarazzao v. Lehman Bros., 232 F.R.D. 176, 186 (S.D.N.Y. 2005) ("Where plaintiffs' claims are based on a combination of omissions and misstatements, courts in this Circuit have acknowledged the applicability of the Affiliated Ute presumption.").

In a case raising a claim under Rule 10b-5(b), the Supreme Court recently addressed the distinction between a pure omission and a half-truth. See Macquarie Infrastructure Corp. v. Moab Partners, L.P., 601 U.S. 257, 263 (2024). The examples of a pure omission and half-truth provided by the Court in Macquarie are particularly instructive to assessing whether the conduct alleged here constitutes a pure omission or a half-truth. As the Court explained in Macquarie,

---

presumption of reliance, nor could they, as the DiDi ADS were purchased during an IPO, which is not an efficient market. See Dodona I, LLC v. Goldman, Sachs & Co., 847 F. Supp. 2d 624, 651 (S.D.N.Y. 2012) (explaining that case law in the Second Circuit indicates that "primary markets are by nature inefficient"); Shapiro v. TG Therapeutics, Inc., No. 22-CV-6106 (JSR), 2022 WL 16555585, at *3 (S.D.N.Y. Oct. 31, 2022) (explaining that the Basic presumption can apply in claims involving allegations of misrepresentations so long as the subject securities were purchased and sold in an efficient market).

[8] As Plaintiffs correctly point out (ECF No. 355 at 7-8), the Affiliated Ute presumption can apply even when a case involves both misrepresentations and omissions. But, as will be discussed, the presumption does not apply here, not because this is a "mixed bag" case (id. at 8), but because the Section 10(b) claim rests *primarily* on a half-truth, and Waggoner says that Affiliated Ute does not apply to half-truths.

"[a] pure omission occurs when a speaker says nothing, in circumstances that do not give any particular meaning to that silence." Id. "Half-truths, on the other hand, are 'representations that state the truth [but omit] critical qualifying information.'" Id. (quoting Universal Health Servs., Inc. v. United States ex rel. Escobar, 579 U.S. 176, 188 (2016)). As a "classic example of an actionable half-truth in contract law," the Court gave an example of a "seller who reveals that there may be two new roads near a property he is selling, but fails to disclose that a third potential road might bisect the property." Id. (internal quotation marks and citations omitted). As the Court explained, "literal accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another." Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 575 U.S. 175, 192 (2015); see also In re Vivendi, 838 F.3d at 239-40 (describing "half-truths" as statements that are misleading because "of what they omit to disclose"). Ultimately, the Court in Macquarie concluded that "[p]ure omissions are not actionable under Rule 10b-5(b)." 601 U.S. at 260.

In the Second Amended Complaint, Plaintiffs allege that Defendants failed to disclose in the Registration Statement: (1) the CAC's directive that DiDi postpone its IPO in the United States until DiDi completed a thorough self-inspection of its business, operations, and policies; and (2) the high risk that the CAC would impose harsh penalties against DiDi "that could harm [DiDi's] business, financial performance, and its reputation if it went forward with its IPO against the CAC's [d]irectives." ECF No. 106 at ¶ 31. But this is not a circumstance where DiDi said nothing "in circumstances that do not give any particular meaning to that silence." Macquarie, 601 U.S. at 263. DiDi spoke on the issue of regulatory compliance and self-inspection in its Registration Statement, as well as on the issue of regulatory risk related to cybersecurity and data privacy.

28

The Registration Statement disclosed two meetings with regulators, an April 2021 meeting with the State Administration for Market Regulation, the Cyberspace Administration, and the State Administration of Taxation, and a May 2021 meeting with the Ministry of Transport "and several other regulators." ECF No. 106 at ¶ 287. As noted in the Registration Statement, following the April 2021 meeting, DiDi was "required to conduct a self-inspection within one month to identify and correct possible violations of anti-monopoly, anti-unfair competition, tax and other related laws and regulations." Id. The Registration Statement goes on to note that DiDi completed the self-inspection and although the company had "made efforts to correct or improve," it could not "assure you that the regulatory authorities will be satisfied with our self-inspection results or that we will not be subject to any penalty with respect to any violations of anti-monopoly, anti-unfair competition, pricing, advertising, privacy protection, food safety, product quality, tax and other related laws and regulations." Id. As it concerns the May 2021 meeting, the Registration Statement indicated that DiDi had "been making efforts to meet the latest guidance from regulators" and the company would "review and modify [its] business practice continually to ensure compliance with regulatory requirements and guidance." Id. Both of those meetings occurred near in time to the CAC meeting that DiDi allegedly failed to disclose. See Tr. at 14-15.

In the Second Amended Complaint, Plaintiffs allege that Defendants failed to disclose in the Registration Statement: (1) the CAC's directive that DiDi postpone its IPO in the United States until DiDi completed a thorough self-inspection of its business, operations, and policies; and (2) the high risk that the CAC would impose harsh penalties against DiDi "that could harm [DiDi's] business, financial performance, and its reputation if it went forward with its IPO against the CAC's [d]irectives." ECF No. 106 at ¶ 31. But given the explanation in the

Registration Statement about two regulatory meetings that occurred near in time to the IPO and concerned overlapping regulatory areas, coupled with the discussion of regulatory risks in the Registration Statement, this is not a situation where DiDi "sa[id] nothing, in circumstances that do not give any particular meaning to that silence." <u>Macquarie</u>, 601 U.S. at 263 (defining a pure omission).

DiDi spoke on the issue of regulatory compliance and self-inspection in its Registration Statement, as well as on the issue of regulatory risk related to cybersecurity and data privacy. Indeed, Plaintiffs' counsel argued that the representations by DiDi in the Registration Statement concerning the April 2021 meeting concerned, like the CAC directive, data protection laws and data privacy, because "the regulatory issues are all very similar and they're interconnected" and all fell under the broader umbrella of cybersecurity. Tr. at 9-12, 15-16. Additionally, the seven governmental agencies worked together to oversee DiDi's regulatory compliance, and although the cybersecurity review was initiated by the CAC, the other agencies, including those DiDi met with in April and May 2021, "were fully involved" in the cybersecurity review. <u>Id.</u> at 15. DiDi thus spoke on the issue of regulatory supervision, self-inspection at the direction of a regulator, and compliance with regulator directives as it pertains specifically to data privacy.

As <u>Macquarie</u> explains, a half-truth is a "representation[ ] that state[s] the truth [but omits] critical qualifying information." 501 U.S. at 263 (internal quotation marks and citations omitted). DiDi's statements concerning the April and May 2021 meetings were truthful, as Plaintiffs also acknowledge. Tr. at 7. But the statements omitted critical information about the even more significant meeting that allegedly occurred with the CAC. ECF No. 106 at ¶ 288. In that respect, DiDi's conduct is no different than the "seller who reveals that there may be two new roads near a property he is selling, but fails to disclose that a third potential road might

bisect the property." Macquarie, 501 U.S. at 263 (internal quotation marks and citations omitted).

DiDi's statements are half-truths as described in Macquarie. And Plaintiffs agree. See Tr. at 7,

31; see also id. at 42-43. They themselves liken DiDi's failure to disclose the meeting with the

CAC as akin to the failure to disclose the third road that bisected the property in the Court's

example in Macquarie—an example of a half-truth. See ECF No. 355 at 8.

  If any doubt remains that the statements here are half-truths, examining the rationale

underlying the Affiliated Ute presumption confirms that Plaintiffs' claim does not rely primarily

on an omission. Because "the distinction between misstatements and omissions is often illusory,

courts also examine whether "reliance as a practical matter is impossible to prove," which, as in

Affiliated Ute, occurs when "no positive statements exist." In re Lehman Bros. Sec. & ERISA

Litig., 2013 WL 5730020, at *3 (internal quotation marks and citations omitted); see also

Waggoner, 875 F.3d at 95 (explaining that the "rationale" for the Affiliated Ute presumption is

that "reliance as a practical matter is impossible to prove" where there are no positive

statements). "When a defendant's fraud consists primarily of omissions, '[r]equiring a plaintiff to

show a speculative set of facts, i.e., how he would have behaved if omitted material information

had been disclosed, places an unrealistic evidentiary burden on the 10(b) plaintiff.'" In re Smith

Barney Transfer Agent Litig., 290 F.R.D. 42, 47 (S.D.N.Y. 2013) (quoting Joseph v. Wiles, 223

F.3d 1155, 1162 (10th Cir. 2000)) (alteration in original).

  DiDi made positive statements in the Registration Statement. And those statements

concerned its interactions with regulators leading up to the IPO, the request by a different

regulator that it conduct a self-inspection, its decision to conduct that self-inspection in the same

area of privacy protection, its compliance generally with regulatory requirements and guidance,

including in the area of data privacy, and regulatory risk factors. ECF No. 106 at ¶¶ 287-88; see

also id. at ¶ 378. As Judge Kaplan explained in his decision on the motion to dismiss, Plaintiffs

"plausibly alleged that DiDi's extensive discussion of regulatory risk was misleading because it

suggested that the CAC had not directed DiDi to postpone its IPO." ECF No. 158 at 28-29. A

plaintiff could argue that a reasonable investor, having reviewed those statements, could

"conclude[ ] that significant contact with regulators, particularly orders from the CAC to conduct

another self-inspection, would have been disclosed as well." Id. This is no different than the

property buyer in Macquarie relying on the truthful disclosure of only two roads to argue that the

statement misleadingly suggested that no other roads abutted or bisected the property. Stated

differently, unlike a situation where the company has not spoken at all, a plaintiff can point to

DiDi's positive statements and argue that they were misleading because of the significant

information that was omitted concerning the CAC. See In re Lehman Bros. Sec. & ERISA Litig.,

2013 WL 5730020, at *3 ("A plaintiff does not have the benefit of the presumption afforded

under Affiliated Ute if the alleged omissions exacerbate the *misleading nature of affirmative*

*statements*.") (emphasis added); Est. of Detwiler v. Offenbecher, 728 F. Supp. 103, 145 n.16

(S.D.N.Y. 1989) (explaining that "reliance as a practical matter is possible to prove" in case

where defendant was alleged to have made affirmative statements to the board about potential

sale of an entity but failed to disclose related information).

     Waggoner makes clear that "[t]he Affiliated Ute presumption does not apply to . . . what

has been described as 'half-truths.'" 875 F.3d at 96. Plaintiffs attempt to distinguish Waggoner

by arguing that Waggoner concerned a half-truth based upon later changed circumstances, "*i.e.*, a

statement becomes false or misleading due to an omission of *later-occurring* facts," and the

Affiliated Ute presumption applies to half-truths where the statement is true but "incomplete due

to the omission of a *contemporaneous* fact." ECF No. 355 at 9 n. 3 (emphasis in original). But

the Court in Waggoner did not expressly distinguish between types of half-truths when it said that half-truths are not entitled to a presumption of reliance. And there is no basis to imply such a distinction when considering whether Affiliated Ute applies, because regardless of how a positive statement becomes a half-truth, a positive statement exists and reliance as a practical matter is therefore not impossible to prove.[9]

Plaintiffs are thus not entitled to a presumption of reliance under Affiliated Ute for their Section 10(b) claim based on their first theory of liability—misleading statements in the Registration Statement. ECF No. 106 at ¶¶ 296-99. For that theory of liability, individual issues will predominate, because each class member will need to prove reliance on an individual basis, and therefore the predominance requirement in Rule 23(b)(3) is not met.

      ii.    Reliance for Plaintiffs' insider trading theory of liability

With regards to Plaintiffs' second theory of liability based on insider trading by DiDi, (ECF No. 106 at ¶¶ 300-05), Plaintiffs allege that DiDi was in possession of material non-public information at the time it sold its ADS in the IPO—namely, the same information underpinning the Rule 10b-5(b) theory of liability (id. at ¶¶ 296, 300). Defendants challenge application of the Affiliated Ute presumption, arguing that the insider trading claim rests on the same misrepresentations as Plaintiffs' first theory of liability. See ECF No. 322 at 22-23 & n.12.

Plaintiffs argue that when an insider with knowledge of material facts trades without disclosing those facts, reliance is presumed under Affiliated Ute. See ECF No. 263 at 31; see also Tr. at 33-34. But the cases relied on by Plaintiffs to support that argument all concerned

---

[9] Plaintiffs also rely on Dodona I, LLC v. Goldman, Sachs & Co., 296 F.R.D. 261 (S.D.N.Y. 2014), to argue that the Affiliated Ute presumption should apply here as well. See Tr. at 32-33. But Dodona predated Waggoner and thus the court in that case did not address or discuss half-truths.

tipper-tippee insider trading and involve insider trading claims brought against the tippee rather than against the issuer. See Simon DeBartolo Grp., L.P. v. Richard E. Jacobs Grp., Inc., 186 F.3d 157 (2d Cir. 1999); Kaplan v. S.A.C. Cap. Advisors, L.P., 311 F.R.D. 373 (S.D.N.Y. 2015). In Simon DeBartolo, the court held that Affiliated Ute applied to the insider trading claim against two tippees who received material non-public information from insider-tippers. 186 F.3d at 162-63, 169-70, 173. The tippees did not make any public disclosures, and thus the insider trading claim was premised on a pure omission. Id. at 172-73. Similarly, in Kaplan, the court applied the Affiliated Ute presumption to an insider trading claim premised on tippee liability where the tippee was not alleged to have made any affirmative statements. 311 F.R.D. at 380-82. By contrast, Plaintiffs' insider trading theory of liability does not involve a tipper-tippee relationship; the allegations involve only DiDi. ECF No. 106 at ¶¶ 300-05. And unlike the tippees in Simon DeBartolo and Kaplan, DiDi made affirmative statements—half-truths—that render inapplicable the Affiliated Ute presumption of reliance. See Lehocky v. Tidel Techs., Inc., 220 F.R.D. 491, 510 (S.D. Tex. 2004) (holding that the Affiliated Ute presumption did not apply to insider trading claim against defendant issuer and officers where defendants made affirmative misrepresentations but failed to "either disclose . . . or refrain from insider trading").

     iii.   Reliance for Plaintiffs' theory of scheme liability under Rule 10b-5(a), (c)

Turning to Plaintiffs' Exchange Act claim based on a scheme liability theory in violation of Rule 10b-5(a) and (c) (ECF No. 106 at ¶¶ 212-23, 306-12), Defendants challenge application of the Affiliated Ute presumption, arguing that the scheme claim also rests primarily on misrepresentations by the Officer Defendants in the Officer Certificates. ECF No. 322 at 27-30. Here, Plaintiffs allege that at the time of the closing on July 2, DiDi and the Officer Defendants knew that the CAC had initiated a cybersecurity review and had prohibited DiDi from accepting

34

new customers; that the inability to register new users would have a detrimental effect on DiDi's business; and that the officer certificates falsely stated that the representations and warranties in the Underwriting Agreement were true as of closing. ECF No. 106 at ¶¶ 273-80, 306-08. As alleged in the Second Amended Complaint, the false Officer Certificates induced the Underwriters to close the IPO. Id. at ¶¶ 280, 289, 309.

Defendants cast Plaintiffs' scheme claim as relying on an affirmative misrepresentation, to argue that Waggoner applies and bars application of Affiliated Ute. ECF No. 322 at 27-29. But the omission that forms the basis of the scheme claim, as alleged in the Second Amended Complaint, is the failure to disclose at the closing of the IPO the cybersecurity investigation and the ban on DiDi accepting new users (ECF No. 106 at ¶¶ 274, 276) and that omission was made to induce the Underwriters to close the IPO (id. at ¶¶ 222, 289, 308-09). In other words, the scheme claim here relies on acts distinct from the alleged misrepresentations and omissions tied to the Registration Statement.

Courts have certified scheme claims, invoking the Affiliated Ute presumption, where the deceptive conduct is distinct from the false or misleading statements themselves. See In re WorldCom Sec. Litig., 219 F.R.D. 267, 297-98 (S.D.N.Y. 2003) (certifying Count IX premised on scheme liability where deceptive conduct was alleged to be the concealment of a relationship, and that concealment was separate from the misstatements alleged in the analyst reports). "While the omissions and misrepresentations" in the Registration Statement and the closing call "are alleged to be interdependent in their significance and effect," the allegations concerning a deceptive act by the Officer Defendants which are alleged to have induced the Underwriters to close the IPO are distinct from the misleading statements in the offering documents. Id. at 298. And courts have held that a scheme claim may be based on non-public misrepresentations made

to induce action by others. <u>See, e.g.</u>, <u>Sec. & Exch. Comm'n. v. Medallion Fin. Corp</u>, No. 21-CV-11125 (LAK), 2024 WL 4227753, at *13 n.156 (S.D.N.Y. Sept. 18, 2024) (holding that scheme liability claim survived motion to dismiss where defendants induced banks to provide a favorable valuation for the company, "solicited bids, unfairly fired their valuation firm, and lied to their auditor, all of which are extraneous to the misleading valuation statements they published"); <u>Sec. & Exch. Comm'n v. Wilcox</u>, 663 F. Supp. 3d 146, 161 (D. Mass. 2023) (finding scheme claim adequately alleged where officer signed a false representation letter to the auditor). Because this theory of liability is premised on an omission, <u>Affiliated Ute</u> applies and reliance is presumed class-wide.

      B.  *The Section 20A Claim against DiDi*

      Further, Plaintiffs bring a claim for insider trading against DiDi under Section 20A of the Exchange Act in Count II. ECF No. 106 at ¶¶ 316-22. The elements for a claim under Section 20A are: (1) "a predicate insider trading violation of the Exchange Act," and (2) "sufficient facts showing that the defendant traded the security at issue contemporaneously with the plaintiff." <u>Gruber v. Gilbertson</u>, No. 16-CV-9727 (WHP), 2021 WL 2482109, at *14 (S.D.N.Y. June 17, 2021) (internal quotation marks omitted) (citing <u>In re Take-Two Interactive Sec. Litig.</u>, 551 F. Supp. 2d 247, 309 (S.D.N.Y. 2008)). Because the predicate insider trading violation of Section 10(b) does not meet the predominance requirement (<u>see</u> <u>infra</u> Section III.A.ii), neither does Plaintiffs' Section 20A claim. <u>See</u> <u>Bratya SPRL v. Bed Bath & Beyond Corp.</u>, No. 22-CV-02541 (TNM), 2025 WL 721770, at *4 (D.D.C. Mar. 6, 2025) (explaining that because predominance was not met with regards to the predicate insider trading violation under Section 10(b), predominance was not met with regards to the correlated Section 20A claim); <u>see also</u> <u>Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.</u>, 663 F. Supp. 3d 334, 379 (S.D.N.Y. 2023) (dismissing

Section 20A claim because the underlying Section 10(b) claim was dismissed); <u>City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.</u>, 450 F. Supp. 3d 379, 429 (S.D.N.Y. 2020) (explaining that a Section 20A claim is "contingent upon an underlying Exchange Act violation"). Therefore, I respectfully recommend that class certification be denied with regards to Plaintiffs' claim in Count II.

    C. *The Section 20(a) Claim against Defendants Cheng and Liu*

    With respect to Plaintiffs' Section 20(a) claim (Count III), which is asserted against DiDi's co-founders Chen and Liu, the predominance requirement in Rule 23(b)(3) is satisfied. To state a claim under Section 20(a) of the Exchange Act, a plaintiff must allege a primary violation of the Exchange Act by a controlled person and control by the defendant of the primary violator. <u>In re Parmalat Secs. Litig.</u>, 375 F. Supp. 2d 278, 307 (S.D.N.Y. 2005). "There is no dispute here that, provided there is predominance with respect to the Section 10(b) claim—*i.e.*, the 'primary violation'—the predominance requirement will also be met with respect to the Section 20(a) claim, as the issue of control is susceptible to generalized proof." <u>In re SCOR Hldg. (Switzerland) AG Litig.</u>, 537 F. Supp. 2d 556, 572 n.21.

    As discussed, Plaintiffs' Section 10(b) claim premised on a theory of scheme liability meets Rule 23(b)(3)'s predominance requirement. <u>See</u> <u>infra</u> Section III.A.iii. Accordingly, Plaintiffs' Section 20(a) claim also satisfies the predominance requirement and should be certified as a class.

## CONCLUSION

For the reasons discussed herein, I respectfully recommend that Plaintiffs' motion for class certification be **GRANTED** for the following claims: Plaintiffs' claims under the Securities Act in Counts IV, V, and VI of the Second Amended Complaint; Plaintiffs' Section 20(a) claim in Count III; and Plaintiff's Section 10(b) claim in Count I premised on a theory of scheme liability. I respectfully recommend that Plaintiffs' motion for class certification be **DENIED** with regards to Plaintiffs' Section 20A claim in Count II, and Plaintiffs' Section 10(b) claim in Count I premised on either a violation of Rule 10b-5(b) or insider trading.

**SO ORDERED.**

DATED:      New York, New York
            July 7, 2025

VALERIE FIGUEREDO
United States Magistrate Judge

### PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

**Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file any objections. See also Fed. R. Civ. P. 6(a), 6(b), 6(d). A party may respond to any objections within 14 days after being served. Any objections and responses shall be filed with the Clerk of the Court. Any request for an extension of time to file objections or responses must be directed to the Honorable Lewis A. Kaplan. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; Fed. R. Civ. P. 6(a), 6(b), 6(d); Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).**